IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| SHAWNTEL BREED, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF DUSTIN KEITH JONES, DECEASED AND AS NEXT FRIEND OF DUSTIN JONES AND CENIYA JONES, MINOR CHILDREN | § § § § § § § | |
| VS. | § § | CIVIL ACTION NO. 1:15-cv-00190 |
| CITY OF KIRBYVILLE, CHIEF PAUL BRISTER, AND OFFICER JOSH HANCOCK OF THE CITY OF KIRBYVILLE POLICE DEPARTMENT, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES | § § § § § § § | |

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, CITY OF KIRBYVILLE ("Kirbyville" or the "City"), CHIEF PAUL BRISTER ("Brister" or "Chief Brister"), AND OFFICER JOSH HANCOCK ("Hancock" or "Officer Hancock") OF THE CITY OF KIRBYVILLE POLICE DEPARTMENT, IN THEIR INDIVIDUAL[1] CAPACITIES, nominated Defendants in the above-entitled and numbered cause, and files this their Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and would show this Honorable Court as follows:

## I.
## SUMMARY OF CASE/ NATURE AND STAGE OF THE PROCEEDING

1.      Plaintiffs initially asserted in their First Amended Original Complaint this Court has "jurisdiction over this action pursuant to 42 U.S.C. § 1983" and "supplemental jurisdiction over *state law claims discussed below* pursuant to 28 U.S.C. § 1367(a) because they arise out of the same case or

---

[1] Defendants Brister and Hancock previously filed a Partial Motion to Dismiss the state and/or federal "official" capacity claims alleged against them (Doc. 7), and the Court dismissed said claims (Doc. 13, p. 6 and 13-14 of 14). Accordingly, they are now filing their MSJs only in their "individual" capacities.

controversy." Plaintiffs allege violations of the Fourth and Fourteenth Amendments to the United States Constitution, primarily based upon Defendant Officers alleged use excessive force against Dustin Jones on May 14, 2013. *See* Doc. 2, ¶¶ 1 and 2 and 9-12.

2.    However, following the filing of Defendants' Answer/Partial Motion to Dismiss and Reply (Doc. 6 and 7), Plaintiffs, in their Response, essentially abandoned their state law claims against Defendants, and the Court, in turn, dismissed all the state law claims, if any, against all Defendants in this case. *See* Docs. 9 and 13, p. 3 and 13 of 14.

3.    Defendants Brister and Hancock also asserted their qualified immunity defenses within their Partial Motion to Dismiss/Reply; however, the Court decided not to definitively rule on these immunity defenses based upon the pleadings alone, but instead, opted for a clearer picture of what occurred, and decided to wait until the facts could be more fully ascertained, through discovery, and presented to the Court. *See* Doc. 13, p. 12-14 of 14

4.    This Court noted, "the Defendants ha[ve] described the events in question in much more detail than Breed, providing facts which fill in the gaps and may explain Hancock's and Brister's conduct, ...," some of which even "Breed mentioned ... in her response to the Defendants' motion to dismiss, ..." and the Court further stated, "that discovery might lead to the conclusion that there is no genuine issue of material fact that could support Breed's claims, and there are 'no procedural or substantive barrier[s] to the [Defendants'] filing of a motion for summary judgment on the issue of qualified immunity.'" *See* Doc. 13, p. 12-13 of 14 (citation omitted).

5.    Discovery has taken place with numerous depositions of parties and witnesses taken as well as the exchange of information, documents, videos, photographs, audio recordings and numerous expert reports.

6.    There being "no procedural or substantive barriers," Defendants now, through their Motions for Summary Judgment, present undisputed evidence establishing a clear picture of the events that transpired, which not only affirmatively establishes both Defendants' qualified immunity defense,

but also affirmatively establishes no constitutional violation, or excessive force, occurred with respect to the incident at issue, and as well, no unconstitutional City policy or custom caused the incident at issue.

7. Plaintiffs have subsequently filed a Second Amended Complaint, deleting the references to their previous state law claims. Defendants begin with the general and vague pleadings within Plaintiffs' Second Amended Original Complaint, as, like the First Amended Original Complaint, there are numerous omissions or deficiencies alleged therein, as stated in footnotes 2-4 below. The "**Factual Background**" within Plaintiffs' Second Amended Original Complaint currently states in its entirety as follows:

"On or about May 14, 2013, CHIEF BRISTER and OFFICER HANCOCK went to a residence located on MLK to attempt to serve a warrant upon DUSTIN KEITH JONES. DUSTIN KEITH JONES attempted to evade the officers but was later detained. During his detainment, DUSTIN KEITH JONES was struck on his head and shoulders with an SL20 flashlight. DUSTIN KEITH JONES was then placed in a chokehold by CHIEF BRISTER. CHIEF BRISTER proceeded to lock his legs around DUSTIN KEITH JONES and OFFICER HANCOCK laid on top of DUSTIN KEITH JONES and held his arms out to his side. During the course of CHIEF BRISTER chokehold, and while OFFICER HANCOCK remained on top of him, DUSTIN KEITH JONES became nonresponsive. Despite Plaintiff's lack of movement and responsiveness, the Defendant did not release the chokehold, nor did OFFICER HANCOCK release his hands and/or get off of DUSTIN KEITH JONES. DUSTIN KEITH JONES died due to asphyxiation[2] as a result of the combined actions of Defendants CHIEF BRISTER AND OFFFICER HANCOCK. CHIEF BRISTER, who placed DUSTIN KEITH JONES in the chokehold, is a policymaker as well as an authorized decision-maker within the Kirbyville Police Department. During the course of this incident, CHIEF BRISTER: (1) placed a chokehold[3] on the Plaintiff for an excessive

---

[2] Defendants, in their Motion to Dismiss, admitted that at the Motion to Dismiss stage of a legal proceeding they were essentially stuck with Plaintiffs' pleadings. However, Defendants were frustrated and concerned with the "asphyxiation" allegations and expressed same, because the medical records and autopsy report pertaining to Jones *do not* mention asphyxiation as a problem, or the cause of death, nor is there any physical evidence of same; instead, Plaintiff Jones died of a myocardial infarction due to hypertensive cardiovascular disease, or excited delirium, with synthetic cannabinoid intoxication as a significant contributing factor. This legal barrier no longer exists, as in this Motion for Summary Judgment, Defendants are able to, and do, present this evidence to be considered by the Court.

[3] Defendants, in their Motion to Dismiss also expressed concern with the repeated flip-flopping between the use of the description "headlock" and "chokehold" in Plaintiffs' First Amended Original Petition. *See* Doc. 2, ¶ 8. Indeed, a review of Plaintiffs' First Amended Original Petition reveals Plaintiffs initial description of the entire incident where on 3 occasions, they repeatedly refer to Brister's hold on Plaintiff Jones as a "headlock;" and then, repeatedly call the "inherently dangerous maneuver" a "chokehold;" and end by calling the dangerous maneuver a "headlock." *See* Doc. 2, ¶ 8. The same process is repeated in Plaintiffs' Response to Defendant's Motion to Dismiss Plaintiffs' First Amended Original Complaint; with the only difference being Plaintiffs' reference to the hold as a "headlock" 4 times in describing the entire incident, and then switching to a "chokehold" 3 times with respect to how long the hold was allegedly in place up until he released the hold. *See* Doc. 9, ¶¶ 7-8. Interestingly, when Plaintiffs referenced the reasonableness prong of their qualified immunity analysis with respect to Plaintiffs' First Amended Original Complaint, they only use the term "chokehold" with respect to five of the six categories of activities listed. Finally, Plaintiff's most recent Second Amended

amount of time, (2) did not check or assess the victim's well-being while applying an inherently dangerous maneuver, (3) did not designate/ask another officer to check/assess the well-being of the victim while applying an inherently dangerous maneuver, and (4) did not release the dangerous maneuver once the Plaintiff had become nonresponsive, and even continued the chokehold past that point. During the course of this incident, OFFICER HANCOCK, laid his body weight across JONES, while holding his arms out, as CHIEF BRISTER maintained a chokehold. OFFICER HANCOCK continued to lie across JONES and restrain him for an excessive amount of time, and continued to pass the point where JONES was no longer responsive. Further, prior to the incident, there were several reported harmful incidents of excessive force against individuals by Kirbyville Police officers." *See* Doc. 24, ¶ 7.[4]

---

Original Complaint, quoted above, changes all the previous references from "headlock" to "chokehold." *See* Doc. 24, ¶ 7 and compare to Doc. 2, ¶ 8. This is not only confusing, but concerning, as the records and statement of Brister reflects a "headlock" was used, and not a chokehold. There is also **no** physical evidence in the autopsy of a chokehold. In short, there is no evidence of a chokehold. Again however, in this Motion for Summary Judgment, Defendants do not have to simply accept Plaintiffs varied pleadings, but instead, Defendants are able to, and do, present evidence which undisputedly establishes *only a headlock was used.*

[4] Plaintiffs appeared to expand on their First Amended Original Complaint's "**Factual Background**" in their Response to Defendants' Motion to Dismiss (Doc. 9, ¶¶ 6-8), perhaps in an attempt to demonstrate their ability for a more detailed amended pleading, by mentioning affidavits and statements allegedly made by Hancock and Brister, as well as a video. However, those additional facts did not make it into Plaintiffs' most recent Second Amended Original Complaint quoted hereinabove. Regardless, Plaintiffs have previously referenced, and sometimes quoted, material which presented a more complete picture of the events aligned with the evidence presented herein, including Hancock losing his handcuffs and taser and Jones taking away his radio and being on top of Hancock during the attempted arrest. Plaintiffs' prior Response also included Brister's assessment that Hancock was in "immediate imminent danger of serious bodily injury or death" based upon Brister's observations of Hancock (labored breath, pale and Jones being on top of Hancock) and Hancock's plea that "I can't breathe, get him off me," which were all observed before Brister resorted to any use of force (struck Jones with a flashlight about the head and shoulders and when that did not work, rolled him off using a headlock) and Brister's immediate release of his headlock when he first noted Jones was in any kind of trouble after Hancock stated, "Paul I don't think he is breathing," all of which is currently supported by Defendants' Motion for Summary Judgment evidence. Defendants also pointed out in their Reply, and point out herein, additional facts within these documents/video that were not mentioned in Plaintiff's Response or their recently filed Second Amended Original Complaint, as well as other facts established herein which demonstrate the inaccuracy of the currently pled facts. Defendants pointed out, and point out, the following evidence which is undisputed herein: When Hancock was being dispatched to the residence to arrest Jones on the 3 outstanding felony warrants for aggravated assault, aggravated robbery and sexual assault of a child, he was advised Plaintiff Jones had been using drugs at the residence and was known to carry a gun, and due to this information and the nature of these warrants, Hancock secured Brister's assistance and Brister was also advised of same; during the pat down search of Jones, Hancock was told by Jones he had a knife on his person; as Hancock tried to arrest and handcuff Jones, Jones hit Hancock hard enough to knock Hancock back into Brister, and then, Jones fled; Hancock attempted to use a taser when Jones fled, but it wouldn't initially fire and then, he missed; no one shot Jones; their statements indicate a headlock was used, and no statement was ever made that a "chokehold" was used. Again, the autopsy did not produce any physical evidence of a chokehold. Contrary to Plaintiffs' assertions in his Response, no statement or document indicates Jones' airway was blocked in any way, and while Hancock said he "was able to get on top of them and hold Jones' arms," and Brister said, "Hancock got up and got on top of us both and held Jones hands," neither person said Hancock got on Jones' "stomach." Further, Jones was lying on top of and/or beside Brister, and Hancock was kneeling beside and laying over them both (so only half of his weight was distributed on both Jones and Brister). Finally, contrary to Plaintiff's assertions in his Response, the 60 second video does show Plaintiff Jones moving and kicking while Brister and Hancock are holding him on the ground, and again, neither the medical records nor the autopsy report mention the "asphyxiation" of Plaintiff, much less a cause of death by asphyxiation at 5:05 p.m. on May 15, 2013. Defendants, in this their Motion for Summary Judgment, now present this and other undisputed evidence to clear up any confusion, misstatements, inaccuracies and/or omissions created by Plaintiffs' various pleadings (i.e., Plaintiffs' First Amended Original Complaint, Response to Defendants Motion to Dismiss and Second Amended Original Complaint), and which undisputedly establishes the reasonableness, necessity and constitutionality of Defendants' actions on the date of the incident in question.

## II.
## DEFENDANTS' SUMMARY OF ARGUMENT AND STATEMENT OF ISSUES

8.    The excessive force claims pled by Plaintiffs against all Defendants should be dismissed in their entirety.  It is Defendants' position they did not violate the Fourth or Fourteenth Amendment of the United States Constitution by using any unnecessary or objectively unreasonable force upon Plaintiff Jones, nor cause any type of injury to Plaintiff during his arrest leading to his death.  The individual Defendants were, at all times, simply trying to execute upon three lawful felony based arrest warrants, and encountered an admittedly fleeing and continuously resisting/attacking suspect, and unfortunately, while Defendants simultaneously attempted to protect themselves and others, and as they attempted to secure/restrain Plaintiff, primarily by physical strength and skill (one of the lowest forms of force), and awaited backup because handcuffs were lost during the attempted arrest/pursuit/struggle, Plaintiff, who had been using synthetic marijuana, had a heart attack or excited delirium episode, and subsequently passed away.  Accordingly, the two primary issues supporting dismissal are as follows: (1) Defendant Officers Brister and Hancock are entitled to qualified immunity, as neither Defendant violated Plaintiff's pled federal constitutional rights, and/or their actions were, at all times, objectively reasonable based on then existing clearly established law; (2) Defendant Kirbyville cannot be vicariously liable, or otherwise liable, as  no unconstitutional act was committed by the Defendant Officers, nor any other City employee, and further, there is no evidence the City had an unconstitutional authorized policy or custom which was the moving force behind Plaintiff's death.  For these reasons, Defendants are all entitled to summary judgment as against all the claims asserted by Plaintiffs herein, which must be dismissed with prejudice.

## III.
## RULE 56 STANDARD OF REVIEW

9.    A party in a lawsuit may move a court to enter summary judgment before trial.  FED. R. CIV. PROC. 56(a) and (b).  Summary judgment is appropriate when the moving party establishes there is no genuine issue of material fact and/or the moving party is entitled to judgment as a matter of law.

FED. R. CIV. PROC. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only disputes about those facts will preclude the granting of summary judgment. *Id.* A material fact is one "that might affect the outcome of the suit under governing law," and a dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).

Once the movant meets its burden under Rule 56, the non-movant must designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Conclusory assertions, unsupported by specific facts presented in affidavits opposing the motion for summary judgment are insufficient to defeat a proper motion for summary judgment. *Lejaun v. Nat'l Wildlife Federation*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L.Ed.2d 695 (1990). The party opposing summary judgment must respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence supports his or her claim. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), cert. denied, 513 U.S. 871, 115 S. Ct. 195, 130 L.Ed.2d 127 (1994). A court should view all evidence and the inferences to be drawn therefrom "in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962). Courts should refrain from weighing evidence or making credibility determinations. *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 150-51, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Finally, if Defendants pled qualified immunity, such as in this case here, and Plaintiff fails to overcome same, summary judgment is appropriate. *Hare v. City of Corinth*, 135 F.3d 320, 329 (5th Cir. 1998).

# STATEMENT OF UNDISPUTED FACTS[5]

10.     The undisputed facts to date and listed below are taken from Exhibit "A," Deposition

Excerpts from Hancock's Deposition, Exhibit "B," Deposition Excerpts from Brister's Deposition,

Exhibit "C," Custodian of Records Affidavit for the City of Kirbyville Police Department ("CKPD")

inclusive of attached records "C1" – "C15," as more specifically identified herein below, Exhibit "D,"

Acadia EMS Records Affidavit inclusive of attached records, Exhibit "E," Death Certificate, Exhibit

"F," Jasper Memorial Hospital Records Affidavit, Exhibit "G," St. Elizabeth Hospital Records

Affidavit, Exhibit "H," Deposition Excerpts from the Deposition of John W. Ralston, M.D., Exhibit

"I," Deposition Excerpts from the Deposition of Krissy Adams, Exhibit "J," Defendants' Medical

Expert Report of Dr. Robert C. Box, Exhibit "K," Defendants' Police Training Expert Report of Albert

Rodriguez, Exhibit "L," Plaintiffs' Medical Expert Report of Dr. Nizam Peerwani and Exhibit "M"

Plaintiffs' Police Expert Report of Michael Lyman, all as identified below, which are all attached

hereto and incorporated by reference the same as if set forth herein.  Defendants reserve the right to

later contest said facts should Defendants' Motion for Summary Judgment be denied.

11. On Tuesday, May 14th, 2013 at approximately 8:50 A.M., City of Kirbyville PD Officer
Sergeant Joshua Hancock received a call from dispatch in reference to a wanted subject out
of Jefferson County named Dustin Keith Jones.  Hancock was advised that 3 Jefferson
County Sheriff's Office warrants had been issued and confirmed for aggravated assault,
aggravated robbery, and sexual assault of a child.  A caller had told dispatch that Jones was
seen in the yard at the residence of Arthur Breed on Chestnut Street off of MLK walking
around without a shirt on, and that he had been using drugs at this residence and he was still
there. *See* Exs. "A," p. 6:20-7:1, 63:15-65:18, 107:14-23; "C" and attached record "C1," p.
000010, ¶¶ 1-2, May 15, 2013 Sworn Statement of CKPD Officer Josh Hancock, taken by
Texas Ranger Daniel Young and "C15," p. 000042, 000044-46, 3 Arrest Warrants
pertaining to Jones.

12. Due to the nature of the warrants Hancock contacted Chief Paul Brister to assist in the
apprehension of Jones at the location given based upon the 3 felony warrants.  While in
route, Hancock was further advised that Jones was known to carry a gun, which he also

---

[5] Plaintiffs have filed pleadings with this Court that appear to contradict Defendants' summary judgment evidence.
However, Plaintiffs' "pleadings are not summary judgment evidence." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047
(5th Cir. 1996); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

relayed to Brister. *See* Exs. "A," p. 65:7-25, 67:9-15, 69:14-22 and "C1," p. 000010, ¶¶ 3-4.

13. City of Kirbyville Chief of Police Paul Brister also confirmed that on Tuesday, May 14, 2013 at approximately 8:50 A.M., he met, and communicated with Kirbyville PD Officer Josh Hancock for 3-5 minutes regarding serving the 3 above described warrants on Jones at the above described residence which was also familiar to him, and he was also advised that Jones always carried a gun. *See* Ex. "B," p. 4:20-5:2, 52:13-54:21, 55:19-56:4, 63:1-5 and "C2," p. 000007, ¶¶ 1-3, May 15, 2013 Sworn Statement of CKPD Chief Paul Brister, taken by Texas Ranger Daniel Young.

14. At the time of the incident at issue, there were *five officers total* working for the Kirbyville Police Department, including the two of them, and it was approximately a couple of miles from the Police Department to the Breed residence. *See* Ex. "B," p. 55:3-18.

15. Both Hancock and Brister proceeded to, and arrived at, the Breed residence (driveway) each in their own vehicles, at approximately 9:02-9:04 A.M., at which time they exited their vehicles and made contact with Mr. Breed who was outside his residence in the yard. *See* Exs. "A," p. 67:19-22, 68:10-69:6, 70:15-17; "B," p. 56:5-57:23; "C1," p. 000010, ¶ 5 and "C2," p. 000007, ¶ 4.

16. Mr. Breed was asked several questions by Hancock regarding who else was at, or inside, the residence, and Mr. Breed eventually identified his daughter, as well as her husband, Dustin Jones. *See* Exs. "A," p. 69:25-70:7, 70:18-71:7; "B," p. 57:24-58:6; "C1" p. 000010, ¶ 5 and "C2," p. 000007, ¶ 4.

17. Hancock approached the door of the residence (a little camper trailer) and Brister went to the end of the camper trailer where he could look through the camper trailer door for Dustin and Officer Hancock, also noticing the door was opened, called out Jones' name "Dustin" and asked him to come outside and speak with them, which he did without incident, and he verified his name as Dustin Jones. *See* Exs. "A," p. 70:7-12, 71:8-16; "B," p. 58:7-61:6 "C1," p. 000010, ¶ 6 and "C2," p. 000007, ¶ 5.

18. Hancock estimates that Jones was about his height and over 200 pounds. The autopsy report of Jones confirms he was 6 foot ½ inch tall, weighing 221 pounds and was 26 years old. Officer Hancock is 6 feet 1 inch tall and was a little under 200 pounds, without gear, and 20-30 pounds heavier with his gear, including his firearm. Hancock was 27 years old (D.O.B. 03/03/1984). Chief Brister is about 5 feet 11 inches tall and weighed around 205, and only carried a gun. Chief Brister was *61 years old* (D.O.B. 04/25/1952). *See* Exs. "A," p. 14:12-13, 43:2- 45:15, 72:14-25 and "B," 7:14-15 and 36:21-37:15 and "C9," p. 000137.

19. Officer Hancock asked Jones to place his hands on the side of the trailer to perform a pat down for weapons and Jones complied. Brister walked down to the side of the trailer and got behind Josh to be there and back him up. Upon initiating the pat down search, Hancock asked Jones if he had any weapons on his person, and Jones said *he had a knife* in his pocket. *See* Exs. "A," p. 73:6-24; "B," p. 61:7-62:25; "C1," p. 000010, ¶ 7 and "C2," p. 000007, ¶ 5.

20. As Officer Hancock continued the pat down search of Jones, or before, Officer Hancock advised Jones that Jones had warrants for his arrest out of Jefferson County and that he was going to be placed under arrest and transported to the Jasper County Jail. *While Hancock was attempting to place handcuffs on Jones (after pulling out his handcuffs and as he reached to grab one of Jones' arms), Jones suddenly turned and hit or struck Officer Hancock in the chest, knocking Officer Hancock backwards into Chief Brister, and they both stumbled backwards.* See Exs. "A," p. 73:6-75:7, 107:24-108:6; "B," p. 63:9-64:4; "C1," p. 000010-11, ¶¶ 7-8 and "C2," p. 000007, ¶¶ 6-7.

21. Upon losing control of Jones, *Jones ran towards MLK and the officers began their pursuit on foot.* See Exs. "A," p. 75:8-13; and "B," p. 64:11-16; "C1," p. 000011, ¶ 8 and "C2," p. 000007, ¶ 8.

22. Officer Hancock first drew his Taser and attempted to fire same at Jones, but it failed to fire, and although his Taser subsequently deployed (fired) in his next attempt, Hancock missed Jones, as Jones tripped in the ditch. Accordingly, the foot pursuit of Jones by Hancock continued across the ditch, where Hancock also tripped and fell, and Brister ran back to get in a patrol unit to follow the fleeing suspect. See Exs. "A," p. 82:6-17, 81:19-20; "B," p. 64:11-65:2; "C1," p. 000011, ¶ 9 and "C2," p. 000007, ¶¶ 9-10.

23. Officer Hancock pursued Jones, who was pretty quick, South on MLK to Henry Robinson St. and then East on Henry Robinson Street. Finally, Officer Hancock was able to bring Jones to the ground and end the foot pursuit in the yard of the church on Henry Robinson Street about a couple of hundred yards from the beginning of the pursuit. See Exs. "A," p. 75:8-77:16, "C1," p. 000011, ¶ 10.

24. When he caught up with Jones, he grabbed Jones from behind and began riding on his back, as Jones continued to run and Jones eventually kneeling down, and while struggling with Jones and attempting to hold onto him with one arm still wrapped around his body and the radio in his other hand in preparation to call for assistance, Hancock realized his handcuffs and Taser had been lost in the pursuit. *Hancock also attempted to call for help on the radio, at which time Jones stripped the radio from Handcock's hand and threw it across the yard.* See Exs. "A," p. 75:14-76:6, 77:18-79:15 and "C1," p. 000011, ¶ 11.

25. The struggle with Jones continued as they both went to the ground at which time Jones was somehow able to get *on top of Officer Hancock, and pinning Hancock to the ground.* See Exs. "A," p. 78:4-80:3 and "C1," p. 000011, ¶ 11.

26. Hancock testified he was still trying to effect an arrest and had wrapped his legs around Jones' legs and was holding on, at which time Jones started beating or hitting on Hancock's chest, which was making him very uncomfortable and knocking the wind out of Hancock and it got to the point where he was unable to breathe, and/or *his ability to breath became restricted and he felt he was close to losing consciousness.* See Exs. "A," p. 80:9-81:19 and "C1," p. 000011, ¶ 11.

27. Chief Brister, in the patrol car, finally caught up with Hancock and Jones on Henry Robinson Street noting both of them were on the ground fighting/struggling, with Hancock on his back and Jones on top of Hancock and he knew Hancock was in trouble. Brister also noted that Jones position' was such that he could have fled, or run, if he had wanted to, as

Jones was on top and Hancock was beneath Jones. *See* Exs. "A," p. 81:19-82:1, 83:23-25; "B," p. 65:12-68:22 and "C2," p. 000007, ¶¶ 10-11.

28. Rapidly assessing the situation, he noted that he only had a flashlight and a gun, and utilizing or discharging his Glock Model 23 .40 caliber pistol with both persons in close proximity to one another (Jones on top of, and straddling, Officer Hancock) could also cause injury to Hancock. Therefore, he retrieved his SL-20 flashlight and ran over to assist Officer Hancock. *See* Exs. "B," p. 69:4-19; "C1," p. 000011, ¶ 12 and "C2," p. 000008, ¶ 12-13.

29. As Chief Brister was going over to assist Officer Hancock, Jones was still on top of Hancock and Hancock was saying with labored breath and kind of a whisper, I can't breathe, and get him off of me. Hancock confirmed that he made this statement or words to that effect. Officer Hancock not only appeared to Brister to be short of breath, but his face was pale, and his eyes had that faraway "oh shit" I'm in a bind look. Brister could see Hancock was in "much distress" and "he was in quite a bind." *See* Exs. "A," p. 81:19-82:1, 84:1-3; "B," p. 69:23-70:4; "C1," p. 000011, ¶ 12 and "C2," p. 000008, ¶ 13.

30. Recognizing that Officer Hancock was in immediate danger of serious bodily injury or death and not knowing if Officer Hancock had already been injured by Jones (possibly Jones got Hancock's gun and shot him or stabbed Hancock with a knife), he struck Jones several times about the head and shoulders with the SL20 flashlight in an attempt to get Jones off of Officer Hancock. Hancock did not remember how many times Brister struck Jones, but it was more than once because, the first strike hit Hancock's left hand and the remaining strike(s) hit between Jones' head and shoulder. Brister testified he swung two or three times with one of the strikes hitting Hancock; so, probably a couple of times. *See* Exs. "A," p. 81:19-82:1, 84:1-85:4; "B," p. 70:5-71:5, 73:22-74:1; "C1," p. 000011, ¶ 12 and "C2," p. 000008, ¶ 13.

31. However, this had absolutely no effect on Jones and provided no relief to Officer Hancock. Seeing that Hancock was still in trouble, Chief Brister threw the flashlight out of reach, and got Jones in a headlock (with his left arm around, and up under, Jones' chin and jaw holding his head back up against his body to prevent head butts and bites from Jones) and rolled him off of Hancock and at the same time Brister wrapped his legs around his waist and his thighs to prevent him from kicking them, and he locked his boots together, all in an effort to contain him and hang on to him until backup arrived. At the time, Brister and Jones were kind of both on their sides (Brister's right butt check and shoulder were on the ground and Jones was kind of on top of Brister and half on his side too), with Brister holding Jones up against himself tightly. *See* Exs. Ex. "A," p. 84:15-17, 85:5-16; "B," p. 71:6-73:11; "C1," p. 000011, ¶¶ 12-13 and "C2," p. 000008, ¶ 14.

32. Officer Hancock was then able to get up off the ground, stand up, and catch his breath. However, because they were both still struggling, and Jones was screaming and trying to hit Brister with his fists, and Brister still had his legs and arms wrapped around him, but he was about to give out and lose control and Jones get free again, and because Brister asked Hancock to get his hands and hold them, Hancock then, laid on top of Brister onto Jones and grabbed and secured both of Jones' wrists/arms to keep him from hitting or getting free from them, and they just laid there waiting for backup. The position of all three has been described as Brister and Jones both on their right sides, with Brister behind Jones and with

Hancock on his knees and his thighs against Brister's back and laid primarily behind and across Brister with his arms extended over the top holding onto Jones' wrists onto the ground, and eventually, possibly after Jones extended his arms, Hancock was able to get his arm around both of Jones' arms and pull them toward himself (Hancock). While Hancock said he may have been laying where both their left ribs would be, he stated he was trying to stay off the top of them, because the Chief had already told him he was having trouble breathing. *See* Exs. "A," p. 85:17-93:2; "B," p. 73:12-74:21; "C1," p. 000011, ¶ 13 and "C2," 000008, ¶ 15.

33. Both Chief Brister and Officer Hancock were exhausted and barely had enough energy to hold Jones in this position until back up officers arrived, who they believed were on the way, as Hancock had reported the pursuit when it started. At that time, Brister was still concerned that Jones posed an imminent threat of serious bodily injury or death to either of them because if Jones broke loose or tore loose, he did not know what was going to happen then, or what injury he could inflict. Brister stated he was "fading pretty quick," he "didn't know how long [his] hold was going to last" and "if he were to break loose," "he could have at that point posed a threat of serious bodily injury." Defendants note that both officers were armed; so, if Jones got loose, he could possibly attempt to take their weapons. *See* Exs. "B," p. 74:22-76:24; "C1," p. 000011, ¶ 14 and "C2," p. 000008, ¶ 16.

34. While on the ground Chief Brister stated he was having trouble breathing, or out of breath, due to the weight of Jones and Hancock being on top of him, and that back up officers needed to get there because he could not hold on much longer. Hancock then tried to adjust his weight off of Brister. Brister also stated don't turn him loose, probably because he was running out of energy, and Hancock said okay. Jones was still struggling at that point. Brister does not recall how long that they were in this position, but he recalls Jones was still fighting, kicking, trying to get his hands loose and squirming. *See* Exs. "A," p. 93:3-94:1, 95:8-12; "B," p.76:25-77:14, 78:6-12; "C1," p. 000011, ¶ 15 and "C2," p. 000008, ¶ 17.

35. During this time frame, Officer Hancock noticed a women (Krissy Adams) standing behind them, as she asked if they needed some help. Hancock responded by asking her to call 911 and let them know where they were all located, and he also requested that she get the bag/backpack or belt in the patrol car as there were another set of handcuffs inside. *See* Exs. "A," p. 95:16-23; "C1," p. 000011, ¶ 16 and "C5," p. 000131, Statement of Krissy Adams.

36. Although the exact amount of time is unknown by the Officers, shortly afterwards Hancock observed that Jones suddenly stopped struggling and was not breathing and advised Chief Brister, stating, "Paul I don't think he's breathing." Brister had not noticed that he had stopped breathing. *See* Exs. "A," p. 95:13-15; "B," p. 77:18-24, 78:20-23, 79:13-20; "C1," p. 000011, ¶ 16 and "C2," p. 000008, ¶ 17-18.

37. There is, however, a video which shows Chief Brister and Officer Hancock simply attempting to hold Plaintiff down until backup arrives, and the video also shows Jones struggling and moving throughout 30 seconds of the 52 second video and 44 seconds of the 53 second video. The video also clearly shows that Jones was on his side, with Brister on his side behind him with his legs wrapped around Jones' legs, and Hancock on his knees, leaning primarily on Brister and reaching across Brister and Jones to hold Jones' hands.

This video clearly refutes any excessive force by these officers. *See* Ex. "C3," p. 000158, Two Videos of Brister and Hancock holding Jones.

38. Krissy Adams, the only other witness and the person who took the video confirmed the basic facts above in a statement that: a guy (Jones) was fighting two Officers (Brister and Hancock); she asked, and an officer confirmed they needed backup and she called 911; she noticed the suspect was not moving and breathing and informed an officer; the officer then requested his utility belt and/or a backpack to secure the suspect; Brister appeared to be in distress; and she retrieved an ambu bag and helped with CPR. *See* Ex. "C5," p. 000131-32.

39. Krissy Adams also completed an affidavit and gave testimony again confirming these basic facts, as well as stating that Jones was fighting both officers, appeared to be getting the best of them; appeared to be the aggressor trying to gain control over the situation; Jones, at one point, was on top of Hancock swinging at, and attempting to hit him; and if her son had been "evading arrest" and "fighting two officers like that" who "ha[d] a gun", she "would expect [her] son to have been shot." She also testified that when she noticed Jones stopped moving (legs and hip thrusts had stopped), she yelled from across the ditch, "Do you need help," and she was asked by the younger officer to get handcuffs in a bag out of the police vehicle, and when she returned with the bag, she first noticed Jones' eyes were open and fixed, and all "at the same time" Brister appeared to be out of breath and was trying to crawl out from under Jones and crawling away, she was also trying to talk to the 911 operator, and Hancock was trying to talk to Jones and requested that she get an ambu bag, and Hancock started chest compressions as she departed to get the ambu bag, and when she returned with the Ambu bag they alternated with compressions and the bag. She testified "the entire event happened very quickly." *See* Ex. "I," p. 1; 5-6; 22-23; 37-46; 51; 167:11-182:7; 182:9-184:24; and 190:9-191:3, Deposition Excerpts from the Deposition of Krissy Adams, including Deposition Exs. "2" and "3," generally, Texas Rangers Statement of Krissy Adams and Affidavit of Krissy Adams, respectively.

40. Similarly, *as soon as Hancock told Brister Jones was not breathing*, Chief Brister *immediately* released his hold, and they both rolled Jones onto his side or stomach, restrained him with the handcuffs, and then rolled him back onto his back, and Officer Hancock, who was unable to detect a pulse or heartbeat in the neck or wrist of Jones, immediately initiated chest compressions, and together with Krissy Adams using the Ambu bag (she happened to be a nurse and the Ambu bag was in the police bag with the handcuffs), they started CPR. *See* Exs. "A," p. 95:16-98:22; "B," p. 77:23-78:3, 79:21-80:2; "C1," p. 000011, ¶ 17 and "C2," p. 000008, ¶ 18.

41. Chief Brister testified he crawled away, and laid down on his back using his cell phone and called Jasper County Sheriff's Office 911 and requested an ambulance. He also testified he "was ruined" and "was spent." Dispatch requested the nearest Ambulance Service out of Jasper, Texas, about 23 miles away. *See* Exs. "A," p. 98:23-25; "B," p. 78:4-5, 81:9-18; "C1," p. 000011, ¶ 17; "C2," p. 000008, ¶ 19; "C4," p. 000156, Third Dispatch Tape and "D," Acadia E.M.S. records pertaining to Jones.

42. Brister testified they did not intend to use deadly force to effectuate the arrest of Jones nor did they go there to kill Jones. Brister does not believe the hold that they put on Jones contributed to his death. *See* Ex. "B," p, 82:13-15 and 82:19-22.

43. Other Officers, including but not limited to unit 614 (Deputy Amon Cathey), Highway Patrolman Eric Dunn, Narcotics Lieutenant Scott Duncan, and EMS arrived and took over CPR and medical treatment of Jones. Hancock was told they (he presumes EMS) were able to get a pulse just before loading him into the ambulance. When Hancock called in pursuit, Jasper County Dispatch, which Kirbyville uses, sent anybody she could find for them. *See* Exs. "A," p. 99:1-102:16; "B," p. 81:20-82:9; 83:5-84:6; "C1," p. 000011-12, ¶¶ 17-18; "C2," p. 000008, ¶ 20 and "C3," p. 000158 and 000146-150, 1 Video of Officers' CPR efforts and 5 related photographs.

44. The three dispatch tapes demonstrate that this incident from the point in time Jones decided to run, until the time they requested an ambulance to be about 8 minutes. More specifically, the first tape (approximately 1 minute and 4 seconds long) starting at 8:47 a.m. and 18 seconds, states that the subject is running about 5 seconds into the tape, and indicates he has caught up to Jones about at the 35 second mark. The second tape (picks up about 4 minutes later and is approximately 3 minutes long) starting at 8:51 a.m. and 40 seconds, records a citizen calling in and reporting that an officer is trying to subdue a citizen and attempting to report their location at the 12-35 second mark; at the 35-51 second mark Hancock can be heard requesting the citizen to look for, and grab, a police officer's belt in the front seat and bring it to him; at the 1:00 to 1:40 minute mark Hancock can be heard requesting the citizen to go to the back of the police unit and lift the back and locate a bag and bring it to him; at the 2 minute and 18 second mark someone asks someone if they need some water; and at the 2 minute and 40-45 second mark Hancock states Jones is not breathing. The third tape (approximately 2 minutes and 58 seconds long) starting at 8:55 a.m. and 16 seconds begins with Brister requesting an ambulance and Brister breathing heavily throughout, and at the 1 minute and 40 second mark, when asked what is wrong with the suspect, Brister states he doesn't know - he just is not breathing. *See* Ex. "C4," p. 000156, Three Jasper County Dispatch audio tapes.

45. The Acadian EMS records show an arrival time of 9:25:18, with CPR still in progress and finding Jones unresponsive, neck and throat unremarkable, assisted breathing via BVM (Bag Valve Mask), the monitor showing no pulse/rhythm (asystole) and with no obvious injury. After a rhythm and pulse was restored (within 5 minutes), Jones was moved to a stretcher, secured, and placed in the ambulance. They departed with Jones at 9:45:36, breathing and sinus rhythm and heart rate were maintained, and he was delivered to Jasper Memorial Hospital without incident. *See* Ex. "D."

46. The Records from Jasper Memorial Hospital in Jasper, Texas on Jones, with an admission date of May 14, 2013, show a patient arrival time of 1010, after full arrest per Acadian EMS, and after cardiopulmonary resuscitation attempt basically unresponsive, but with a pulse rate of 97 and a respiratory rate of 24, and a Glasgow Coma score of 3, and reflect a Chief Complaint of cardiopulmonary arrest (p. 000079 and 000084). He was continuously treated and subsequently discharged around 1510-1518 of same date, still unresponsive, in critical condition, with a pulse rate of 134, respiratory rate of 18 and a Glasgow Coma score of 3, and a departure primary impression of cardiac arrest, and he was sent by ambulance to Christus Hospital St. Elizabeth in Beaumont, Texas (p. 000084, 000087, 000094). The records also show the reported headlock (p. 000085 and 000096), and there is no reference to a chokehold anywhere within the Jasper Memorial Hospital records. *See* Ex. "C6," p. 000078-127, Jasper Memorial Hospital records pertaining to Jones and Ex. "D" and "F," Jasper Memorial Hospital Records Affidavit.

47. After his transfer, the Christus Hospital St. Elizabeth and Dr. Harold Z. Bencowitz MD records show Plaintiff continued to be tested and treated, and reflect a clinical history of cardiac arrest and a chief complaint of full cardiac arrest, a finding of brain death and that he remained unresponsive. *See* Ex. "C7," p. 000048-76, Christus Hospital St. Elizabeth and Dr. Harold Z. Bencowitz MD medical records pertaining to Jones and Ex. "G," St. Elizabeth Hospital Records Affidavit.

48. The NMS Labs Toxicology Report dated June 13, 2013 by Forensic Toxicologist Edward J. Barbieri, Ph.D., evaluated samples taken from Plaintiff (analysis of ante mortem blood specimen) and said report shows Plaintiff was on a synthetic cannabinoid/marijuana or KLR-11(K2) at the time of his death. Brister thought Arthur Breed had told Hancock that they had been smoking it all that night. *See* Ex. "B," p. 80:20-81:8; and "C8," p. 000142-44, NMS Labs Toxicology Report pertaining to Jones.

49. Plaintiff died at 5:05, on May 15, 2013. *See* Ex. "C9," p. 000135, Autopsy Report of Dr. John Walston pertaining to Jones, and "C7," p. 000048.

50. The final autopsy report by Chief Forensic Pathologist John W. Ralston. M.D. of Forensic Medical Management Services of Texas, P.A., dated July 22, 2013 shows the cause of death as myocardial infarction with hemorrhage within the myocardium due to hypertensive cardiovascular disease with left ventricular hypertrophy of the heart, 1.9 cm., and that a significant contributing factor in his death was synthetic cannabinoid intoxication. The autopsy report does not show any signs of a chokehold, such as damage or injury to the neck organs including: the anterior muscles of the neck, which were free from hemorrhage; the larynx and epiglottis and hyoid bone, which were all intact; the trachea and proximal bronchi, which were unremarkable; and the mucosal surfaces, which were tan and smooth. There were no notable remarks related to the respiratory system and the injuries to the left chest area were "compatible with resuscitation efforts. There was also no evidence of severe trauma. *See* Ex. "C9," p. 000135-39.

51. There is no mention of asphyxiation in the medical or death certificate records. *See* Ex. "C," and attached Exs. "C6" – "C9," "D," "E," "F" and "G," generally.

52. Although the phrase "chokehold" is mentioned *once* in the medical records by Dr. Benckowitz, Dr. Benckowitz specifically and admittedly wrote that he got this information directly from the Jasper Memorial Hospital notes ("according to JMH notes"), which clearly only reference a "headlock," and do not mention a chokehold. *See* Exs. "C6," p. 000085, 000096 and generally, and "C7," p. 000049. Likewise, the Acadian Ambulance Service, Inc. records, the only other medical records Dr. Benckowitz could have reviewed, do not mention a chokehold. *See* Ex. "D," "F" and "G," generally. Additionally, Brister is the only person that witnessed and described the "headlock," which description refutes using a chokehold (i.e., a headlock just secures the head and a chokehold cuts off the airflow), he also notes a chokehold is forbidden by the Kirbyville Police Department, and he did not communicate his hold, or a description of same, to the EMS or hospital medical personnel, as he did not talk to any of them about Mr. Jones or what happened during the incident. Finally, Brister had no improper reason, or motive, to list a "headlock," instead of a chokehold, in his statement, as he did not know, and still doesn't know, the cause of Mr. Jones' death, and asphyxiation is not mentioned, or evidenced, in the medical records. *See*

Exs. "B," p. 70:12-72:19, 80:10-16, 82:16-18 and 86:8-24; "C6, p. 000085, 000096 and generally; "C7," p. 000049; and "D," "F" and "G," generally.

53. The Death Certificate pertaining to Jones states he died of "myocardial infarction due to hypertensive cardiovascular disease" and describes how the injury occurred as an "overdose." *See* Ex. "E," Death Certificate pertaining to Jones.

54. Dr. John William Ralston, the Chief Forensic Pathologist for Forensic Medical of Texas, who performed, and was experienced and qualified to perform, the autopsy at issue, testified extensively and he stated: (1) law enforcement cannot directly request, or authorize an autopsy; (2) Mr. Jones did not have any injuries that would have been immediately life threatening or constitute immediate or severe trauma, and the blow to the head, which he could not determine the seriousness of, did not have any bleeding, or bruising, into his brain nor was there a fracture to his skull, and he characterized same as a bruise located in the area of his jaw muscle; (3) he found a recent (within 24 hours) "hemorrhage in the left ventricle papillary muscle, 2.3 by 1.5 by 0.4 centimeters" and edema or swelling of the brain due to lack of blood flow (as evidenced by flattening of the gyri and loss of the sulci), which collectively he attributed to his heart not beating properly and a cardiac arrest; (4) the MRI brain scan also confirmed lack of intracranial vascular blood flow; (5) it was his opinion Dustin Jones' cause of death was sudden, and within a reasonable degree of medical certainty was caused by, a myocardial infarction (lack of blood flow to the left ventricle as evidenced by recent hemorrhage there within the papillary muscle) due to pre-existing (several to 10 years) hypertensive cardiovascular disease (as evidenced by an enlarged heart and thickening of the left ventricle muscle causing increasingly constricted flow and an overstressed system and pitting scars within the kidney - nephrosclerosis), which was contributed to by sudden physical exertion and/or the synthetic cannabinoid in his system, both of which would increase his heart rate, and outstripped its blood supply causing the area of hemorrhage; (6) he found no signs of pulmonary arrest; (7) he found no evidence of injury or bruising to any part of his neck in any manner and the hyoid bone was intact, which is frequently fractured in strangulation and his windpipe had not been crushed – there was also no physical evidence of a chokehold including things like petechial hemorrhages in the eyes caused by airway constriction; (8) there was no bruising to the surface of the heart; so, it was unlikely the damage to the papillary muscles was caused by resuscitation efforts; (9) he saw no evidence that the carotid arteries had been cut off for a sufficient length of time to cause damage to the brain; (10) although he found evidence of a physical altercation, he found no evidence of excessive or lethal force; (11) the fractures to the 4th and 5th rib were likely caused by resuscitation efforts and there was no evidence this caused a flailing chest where the whole side of the chest would collapse while breathing, and same also did not cause his death; (12) the blow to the head in a non-critical area did not cause his death and the sudden collapse is more consistent with a heart attack, and there were no physical signs indicating a concussion; and (13) there was no evidence of overlay in this case, as there was no deep tissue hemorrhage, no lateral rib fractures, and there was no evidence of positional asphyxia or Epinephrine toxicity. *See* Ex. "H," p. 5:20-25, 10:16-11:15, 17:22-18:9, 20:5-10; 25:15-24; 26:6-14, 27:1-20; 46:11-25; 48:6-49:24; 53:18-65:9; 80:17-19; 83:5-7; 89:4-25; 94:16-96:6; 98:5-19; 99:4-100:19; 101:22-102:3; 102:24-105:5; 105:10-108:5; 111:21-112:24; 114:16-24; 115:3-21; 116:9-124:25; 131:13-132:10; and 133:13-16, Deposition Excerpts from the Deposition of John W. Ralston.

55. A medical expert, Dr. Robert C. Box, MD, retained by Defendant, also opined that there was no autopsy evidence whatsoever to indicate Plaintiff was choked or that any force was applied to the neck and he would have recovered quickly upon release if his airway or carotid arteries were compressed due to a choke hold and there would be physical evidence of a choke hold. He also stated, Plaintiff's sudden significant to lethal cardiac arrhythmia and arrest and death resulted from an excited delirium and massive adrenalin discharge into his blood stream occurring as a result of a several block foot chase and violent struggle with two officers and the presence of XLR-11 intoxication, along with the contributing pre-existing factors of hypertension and an enlarged heart. *See* Ex. "J," Defendants' Medical Expert Affidavit of Dr. Box.

56. Another medical expert, Dr. Nizam Peerwani, MD, retained by Plaintiffs, simply concludes that Plaintiff's death was due to asphyxiation, but he does not create a material factual issue in that regard. In doing so, he did not discuss the undisputed fact that there was no physical autopsy evidence of asphyxiation, no mention of asphyxiation in the medical records, and no facts in evidence that the officers intentionally asphyxiated or choked Plaintiff Jones. Instead, he simply generally mentions the alleged "investigative evidence that documents application of a chokehold," which was used to "roll[] [Plaintiff] off of the officer. However, he totally fails to identify that evidence, and totally fails to consider, or address, the undisputed eye witness and autopsy physical evidence above that establishes no chokehold was every applied. He further states Plaintiff was sandwiched between two officers, without describing how their actual positioning could possibly lead to asphyxia or addressing why asphyxia is not addresses in the medical records. In analyzing the autopsy findings relating to the alleged myocardial infarction, he does not contest the physical findings, nor actually disprove any of the opinions, but merely asserts that some of Dr. Ralston's opinions are potentially incorrect or that further testing is necessary to confirm same. By way of example, Dr. Ralston felt the hemorrhage within the papillary muscle was evidence of a myocardial infarction, whereas Dr. Peerwani, although acknowledging that the "papillary muscle is prone to myocardial infarction" and admitting this can occur, further states that they are rare and thus, he believes the hemorrhage was most likely caused by resuscitation efforts. Dr. Peerwani also simply asserts, "Dr. Ralston failed to examine this 'focal area of hemorrhage' by histology [examination of myocardial tissue by microscopy] to document or prove that this lesion was indeed a true myocardial infarction vs. merely a resuscitative focus of hemorrhage." Thus, Peerwani did not prove that Dr. Ralston was wrong in his findings or that Peerwani was right, he just suggested further testing was indicated. Importantly, Peerwani does not otherwise deny that Plaintiff fled from police, fought with police, nor dispute the physical findings of the autopsy, nor deny that Plaintiff had synthetic marijuana in his blood stream, and he confirms, as did Dr. Box, that synthetic marijuana causes anxiety, agitation, hallucinations, hypertension, and tachycardia. Dr. Peerwani also discusses "sudden cardiac death." In discussing sudden cardiac death, he acknowledges same can be caused by the narrowing of coronary vessels, or an enlarged heart, but he also gives an overly simplified analysis by simply stating Plaintiff's 25% restriction is not a "critical stenosis" and his 470 gram heart is within the normal range (when actually it is on the extreme upper range of normal - 470 grams on a 296 to 516 gram scale). However, and important here, he does not dispute Dr. Ralston's testimony that 500 grams is the cutoff to trigger fatal cardiac arrhythmia, regardless of exertion, and 400-500 is in the high risk category, and Dr. Peerwani does not further discuss the combined effect of the 25% stenosis in a relatively young male, his enlarged heart, the synthetic marijuana in his bloodstream and the physical exertion he expended on the date of

the incident, all of which are accounted for by Drs. Ralston and/or Box. In sum, Dr. Peerwani's opinions do nothing to create a factual dispute that Plaintiff died by accident or natural causes and not any intentional act by Defendants. *See* Ex. "L," Plaintiffs' Medical Expert Report Letter of Dr. Peerwani, and Ex. "J," (Dr. Box's Report Letter), and Ex. H, p. 83:14-84:13.

57. Hancock has extensive police training and experience, including use of force, as follows: (1) a Criminology/terrorism course at Lamar Institute of Technology (LIT); (2) attended and graduated from a 6 month police Academy at LIT in 2006 covering at least the Texas Penal Code, Code of Criminal Procedure, Traffic Code, the Constitution, use of force, self-defense, as well as other matters; (3) after graduating he received his Texas Peace Officers License in 2007 and he began working for the Newton County Sheriff's Office as a patrol deputy for about a year responding to calls and keeping the peace, and then he was moved to a narcotics officer for a time, and then was promoted to Patrol Sergeant making sure cases were put together right, making sure they had equipment, assisting with situations and giving advice when asked for help; (4) he also assisted in Newton County as a jailer and he went to school and became a certified jailer in December of 2011 until November of 2012, at which time he stopped working for Newton County; (5) at that time he had no complaints made against him, nor any lawsuits filed against him based upon excessive force; (6) he left Newton County in 2012 without incident, to work for the Kirbyville Police Department as a patrol officer with similar duties, and he was eventually promoted to patrol Sergeant supervising two patrol officers, and he had similar duties but with more employee duties and office work, where he still works today; (7) He has mandatory annual training through TCOLE; (8) As evidenced by his deposition responses, he has had training on arrests, detentions, various uses of force during same, including deadly force; (8) He has also had training on various types of restraints, and he has always been taught never to use a choke hold. *See* Ex. "A," p. 15:13-20, 18:2-28:16, 29:8-13, 31:7-41:21 and 45:16-57:6.

58. Hancock's experience and training records, inclusive of use of force training, are also contained within his 12/17/15 Texas Commission On Law Enforcement ("TCOLE") printout. Said printout reflects his graduation from, or completion of, the Lamar Institute of Technology Regional Police Academy around May of 2007 (696 hours), 8 years and 4 months of law enforcement service time and experience as a Jailer and Peace Officer, 1575 hours of law enforcement education and training, inclusive of 80 hours of post-Academy Peace Officer Field Training, 16 hours of Law Update, Legal Standards and Legislative Session Legal Updates, 5 hours of Patrol/Tactical, 16 hours of Intermediate level Arrest, Search and Seizure, and 13 hours of Intermediate level Use of Force. He has also received his Texas Jailer's and Peace Officer's license, as well as his Texas Basic and Intermediate, Peace Officer's certificates. Additionally the only criticisms on Hancock's Academy Use of Force F.A.T.S. sheet in 13 different categories states he spoke with timid/quiet voice, did not identify himself as a police officer, and used too little force. The Basic Peace Officer Course taught at the Academy to obtain a Peace Officers License in Texas in 2007 mandates at least 24, and 24, and 40 hours on Arrest, Search and Seizure, and Use of Force, and Mechanics of Arrest, respectively. *See* Ex. "C11," p. 000194-98, TCOLE Training and Experience Printout on Hancock and Ex. "C12," p. 000249 and 000251, Law Enforcement Records of Hancock.

59. Likewise, Brister has extensive police training and experience, including the use of force, as follows: (1) in 1982 he started working at the Orange County jail, and subsequently went to

jail school and then was put on the street where he worked for about a year; (2) next, he went to and completed the Jefferson County Sheriff's Academy, graduating second in his class; (3) the Academy covered anything from Constitutional law, to the Penal Code, the Code of Criminal Procedure, traffic and investigative training and basic police patrol officer skills and techniques; (4) he continued to work for the Orange County Sheriff's Office from 1982-84, starting as a patrol officer and then a sergeant investigator working in the warrant and civil process divisions; (5) from 1984-95, he worked as a patrol officer for the West Orange Police Department; (6) from 1995-96, he went back to the Orange County Sheriff's department as Chief Deputy for Sheriff Huel Fontenot, assisting the Sheriff with oversight of the entire department, and after an injury in 1997, he was moved to a volunteer reserve officer for a little less than a year; (7) in late 1997-2005, he went to work for the Jasper County Sheriff's Office as Chief Deputy for Sheriff Billy Rowles, with similar responsibilities; (8) next, for about one year, he worked as a District Attorney Investigator for A.W. Davis at the Newton County District Attorney's Office assisting with reviewing and investigating pending cases; (9) in October of 2005-2008, he went to work for the City of Kirbyville as Chief of Police, overseeing the operations of the police department such as making sure officers (4 patrolmen and 1 school resource officer) follow departmental rules and regulations, and received the required TCOLE training, and he also was charged with investigating and disciplining the officers, if necessary; (10) from 2009-11, he went to work as Chief Deputy for Sheriff Joe Walker with the Newton County Sheriff's Department; and (11) from 2011 to the present he has worked as Chief of Police for the City of Kirbyville Police Department. *See* Ex. "B," p. 9:7-33:5.

60. Brister also demonstrated his training and experience by answering a number of deposition questions dealing with arrests, detentions, imminent threat, serious bodily injury or death, resisting arrest, excessive force, deadly force and when the use of same is permitted, impact weapon, threats posed by fleeing suspects, letting a suspect go, continuing threats, traffic stops and the process of charging a suspect based upon probable cause. *See* Ex. "B," p. 38:16-52:12, 84:7-85:14, 87:8-22.

61. Brister's experience and training records, inclusive of use of force training, are also contained within his 12/17/15 Texas Commission On Law Enforcement ("TCOLE") printout. Said printout reflects his graduation from, or completion of, the Jefferson County Sheriff's Academy around May of 1984 (440 hours), 29 years and 11 months of law enforcement service time and experience as a Jailer, Peace Officer, Reserve Officer and Chief of Police, 1317 hours of law enforcement education and training, inclusive of 87 and 48 hours of post-Academy training on the Law and Patrol/Tactical, respectively. He has also received his Texas Jailer's and Peace Officer's license, as well as his Texas Basic, Intermediate, Advanced and Master's Peace Officer's certificates and his Basic and Intermediate Jailer's certificates. *See* Ex. "C13," p. 000160-166, TCOLE Training and Experience Printout on Brister.

62. *Hancock stated he has never had any complaints, much less a use of force complaint against him while at the City of Kirbyville Police Department, nor has Chief Brister.* Hancock has never had to use deadly force, nor caused a person's death during detention or arrest, nor was he aware of any instance where Brister did. Hancock could not recall how many times he had to use force to effectuate an arrest, but he said it wouldn't be a very high number and the majority of the time he doesn't have to use force. He also stated he could not remember filling out a use of force form for a taser. Hancock didn't know if the other

two officers working for Kirbyville at the time of the incident had had and prior use of force complaints. *See* Ex. "A," p. 57:7-59:25, 63:1-10.

63. Brister testified he never had any complaints, much less a use of force complaint against him, while working at the Orange County Sheriff's Office (no complaints), West Orange Police Department (no complaints, no arrestee injuries, and no use of deadly force or a firearm or taser during an arrest or detention), Orange County Sheriff's Office (during his second time there, no complaints were made by citizens, no investigations were conducted by the Sheriff, and there was no use of his revolver in any incidents, and no use of deadly force), Jasper Sheriff's Office (no complaints for excessive force), *City of Kirbyville Police Department (no formal complaints against his officers, no informal complaints against his officers concerning use of force, no officers used deadly force to effect an arrest or detention, and no informal or formal complaints about how he was doing his job)*, Newton County Sheriff's Department (no informal or formal complaints lodged against him for excessive force). This case is the first time Brister, a 30 year law enforcement officer, has had a lawsuit filed against him in relation to his duties as a police officer. *See* Ex. "B," p. 13:8-17, 14:6-15:5, 20:18-21:7, 29:20-31:10 and 32:7-12.

64. The City of Kirbyville has a practice and written policy *against* the use of excessive force. *See* Exs. "B," p. 37:20-38:7, and "C14," p. 000297-305, Use of Force Policy.

65. Although, Brister testified he is permitted to write and enforce Kirbyville Police Department policy, he has expressly testified he has not written any; but a previous police chief did. Further, he also expressly testified that the City Council and the Mayor have the "say-so, and they approve our policies" and "have to approve" any "policy that I want to make." *See* Ex. "B," p. 33:25-34:24, 87:23-88:2.

66. Brister testified he talks to his officers on a daily basis about how they act and react with the public and to use the least amount of force necessary in effecting an arrest and detention, and his "main priority is professionalism, courtesy and respect" and he "won't tolerate – I let them know that we're not bullies and we're not going to be bullies." *See* Ex. "B," p. 34:25-35:8 and 37:20-38:7.

67. Although Brister had the right to investigate this incident himself, he thought the Texas Rangers should investigate same. *See* Ex. "B," p. 88:16-89:9.

68. Texas Ranger Daniel Young conducted an extensive and thorough investigation as it relates to the Jones incident involving Hancock and Brister, and his investigation was presented to the Jasper County District Attorney, who chose not to present same to a Jasper County Grand Jury. *See* Ex. "C10," 000027-28, and generally, Texas Ranger's Report, exclusive of exhibits.

69. Finally, Police officer training expert Albert Rodriguez, who is a 38 year law enforcement officer who retired on September 31, 2009 from the Texas Department of Public Safety with the rank of Commander of the Training Academy (a position held from 1993-2009), and who is presently a Captain Director of Training with the Texas Alcoholic Beverage Commission (since May 2013), and was retained by Defendants, has reviewed the undisputed evidence above, as well as the expert reports submitted in this case, and has produced a report which contains a thorough step-by-step analysis of each Officer's use of force actions in this case, as

compared to the proper police officer training and law on use of force, and has thoughtfully concluded that all of their actions were objectively reasonable law enforcement actions, as the officers' undisputed actions (and factually unsupported hypothetical disputed actions - chokehold) comport with then existing law, and with how law enforcement officers are trained with respect to the appropriate use of force; and accordingly, their actions do not constitute the excessive use of force. Thus, Plaintiff cannot prove that no reasonable officer would have acted like Defendants did on the occasion in question; at most, Plaintiff can only demonstrate that reasonable officers can differ on how to handle the situation at issue here. *See* Ex. "K," ¶¶ 1-2, 8 and generally, Defendants' Police Expert Report of Albert Rodriguez dated 6/20/2016.

70. Also relevant here, Captain Rodriguez holds Advanced, Instructors' and Masters' certifications from the Texas Commission on Law Enforcement Officer; he has been certified for over 25 years as a defensive tactic's instructor, firearms' instructor and emergency medical technician; he is certified by the Federal Bureau of Investigation as a Use of Force and Defensive Tactics Instructor; and has attended over 6000 hours of various law enforcement seminars and schools throughout the United States and/or has given instruction classes on, and/or has been qualified in state and federal courts as an expert on, topic areas such as: use of force, the use of Taser, in custody deaths, positional asphyxia, arrest and control tactics, reasonable suspicion, probable cause, police supervision, law enforcement training, patrol procedures, constitutional law, firearms and officer safety. *See* Ex. "K," ¶¶ 3-7.

71. In his report Captain Rodriguez notes the following with respect to police officer training as applied to Hancock and Brister and the same undisputed facts above (¶¶ 9-27): (1) there was probable cause to arrest Jones not only for the three outstanding felony warrants, but also because he undisputedly assaulted Hancock during an attempted arrest, continuously resisted arrest, and attempted to evade arrest by flight, and thus, undisputedly violated Texas Penal Code Sections 22.02 (aggravated assault) and 38.04 (evading arrest or detention)(¶¶ 36, 38); (2) Hancock and Brister both had authority to arrest and use force on Jones based upon Texas Code of Criminal Procedure Article 2.13 (officer duties and powers)(¶¶ 37, 38); (3) use of force was statutorily authorized under Texas Penal Code Sections 9.31 (self-defense), 9.32 (deadly force in defense of person), 9.33 (defense of a third person), 9.51 (during arrest or search) and under federal case law *Graham v. Connor* – officers have the right to use reasonable force to affect an arrest(¶¶ 39-41); (4) officers Hancock and Brister were both entitled to use their discretion and judgment with respect to their use of force while quickly evaluating the undisputed facts within their personal knowledge (i.e., the totality of the circumstances) including: Jones' 3 felony warrants including those for aggravated robbery, aggravated assault and sexual assault of a child, his reportedly being under the influence of illegal drugs, his reportedly being known to carry a gun, his asserted possession of a knife, his active resistance to arrest to, and assault of, Hancock during the arrest, his flight from arrest and danger to the public due to previous felonies and his asserted being in possession of a weapon, his subsequent continued resistance to arrest and continued assault on Hancock – getting on top of him and beating him, and Hancock being without handcuffs, taser and a radio which were taken or were lost during the attempted arrest or struggle, Chief Brister's absence while retrieving and utilizing his vehicle to pursue and not knowing what happened between them during the time Brister was absent, Brister's return and noting Jones was on top of Hancock and Jones was fighting and hitting him, and Hancock stating he cannot breathe, get him off, and exhibiting an appearance of extreme distress, and Jones continuing to resist and or fight even after being struck with a flashlight, until they noticed he was not

breathing (¶¶ 42-46 and 48-49); (5) officers are entitled to use one level of force higher than the force used by the suspect (¶ 56); (6) the autopsy report and the autopsy examiner's testimony confirmed there was no evidence of severe trauma or excessive or lethal force (¶ 58 and 92); (7) in evaluating the information received, Hancock complied with proper training on arrest and acted within the use of force continuum in requesting assistance from Brister, in attempting to arrest Jones (based upon the outstanding warrants, probable cause, and aggravated assault and evading arrest), and being in uniform (professional presence is the lowest use of force) and verbally communicating his purpose of arrest and his intent to handcuff Jones (the next level of force), attempting to physically handcuff Jones (the next level-weaponless force), using his taser (which missed and was subsequently lost in the pursuit and no longer available) only after Jones broke free and hit Hancock and fled (the next level – intermediate weapon), and simply went back to weaponless force (the lowest physical force level) in bringing a fleeing Jones to the ground, then attempted to use his radio to call for help, which Jones took and discarded, and then Hancock went back to weaponless force, the lowest physical force, while defending himself from Jones' strikes, pleading for help because he could not breathe and ultimately attempting to hold down and control a continuously resisting and assaulting Jones while waiting for backup (¶¶ 35, 47, 59-66, 74-75 and 93); (8) in evaluating the information received, Brister complied with proper training on arrest and acted within the use of force continuum, as he accompanied Hancock on the arrest, initially pursued Jones on foot but opted to retrieve a patrol car, decided to use several ultimately ineffective flashlight strikes (intermediate weapon) instead of his gun (deadly force) when faced with his reasonable perception of a deadly force situation (i.e., it appeared Hancock was in immediate danger of serious bodily injury or death, as he was aware of all of the preceding facts above and he did not currently know if Hancock had been shot or stabbed, and he also observed Jones on top of, and beating, Hancock, and Hancock was having labored breathing, his face was pale and his eyes had a faraway look about them, and he was stating, "I can't breathe, get him off of me."); and when that did not work, he reverted back to the lowest form of physical force, weaponless force, in the form of a permissible headlock pending the arrival of backup even while having difficulty breathing, and although there is no evidence of a chokehold (no physical evidence in the autopsy and he was resisting and yelling during the struggle and Plaintiff's expert in a conclusory fashion incorrectly refers to a headlock as being the same as a neck hold), even a hypothetical chokehold would have been proper when it reasonably appeared Officer Hancock was facing immediate danger of serious bodily injury or death, and thus, even deadly force was justified (¶¶ 65-75, 78-85 and 93); (9) Rodriguez also hypothetically addressed asphyxiation, noting Brister was 61 years of age and Jones was 26 and that Brister who was underneath Jones and Hancock was not asphyxiated and Jones only had the partial weight of Hancock on him, and he further stated same is irrelevant because there was no evidence he was *intentionally* asphyxiated, as the officers involved were breathing hard and fatigued and under such circumstances they did not have the ability to monitor Jones' respiration and once Hancock discovered Jones was not breathing Jones was immediately released, they administered CPR and called EMS (¶¶ 77 and 86-91); and (10) he noted, Plaintiff's expert incorrectly and absurdly insinuated with respect to a sentence in the deposition of the only independent eye witness that she witnessed Plaintiff "Jones" was having heart and breathing problems, when clearly the witness's deposition statement was referring to 61 year old Brister having heart and breathing problems; he also noted that when Plaintiff and/or possibly his expert claims, or insinuates, that Defendant should have requested assistance, same is incredulous where, as here, assistance was requested and present, and he finally stated Plaintiff's expert, although noting, and allegedly using, the *Graham v. Connor* analysis, did not properly include the required

analysis of: the offenses committed or being committed by Jones at the time; whether Jones presented a danger to the officers or others; and whether Jones was resisting or evading arrest (¶¶ 47, 76 and 85). *See* Ex. "K," as referenced hereinabove.

72. Captain Rodriguez also outlined the TCOLE training received by Brister and Hancock and required by the Texas State Legislature and TCOLE, which in relevant part includes: Patrol Procedures, United States and Texas Constitution, Use of Force and Deadly Force, Texas Penal Code, Texas Code of Criminal Procedure, Arrest Search and Seizure, Arrest and Control Strategies and First Aid and positional asphyxia. He confirmed Brister and Hancock received this training and were state certified and licensed through TCOLE, as required by the State of Texas. Regarding positional asphyxia during arrests and relevant here, Captain Rodriguez also wrote that officers, including Brister and Hancock, are taught to first control, restrain and handcuff a violent and combative suspect, as placing them upright during a struggle is impractical and would give the suspect the opportunity to continue his assault. Accordingly, positional asphyxia does not come into play while dealing with a fighting and struggling arrestee, but instead applies after arrest and handcuffing, when the person can be safely positioned on his side or seated in an upright supine position. Here, Jones stopped breathing during his struggle with police, and before handcuffing; thus, positional asphyxia did not come into play. Accordingly, he concluded the acted objectively reasonably and in compliance with proper law enforcement training. *See* Ex. "K," ¶¶ 95-97, 99-103.

73. Rodriguez also clarified that *other* state's Peace Officer Standards and Training (POST) do not apply to Texas Officers Brister and Hancock, and entities such as the International Chiefs of Police Association (IACP) and the National Institute of Justice do not establish training standards for officers, but merely make recommendations or suggestions. *See* Ex. "K," ¶¶ 34 and 53.

74. Finally, Captain Rodriguez stated the City of Kirbyville Use of Force Policy meets all TCOLE Texas State Training Standards and is in compliance with the United States Supreme Court decisions of *Graham v. Connor* and *Tennessee v. Garner*, and the City of Kirbyville met all TCOLE required law enforcement officer hiring and training standards with respect to Hancock and Brister, which have never been determined to be unconstitutional, and that Hancock's and Brister's actions were objectively reasonable and in compliance with that contemporary law enforcement training, including on use of force and asphyxiation. *See* Ex. "K," ¶¶ 94- 104.

75. Plaintiffs have also retained a police expert, Michael D. Lyman, PH.D, but his report does not create any material fact issues here. Initially, Defendants note his findings and opinions are based upon model law enforcement policies from the International Association of Chiefs of Police (IACP)(p.11-12), which have not been shown to govern, or regulate, or be utilized by, law enforcement officers, or law enforcement trainers, in Texas. In fact, Rodriguez stated these policies do not govern Texas law enforcement training. It also appears that Lyman does not have any experience whatsoever with respect to Texas law enforcement and/or required Texas law enforcement training (p. 1-4). Although he talks about training, teaching and law enforcement experience in Kansas, Oklahoma and Missouri and is a member of some national associations, it is also somewhat unclear as to whether he was ever a state licensed law enforcement officer (p. 1-4). By way of example, while his attachments reference his criminal investigator status/responsibilities with two state police bureaus in Oklahoma and Kansas, and a civilian criminal investigator agent with a Kansas City/County Investigative

squad all from 1974-1986, he does not specifically state he was a state licensed police officer in either of those two states. Finally, his references to Societies, Academies, Colleges and Associations are immaterial as to the Texas law enforcement training applicable here and received by Brister and Hancock (p. 2-3). *See* Ex. "M," generally and as indicated hereinabove, Plaintiffs' Police Expert Report of Michael D. Lyman, PH.D.

76. His description of the incident is consistent with the undisputed facts above, *except on p. 5*, where he references a "*neck hold*," by Brister (p. 4-6). Interestingly, although expert Lyman lists each of the officer's 23 prior actions and references same to either an affidavit, or deposition source, there is no reference to the asserted "neck hold." *Id.* This statement either appears to be "made up," or assumed, as it is without any evidentiary support. Further Lyman's discussions about failing to properly prepare for an arrest are not only *admittedly* irrelevant to the analysis of alleged excessive force (in foot note 27 Lyman admits that you focus on the time of the arrest), but he also appears to ignore the facts, as Hancock, *who worked on a 5 man police force*, did request, and had, additional officer Chief Brister to assist him, and he further attempted to request more backup during the attempted arrest when the need presented itself, and although Brister did not have a taser, Hancock did and he in fact deployed his taser, and although Hancock did not have his baton, Brister had his flashlight that could be utilized, and was utilized, in the same way as a baton (p. 7-11). *See* Ex. "M," as indicated herein.

77. Lyman next jumps from preparing for the arrest, to the last 53 seconds of the arrest incident, as if nothing had occurred in the interim. He then focuses the remainder of his discussion on "positional asphyxia," even though the IACP policies he cites deal with asphyxia related to "positioning a *handcuffed* subject," or "positioning a subject during … *handcuffing*," neither of which occurred here (p. 11-15). The undisputed evidence above, establishes the handcuff's had been lost during the struggle and Plaintiff stopped breathing while fighting, and during his attempted restraint by, two officers. In short, there was no ongoing handcuffing procedure, nor was Plaintiff handcuffed at the time he initially stopped breathing. However, Lyman does not stop there, as he next states that Hancock's "full body weight" was on top of Plaintiff only, this alleged position lasted "for over one minute" with no struggle or resistance, and that a neck hold was involved, and that no verbal communication was ongoing, when he undoubtedly knows that: the undisputed evidence demonstrates most of the weight from Jones and Hancock was on Brister, and that Hancock is merely kneeling beside and behind Jones, with only Hancock's upper torso and arms distributed across both Jones and Brister, the video was admittedly 53 seconds and did exhibit movement by Jones 8-10 seconds into the video, and a headlock, not a neck hold, was involved, and the video was being recorded from a distance of 30-50 feet, and thus, there is no evidence it would have picked up any communications between the three of them and it would not have picked up communications before and after the video. (p. 11 and 15). *See* Ex. "M," as indicated herein.

78. Lyman also discusses alleged discrepancies with eye witness Krissy Adams, but the alleged inconsistencies he points out are immaterial to the case here, and he fails to point out that her statement, affidavit and testimony are all consistent with respect to the relevant facts of Plaintiff being the aggressor and resisting arrest (p. 13-15). Specifically, as established above, she testified that Jones was fighting both officers, was the aggressor, *was getting the best of the officers* and if her son had been "evading arrest" and "fighting two officers like that" who "ha[d] a gun", she "would expect [her] son to have been shot." *See* Ex. "M," as

indicated herein and Ex. "I," p. 1; 5-6; 22-23; 37-46; 51; 167:11-182:7; 182:9-184:24; and 190:9-191:3.

79. Lyman also attempted to insinuate Krissy Adams stated Jones was having heart and breathing problems, when clearly her deposition testimony refers to Chief Brister's heart and breathing problems (p. 13). *See* Ex. "M," as indicated herein.

80. Lyman also states once officers realize that a suspect is not breathing, the officers should take measures to ensure that he is breathing, but he completely ignores the undisputed evidence that demonstrates once Hancock realized Plaintiff was not breathing, he communicated same to Brister, and they both immediately released him, and CPR was initiated and EMS was called. Along those same lines, and critically important here, Lyman never analyzes the officers' actions, or undisputed facts, from a reasonable officer's perspective taking in the totality of the circumstances presented. He only tends to take a snap shot view at various points in time (i.e., before the incident and at the very end), and even then, misconstrues, or misinterprets, the undisputed evidence. *See* Ex. "M," as indicated herein.

81. Finally, Lyman's statements about Kirbyville's policy being deficient because it does not caution against positional asphyxia, are immaterial where the officers here have already been trained on positional asphyxia within their required Texas law enforcement training, and where the situation regarding positional asphyxia training and caution had not yet arisen (i.e., - Plaintiff had not been handcuffed when he initially stopped breathing)(p. 15-16). *See* Ex. "M," as indicated herein.

## V.
## ARGUMENT AND AUTHORITIES

A. **Plaintiffs' "Individaul" 42 U.S.C. § 1983 Claims Against Defendants Brister and Hancock Must be Dismissed Based on Qualified Immunity as Neither Defendant Violated Plaintiffs' pled Federal Constitutional Rights, and/or Their Actions Were, at all Times, Objectively Reasonable Based on Then Existing Clearly Established Law.**

82. In a 42 U.S.C. § 1983 claim such as the one pled in this case, Governmental officials, such as Brister and Hancock, are entitled to qualified immunity if their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). *See* Doc. 24, ¶¶ 8-11.

83. "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019( 2014)(citing *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)(quoted cite omitted)). Accordingly, a "heightened pleading" requirement must be met by Plaintiff requiring them to "state with factual detail and particularity the basis

for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity," and Plaintiff must ultimately negate and disprove the defense *Elliot v. Perez*, 751 F.2d 1472, 1473 (5th Cir. 1985); *Stogner v. Sturdivant*, 515 F. App'x. 280, 282 (5th Cir. 2013)(plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations); *Michalik v. Hermann*, 422 F.3d 252, 262 (5thCir. 2005)(same). "In order to meet [this] burden, the plaintiff must show that 'the officers' actions were objectively unreasonable, in light of clearly-established law at the time, and in light of the information the officers possessed.'" *Stogner*, 515 F. App'x at 282 (*quoting Wagner v. Bay City, Tex.*, 227 F.3d 316, 321 (5th Cir. 2000). "Qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Estate v. Davis v. City of N. Richland Hills*, 406 F.3d 375,380 (5th Cir. 2005)(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

84.     Each officer's actions are to be examined independently to determine whether each officer is entitled to qualified immunity. *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007). In a qualified immunity analysis, the court must: (1) determine whether a constitutional right was in fact violated, *and* (2) whether a constitutional violation was clearly established at the time of the events in question and whether the officer acted unreasonably based upon clearly established law. *Plumhoff*, 134 S. Ct. at 2020-23 (citations omitted). The Court can determine which prong to analyze first. *Plumhoff*, 134 S. Ct. at 2020 (*Pearson*, 555 U.S. at 242).

85.     In analyzing the first qualified immunity prong (whether a constitutional right was violated), Defendants initially note the Fourteenth Amendment claims, which are pled in a conclusory fashion, are actually inapplicable to the arrest facts pled here. *See* Doc. 24, ¶¶ 9-10. In *Graham v. Connor*, 490 U.S. 386, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989) the Supreme Court held, "all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 395; *see also Bazan v. Hidalgo Co.*, 246 F.3d 481, 487 (5th Cir. 2001). There is no dispute in the pled facts

or evidence, that Defendants were attempting to arrest Plaintiff based upon 3 felony warrants, when the incident at issue occurred. Accordingly, the Fourteenth Amendment claims must be dismissed, and the Fourth Amendment claims must be further analyzed. *See* Doc. 24 ¶¶ 8-11.

86.     Defendants also note a number of Plaintiffs claims in ¶ 7 of Doc. 24 tend to lean toward negligent acts and/or omission regarding how long one can lay on the suspect, or how long a hold should be applied, or getting another officer to monitor the well-being of a suspect being restrained. However, it is clear under the law that negligence theories cannot be used to establish claims under either the Fourteenth or Fourth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 849, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *Watson v. Bryant*, 532 F. App'x 453, 457 (5th Cir. Feb. 4, 2013)("Fourth Amendment violations occur only through intentional conduct.").

87.     The Fourth Amendment, the pertinent proposed provision pled here, states: "The right of the people to be secure in their persons, …, against unreasonable … seizures, shall not be violated …" *See* U.S. Const. Amend. IV.  To maintain an excessive force claim thereunder, Plaintiffs must allege and prove: (1) any injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable. *United States v. Sipe*, 388 F.3d 471, 480, n.22 (5th Cir. 2004); citing *Bazan*, 246 F.3d at 487; *see also Tarver v. City of Edna*, 410 F. 3d 745, 751 (5th Cir. 2005)(lists the third prong as "the excessiveness of which was clearly unreasonable").

88.     Therefore, considering the first prong of the qualified immunity analysis (has an excessive force claim been pled), Courts should "balance the amount of force used against the need for that force." *Flores v. City of Palacious*, 381 F.3d at 399 (5th Cir. 2004).  "[D]etermining the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Plumhoff*, 134 S. Ct. at 2020 *(quoting Graham v. Connor*, 490 U.S. at 396). "The inquiry requires

analyzing the totality of the circumstances." *Id.* The Court is to "analyze this question from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quotations and cites omitted). The Court must "'allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (*quoting Graham*, 490 U.S. at 396-97). The Court must consider "whether the officer's actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Relevant factors to consider are "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Finally, the right to make an arrest carries with it the right to use some degree of force or threat thereof to affect same. *Graham v. Connor*, 490 U.S. 386, 396 (1089).

89.     "Deadly force is a subset of excessive force" and "violates the Fourth Amendment <u>unless</u> the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or to others." *Bazan*, 246 F.3d at 487-88 (citations omitted). Therefore, if the court determines "the officer ha[d] probable cause to believe that the [plaintiff] pose[d] a threat of serious physical harm either to the officer or to others," a court will generally determine the deadly force was not "excessive to the need" and did not violate the Fourth Amendment. *Id.* at 492 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)).

90.     Even if an officer technically violates the Fourth Amendment (prong one), the Officers are still entitled to qualified immunity under the second prong, "unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff*, 134 S. Ct. at 2023 (citing *Ashcroft v. al-Kidd*, 563 U.S. __, 131 S. Ct. 2074, 2077, 179 L. Ed. 2d 1149, 1153 (2011). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023 (*citing Ashcroft*, 131

S. Ct. at 2083). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (*quoting Ashcroft*, 131 S. Ct. at 2083). "[T]he salient question …is whether the state of the law" at the time of the incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730,741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). To establish an officer's objective unreasonableness, Plaintiff must establish that no objectively reasonable police officer would have acted the way defendant officers did on the occasion in question based upon clearly established law. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). Similarly, "[i]n the Fifth Circuit, a governmental official is entitled to qualified immunity unless *all reasonable officials* would have realized that the challenged conduct was proscribed by law." *Cooper v. Morales*, 535 Fed. App'x. 425, 429 (5th Cir. 2013)(emphasis added)(citing *Dudley v. Angel*, 209 F.3d 460, 462 (5th Cir. 2000).

91.     Considering the two prong qualified immunity analysis, Hancock is entitled to qualified immunity, as his use of force was necessary, not excessive to the need, and objectively reasonable, as he simply attempted to arrest and place handcuffs on Jones, (who was on drugs, known to carry a gun, and said he had a knife), based on 3 outstanding dangerous felony warrants (including aggravated assault, aggravated robbery, and sexual assault of a child), and pursued Jones on foot only *after* Jones resisted arrest by hitting Hancock knocking him back into Brister while Hancock was attempting to handcuff Jones, and only *after* Jones hit him and fled the officers attempting to arrest him did Hancock fire his taser at Jones, but Hancock missed, and only *after* continuing to pursue the fleeing suspect on foot did Hancock bring Jones to the ground in a yard, and as Hancock realized he had lost his handcuff's and attempted to radio for help, Jones took Hancock's radio from him and threw it aside and climbed on top of Hancock (who still had his holstered firearm), pinning Hancock to the ground and hitting Hancock and restricting Hancock's breathing to the point of Hancock being pale, almost losing consciousness, and with a distressed look and pleading for Brister to get him off; and after Brister arrived to help and rolled Jones off of Hancock, Hancock, *after* noticing that Jones was still

fighting with his hands and since he was also being asked to secure Jones' arms/hands by Chief Brister, simply knelt down behind Brister (who was lying on his side restraining Jones from behind who was also on his side), with his torso primarily on and over Brister and extending across Jones to hold Jones' fighting arms/hands, while they waited for backup. Hancock also stated he was trying to keep his weight off of the Chief, and correspondingly Jones, as Chief Brister stated he was having trouble breathing. While waiting for backup, when Hancock noticed Jones was not breathing, he advised Brister of same, and they both immediately released their hold of Jones, handcuffed him and started CPR.

92.     Although Plaintiff Jones later died, according to the autopsy report and testimony of Dr. Ralston said death was deemed caused by a myocardial infarction due to hypertensive cardiovascular disease with left ventricular hypertrophy of the heart, 1.9 cm., with a significant contributing factor in his death being synthetic cannabinoid intoxication. While Plaintiffs' medical expert has made conclusory statements that Plaintiff died from asphyxiation, the medical records do not reference asphyxiation, nor reflect any physical findings consistent with asphyxiation, nor is there factual evidence of any negligent or intentional asphyxiation. Another medical opinion by Dr. Box indicates Plaintiff's sudden significant to lethal cardiac arrhythmia/arrest and death resulted from an excited delirium and massive adrenalin discharge into his blood stream occurring as a result of Plaintiff's own actions and pre-existing conditions, including a several block foot chase and violent struggle with two officers and the presence of XLR-11 intoxication, along with the contributing pre-existing factors of hypertension and an enlarged heart. Regardless, there is no evidence that either the myocardial infarction, excited delirium, pre-existing heart conditions or Jones' prior use of synthetic cannabinoids was caused by Hancock's minimal use of force (i.e., physical strength and skill) solely in response to Plaintiff's actions. There is also no evidence, physical or otherwise, that Hancock intentionally, or negligently for that matter, restricted Jones' airway, or ability to breathe, or used a chokehold, or asphyxiated Plaintiff in any way. In fact, the evidence establishes, once he realized Jones had stopped

breathing, they released their hold (Hancock released Jones' wrists/arms), handcuffed Jones and Hancock started CPR. Further, Hancock's actions were at no time excessive to the need, nor did they constitute any form of deadly force, nor did they cause Jones' death, nor where they objectively unreasonable, and no clearly established law existed at the time which demonstrates no reasonable officer would have acted as Hancock did under the circumstances.[6]

---

[6] In fact, law existed in the Fifth Circuit and elsewhere, stating his actions did not constitute excessive force. In cases involving officers and others *piling on top of a suspect's back* while securing a resisting suspect in a prone position and/or his appendages (hands in handcuffs and legs in flex cuffs) for four to ten minutes while waiting for backup where the suspect died of asphyxiation, the courts have found no excessive force, as the officers acted reasonably in attempting to secure the suspect who was actively resisting arrest. *Castillo v. City of Round Rock, Texas*, 177 F.3d 977, 1999 U.S. App. LEXIS 41148 at *2-4, 7-11 (5th Cir. March 15, 1999), *cert. denied*, 528 U.S. 1019, 120 S. Ct. 526, 145 L. Ed. 2d 407 (1999)(citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593-97 (7th Cir. 1997)(same), *cert. denied*, 522 U.S. 1116, 118 S. Ct. 1052, 140 L. Ed. 2d 115 (1998)); *Deshotels v. Marshall*, 454 F. App'x 262, 268-69 (5th Cir. 2011)(same). With respect to positional asphyxia, most Fourth Amendment cases involving law enforcement officers have evaluated same based upon "hog-tying," which did not exist here, but in any event, the Fifth Circuit has "never held that hog-tying is a per se unconstitutional technique for controlling a resisting arrestee," and although one "limited" case found a constitutional violation were the officers hog tying the suspect knew he was on cocaine (he told them he had used bad cocaine) and he was placed face down in a prone position for an extended period of time while being transported to jail, the other Fifth Circuit cases found qualified immunity. *Pratt v. Harris Cnty., Tex.*, 2016 U.S. App. LEXIS 8049 at * 14- 21 (5th Cir. May 3, 2016)(hog-tying is not per se unconstitutional, and qualified immunity was upheld where the officers did not know he was on cocaine and alcohol, and he was only restrained for a brief period of time – until EMS arrived);; *Hill v. Carrol Cnty., Miss.*, 587 F.3d 230, 232-37 (5th Cir, 2009)(defendants' summary judgment upheld, as hog-tying is not per se unconstitutionally excessive use of force; and, since the continuously resisting arrestee was not under the influence of drugs or alcohol during the arrest, even though he was hog-tied and placed face down in the patrol car and transported for 30 minutes, there was no objective reason not to use a four point restraint –"deputies cannot be held responsible for the unexpected, albeit tragic result, of their use of necessary force"); *Khan v. Normand*, 683 F.3d 192, 195-96 (5th Cir. 2012)(qualified immunity upheld as the Court determined that an officer's decision to hog-tie a drug-affected arrestee did not violate a clearly established constitutional right, because the restraint was used only briefly and the arresting officers did not know the arrestee was under the influence of drugs.); *Wagner v. Bay City*, 227 F.3d 316, 319-24 (5th Cir. 2000)(In this case, no hog-tying was involved, but positional asphyxia was alleged with respect to Plaintiff being handcuffed face down on the pavement for a period of time, then carried to a patrol car and placed in the back seat on his stomach facing the front of the vehicle, and driven to the county jail, where they carried him into the jail placing him face down, at which time they discovered he was not breathing. The court upheld qualified immunity based upon the objective reasonableness of their actions, as plaintiff was not hog-tied, there was no evidence he was a drug user, much less a user of cocaine at risk of cocaine psychosis, he was somewhat monitored, and there were no observable physical signs indicating he was substantially at risk (i.e., obesity), the use of chemical spray and a chokehold were reasonable because he physically resisted arrest and created a dangerous situation, and all the officers' actions were consistent with trying to restrain a violent individual); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 443-451 (5th Cir. 1998)(factual issues were present preventing qualified immunity summary judgment, as hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances –i.e., when a known drug-affected person (cocaine user) in a state of excited delirium is hog-tied, against policy, and placed down in a face down prone position and transported to the hospital more than 10 minutes away without being monitored); *See also, Sanders-Burns v. City of Plano*, 594 F.3d 366, 381-82 (5th Cir. 2010)(although pertaining to claims against the governmental entity discussed more fully below and not qualified immunity, inadequate positional asphyxia training claim was dismissed where officers had Texas state mandated training and there was no pattern alleged indicating deliberate indifference via another similar asphyxia related death involving the Plano Police Department). Under our set of facts, qualified immunity is appropriate, as Plaintiff was clearly resisting arrest and fighting with the police, and there was no hog-tying of Jones, the Courts have not held that holding someone on the ground while waiting for back-up is per se unconstitutional, and they only held him down for a short period of time, and immediately released him, and administered life saving measures, once they noticed he was not breathing.

93.     Also, despite the speed with which this incident occurred and the rapidly changing dynamics, Hancock followed the departmental use of force continuum exactly by presenting himself as an officer of the law, advising Jones he was under arrest for 3 felony warrants, attempting to handcuff Jones in a cooperative manner, and only using his taser (which missed) when Jones resisted arrest, hit him, and fled, at which time he had to use soft hands to bring Jones to the ground, and hard hands to defend himself from Jones who was striking him and eventually on top of him and causing Hancock's loss of breath to the point of perceived imminent unconsciousness.  Finally, Hancock used soft hands to secure Jones' fighting hands/arms as he awaited backup or help, as he had lost his handcuffs when Jones resisted arrest and fled.

94.     Defendants' expert on police training, Captain Rodriguez, has expressed his opinion that Hancock acted in an objectively reasonable fashion, within the confines of his state mandated officer training, the Constitution, and *Graham*, and there is no law or rule which would have indicated to Hancock that what he did was a violation of the Constitution, *Graham*, or his police training. Accordingly, Plaintiff cannot prove, as required to defeat qualified immunity, that no officer would have acted as Hancock did under the same or similar circumstances.  Plaintiffs' expert opinion concerning Hancock's alleged inadequate preparation to arrest Plaintiff is not only a red herring, as Hancock *did* request backup from Chief Brister, and eventually others, and he *had, and used*, a taser, but also because there is nothing in the United States Constitution requiring a certain number of people, or certain equipment, to be utilized in an individual arrest.  Further, Plaintiffs know that excessive force claims are to be analyzed at the time force is used, not based upon the pre-incident preparation therefore. Positional asphyxia, another basis for Plaintiffs' expert's opinion, is yet another red herring, as law enforcement concerns regarding same only apply to the handcuffing, and post-handcuffing, process and Plaintiff stopped breathing before he was handcuffed.  Further, Hancock did not have his entire weight on Plaintiff, but instead, Hancock was kneeling down with the upper part of his torso distributed across both his Chief and Plaintiff.  There is also no physical evidence of

asphyxiation, intentionally applied, or otherwise, or a choke hold, by anyone.  Defendant also notes Hancock at no time used an impact weapon, nor discharged his firearm, nor used any form of deadly force.

95.     There was simply no unreasonable, excessive or deadly force used with respect to Hancock's actions, under current or then existing clearly established law, the United States Constitution, or otherwise, nor did any of his actions cause Jones' death.  In fact, Defendants submit no lesser amount of force could have been utilized by Hancock under these clearly dangerous, dynamic, and rapidly evolving circumstances, to accomplish this arrest.  Hancock is undeniably entitled to qualified immunity from this suit.

96.     Considering the two prong qualified immunity analysis, Brister is entitled to qualified immunity, as his use of the flashlight, and when that did not work the headlock and leg hold, were necessary, not excessive to the need, and objectively reasonable, as they were only utilized when Brister had probable cause to believe officer Hancock was in imminent danger of serious bodily injury. At that time, Jones was a dangerous felon, had been known to be armed, said he had a knife, was on drugs, previously resisted arrest assaulting and striking Hancock, fled, and had pinned Hancock down on the ground and was on top of him striking Hancock when Brister arrived, and Brister observed Hancock's extreme distress (i.e., Hancock appeared to Brister to be short of breath, but also his face was pale, and his eyes had that faraway "oh shit" I'm in a bind look and we was in "much distress" and "he was in quite a bind."), and Hancock actually stated he could not breathe and to get Jones off of him, and recognizing that Officer Hancock was in immediate danger of serious bodily injury or death, and because Brister had not witnessed the entire pursuit, and thus, also didn't know if Jones had taken Hancock's gun (but regardless Jones still could acquire Hancock's gun), or whether Hancock had already been injured, shot, stabbed with a knife or otherwise wounded by Jones, he struck Jones a couple of times about the head (the autopsy established he ended up striking the jaw muscle area) and shoulders with his flashlight.  The strikes by Brister with the flashlight were described as more than

once because the first strike actually hit Hancock's left hand, and the remaining two strike(s) hit about Jones' head (jaw) and shoulder area but had little to no effect on Jones. The subsequent reasonable and necessary arm headlock was described as Brister using his left arm to wrap around, and up under, Jones' chin and jaw holding his head back up against his body to prevent head-butts and bites from Jones, and which he used to roll Jones off of a distressed almost unconscious Hancock and to secure a still fighting Jones. There is no evidence, including physical evidence, he used a chokehold. Simultaneously, a subsequent reasonable and necessary leg hold was also utilized by Brister to restrain the still kicking and fighting Jones, and was described by Brister as wrapping his legs around Jones' waist and his thighs to prevent him from kicking them, and he locked his boots together, all simply in an effort to restrain/contain him, and hang on to him, until backup arrived. At the time, Brister and Jones were basically both on their sides (Brister's right butt check and shoulder were on the ground and Jones was kind of on top of Brister and half on his side too), with Brister holding Jones up against himself tightly. Brister also reasonably and necessarily requested that Hancock secure Jones' still fighting hands. These purely physical restraints were necessary, as Jones, with three felony arrest warrants and reportedly known to be armed, had said he had a knife during a search being conducted by Handcock and shortly before hitting Hancock knocking him back into Brister, and fled arrest, handcuffs were lost in the process, he was fighting the Officers, and both Officers were armed and they could not allow Jones to get to their weapons, or his knife, or cause any or additional injury to them or others. Further, both Officers released Jones immediately when Hancock discovered he had stopped breathing, and they started CPR.

97. It is also worth noting, Brister also followed the Department's use of force continuum, as they had identified themselves as police officers, advised Jones he was under arrest based upon three felony warrants, Brister had witnessed Hancock's attempt to cooperatively handcuff Jones, heard Jones state he had a knife in his pocket, and witnessed Jones' subsequent resistance to arrest by hitting Hancock and knocking Hancock into Brister, and Hancock's use of the taser which missed, as Jones

took flight after the attempted arrest, and then, Brister used an impact weapon, striking Jones twice, when he caught up with Jones and Hancock, as he found Jones on top of Hancock with Hancock stating he could not breath and Brister was thus in imminent fear of death or serious injury to Hancock, and then he subsequently used soft hands to roll Jones off and hold Jones in a headlock, and also wrapped his legs around Jones' kicking legs until backup could arrive.  Finally, there is no pleading the head strike, or the headlock, or leg hold contributed to Jones' death by myocardial infarction or excited delirium due to hypertensive cardiovascular disease with left ventricular hypertrophy of the heart(1.9 cm.) and a significant contributing factor in his death being synthetic cannabinoid intoxication..  Therefore, Brister's actions were at no time excessive to the need, nor objectively unreasonable, nor did they cause Jones' death, and no clearly established law existed at the time which demonstrates no reasonable officer would have acted as Brister did under the circumstances.[7]

---

[7] Although our case undisputedly involves a *headlock*, since there appears to be some confusion in the pleadings and elsewhere regarding an *alleged chokehold*, Defendant references a factually similar case involving an *alleged chokehold*, along with video showing the officer wrapping his arm around the suspect's neck, where a suspect resisted arrest, officers restrained him on the ground, another officer who had arrived noticed he was not breathing, they administered CPR, but he was pronounced dead at the hospital and an autopsy confirmed a pre-existing heart condition and methamphetamine abuse contributed to his death, wherein the Fifth Circuit upheld qualified immunity on the excessive force claim based upon the objective reasonableness of their actions, and also stated, "choke-holds in themselves are not legally impermissible." *Stogner*, 515 F. App'x. at 281 n.1 (5th Cir. 2013); *see also Wagner*, 227 F.3d at 324 (agreeing that "nothing about the use of … a choke-hold was objectively-unreasonable conduct where the suspect physically resisted arrest.").  In *Williams v. City of Cleveland*, 736 F.3d 684, 688 (5th Cir. 2013), qualified immunity was sustained, as no clearly established right against excessive force was violated and their actions were reasonable, in a case involving multiple uses of a Taser and a *chokehold*, where the suspect plaintiff had, on July 23, 2010, used cocaine earlier that day, and fled the scene from officers with drugs in his hand, and was subsequently non-compliant, was warned about being tased, ignored the warning, remained unfazed after being tased and continuously struggled with both individual defendant officers, and after being handcuffed lapsed into unconsciousness and was pronounced dead at the hospital.  The Fifth Circuit's "rule on qualified immunity is that '[u]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others.'"  *Id.* at 688 (*quoting Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)).  *See also Gassner v. Garland*, 864 F.2d 394, 400 (5th Cir. 1989), overruled in part on other grounds, 543 U.S. 146, 154 (the court denied an excessive force claim where Plaintiff resisted arrest until the officer put him in a *chokehold*, wrestled him to the ground, and handcuffed him, as Plaintiff resisted arrest and the force used by the officer was reasonable.); *Kalma v. City of Socorro*, EP-06-CA-418-DB, 2008 U.S. Dist. Lexis 109441 (W. D. Tex. March 17, 2008)(officers entitled to qualified immunity because it was reasonable to use a *chokehold*, as the officers could have reasonably believed that when the suspect raised his hand in a defensive manner and pulled away from the officer, the officer on the scene could have reasonably, but mistakenly, believed that the suspect was going to fight back.).  Importantly, Defendants end where they began, and again note in this case there is *no evidence* of a chokehold, only a headlock, and Jones died of myocardial infarction due to hypertensive cardiovascular disease with left ventricular hypertrophy of the heart (1.9 cm.) or excited delirium, and with a significant contributing factor in his death being synthetic cannabinoid intoxication.  Therefore, qualified immunity clearly applies to Brister in this case.

98.     Again, Defendants expert on police training, Captain Rodriguez, has expressed his opinion that Brister acted in an objectively reasonable fashion, within the confines of his state mandated officer training, the Constitution, and *Graham*, and there is no law or rule which would have indicated to Brister that what he did was a violation of the Constitution, *Graham*, or his police training. Accordingly, Plaintiff cannot prove, as required to defeat qualified immunity, that no officer would have acted as Brister did under the same or similar circumstances.  Similarly, the alleged lack of pre-arrest preparation and alleged positional asphyxia put forth by Plaintiffs' expert are red herrings, and do not demonstrate a violation of the Fourth Amendment.  Further, there is also no physical evidence of asphyxiation, intentionally applied or otherwise, or a choke hold, or a neck hold, by anyone.  Even if there was a choke hold or a neck hold, under the law and Constitution, a choke hold was reasonable and permissible under the totality of the circumstances, as Brister reasonably perceived imminent fear of death or serious injury to Hancock.  Instead, the undisputed medical evidence establishes Plaintiff Jones' death was solely caused by his decision to flee the officers, his decision to fight and struggle with the officers, his decision to take synthetic marijuana, and his pre-existing heart conditions.  Even, if this Court is inclined to recognize the unsupported conclusion of Plaintiff's medical expert that Plaintiff died of asphyxiation (which Defendants deny), there is no physical or testimonial evidence to support same, and certainly no evidence of any intentional action on the part of Brister, or Hancock, which caused Plaintiff's asphyxiation or death, and certainly no evidence of excessive force under the circumstances then existing.

99.     Finally, like Hancock, Defendants submit there was no lesser amount of reasonable force which could have been utilized by Brister to effect this arrest under these clearly dangerous, dynamic, and rapidly evolving circumstances. Brister essentially just rolled Plaintiff off of Hancock, and attempted to restrain Plaintiff until additional assistance, or backup, arrived.  Brister is not constitutionally required to simply release a fleeing, resisting, dangerous, and potentially armed and assaulting suspect under the undisputed circumstances presented here.  Brister is entitled to qualified

immunity from suit, and Plaintiffs' certainly have not demonstrated why, under either the undisputed facts or law, he is *not* entitled to same.

100.    In summary, Plaintiffs have put forth no pleading, nor any evidence, nor can they, indicating Defendants violated the Fourth Amendment of the United States Constitution, nor have they pointed to any clearly established law indicating Defendants' actions were objectively unreasonable, and that no officer would have acted as they did on the date of the incident in question.  Therefore, the individual capacity § 1983 claims against Hancock and Brister must be dismissed based upon qualified immunity and no constitutional violation.

     **B.**    **<u>Plaintiffs' 42 U.S.C. § 1983 Claims Against the City Cannot be Maintained Based Upon Vicarious Liability, or Otherwise, as no Unconstitutional Act was Committed by Brister or Hancock, nor any other City Employee, and There is no Evidence the City had an Unconstitutional Authorized Policy or Custom Which was the Moving Force Behind Plaintiff's Death.</u>**

101.    Plaintiffs' have also made 42 U.S.C. § 1983 claims against Defendant Kirbyville.  *See* Doc. 24, ¶¶ 12-16.  To the extent any of these claims are based upon respondeat superior, or vicarious liability via the acts/omissions of Brister and Hancock, they must be dismissed as respondeat superior claims are not allowed under 42 U.S.C. § 1983.  *Monell*, 436 U.S. at 691 and 694 (respondeat superior not available under § 1983); *Goudeau v. E. Baton Rouge Paris Sch. Bd.*, 540 F. App'x 429, 437-38 (5th Cir. 2013)(same); *Okon v. Harris Cnty. Hosp. Dist.*, 426 F. App'x 312, 316 (5th Cir. 2011)(same).  Further, any other 42 U.S.C. § 1983 claims asserted against Kirbyville cannot possibly be maintained, and must be dismissed because, as established hereinabove, its involved employees - Brister and Hancock - did not violate any constitutional right of Plaintiff.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)(held a municipality cannot be held liable under § 1983 where no constitutional violation has occurred); *Mace v. City of Palestine*, 213 F. Supp. 2d 691, 698 (E.D. Tex. 2002)("… a municipality cannot be held liable under § 1983 where no constitutional deprivation has occurred.").  Stated another way, because Plaintiffs have not and cannot establish a constitutional violation of excessive force under the Fourth Amendment, or a violation of his substantive due process rights under

the Fourteenth Amendment, by either Chief Brister or Sergeant Hancock (the only officers involved), Plaintiff is barred from asserting a § 1983 civil rights claim against the City because regardless of what the City's policies or customs might have been at the time of the incident, the policies/customs could not possibly have caused the alleged constitutional violation. *See Huong v. City of Port Arthur,* 961 F. Supp. 103, 107 (E.D. Tex. 1997). Accordingly, Plaintiffs' claims against all Defendants must be dismissed.

102. Even if Defendants assume, for purposes of argument only, one or more of the City's employees violated the Constitution, which they undisputedly did not, the United States Supreme Court has expressly held that governmental entities may be sued directly under § 1983 *only where* "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or where there are "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Paz v. Weir*, 137 F. Supp. 2d 782, 797 (S.D. Tex. 2001), quoting *Monell v. Dept. of Social Services*, 436 U.S. 658, 690-91; 56 L.Ed.2d 611; 98 S. Ct. 2018 (1978); *see Languirand v. Hayden*, 717 F.2d 220, 223 (5th Cir. 1983), cert. denied, 467 U.S. 1215 (1984). Thus, the key to establishing municipal liability is demonstrating that a deprivation of a constitutional right was inflicted pursuant to a governmental entity's official policy or custom. *Id.* at 797, citing *Flores v. Cameron County*, 92 F.3d 258, 263 (5th Cir. 1996). Stated another way, "[m]unicipal liability inures only when the execution of a local government's policy or custom causes injury." *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996); *see Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009), cert. denied, 559 U.S. 1048 (2010). Therefore, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur [i.e., policy or custom]." *Paz*, 137 F. Supp. 2d at 797, quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Moreover, when a plaintiff is proceeding under

§ 1983, "each and any policy which allegedly caused constitutional violations must be specifically identified by plaintiff." *Id.*

103.    The Fifth Circuit has defined official policy or custom as:  (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent widespread practice of city officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.   Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. *Paz v. Weir*, 137 F. Supp. 2d at 797, *citing Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) (*quoting Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984)); *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168-69 (5th Cir. 2010).

104.    Considering these definitions, there are essentially three types of "policies."  The first type of "policy" is characterized by formal rules and understandings which constitute fixed plans of action to be followed under similar circumstances consistently and over time. *Paz v. Weir*, 137 F. Supp. 2d at 798, *citing, Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81; L.Ed.2d 452; 106 S. Ct. 1292 (1986).   The second type of "policy" arises from custom i.e., "conduct that has become a traditional way of carrying out policy and has acquired the force of law." *Id., quoting, Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984).   The third type of "policy" stems from "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations'"). *Id., citing, Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 410; 137 L.Ed.2d 626; 117 S. Ct. 1382 (1977) (*quoting Pembaur*, 475 U.S. at 481).

105.    Although a single decision by a policy maker under certain circumstances can constitute a policy for which a governmental entity may be liable, a municipality can only be liable if

the decision to adopt that particular course of action is properly made by the government's authorized decision makers. *Id., citing, Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000). These "authorized decision makers" are defined to be officials "'whose acts or edicts may fairly be said to represent official policy'" and whose decisions may therefore result in municipal liability under § 1983. *Id., citing, Pembaur*, 475 U.S. at 480 (*quoting Monell*, 436 U.S. at 694).

106. Proof of a responsible policymaker is a necessary element for the imposition of municipal liability under § 1983. *Id., citing Piotrowski*, 237 F.3d at 578-79 (*citing Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 105 L. Ed. 2d 598, 109 S. Ct. 2712 (1989)). State law determines whether a particular individual is a final decision maker of a governmental entity with respect to a certain sphere of activity. *Id., citing Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir.), *cert. denied*, 519 U.S. 817, 136 L. Ed. 2d 29, 117 S. Ct. 68 (1996) (*citing Jett*, 491 U.S. at 737). A Home Rule City, such as the City of Kirbyville, is authorized under the Texas Local Government Code, and it has the full power of local self-government. *See Zachry v. City of San Antonio*, 296 S.W.2d 299, 301 (Tex. Civ. App. –San Antonio 1956), *aff'd*, 157 Tex. 551, 305 S.W.2d 558 (Tex. 1957). The Texas Local Government Code grants authority to organize a police force to the City itself. *See Tex. Loc. Gov't Code* § 341.003. Pursuant to the power of self-government, the City can vest and retain its official policy-making authority in the City Council, the City Manager, or others. *Abdeljalil v. City of Fort Worth*, 55 F. Supp. 2d 614, 620 n.3 (N.D. Tex. 1999). Where Plaintiff fails to demonstrate that a particular person had authority to create City policy, they fail to satisfy the threshold issue of establishing an unconstitutional city policy or custom. *Id.; See also Good v. City of Irving*, 2009 U.S. Dist. LEXIS 46140, at * 26-27 (N.D. Tex. June 1, 2009)("A city's employee is not the policymaker unless *exclusive* policymaking authority has been delegated to that employee by its lawmakers...it is Plaintiff who bears the burden of establishing...whether the City's governing body has delegated policymaking authority to lower-ranking city officials, in this case the Chief of the Irving Police Department....Without any evidence to the contrary, the Court *must assume the City's policymaking*

*authority lies with the City's governing body…"*)(citations omitted)(emphasis added)). Further, as stated above, applicable law dictates where the municipality's policymaking authority lies, and the federal court may not assume it lies anywhere else. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988).

107.    "Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Id.*, citing *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5ᵗʰ Cir. 1984)); *See also Zarnow*, 614 F.3d at 167.  If Plaintiff is to use actions of city employees as a basis for proof with regard to a custom for which the municipality is liable "those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Paz v. Weir*, 137 F. Supp. 2d at 798-99; citing *Webster*, 735 F.2d at 842; *See also Zarnow*, 614 F.3d at 169. Accordingly, and "[c]onsistent with the commonly understood meaning of custom, proof of random acts or isolated incidents is not sufficient to show the existence of a custom or policy." *Paz v. Weir*, 137 F. Supp. 2d at 799, citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5ᵗʰ Cir. 1992).

108.    Stated another way, "'isolated violations are not the persistent, often repeated constant violations that constitute custom and policy' as required for municipal section 1983 liability." *Id.*, citing *Campbell*, 43 F.3d at 977 (quoting *Bennett*, 728 F.2d at 768, n.3).  Thus, a "customary municipal policy cannot ordinarily be inferred from a single constitutional violation." *Id.*, citing *Campbell*, 43 F.3d at 977.  To establish a municipal policy or custom, plaintiff must at least show "a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force." *Id.*, citing *Fraire*, 957 F.2d at 1278 (citing *Languirand*, 717 F.2d at 227-228); *See also Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5ᵗʰ Cir. 2005). "A pattern requires similarity and specificity" and "a pattern also requires "sufficiently numerous prior

incidents"[8] as opposed to "isolated instances." *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (citations omitted). "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis*, 406 F.3d at 383 (footnotes omitted). Regarding the similarity requirement, the Fifth Circuit has held, an officer's "habit of displaying a firearm during a traffic stop does not constitute a relevant pattern with respect to using deadly force during a traffic stop." *Estate of Davis*, 406 F.3d at 384, citing *Roberts v. City of Shreveport*, 397 F.3d 287, 294 (5th Cir. 2005). Also, prior incidents of excessive force may not be sufficiently similar to the incident at issue. *Lewis v. Pugh*, 289 Fed. Appx, 767, 773 (5th Cir. 2008). The alleged prior similar acts must <u>all</u> be unconstitutional actions in order to be considered evidence of an unconstitutional policy or custom. *Gates v. Texas Dept. of Protective & Regulatory Services*, 537 F.3d 404, 436-37 (5th Cir. 2008). Further, unsubstantiated complaints should not be considered, and the number of complaints may bear no relation to their validity, as there may be a logical explanation as to why a large number of complaints have been filed against an officer – he patrols a high crime area where experienced suspects frequently use citizen complaints as a means of harassing officers. *Estate of Davis*, 406 F.3d at 384 and n. 45. National studies or statistics are irrelevant in establishing a pattern of similar incidents by a city or county. *Cano v. Bexar County, Texas*, 280 Fed. Appx. 404, *407, *7, fn. 1. Only if the plaintiff demonstrates that his injury resulted from a "permanent and well

---

[8] The following cases illustrate what the Fifth Circuit has considered with respect to the similarity and numerocity requirements. *Castro v. McCord*, 259 Fed. Appx. 664, *669, 2007 U.S. App. LEXIS 29277, **14 (5th Cir. 2007) (Three prior shooting deaths, including the one at issue, by the 34 patrol officers in the 5 years preceding was not a persistent and widespread practice; so, no policy or custom established.); *Peterson v. City of Fort Worth*, 588 F.3d 838, 850-52 (5th Cir. 2009)(Twenty-seven complaints of excessive force and IAD investigations between 2002 and 2005 did not establish the city maintained an official policy of condoning excessive force, where plaintiffs do not provide context showing a pattern establishing municipal policy. For example, the size of the police department, the number of arrests, etc.); *Cano v. Bexar County, Texas*, 280 Fed. Appx. 404, *407, 2008 U.S. App. LEXIS 11990, **6-7 (5th Cir. 2008)(A dozen I.A. Complaints over 15 years, none of which have merit, do not create a factual issue on a pattern of excessive force.); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002)(Eleven incidents of purported unconstitutional conduct -warrantless searches - in a large metropolitan police force was insufficient to create a factual issue regarding a pattern of illegality that would constitute an unwritten municipal custom.); *Hinojosa*, 547 F.3d at 296 (Simply noting "that between 2001 and 2005, 258 complaints of excessive force were lodged against [the department] officers which resulted in only 18 incidents of discipline" is not enough "evidence [to] demonstrate the city's tolerance of officer misconduct" as "these statistics, however, beg more questions than they answer. For example, *Hinojosa* provides no reason for a rational fact finder to conclude that most of the incidents complained of actually involved an officer using an unconstitutional level of force, or that the number of complaints filed against [department] officer is high relative to other metropolitan police departments.").

settled" practice may liability attach for injury resulting from a local governmental custom. *Paz v. Weir*, 137 F. Supp. 2d at 799, citing *Praprotnic*, 485 U.S. at 127 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)).

109.    Moreover, a governmental entity does not incur liability under § 1983 unless there exists "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id., citing City of Canton v. Harris*, 489 U.S. 378, 385; 103 L.Ed.2d 412; 109 S. Ct. 1197 (1989); *Piotrowski*, 237 F.3d at 580. This is a high "threshold" burden of proof and plaintiff must establish the policy was the "'moving force' behind the violation." *Id., citing Piotrowski*, 237 F.3d at 580 (*quoting Monell*, 436 U.S. at 694); *City of Canton*, 489 U.S. at 389. Thus, "the plaintiff must initially allege that an official policy or custom 'was a cause in fact of the deprivation of rights inflicted.'" *Id., citing Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997) (*quoting Leffall v. Dallas ISD*, 28 F.3d 521, 525 (5th Cir. 1994)). Nevertheless, "this connection must be more than a mere 'but for' coupling between cause and effect." *Id., citing Fraire*, 957 F.2d at 1281. The "plaintiff must also establish that a governmental policy or custom was the proximate cause of the injuries sustained." *Id., citing Rheuark v. Shaw*, 628 F.2d 297, 305 (5th Cir. 1980), cert. denied, 450 U.S. 931 (1981) (other citations omitted). Accordingly, "[p]ointing to a municipal policy action or inaction as a 'but-for' cause is not enough to prove a causal connection under *Monell*. Rather, the policy must be the proximate cause of the section 1983 injury." *Id.* at 799-800, *citing Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996), cert. denied, 519 U.S. 1111; 136 L.Ed.2d 837; 117 S. Ct. 950 (1997). Further, good faith statements defending complaints against municipal employees do not demonstrate ratification, and a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality. *Zarnow,* 614 F.3d at 169, *citing, Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 and 853 (5th Cir. 2009). Also, actions which occur *after* the alleged constitutional violation lack a causal connection. *Davis v. City of North Richland Hills*, 406 F.3d 375, 382 n. 33 (5th Cir. 2005); *Barkley v. Dillard Dept. Stores*, 277 Fed. Appx. 406, 2008

U.S. App. LEXIS 9603, 2008 WL 1924178 (5th Cir. May 2, 2008)(Investigations of incidents subsequent to the incident at issue are not relevant because such incidents "could not have informed [the] county's judgment" with respect to the instant claim).

110.     In addition, the "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Paz v. Weir,* 137 F. Supp. 2d at 800; *Bryan Co.,* 520 U.S. at 411-12.  The Supreme Court has explained:

> "It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id., citing Bryan Co.,* 520 U.S. at 404; *Spiller,* 130 F.3d at 167.

111.     "Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights. *Id., citing Byran Co.,* 520 U.S. at 415.  Thus, a plaintiff seeking to recover against a governmental entity under § 1983 "must first prove a direct causal link between the [governmental] policy and the constitutional deprivation; they then must establish that the [city] consciously enacted a policy reflecting 'deliberate indifference' to the constitutional rights of its citizens." *Id., citing Snyder v. Trepagnier,* 142 F.3d 791, 795-96 (5th Cir. 1998) (citing City of Canton, 489 U.S. at 389).  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregard a known or obvious consequence of his actions." *Id., citing Bryan Co.,* 520 U.S. at 410.  "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Davis,* 406 F.3d at 381 (*quoting Smith v. Brenoettsy,* 158 F.3d 908, 912 (5th Cir 1998)(internal quotation marks and citations omitted)). "'Unintentionally negligent oversight' does not satisfy the deliberate indifference standard." *Zarnow,* 614 F.3d at 170, *quoting, Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 756 (5th Cir.

1993)(citation omitted); *James v. Harris County*, 577 F.3d 612, 617-18 (5th Cir. 2009)("Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.'")(*quoting Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992). Defendants also note an expert alone can't establish a City's deliberate indifference or a City policy or custom. *Stakes v. Bullins*, 844 F.2d 269, 275 (5th Cir. 1988); *Snider v. Trepagnier*, 142 F.2d 791, 799 (5th Cir. 1998), cert. dismissed, 526 U.S. 1083(1999); *Castro v. McCord*, 259 Fed. Appx. 664, *670, 2007 U.S. App. LEXIS 29277, **17 (5th Cir. 2007).

112.     Thus, the only way a governmental entity, like Kirbyville, can be held liable under 42 USC § 1983 is if the plaintiff alleges and proves:

(1)     a policy or custom existed;
(2)     the governmental policymakers actually or constructively knew of its existence;
(3)     a constitutional violation occurred; and
(4)     the custom or policy asserted is a moving force behind the violation. *Paz v. Weir*, 137 F. Supp. 2d at 800, citing *Meadowbriar Home for Children, Inc.*, 81 F.3d at 521, 532-33 (5th Cir. 1996); *See also Zarnow*, 614 F.3d at 166; *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 753 (5th Cir. 2009); and *Okon*, 426 F. App'x at 316.

113.     In other words, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nevertheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id., citing Bryan Co.,* 520 U.S. at 405 (citing *City of Canton*, 489 U.S. at 391-92). The Fifth Circuit and the United States Supreme Court have stressed that the requirements listed above "must not be diluted for 'where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *Id., citing Snyder*, 142 F.3d at 796 (quoting *Bryan Co.,* 520 U.S. at 415); *See also James*, 577 F.3d at 618.

114.     Considering the law referenced above, Plaintiffs have not established an unconstitutional policy or custom of excessive force which was the moving force behind an unconstitutional use of force in this case. Defendants first note, the incident at issue, did not even

involve a use of force that was unconstitutionally applied by any City of Kirbyville officer/employee, and caused any injury to Jones, as Jones' hitting the officer after the officer announced Jones was under arrest, Jones' subsequent flight from the officers, fighting, hitting and struggling with the officer(s), getting on top of officer Hancock and pinning him on the ground and hitting him to the point of near unconsciousness, and Jones' continuing resistance to arrest and struggle once the second officer caught up and attempted to get him off of Hancock and secure him, if anything, certainly necessitated the use of force in this case, including deadly force. Hitting Plaintiff about the head (jaw) and shoulders a couple of times with a flashlight, and when that did not work, using a head lock and wrapping his legs around Jones, was reasonable and necessary, as Jones (who had previously stated he had a knife) was on top of, and in a dominant position over, a previously armed officer, who might have been disarmed and/or injured, and who definitely could not breathe (and exhibited distress and expressed same) and felt he was losing consciousness, and Jones would not follow commands and get off of the Officer even after being hit by a flashlight from another armed officer, and Brister reasonably thought Hancock was in imminent danger of serious bodily injury. Defendants' expert has stated these officers acted in compliance with their state mandated training and did not use excessive force during the incident in question.

115.    Plaintiffs also have failed to identify any other incidents, much less *numerous*, *similar* excessive force *prior* incidents, or any written policy which permits excessive force, nor have they established sufficient deliberately indifferent and egregious facts to establish this singular incident constitutes an unconstitutional policy or custom. Negligence, or negligent oversight, is not enough.

116.    Defendants' expert has stated the City's written use of force policy is consistent with state mandated use of force training, and he is unaware of any instance where the state mandated training has been determined to be unconstitutional. Plaintiff's expert merely asserts that the City's use of force policy should have cautioned officers on positional asphyxia; however, he does not state that this makes the use of force policy constitutionally deficient, nor does he address the fact that these

officers had state mandated law enforcement training that covers positional asphyxia, nor does he convincingly address the fact that the positional asphyxia law enforcement policies he references only apply to the position of suspects during the handcuffing and the post-handcuffing process, and not the position of suspects that are un-handcuffed and still fighting officers - as occurred in this case. Defendants' expert points out these deficiencies in Plaintiffs' expert's analysis, and as well, states that the policies referenced by Plaintiffs' experts (ICAP policies) are not the same law enforcement training standards that Texas Peace officers are held accountable to.

117.    Further, Defendants have put forth evidence this incident did not demonstrate an excessive use of force by either officer, there are no recent *prior* incidents of excessive force or deadly force incidents within the Kirbyville Police Department (none while Chief Brister was there during 2005-2008, and 2011 - May 14, 2013, the time of the incident in question), there are no prior complaints involving the use of excessive force regarding the two officers involved throughout their *entire* law enforcement careers, and there exists a written policy against the use of excessive force by the Kirbyville Police Department.

118.    Additionally, it appears Plaintiff died by accident, or due to natural cardiac deficiency causes, and/or because of his use of synthetic marijuana, and/or his decision to flee and fight with police, and not based upon any alleged headlock, leg restraint, hold, or any resultant physical injury, inflicted upon him by the Officer's involved.   There is also no physical evidence he died of asphyxiation or was ever in a choke hold.

119.    Finally, there is no evidence that either Officer was deliberately indifferent to Plaintiff, or Plaintiff's needs or even knew Plaintiff was having any physical difficulties until just prior to getting off of him.  Once they discovered he was not breathing, they promptly released him, initiated CPR and called for an ambulance.  If anything, and at most, the Officers were merely arguably negligent in not discovering that Jones had stopped breathing sooner, but they were not deliberately indifferent.  They were not even negligent.  Regardless, negligence is not the constitutional standard.

Further, and importantly, there is no evidence that even if they had discovered he had stopped breathing sooner, he would have survived the heart attack, or otherwise survived this incident. The undisputed facts of this case simply do not present the type of egregiousness that warrants the single incident exception.

120. The single incident exception also cannot apply because the City has established that Chief Brister is not a policymaker for the City of Kirbyville, or the Kirbyville Police Department, because not only did he not ever draft any City of Kirbyville Police Department written policies, but he also testified that even if he did, same would have to be approved by the City Council. Further, the state law referenced above vests authority with the City Council and Plaintiff has not put forth any evidence that the Council delegated policymaking authority to Brister. In short, Plaintiff has not, and cannot, establish Brister is an authorized policy maker for the City, and therefore, his actions alone, whether alleged to be deliberately indifferent or not, cannot bind the City. Similarly, there is no evidence Hancock was an authorized policymaker for the City. Therefore, as a matter of law, and based upon the undisputed evidence, and lack of evidence, Plaintiff's 42 U.S.C. § 1983 constitutionally based claims against Kirbyville must be dismissed.

121. Plaintiffs have also, in a conclusory fashion, alleged post-incident ratification as being applicable. *See* Doc. 24, ¶ 16. While, in an extreme case, the Fifth Circuit has found post-incident ratification applicable, where supervisors denied their failures, and when the entire night shift directed hails of gunfire at someone accused of a minor traffic violation and killed an innocent bystander. *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), facts, including the undisputed facts in this case, rarely justify such an application. Defendants note the Fifth Circuit went on to state the year after the *Grandstaff* decision that "Grandstaff … does not stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy." *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986). The Coon decision also stated, "[t]he Grandstaff panel

emphasized the extraordinary facts of the case, and its analysis can be applied only to equally extreme factual situations." *Id.* (emphasis added). Thus, the Fifth Circuit has limited ratification to "extreme factual situations." *See Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir, 1998). In *Snyder*, the court refused to find ratification in a case involving an officer shooting a fleeing suspect in the back. *Id.* Further and again, as indicated above in *Coon*, 780 F.2d at 1161, a policymaker who defends conduct later shown to be unlawful has not ratified that conduct as a basis for municipal liability.

122.    In this case, there has been no such extreme unconstitutional conduct similar to that in *Grandstaff* which would allow municipal liability based upon post-incident ratification. In fact, there should not be any finding of any unconstitutional act(s) by Brister and/or Hancock, and the D.A. refused to bring charges after a thorough Texas Ranger's investigation. Accordingly, the conclusory ratification claims, to the extent Plaintiffs are even able to prove ratification of Defendants' actions by some City policymaker, which they have not, must be dismissed because there is no evidence any ratification caused this incident. Regardless, City policymakers are constitutionally allowed to comment on, or defend, their subordinate's actions, particularly constitutional actions.

123.    Finally, Plaintiffs have, in a conclusory fashion, also alleged Defendant inadequately trained and screened[9] its officers. *See* Doc. 24, ¶ 14.    For Plaintiff to sustain their claim the training/screening was constitutionally inadequate, Plaintiff must establish three elements:

(1)    the city's training, supervision, hiring, discipline procedures were inadequate;
(2)    the city's policymakers were deliberately indifferent in adopting the training, supervision, hiring, and discipline policy; and
(3)    the inadequate training, supervision, hiring, and discipline policy directly caused [was the moving force behind] plaintiff's injuries.

---

[9] Defendants are not sure what Plaintiffs' mean when they, in a conclusory fashion, use the phrase "inadequate … screening of police officers," as they do not associate "screening" with any particular activity, or otherwise define "screening" in any subsequently pled sentence. Therefore, the alleged "inadequate … screening" could conceivably, or arguably, apply during the training, supervision, discipline or hiring process. Therefore, Defendants will briefly address all 4 categories and establish no constitutional violation by Defendants herein.

*Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir.1996)(hiring and training); *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992)(hiring or training); *Zarnow*, 614 F.3d at 170 (training); *Goodman v. Harris County*, 571 F.3d 388, 395-96 (5th Cir. 2009)(training and supervision); *Graniczny v. City of El Paso*, 2011 U.S. Dist. Lexis 98182, * 16 (W.D. Tex., March 11, 2011)("All failure-to-act claims, such as [failure to adequately investigate and discipline, train and supervise] require that a plaintiff show the [3 elements listed above]"); *Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010)(training).

124.    With respect to inadequate training cases, the Eastern District of Texas has clearly held that officers and cities can avoid such claims if the officers have maintained their state officer's license through the Texas Commission on Law Enforcement Officer Standards & Education (TCLEOSE). *See Huong v. City of Port Arthur*, 961 F.Supp. 103, 107 (E.D. Tex. 1997) (stating "all that is required for the municipality to prevail in a claim based on inadequate training is compliance with state-mandated training standards for its officers"). Although the Fifth Circuit has not stated that compliance with state mandated training is dispositive, they have stated, "[w]e consider compliance with state requirements as a factor counseling against a 'failure to train' finding." *Zarnow v. City of Wichita Falls Tex.*, 614 F.3d 161 at 171 (5th Cir. 2010)(emphasis added).

125.    Further, with respect to causation, the Supreme Court has held it will not "suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct [since]…such a claim could be made about almost any encounter resulting in injury." *See City of Canton*, 489 U.S. at 391. Plaintiff must show that any alleged lack of training was so obvious to the city or the city supervisors that it would likely result in violations of constitutional law. *Benavidas*, 955 F.2d at 973. Allegations of inadequate training generally cannot be based on a single incident. *Wassum v. City of Bellaire*, 861 F.2d 453, 455 (5th Cir. 1988). To rely on a single incident, a limited and narrow exception, plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific

injury suffered, and that the failure to train represented the moving force behind the constitutional violation. *Estate of Davis*, 406 F.3d at 385-86. When a plaintiff cannot identify any facts or evidence regarding a pattern of deficient training or a specific deficiency, plaintiff's constitutionally deficient training claims fail. *Roberts*, 397 F.3d at 293 ("a plaintiff must allege with specificity how a particular training program is defective"); *Estate of Davis*, 406 F.3d at 382-83 and n. 34 (Plaintiff must demonstrate a pattern). Plaintiff "must demonstrate 'at least a pattern of similar violations arising from training that is so clearly inadequate as to be obviously likely to result in a constitutional violation." *Roberts*, 397 F.3d at 292 (citation omitted). When plaintiff fails to satisfy these elements, even in a shooting case (i.e., resident shot in the back fleeing on foot after a high-speed car chase), no liability can be had against the city. *Snyder v. Trepagnier*, 142 F.3d 791, 798-800 (5th Cir. 1998).

126. Inadequate supervision claims also require Plaintiff to demonstrate a pattern of similar incidents in which the citizens were injured. *Davis*, 406 F.3d at 382-83 and n. 34. "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to a specific violation in question." *Id.* at 383. A plaintiff seeking to recover for failure to supervise must prove the police chief failed to control an officer's known propensity for the improper use of force. *Roberts*, 397 F.3d at 292.

127. In failure to investigate and discipline cases where plaintiff cannot show investigations are "formalistic investigation[s] in which little evidence was taken, the file was bare, and the conclusions of the investigator were perfunctory," there is "no systematic inattention to the complaints," "[r]egardless whether one agrees or disagrees with the IAD conclusions exonerating [the officer]." *Piotrowski v. City of Houston*, 237 F.3d 567, 581-82 (5th Cir. 2001). Further, where plaintiffs cannot prove that the *defendant officer* was aware of the police department's alleged cursory or lax investigations and discipline, no liability can be had as there is no causation. *James v. Harris County*, 577 F.3d 612, 618 (5th Cir. 2009). Also any claims that a Department tolerates police misconduct are defeated if the evidence establishes that each incident is investigated and some officers

received discipline and the number of incidents are too few to demonstrate a pattern. *Lewis*, 289 Fed. Appx, 767, 774 (5th Cir. 2008).

128.    With respect to inadequate hiring cases, plaintiff must demonstrate the city's decision to hire or retain the officer(s) reflects deliberate indifference to the risk that a violation of the type that occurred in this case would occur or naturally flow from the allegedly improper hiring decision. *Centamor v. City of Houston*, 9 F.Supp.2d 717, 723 (S.D. Tex. 1997). Accordingly, it is not enough for plaintiff to show it was merely probable the governmental employee would commit this type of act, but that it was highly likely the governmental employee would commit the particular injury suffered by plaintiff. *Id; Bryan County*, 520 U.S. at 412 (same).

129.    Finally, allegations that a police force retained an officer for years notwithstanding the repeated investigations of his conduct and his pattern of making things up, as well as testimony from department personnel "to the effect that the [dept.] generally does not investigate an officer's conduct if no formal complaint is filed against him," does not create a fact issue of an "atmosphere which … engender[ed] excessive force," and "at most" only shows the police department "was negligent in not more aggressively monitoring Butler or regulating his conduct. Such evidence is insufficient to show that city regularly ignores, and thereby tacitly endorses, the use of excessive force and deliberate indifference by its officers." *Hinojosa v. Butler*, 547 F.3d 285, 296 (5th Cir. 2009).

130.    Considering the above, Plaintiffs have not put forth any evidence tending to establish an inadequate training or "screening claim," nor an inadequate supervision, discipline or hiring claim for that matter. Conversely, Defendants' expert has stated the City met hiring and screening requirements, and the officers involved were properly trained, as the officers here were licensed and trained by the state of Texas and TCOLE's qualifications, rules, and regulations for licensing and training (including on use of force and positional asphyxia), which have never been declared unconstitutional. Defendants have also established the two Defendant Officers involved both have extensive Texas State mandated and certified training, as well as years of experience, including in the

use of force, and the Kirbyville Police Department has a detailed written policy against the use of excessive force. Plaintiff has not identified any evidence nor produced any evidence tending to establish a constitutional deficiency in the training or a pattern of similar unconstitutional acts resulting from any allegedly constitutionally deficient training which was so clearly inadequate as to be obviously likely to result in a constitutional violation.

131.   Defendants have also established neither officer has any prior use of force complaints alleged against them; so, their retention or hiring by the City cannot possibly represent the hiring of someone with a propensity for excessive use of force.

132.   Defendants have further established there was also adequate supervision put in place prior to and during this incident, as Chief of Police Brister, and supervisor Patrol Sergeant Hancock, were both present during this incident, and Sergeant Hancock also supervised the two patrol officers under his direction, and Brister also helped ensure they all got their state required training.

133.   Additionally, any use of force incidents were to be reported to, and investigated by, Brister; however, since this incident involved Chief Brister, the Texas Rangers were immediately brought in to investigate, and the investigation results were turned over to the District Attorney, who decided not to bring charges against Brister and Hancock.

134.   There is also no evidence of any prior use of excessive or deadly force by any City of Kirbyville Police Department Officers. Thus, Plaintiffs have not identified any deficiency in training, hiring, discipline, or supervision, much less a deficiency that proximately caused this incident.

135.   Likewise, there are no prior indicators, or similar incidents, that were ignored, or went unaddressed, in such a way that a use of excessive force was the likely or highly probable result of the alleged inadequate training, screening, supervision, hiring, or discipline, nor is there any evidence the City or its Police Department was deliberately indifferent to same.

136. This singular incident simply does not establish, or amount to, an inadequate training, screening, supervision, hiring or discipline claim against Kirbyville under 42 U.S.C. § 1983; therefore, Plaintiffs' claims regarding same, if any, must be dismissed.

**VI.**
**CONCLUSION**

137. In conclusion, neither Defendant Officers Brister nor Hancock used excessive or deadly force upon Plaintiff Jones, nor did they act in an objectively unreasonable fashion under then existing law, during the incident in question, nor did they commit any act which violated the constitution and caused Jones' injury or death; and therefore, both Brister and Hancock are each entitled to qualified immunity and neither can be liable for their actions under 42 U.S.C. § 1983. Likewise, Defendant Kirbyville cannot be liable because none of its employees violated Plaintiff Jones' constitutional rights, and no Kirbyville formal written policy, nor any authorized practice or custom was the moving force behind any alleged violation of Plaintiff Jones' constitutional rights and resultant injury or death. Accordingly, Plaintiff's claims against all three Defendants should be dismissed with prejudice.

WHEREFORE, PREMISES CONSIDERED, Defendants, **CITY OF KIRBYVILLE, CHIEF PAUL BRISTER, AND OFFICER JOSH HANCOCK OF THE CITY OF KIRBYVILLE POLICE DEPARTMENT, IN THEIR INDIVIDUAL CAPACITIES**, pray that their Rule 56 Motions for Summary Judgment be granted, that Plaintiffs take nothing by reason of Plaintiffs' suit against them, and for such other and further relief to which Defendants may be justly entitled.

Respectfully submitted,

CALVERT EAVES CLARKE & STELLY, L.L.P.
Beaumont Tower
2615 Calder Avenue, Suite 1070
Beaumont, Texas 77702
Phone: (409) 832-8885
Fax: (409) 832-8886
E-MAIL: fcalvert@calvert-eaves.com

By: _____
Frank D. Calvert
State Bar No. 03667700
SD #4226

**ATTORNEYS FOR DEFENDANTS,
CITY OF KIRBYVILLE, CHIEF PAUL BRISTER,
AND OFFICER JOSH HANCOCK OF THE CITY
OF KIRBYVILLE POLICE DEPARTMENT, IN
THEIR INDIVIDUAL CAPACITIES**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was furnished to all counsel of record by:

___XX___ By Electronic Filing

on this __5th__ th day of August, 2016.

_____
Frank D. Calvert