EXHIBIT "A"

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                     BEAUMONT DIVISION

 4   SHAWNTEL BREED,              )
     INDIVIDUALLY AND AS          )
 5   REPRESENTATIVE OF THE        )
     ESTATE OF DUSTIN             )
 6   KEITH JONES,                 )
     DECEASED, AND AS NEXT        )
 7   FRIEND OF DJ AND CJ,         )
     MINOR CHILDREN               )
 8                                )
              Plaintiff           )
 9                                )
     VS.                          )  CIVIL ACTION NO: 1:15-CV-190
10                                )
     CITY OF KIRBYVILLE,          )  JURY DEMANDED
11   CHIEF PAUL BRISTER,          )
     AND OFFICER JOSH             )
12   HANCOCK OF THE CITY          )
     OF KIRBYVILLE POLICE         )
13   DEPARTMENT,                  )
     INDIVIDUALLY, AND IN         )
14   THEIR OFFICIAL               )
     CAPACITIES                   )
15                                )
              Defendants.         )
16
     * * * * * * * * * * * * * * * * * * * * * * * * *
17              ORAL AND VIDEOTAPED DEPOSITION OF

18               OFFICER JOSHUA C. HANCOCK

19                     MARCH 1, 2016

20   * * * * * * * * * * * * * * * * * * * * * * * * *
21     ORAL AND VIDEOTAPED DEPOSITION OF

22   OFFICER JOSHUA C. HANCOCK, produced as a witness at the

23   instance of the PLAINTIFF, and duly sworn, was taken in

24   the above-styled and numbered cause on MARCH 1, 2016,

25   from 10:05 A.M. to 1:09 P.M., before Carly Michelle
```

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

**Page 2**

1  Barton, CSR No. 8985, Louisiana CCR No. 2015004, in and
2  for the State of Texas, reported by machine shorthand and
3  computer-aided transcription, at the offices of Calvert
4  Eaves Clarke & Stelly, L.L.P., 2615 Calder Avenue,
5  Suite 1070, Beaumont, Texas 77702, pursuant to the
6  Federal Rules of Civil Procedure and the provisions
7  stated on the record or attached hereto.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1                    A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4    Mr. Ronnie Turner, Jr.
5    SBOT NO. 24075533
6    PROVOST * UMPHREY LAW FIRM, L.L.P.
7    490 Park Street
8    Beaumont, Texas 77701
9
10 FOR THE DEFENDANTS:
11   Mr. Frank D. Calvert
12   SBOT NO. 03667700
13   CALVERT EAVES CLARKE & STELLY, L.L.P.
14   2615 Calder Avenue, Suite 1070
15   Beaumont, Texas 77702
16
17 ALSO PRESENT:
18   Mr. Paul A. Robbins
19   LAW OFFICE OF PAUL A. ROBBINS
20   116 East Lufkin Avenue
21   Lufkin, Texas 75902
22
23
24
25

**Page 4**

1  VIDEOGRAPHER:
2    Mr. Paul Robichau
3    COMPLETE LITIGATION SUPPORT
4    490 Park Street
5    Beaumont, Texas 77701
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1                      I N D E X
2                                      PAGE
3  Appearances.......................... 3-4
4  Stipulations......................... 6
5
6  OFFICER JOSHUA C. HANCOCK
7    Examination by Mr. Turner...................... 6
8    Examination by Mr. Calvert.................... 107
9    Reexamination by Mr. Turner................... 108
10
11 Signature and Changes............................ 113
12 Reporter's Certificate........................... 115
13
14              E X H I B I T S
15 NUMBER  DESCRIPTION                          PAGE
16   1    Notice to Take Deposition.............. 10
17   2    Objections to Plaintiffs' Subpoena..... 10
18   3    Supplemental Disclosure................ 10
19   4    Officer Hancock History Report......... 22
20
21          C E R T I F I E D   Q U E S T I O N S
22 NUMBER                          PAGE/LINE
23          (NONE)
24
25

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1    THE VIDEOGRAPHER: We're on the record at
2  10:05.
3    (WITNESS SWORN)
4    THE REPORTER: Okay. Stipulations?
5    MR. CALVERT: Pursuant to the Rules.
6  I will state for the record that we filed an
7  objection to the subpoena duces tecum, and we'll ask that
8  that be attached as an exhibit to the deposition,
9  although, as I advised Counsel, Mr. Hancock did bring
10  some additional documents, which we did produce, and
11  those are all the documents that he has that are not
12  privileged documents.
13    MR. TURNER: Okay.
14      ***
15    OFFICER JOSHUA C. HANCOCK,
16  having been first duly sworn, testified as follows:
17      EXAMINATION
18      (10:05 A.M.)
19  BY MR. TURNER:
20    Q. Could you state your full name for the record,
21  sir.
22    A. Joshua Carrold Hancock.
23    Q. And the ladies and gentlemen of the jury can see
24  it, but could you tell them what do you do for a living?
25    A. I'm a sergeant at the police department in

6

1  Kirbyville.
2    Q. Okay. How would you like for me to refer to you?
3  Officer Hancock or Sergeant Hancock?
4    A. Josh is fine.
5    Q. Josh is fine?
6    A. Josh is fine.
7    Q. I will refer to you as Mr. Hancock. Okay?
8    A. That's fine.
9    Q. Mr. Hancock, have you ever given a deposition
10  before?
11    A. I have not.
12    Q. Okay. This is your first time?
13    A. Yes, sir.
14    Q. Okay. Well, I will give you a couple of ground
15  rules. You know, all of us have, obviously, already
16  been, you know, through depositions before. But what's
17  going on is basically -- I'm sure your Counsel has gone
18  over this -- our court reporter here is typing out
19  everything that's being said, okay, both my questions and
20  your answers.
21    And, so, we'll ask for her sanity if you will
22  do a couple of things. Okay? The first is to answer
23  verbally, you know, "yes" and "no," as opposed to
24  uh-huh's and huh-uh's or shaking or nodding of the head.
25  Okay? It's really hard for her to take it down and for

7

1  us to understand later what that meant. Is that fair?
2    A. Yes.
3    Q. Okay. And, secondly -- and this will be an
4  agreement between you and I -- she can't really take down
5  two people talking at the same time. So, I will make
6  sure that I will allow you to finish your answer before I
7  ask the next question, if you'll allow me to finish my
8  question before you answer it. Is that fair?
9    A. Yes.
10    Q. Okay. Thirdly, sometimes I ask bad questions or I
11  might ask questions that you don't understand. If you
12  don't understand the question, just ask me to rephrase
13  it. I'll be happy to do that. Okay?
14    A. Okay.
15    Q. In the same vein, if you don't understand -- if
16  you don't ask me to rephrase, then I'm going to assume
17  that you understood the question I was asking you. Is
18  that fair?
19    A. Yes.
20    Q. Okay. And you understand that you took an oath?
21    A. Yes, sir.
22    Q. And you understand what that oath means?
23    A. Yes, sir.
24    Q. Okay. Now, as your Counsel was briefly talking
25  about earlier, that we did issue what's called a

8

1  subpoena duces tecum, which, basically, asks you to
2  produce some documents for us.
3    And you did produce some documents?
4    A. Yes, sir.
5    Q. Okay. Okay. And from my review of the documents
6  that you -- that you submitted, it looks like it's an
7  e-mail conversation between you and Krissy Adams?
8    A. Yes, sir.
9    Q. Okay. All right. And that e-mail conversation
10  took place on May 14th, 2013?
11    A. I don't remember the exact date.
12    Q. If that's what it says on the --
13    A. Yes, sir. If that's what it says on the paper,
14  yes, sir, that's correct.
15    Q. Okay. Have you and her had any other
16  conversations via e-mail aside from these that you
17  produced today?
18    A. No, sir, not that I can remember.
19    Q. Okay. And, secondly, it looks like there is a --
20  maybe a copy of some cards with some phone numbers and
21  names on there. I'll just show it to you.
22    MR. TURNER: I'll go ahead and mark this --
23  this production in its entirety as exhibit --
24    (OFF-THE-RECORD CONVERSATION BETWEEN
25    MR. TURNER AND THE REPORTER)

9

1    MR. TURNER: We'll mark this as Exhibit 3 to
2    your deposition. We'll mark Exhibit 1 as your subpoena,
3    okay, your amended subpoena; and we'll mark Exhibit 2 as
4    the objections given to us by your Counsel today.
5        (EXHIBIT NOS. 1 THROUGH 3 MARKED)
6    Q. (BY MR. TURNER) Okay?
7    A. Okay.
8    Q. Okay. Now, could you just -- I'm giving you what
9    I've marked as Exhibit 3 to your deposition, the last
10   page is marked 000309 (tendering).
11       What is this? What am I looking at right
12   here?
13   A. This here, from what I can remember, this was the
14   family of Dustin's. They had come to speak to me. I
15   took down their phone numbers for cell, office, and
16   another cell phone number, and then they left me their
17   business cards with some information on it.
18   Q. Okay.
19   A. This here is just notes that I had taken on times
20   as the incident occurred. I've got marked as (reading):
21   Video, Calls to 911, and then the Call Logs. This --
22   this shows the checked-out time, the time that we called
23   pursuit, call from an individual, and then 614 is the
24   unit number of one of the deputies that checked out when
25   we called for assistance. That's his time that he

10

1    checked out.
2    Q. Okay. So, let's go over this real quick. Okay.
3    So, the video -- and that's the video that was taken by
4    Krissy Adams?
5    A. I'm not absolutely for sure --
6    Q. Okay.
7    A. -- what -- what that video is.
8    Q. Okay. Checkout time 9:02, tell me what that
9    represents again.
10   A. The time that we checked out on the call, on the
11   incident.
12   Q. Okay. So, this was the time that you left the
13   actual Kirbyville Police Department office or --
14   A. Normally the checkout time is whenever we arrive
15   on scene.
16   Q. Okay. All right. And then 9:04 what time you
17   said the pursuit began?
18   A. What I got noted here was the check for pursuit.
19   That would be the time that I called pursuit on the radio
20   for foot pursuit.
21   Q. Okay. All right. 9:10, it says -- what does it
22   say there?
23   A. My -- my notes say "Call from individual." I
24   don't know exactly what that is. I would have to go back
25   and check the actual call spring from the Sheriff's

11

1    Office, but I did note that it said "Call from
2    individual."
3    Q. Okay.
4    A. I don't know exactly what it was, though.
5    Q. And then "9:15, 614." You said that that was the
6    checkout time for another unit?
7    A. Yes, sir. 614 is the unit number for the deputy
8    that come out.
9    Q. Okay. And all these times are in the a.m.?
10   A. Yes, sir.
11   Q. Okay. And, so, this 9:15 time would be your
12   estimate of when Unit 614 arrived at the scene?
13   A. Yes, sir.
14   Q. Okay. And am I correct that all these are
15   estimates or were you looking at your watch when this
16   stuff happened?
17   A. No, sir. I was not looking at my watch. They are
18   all estimates.
19   Q. Okay. "Christy," that phone number there, is that
20   the witness on the scene?
21   A. I believe so. I believe that's Ms. Adams' phone
22   number.
23   Q. Okay.
24   A. I've got it noted as "witness," and that was the
25   only witness that I knew of, and then her e-mail address.

12

1    Q. Okay. And the last one is her e-mail address?
2    A. Yes, sir.
3    Q. Okay. Thanks.
4        Okay. Now, you are aware that I do represent
5    Dustin Jones and his family in the lawsuit that was filed
6    against you and the City of Kirbyville and the
7    Kirbyville Police Department?
8    A. Yes, sir.
9    Q. And at least for the purposes of this deposition,
10   that we are on opposite sides?
11   A. Yes, sir.
12   Q. Okay. I like to give a little kind of roadmap as
13   to where I go when I take depositions, just so you know.
14   First, we'll talk about you a little bit, background
15   information about you, you know, your name, your -- where
16   you are from -- that kind of thing -- work history,
17   education history. Okay?
18       Then after that, we'll talk a little bit
19   about your training history with Kirbyville Police
20   Department. Then we will talk a little bit about, you
21   know, the rules of the road when it comes to being a
22   police officer and what that is all about. And then we
23   will talk about this incident.
24       And then after that, I might have, you know,
25   some random questions for you. Okay?

13

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

**Page 14**

1    A. Okay.
2    Q. I will tell you, if there's ever anything that you
3    don't remember, I don't want you guessing. Just tell me
4    that you don't remember. Okay?
5         Also, this is not an endurance contest. So,
6    if you need to take a break, you know, I just ask that
7    you finish the last question I ask and then you can take
8    a break and do whatever. Okay?
9    A. Okay.
10   Q. All right. So, let's get started. You already
11   told us your name.
12        What is your date of b███, sir?
13   A. ████████
14   Q. And where were you born at?
15   A. Nederland, Texas.
16   Q. Did you grow up in Nederland?
17   A. No, Silsbee.
18   Q. Silsbee.
19   A. And then several other places. Do you want me to
20   tell you where all I was from?
21   Q. No. No. No. No.
22   A. Okay.
23   Q. Where did you go to high school at?
24   A. Port Neches.
25   Q. Okay. Okay. Did you graduate from Port Neches?

**Page 15**

1    A. A GED.
2    Q. Okay. And what institution did you get your GED
3    from? What institute did you get your GED from?
4    A. I don't remember. I don't -- I would have to
5    look.
6    Q. Okay. When did you get your GE- -- GED?
7    A. Senior year.
8    Q. What year would that be?
9    A. I don't remember that either.
10   Q. Okay. 1984. Maybe 2003? Would that sound about
11   right?
12   A. I don't remember, I really don't.
13   Q. Okay. Okay. Have you done any -- any type of
14   coursework, you know, educational work after you
15   received your GED?
16   A. Yes.
17   Q. What's that?
18   A. Criminology at LIT, terrorism law, I took a course
19   in it. And I would have to look on the others to see
20   what they were.
21   Q. Did you receive any type of degree or certificate
22   from LIT?
23   A. No, sir.
24   Q. Okay. Are you currently married?
25   A. Yes, sir.

**Page 16**

1    Q. What's your wife's name?
2    A. Stacey.
3    Q. Stacey.
4    A. S-T-A-C-E-Y, Hancock.
5    Q. Do you have any children?
6    A. Three.
7    Q. Okay. Are they minors?
8    A. Yes.
9    Q. Okay. And I don't need their names, but can you
10   tell me are they two girls, a boy, what?
11   A. Two boys, one girl.
12   Q. Two boys, one girl.
13        Is the boy the oldest?
14   A. He is.
15   Q. Okay. Do you have any family members that reside
16   in either Jefferson, Hardin County, Orange County --
17   yeah, Orange County -- with the last name other than
18   Hancock?
19   A. My mom's last name is not Hancock anymore.
20   Q. Okay. What is your mom's last name?
21   A. Her last name is Gordy now, G-O-R-D-Y.
22   Q. Okay. Anybody else?
23   A. My Uncle Terry, he lived in Nederland, but I don't
24   think he's living in Nederland anymore. I don't know
25   where he is living at.

**Page 17**

1    Q. Okay. And I will tell you, I am just asking you
2    because, you know, in case this case -- in case this case
3    goes to a trial, you know, we don't want anybody, any of
4    your family members --
5    A. Right.
6    Q. -- on the jury.
7         So -- so, all you can think of is Gordy right
8    now?
9    A. Yes, sir.
10   Q. Okay. Okay. Now, what was the first job that you
11   held after you got your GED?
12   A. I had a wrecker service in -- south end of
13   Jasper County.
14   Q. What was the name of that wrecker service?
15   A. Topline, T-O-P-L-I-N-E.
16   Q. And were you the owner/operator?
17   A. Me and my dad.
18   Q. Okay. How long -- how long did you and your dad
19   have the wrecker service?
20   A. A couple of years.
21   Q. Okay. And what was the next job that you held
22   after the wrecker service -- well, first of all, what
23   happened with the wrecker service? Y'all just...
24   A. It wasn't doing very well. So, I decided to go to
25   the police academy and he went back to his business,

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1   house moving.
2     Q. Okay. Okay. Where did you go to the police
3   academy at?
4     A. LIT.
5     Q. LIT.
6         Did you graduate from the police academy
7   there?
8     A. I did.
9     Q. Do you remember about when you graduated from the
10  police academy?
11    A. 2006.
12    Q. Okay. Okay. How long is -- is the program at LIT
13  for the police academy? How long does it last?
14    A. About six months.
15    Q. Okay. What kind of things did you learn in that
16  six months?
17    A. Well, Penal Code, Code of Criminal Procedure,
18  Traffic Code, use of force, constitution. I can't think
19  of everything that we -- that we went through. It was so
20  much.
21    Q. Did y'all do any type of self-defense training at
22  LIT?
23    A. We did.
24    Q. And you said that y'all -- one of the -- one of
25  the things that y'all learned about while you were there

18

1   was the use of force?
2     A. Uh-huh.
3     Q. Okay.
4     A. Yes, sir.
5     Q. Okay. Okay. And what did you do next after you
6  graduated from the police academy?
7    A. Went to work for Newton County Sheriff's Office.
8    Q. Okay. What was your job title once you got to
9  Newton County?
10    A. I was a patrol deputy, initially.
11    Q. And tell us what the duties are for patrol deputy.
12    A. To respond to calls, keep the peace, more or less.
13    Q. How long were you a patrol deputy?
14    A. Well, for about a year, that was all that I done
15  was patrol -- I was a patrol officer. After about a
16  year, I was a narcotics officer.
17    Q. Okay. And how -- how did your job duties for a
18  narcotics officer differ from a patrol deputy?
19    A. I still responded to calls, I still answered
20  calls. It was -- the narcotics officer was more based on
21  drugs than it was anything, control of drugs.
22    Q. Okay. And how long were you a narcotics officer?
23    A. I don't remember how exactly long that it was.
24    Q. Uh-huh.
25    A. Right before I left Newton County I was made the

19

1   patrol sergeant in Newton County. So, right up until the
2  last year that I was there.
3    Q. Okay. And what's the difference between a patrol
4  deputy and a patrol sergeant?
5    A. With Newton County, not a whole lot. I still
6  answered calls. I was just responsible for all the
7  deputies that were out on the street.
8    Q. And what responsibilities did you have with regard
9  to those deputies?
10    A. Making sure their cases were put together, making
11  sure they had all their equipment that they had, if they
12  got into a situation that they didn't know about or were
13  unsure about, they called me for assistance, for help.
14    Q. Is patrol sergeant a -- a promotion from a
15  narcotics officer?
16    A. Yes, sir.
17    Q. Okay. Okay. Do you know why you were at -- okay.
18  I'm sorry.
19        Was -- was patrol sergeant the last job that
20  you held while you were in Newton County?
21    A. Yes, sir.
22    Q. Okay. As a -- as a peace officer?
23    A. Yes, sir.
24    Q. Okay. Now, it's my understanding that after you
25  were a patrol sergeant, you were a jailer for a while.

20

1   Is that true?
2     A. No. It was at the same time. In Newton County
3  we -- we didn't have a big jail staff. So, we were
4  responsible for booking in our own inmates. So, the
5  Sheriff sent us all to jail school. That's why we become
6  jailers.
7    Q. Okay. So, I saw some documents that you guys
8  produced and it said that those are -- you know, that you
9  were a jail officer. So, at the time where it says "jail
10  officer," you also would have been a patrol sergeant as
11  well?
12    A. I would have to look and see what the date was
13  that I received my jailer's license.
14    Q. Okay.
15    A. But, like I said, the Sheriff sent us all to jail
16  school to become jail certified so we could book in our
17  own inmates and we would --
18    Q. And would -- I'm sorry. Tell me what the language
19  is. It's jail what? The exact, it's called a jail
20  officer or jail...
21    A. A jailer is what we called it.
22    Q. A jailer? Okay.
23    A. Yes, sir.
24    Q. Okay. Now, is being a jailer, is that a
25  promotion, demotion from being a patrol sergeant or is

21

| | |
|---|---|
| 1   it -- | 1   MR. CALVERT: Object to the form. |
| 2   **A. It's -- it's neither in that circumstance because** | 2   MR. TURNER: Okay. |
| 3   **it was just a license that we held so we could book** | 3   MR. CALVERT: He testified he wasn't just a |
| 4   **people in jail. We were still all deputies. Every one** | 4   jailer. So -- |
| 5   **of the deputies, including the supervision, went through** | 5   MR. TURNER: Oh, okay. |
| 6   **jail school.** | 6   MR. CALVERT: I'm not objecting to the date |
| 7   Q. Uh-huh. | 7   issue. |
| 8   **A. So, we didn't actually change job titles. We just** | 8   Q. (BY MR. TURNER) Okay. So -- but at least for -- |
| 9   **received a license to be a jailer.** | 9   as for the date, that would have been the end of the date |
| 10   **(EXHIBIT NO. 4 MARKED)** | 10   where you were working with Newton County Sheriff's |
| 11   Q. (BY MR. TURNER) Okay. I want to show you, it's a | 11   Office? |
| 12   "F5 History Report" for Joshua Hancock. | 12   A. Yes, sir. |
| 13   MR. TURNER: It's -- it is Kirbyville -- | 13   Q. Okay. Are you aware of any complaints that were |
| 14   it's identified by Bates -- Bates marked as | 14   lodged against you while you were working at |
| 15   "Kirbyville 000214." I will make this a fourth -- is it | 15   Newton County Sheriff's Office? |
| 16   4? | 16   A. No, sir. |
| 17   THE REPORTER: Uh-huh. | 17   Q. Are you aware of any lawsuits that were filed -- |
| 18   MR. TURNER: Fourth exhibit to your | 18   filed against you for excess of force while you were at |
| 19   deposition. | 19   the Newton County Sheriff's Office? |
| 20   You want to see this? | 20   A. No, sir. |
| 21   MR. CALVERT: Okay. | 21   Q. Okay. What's the next place you worked after -- |
| 22   Q. (BY MR. TURNER) Okay. Okay. You see -- you see | 22   after Newton County? |
| 23   what I'm saying there, is that right here it says from, | 23   **A. Kirbyville Police Department.** |
| 24   basically, 2007 until 2012, Newton County Sheriff's | 24   Q. Okay. And do you still currently work for |
| 25   officer -- I'm sorry -- Sheriff's Office, Peace Officer, | 25   Kirbyville Police Department? |
|                                           22 |                                           24 |

| | |
|---|---|
| 1   Peace Officer license; is that correct? | 1   **A. Yes, sir.** |
| 2   **A. Yes, sir.** | 2   Q. Okay. Before we talk about your work with |
| 3   Q. All right. And then the next thing it has, you | 3   Kirbyville, let me ask you this question: What made you |
| 4   know, as of November -- yeah, November -- I'm sorry. | 4   decide to become a police officer? |
| 5   December 16th, 2011, Newton County Sheriff's Office | 5   **A. Well, I wanted to help people.** |
| 6   jailer/jailer license. Right. | 6   Q. Is there any reason why, you know, a police |
| 7   And, so, at this point you would also have | 7   officer as opposed to a nurse or opposed to some other |
| 8   been a patrol sergeant as well? I guess that's my | 8   job that helps people? |
| 9   question. | 9   **A. Well, that's kind of a hard question. As a police** |
| 10   **A. In 2011, yes.** | 10   **officer, I'm also a fireman and a first responder. So, I** |
| 11   Q. Okay. | 11   **do a little bit of it -- of it all. It kind of gives me** |
| 12   **A. Yes, sir. And it was just a jailer's license. I** | 12   **a wide range of stuff that I can do to help people.** |
| 13   **wasn't actually designated as a jailer.** | 13   Q. Okay. Do you recall when you began your |
| 14   Q. Okay. Okay. I just asked that question because | 14   employment with -- with the Kirbyville Police Department? |
| 15   going -- going through the paperwork, at least that we | 15   **A. I don't remember the exact date.** |
| 16   got, I never saw a designation as a -- as a patrol | 16   Q. Do you remember the year? |
| 17   sergeant, but you don't know why that is or why that's | 17   **A. I believe it was '12, just short time after I left** |
| 18   not... | 18   **Newton.** |
| 19   ~~A. No, sir, I wouldn't be able to answer that.~~ | 19   ~~Q. What was the reason why you left Newton County?~~ |
| 20   Q. Okay. All right. And going back to this | 20   **A. Employment for the Kirbyville Police Department.** |
| 21   document. It says that you had stopped -- the end date | 21   Q. Okay. So, the only reason was because you thought |
| 22   for you being a jailer was November 9th of 2012. | 22   Kirbyville was a better job or was getting paid more? |
| 23   Would that also have been around the end date | 23   **A. At the time, yes.** |
| 24   of you -- your work for Newton County Sheriff's Office? | 24   Q. Okay. So, there were no problems at Newton County |
| 25   **A. Yes, sir.** | 25   that made you leave? |
|                                           23 |                                           25 |

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

A. No, sir.

Q. Okay. When you began working for Kirbyville, what was your job title?

A. I was just a patrol officer.

Q. Patrol officer.

And your duties as a patrol officer for Kirbyville, were they about the same as your job duties for -- as a patrol officer with Newton County?

A. Well, the only addition was that we -- we enforced the traffic code more in Kirbyville. We write more tickets than we did in Newton County.

Q. And why is that? Why -- why is that? I mean, was that something that somebody told you-all to do or was that just a part of the policy in Kirbyville or...

A. Well, we don't have a policy for writing tickets. It's just one of our job duties.

Q. Do you feel like there were more traffic infringements in Kirbyville than there were in Newton?

A. I do.

Q. Okay. Okay. How long were you a -- how long were you a patrol officer with Kirbyville Police Department?

A. I don't remember exactly how long.

Q. Okay. Did you eventually move to another position?

A. To patrol sergeant.

26

Q. Okay. As patrol sergeant with Kirbyville, how many officers were you -- well, let me ask you this first: Were the job duties as a patrol sergeant in Kirbyville about the same as they were in Newton or were they different?

A. Whenever it come to dealing with employees with the -- the other officers, yes. I have more office duties with Kirbyville than I had with Newton.

Q. When you say "office duties," what do you mean?

A. I keep up with the Uniform Crime Report for Kirbyville, as well as the evidence room. I did not have that in Newton County.

Q. Okay. As patrol sergeant were you still responsible for patrol officers?

A. Yes.

Q. Okay. How many patrol officers were you responsible for at Kirbyville?

A. Now in Kirbyville?

Q. Well, let's -- let's say on May 14th, 2013.

A. Just two at the time.

Q. Two.

And tell me again what your responsibilities were with regard to those two officers.

A. Made sure that they keep their cases. I would put their cases together and bring them to the District

27

Attorney's office. I kept up with their equipment in their vehicles. I made sure their vehicles were running properly. If they had any issues that they needed to be addressed with equipment or vehicles or work, then they would come to me for -- if they had any problems that they didn't know how to deal with, they would come to me for it.

Q. How does one move from a patrol officer to a patrol sergeant in Kirbyville? Does somebody have to nominate you or, you know, or is that an appointed job or is that just a natural -- that just happens after so many years?

A. It's -- it's selected by the Chief.

Q. Okay. And who was the Chief that selected you to be a patrol sergeant?

A. Paul Brister.

Q. Okay. What is your understanding of the duties of the Police Chief of Kirbyville?

A. Well, I don't understand your question.

Q. Okay. What is your understanding of the responsibilities that the Police Chief has, I guess, as opposed to, say, a patrol sergeant or a patrol officer? What extra responsibilities, is it your understanding, that the Police Chief has at Kirbyville?

A. He's responsible for the whole department.

28

Q. He oversees all the officers?

A. Yes, sir.

Q. Set -- does he set the policies?

A. Yes, sir.

Q. Is he in charge of training the officers?

A. He's in charge of making sure that we have training.

Q. Does he choose what training that y'all have to undergo and which ones y'all don't?

A. Well, he's -- he doesn't select. We have mandatory training that we are required by TCOLE that we are to take yearly. So -- but any other training the officers may want then, yes, he would send them to.

Q. Is it fair to say with regard to, you know, all the officers at Kirbyville Police Department that, you know, he has the ultimate say in what goes on?

A. It depends on the situation.

Q. Okay. And what situations do you feel like he wouldn't or -- or would, whichever one? I'm just trying to get a more -- a better understanding.

So, when wouldn't he have the ultimate say and when would he?

A. Well, there were certain -- certain things with the police department that the city council would have to approve.

29

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1    Q. Okay. Is there anything you can think of off the
2 top of your head that the city council would have to
3 approve?
4    A. I can't -- I know purchasing is one. I can't
5 think of all of them.
6    Q. So, maybe more budgetary concerns?
7    A. Some of them, yes, sir.
8    Q. Okay. I guess but with how the actual police
9 department is -- is ran, that's something that
10 Chief Brister would have the most say over?
11    A. Correct.
12    Q. At the time when this incident happened on
13 May 14th of 2013, you were a patrol sergeant?
14    A. Yes, sir.
15    Q. Okay. Excuse me. When you moved from
16 Newton County to Kirbyville, did you have to go -- did
17 you have to undergo any special or additional training?
18    A. The move from the sheriff's office to the police
19 department?
20    Q. The move from Newton County to Kirbyville. Did
21 Kirbyville require you to do any additional training?
22    A. No, sir.
23    Q. Okay. Let's talk about the training that you did
24 while you were at Newton. You talked -- you talked about
25 you had some use of force -- wait. Hold on. Let's talk

30

1 about training.
2    Could you tell me what type of training --
3 well, first of all, when you went to Newton County, did
4 you undergo any special training outside of what you had
5 underwent at LIT at the police academy?
6    A. No, sir.
7    Q. Okay. So, what did the -- what do you recall
8 about what the police academy trained -- trained you with
9 regard to use of force? And we will -- I will limit it
10 down to use of force while attempting to make an arrest.
11    A. I don't understand your question exactly. Are you
12 wanting the entire for use of force? It would all depend
13 on the situation.
14    Q. Okay. Let's -- let's do it like this. I might --
15 I think that I might be a little bit off on some -- some
16 definitions. So, let's -- let's -- we'll go through it
17 like that. Okay?
18    A. Okay.
19    Q. What is the difference between a detention and an
20 arrest, or is there a difference?
21    A. Well, yes. Detention, if you were being
22 stopped -- if you were being pulled over on the side of
23 the road, say, for a traffic offense, that's a detention.
24 An arrest would be if I was to take you into custody for
25 an offense that occurred.

31

1    Q. Okay. And at what point would you say somebody is
2 in custody? When the handcuffs are put on them? When,
3 you know -- I guess, how do you know when somebody is in
4 custody as opposed to just being detained?
5    A. If I -- if I've told you "I'm placing you under
6 arrest," I would consider that, that you are in custody.
7    Q. Okay. Okay. And I want to talk to you about use
8 of force, but I am going to break this down in two
9 different categories: Just use of force and then use of
10 deadly force. Okay?
11    Is that a fair separation?
12    A. Yes.
13    Q. Okay. When is it your understanding that officers
14 are allowed to -- to use force in order to help them
15 either detain or -- well, let me ask you this first --
16 strike that.
17    Let me ask you this question first: Are you
18 guys allowed to use force in order to detain a suspect?
19    A. Depending on the detention.
20    Q. Well, why don't you tell me about that?
21    A. Well, there's such a wide range. It would depend
22 on the circumstance, would be what I'm referring to.
23    Q. Okay.
24    A. Just detaining somebody on a traffic stop? No, we
25 wouldn't use force for that.

32

1    Q. Okay.
2    A. It would just depend.
3    Q. Okay. So, generally -- in which we are talking in
4 generalities, right, unless something crazy happened,
5 right, unless somebody at a traffic stop pulled out a
6 knife, or something like that. Generally when you are
7 just trying to detain somebody, use of force is generally
8 not necessary. Is that -- is that a fair statement?
9    A. Yes.
10    Q. Okay. Okay. And, so, generally, use of force in
11 a traffic stop would not be okay, you know, with
12 Kirbyville Police Department?
13    A. Yes.
14    Q. Okay. So, now, when it comes to arrests, again,
15 you, obviously, you don't want to -- is it fair to say
16 you obviously don't want to use force, unless you have
17 to, to make an arrest. Is that a fair statement?
18    A. Yes.
19    Q. Okay. But -- but it's more allowable, I guess, to
20 use force in an arrest than just than while -- while a
21 person is under detention. Is that fair?
22    A. I don't understand your question --
23    Q. Okay.
24    A. -- what your...
25    Q. It might have been a bad question.

33

**34**

1    Well, let me ask you this -- a different
2    question. When you are trying to make an arrest, under
3    what circumstances, is it your understanding, that use of
4    force is okay?
5        A. That would be another one that would depend on the
6    circumstance. If -- depending on what the person is
7    doing, whether use of force or what use of force was
8    needed.
9        Q. Okay. So, I guess that's what I'm asking. In
10    what circumstances would you say, okay, under this
11    circumstance use of force is -- is okay?
12        A. If a person is resisting arrest, there's a mound
13    of use of force, it would depend on what type of
14    resistance. The -- them having a weapon would be
15    justified for use of force, depending on what kind of
16    weapon and what threat they are to you.
17        Based on the threat that they are to you or
18    to someone else would determine use of force.
19        Q. Okay. Okay. And, so, what I got -- what I wrote
20    down is use of force to make an arrest is okay when the
21    person is resisting arrest, when they use some type of
22    force against you, if they have a weapon and maybe they
23    are threatening you with a weapon, or if they just
24    threaten the officer in general -- or if they -- let me
25    say it a different way -- if they are a threat to the

**35**

1    officer or to the public at large.
2        Is that -- is that a good sum up of the times
3    when you feel like it's okay to use force during arrest?
4        A. It all depends -- it all depends on the
5    circumstance.
6        Q. Okay. But in those four circumstances, you would
7    say that it's okay to use force?
8        A. Could you read them to me again?
9        Q. Yeah. When they are resisting arrest, when they
10    use some type of -- when they use some type of force
11    against you, if they have a weapon, or if they make some
12    type of threat against you or against the public
13    generally.
14        A. Depending on the threat that they are making
15    would -- would determine whether use of force. If it's
16    just verbal, then, no, there wouldn't be use of force.
17        Q. Okay.
18        A. If they had -- if they had one of the others, a
19    weapon and they were making a threat towards someone
20    else, then yes.
21        Q. Okay. What about if a person is attempting to
22    evade arrest, is use of force okay at that point in
23    Kirbyville?
24        A. If all they are doing is evading?
25        Q. (Nodding head up and down)

**36**

1        A. Whatever force is necessary to make the arrest.
2    It would -- it all depends on the circumstance.
3        Q. Okay. And, again, I'm not talking about use of
4    deadly force. I'm just talking about use of force.
5        A. Right.
6        Q. You know, if you are trying to arrest somebody and
7    they try to evade the arrest, at that point, under
8    Kirbyville's rules or policies or customs, is it okay to
9    use force in order to -- to make the arrest?
10        A. The minimal amount of force, yes.
11        Q. And would you say that that is generally true,
12    that no matter what type of force you are using, you need
13    to use the minimum amount of force in order to -- to make
14    the arrest or make the detention, or whatever?
15        A. Correct.
16        Q. Okay. And that's just true as a police officer
17    generally?
18        A. Yes.
19        Q. Could you define resisting arrest for me?
20        A. I don't have the definition for it. Do you --
21        Q. In your own words.
22        A. If I have advised somebody that they are going to
23    be placed under arrest and they begin to try and get away
24    from me, pull away, anything other than comply with what
25    they are being arrested for.

**37**

1        Q. Okay. I assume, but you tell me, does resisting
2    arrest -- I assume that resisting arrest is done
3    physically as opposed to verbally? I mean, if -- to kind
4    of clarify my question. If you are arresting somebody
5    and they were saying, no, no, no, I don't want to be
6    arrested, I don't want to be arrested, but, you know,
7    they were complying while you put the handcuffs on them,
8    would you consider that to be resisting arrest?
9        A. No, sir.
10        Q. Okay. So, it has to be some type of physical
11    elements to resisting arrest?
12        A. Yes, sir.
13        Q. Okay. "Imminent threat of serious bodily injury
14    or death." We'll break that down just a little bit.
15        And -- are you familiar with that phrase?
16        A. Yes, sir.
17        Q. Okay. In that phrase, what does "imminent" mean
18    to you?
19        A. Imminent?
20        Q. Uh-huh.
21        A. That you are on the verge of it happening.
22        Q. And to you would that be -- would that be a matter
23    of, you know, if it's going to happen 30 minutes from
24    now, would you consider that to be imminent?
25        A. No, sir.

Q. Okay. If it's going to happen a couple of minutes from now, would you consider that to be imminent?

A. Depending on the circumstance.

Q. Okay. But definitely if it's going to happen in a matter of seconds, that's -- that's really what the imminent he was talking about?

A. Yes, sir.

MR. CALVERT: Object to the form.

Q. (BY MR. TURNER) Okay. And "serious bodily injury." What is your understanding of what -- what constitutes serious bodily injury in that -- in that phrase?

A. Well, an injury that would be considered serious. It would be depending on what you are referring to. Broken bones, severe cuts, lacerations. It would just depend.

Q. You wouldn't consider being bruised, that's not a serious bodily injury?

A. No, I wouldn't.

Q. Okay. Would it be fair to say that a serious bodily injury is a bodily injury that's going to have some type of, maybe, lasting effect on the person who the injury happens to?

A. That depends, too. Some serious bodily injuries don't have a long-lasting effect. It would depend on the

38

person, I would think. It would just depend. Depending how long you are referring to as a long time.

Q. Okay. Well, let me ask you -- let me ask the question you just posed. What serious bodily injury do you think applies with this phrase that wouldn't have a lasting effect on an individual?

A. Impeding someone's breath, that -- I mean, it would just depend. I don't know them all, but I am sure there are a few.

Q. You feel like impeding someone's breath is a serious bodily injury?

A. Could be, yes.

Q. Okay. And you said it "could be." Would you say generally it is or generally it is not?

A. When somebody is not breathing, that is pretty serious. I would think so.

Q. Okay. And the phrase is "imminent threat of serious bodily injury or death." We all know what death is; right?

A. Correct.

Q. Okay. Okay. "Poses a serious threat to himself or others." What factors do you use in order to determine whether or not a person "poses a serious threat to himself or others"?

A. The manner in which they are acting, whether they

39

are armed or unarmed, would be probably the best way.

Q. You said "whether they are armed or unarmed," is one of the best ways?

A. And the manner in which they are acting, yes.

Q. Okay. And, so, those two go together kind of?

A. Well, you can be a threat to somebody else even unarmed, depending on how that you are acting.

Q. And you could be armed and not --

A. And not be a threat.

Q. -- and not be a threat?

A. That's right.

Q. Okay. One way you would know if somebody poses a serious threat to others is if they say, "When I get out of here, I'm going to go do something bad towards somebody else"?

A. Re-- re-- say it again.

Q. Yeah. Sure.

One of the ways that you know whether or not a person is going to be a serious threat to himself or others is maybe if they say it, you know, they say either, "If I get out of here I am going to kill myself," or "If I get out of here I'm going to kill somebody else"? That's one of the ways that you could tell if a person is --

A. Not always.

40

Q. Okay. Why don't you explain?

A. Well, some people will say things like that just to -- while they are enraged or mad that they will say things that they don't mean. Just because they say it, don't mean that they are going to do it.

Q. And, so, is your job as a police officer to judge the situation and --

A. To determine --

Q. -- to make the determination -- I'm sorry -- to make the determination of whether or not, regardless of what they say, they are actually a serious threat?

A. Yes, sir.

Q. Okay. Do you know what the definition of deadly force is?

A. I don't know the definition.

Q. Okay. What is your definition?

A. Of deadly force? It would be to cause death. It would be a use of force that would cause death.

Q. Can a person use deadly force without intending to cause death?

A. Yes.

Q. Okay. Okay.

MR. TURNER: How long have we been going for?

(OFF-THE-RECORD DISCUSSION BETWEEN MR. TURNER AND THE REPORTER)

41

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1    MR. CALVERT:  Why don't we take a break real
2  quick, if that's okay?
3    MR. TURNER:  That's fine.
4    THE VIDEOGRAPHER:  We are off the record at
5  10:56.
6    (RECESS TAKEN AT 10:56 A.M. TO 11:09 A.M.)
7    THE VIDEOGRAPHER:  We are back on the record
8  at 11:09.
9  Q. (BY MR. TURNER)  Okay.  You ready to go?
10  A. I'm ready.
11  Q. Okay.  We took a quick break?
12  A. I did.
13  Q. Okay.  I think we just got through talking about
14  deadly force I think a little bit; is that correct?
15  A. Yes.
16  Q. Do you know what an impact weapon is?
17  A. Yes.
18  Q. What is an impact weapon?
19  A. ASP baton.  I believe there's a few more out on
20  the market that they use.
21  Q. What -- what -- I think it's a SLK flashlight, is
22  that what the -- the flashlight -- the police-issued
23  flashlight, would that be considered an impact weapon?
24  A. Depending on the circumstance.
25  Q. Okay.  It could be?

42

1  A. Yes.
2  Q. Okay.  How tall are you, Mr. -- Mr. Hancock?
3  A. 6'1".
4  Q. 6'1".
5    And how much do you weigh?
6  A. Now about 215.
7  Q. 215.
8    What did you weigh on May 14th, 2013?
9  A. A little under 200.
10  Q. Okay.  Right now you have on standard -- is it the
11  standard equipment that the police officers at Kirbyville
12  should have on them?
13  A. I don't carry everything that the other guys
14  carry.
15  Q. Okay.  All right.  How much would the -- how much
16  does the equipment that you carry normally, how much does
17  that weigh?
18  A. What all equipment?  Just what we keep on our belt
19  or vest included?
20  Q. Everything included.
21  A. Everything included?  Anywhere from 20 to
22  30 pounds.
23  Q. Okay.  On the day when this incident happened, did
24  you have, you know, full gear on?
25  A. Yes.

43

1  Q. Okay.  And full gear, what is -- what all does
2  that include?
3  A. What I had on that day?
4  Q. Yes.
5  A. That day would be a -- vest, armored vest.
6  Q. How much does the vest weigh?
7  A. Probably 15 pounds, maybe a little less.
8  Q. Armored vest.  What else?
9  A. My sidearm, pair of handcuffs, a Taser, a radio, a
10  magazine, pouch with magazine.  That's usually it on our
11  equipment.
12  Q. Okay.  What type of firearm do you carry?
13  A. At the time or now?
14  Q. At the time.
15  A. At the time.  A Glock .40 caliber.
16  Q. What size clip is there in a Glock .40 cal -- or
17  in a Glock .40 cal that you were carrying at the time
18  when this happened?
19  A. What size?
20  Q. I guess, how many bullets?
21  A. How many rounds?  About 15.
22  Q. 15.
23    And you said that all of that stuff together
24  weighs about 30 -- between 20, 30 pounds, you said?
25  A. A guesstimate.

44

1  Q. Okay.  Could you -- could you tell me about how
2  much you think your radio weighs?
3  A. A couple of pounds.
4  Q. A couple of pounds.
5    One to two pounds?  Would you say one to two
6  pounds?
7  A. Yes.
8  Q. Handcuffs not that much?
9  A. No, sir.
10  Q. What about your sidearm?  How much would -- was
11  your gun fully loaded when this incident occurred?
12  A. Yes.
13  Q. Okay.  How much would a fully -- fully-loaded
14  Glock .40 weigh, in your approximation?
15  A. Four to five pounds, maybe.
16  Q. Okay.  Okay.  Okay.  Okay.  Let's talk about a
17  couple of the rules -- rules of the road, is what I call
18  them.  And it just means that, you know, things that we
19  probably could agree to.  Like, for example, the job of a
20  police officer generally is to protect the peace?  The
21  job of a police officer generally is to protect the
22  peace?
23  A. Yes.
24  Q. To keep people safe?
25  A. Yes.

45

1    Q. Enforce the laws?

**Page 46**

1    Q. Enforce the laws?
2    **A. Yes.**
3    Q. As a police officer you are aware that a suspect
4  is innocent until proven guilty?
5    **A. Yes.**
6    Q. And that's true even if you have probable cause to
7  arrest that person?
8    **A. Yes.**
9    Q. And you are aware that suspects have the right to
10  be freed from excessive use of force by police officers?
11   **A. Yes.**
12   Q. And you are aware that everybody has the right to
13  their life?
14   **A. Yes.**
15   Q. One of the things when you are trying to
16  accomplish an arrest or detention is to do so as safely
17  as possible?
18   **A. Yes.**
19   Q. All right. Safely for you?
20   **A. And the other person.**
21   Q. And the other person?
22   **A. Yes, sir.**
23   Q. And other potential bystanders?
24   **A. Yes, sir.**
25   Q. Would you agree with me that a person's -- that

46

**Page 47**

1    their right to their own life is higher than the
2  Government's right -- let me rephrase that. Scratch
3  that.
4      Do you believe that a person's interest in
5  their life is greater than the Government's interest in
6  serving an arrest warrant, for example?
7    **A. I don't understand your question completely.**
8    Q. Okay. Well, I'm sorry. Go ahead, finish what you
9  are saying.
10   **A. Well, I was going to ask you if you were asking me**
11  **if an arrest warrant is -- if a person's life is worth an**
12  **arrest warrant?**
13   Q. Yes.
14   **A. No.**
15   Q. Okay.
16   **A. No.**
17   Q. Okay. Meaning, if you have to take somebody's
18  life in order to give an arrest warrant, the better
19  option, as opposed to taking somebody's life, would be
20  just don't issue that person an arrest warrant?
21    MR. CALVERT: Object to the form.
22   **A. It would depend on the circumstance.**
23   Q. (BY MR. TURNER) And I agree with that. Let's
24  say -- let's say if that person was not a threat to
25  themselves or not an imminent threat to themselves or the

47

**Page 48**

1    public at large, you would agree with me then if the
2  options are kill -- kill the person to serve them an
3  arrest warrant or not serve them the arrest warrant at
4  that time, you would wait until later to serve them the
5  arrest warrant?
6    **A. I don't understand your question completely about**
7  **how that you are asking it.**
8    Q. Uh-huh.
9    **A. The only way that we would use deadly force was if**
10  **it was justified. If I was trying to protect another**
11  **person, myself, or someone in the public. It would just**
12  **depend on the circumstance.**
13   Q. And I guess -- my question is just generally, the
14  person's interest in being alive is greater than the
15  Government's interest in trying to issue an arrest
16  warrant. Would you agree with that statement?
17   **A. That's -- that's one of the things that would**
18  **depend on the circumstance. I know kind of what you are**
19  **saying is that -- a person's life is priceless. It's not**
20  **something that I could say just because I was serving**
21  **them an arrest warrant, that that would be justified in**
22  **taking somebody's life. That's not -- it would only be**
23  **if I was protecting someone else or myself --**
24   Q. Okay.
25   **A. -- I can see it.**

48

**Page 49**

1    Q. The serving of an arrest warrant by itself does
2  not justify the taking of somebody's life --
3    **A. No.**
4    Q. -- can we agree to that?
5    **A. Yes, sir.**
6    Q. Okay. Because, you know, you could come back and
7  serve that arrest warrant another day, is that true?
8    **A. Depending on the circumstance.**
9    Q. Depending on the circumstances?
10   **A. It would -- it would really depend on the**
11  **circumstance here.**
12   Q. Well -- but we can say that once that person is
13  alive -- is no longer alive, there is nothing you can do
14  to -- to bring that person back?
15   **A. Well, yeah.**
16   Q. All right. And, so -- so, I guess I'm just making
17  a comparison. You know, there is potential to be able to
18  serve that arrest warrant at another time, is that true?
19   **A. It would depend on the circumstance.**
20   Q. Right. But once that person is dead, that person
21  is never -- you are never going to be able to bring that
22  person back.
23   **A. Right.**
24   Q. Right. And, specifically, isn't that -- wouldn't
25  you agree with me also that there's an interest -- that

49

**50**

1  the public also has an interest in bringing in suspects
2  alive as opposed to dead?
3  **A. I don't understand your question. Are you asking**
4  **me that people would rather -- that people come in alive**
5  **than dead? Is that what you are asking me?**
6  Q. Well, you agree with me that the justice system is
7  based on having people, you know, face the Court system
8  and have a determination of guilt or innocence?
9  **A. Yes.**
10  Q. Okay. So, they can't have that determination of
11  guilt of innocence if that person, you know, is no longer
12  alive?
13  **A. Yes.**
14  Q. And that's -- personally, that's your goal or it
15  should be your goal when you go to arrest somebody, serve
16  an arrest warrant, to bring that person in alive and
17  unharmed?
18  **A. Yes.**
19  Q. If possible?
20  **A. Well, all the time. I want to make sure they come**
21  **in alive all the time, if I can help it.**
22  Q. You said earlier that you went through some
23  self-defense training.
24  **A. Yes.**
25  Q. As part of the self-defense training, did you

**51**

1  learn about headlocks and choke holds?
2  **A. Are you asking me if we learned those**
3  **techniques --**
4  Q. Those techniques.
5  **A. -- or if we learned about them?**
6  Q. Both, really. Did you learn those techniques?
7  Did you learn about them?
8  **A. We learned about -- about choke holds and head**
9  **restraints and different types of restraints, we learned**
10  **that you are not to use choke holds. We don't -- that's**
11  **not something that we use. We were showed techniques,**
12  **ways to restrain people without causing serious bodily**
13  **injury.**
14  Q. Okay. Well, let's talk about choke holds. Why
15  were y'all taught not to use choke holds?
16  **A. Your --**
17  Q. What is your understanding of why -- why it's not
18  a good idea to use a choke hold?
19  **A. You are cutting off someone's breath. I mean,**
20  **it's going to cause them some injury, if not death.**
21  Q. So -- so, does that apply, generally, any
22  maneuverers that are cutting off a person's ability to
23  breathe, they are generally not supposed to be used by
24  you-all?
25  **A. Yes.**

**52**

1  Q. Is that something that you learned in training or
2  is that something that you were told by -- when you got
3  to Kirbyville?
4  **A. That's something we learned in training.**
5  Q. Okay. Okay. So, tell me about choke holds.
6  Okay? How -- okay. I wish I had something, that way you
7  could show me.
8  But could you just generally tell me, like,
9  how does it work? How does a choke hold work? What's
10  the technique involved in a choke hold?
11  **A. Well, we don't use them. I don't -- as far as I**
12  **know, it would be cutting off their airway.**
13  Q. Okay. What about a headlock?
14  Are you guys allowed to use headlocks?
15  **A. Well, it's -- it's a way of controlling somebody**
16  **without cutting off their airway. Minimal force, that**
17  **you just -- it's placed where you are holding onto**
18  **somebody.**
19  Q. Okay. So, could you describe for me the technique
20  involved in doing a headlock? I guess, what position --
21  okay.
22  If you are applying a headlock, are you
23  behind the person, are you in front of the person?
24  **A. Well, it would depend on the circumstance.**
25  Q. Okay.

**53**

1  **A. If used properly, it could be used about any**
2  **position.**
3  Q. Okay.
4  **A. It's just a hold. It's just holding onto**
5  **somebody. It would be just like if you were holding**
6  **around somebody's waist or a leg or a arm or anything**
7  **else. You are not applying a whole lot of pressure, you**
8  **are just holding onto them.**
9  Q. Okay. And the hold is being applied around what
10  part of the person's body, the headlock?
11  **A. Well, just like it says, their head.**
12  Q. Okay. Around their head. Around the top of their
13  head or...
14  **A. Just depends on where you can grab them at.**
15  Q. Okay.
16  **A. It's not meant to hurt them, it's meant to**
17  **restrain them.**
18  Q. And I understand that and I'm just trying to get
19  an idea --
20  **A. Right.**
21  Q. -- of what a headlock actually is.
22  Is there any -- such thing as a standard
23  headlock?
24  **A. Not that I know of.**
25  Q. Okay. Okay. So, a headlock, from what I

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1  understand, is just meant to hold that person's head in
2  one single position? Is that the purpose or the goal of
3  it?
4     A. Yes, more or less. Yes. It would depend on the
5  way that that person is moving around, whether you are
6  going to be able to hold them in one spot or not.
7     Q. Is the difference between -- can you have a
8  headlock where a person -- a person's arm is around the
9  person's neck?
10    A. I'm sure it's possible.
11    Q. Right. As long as you are not -- I guess the
12  difference is, is that whether or not you were squeezing
13  tight or whether or not it was looser?
14    A. Right. Applying force, yes.
15    Q. Okay. Okay. Now, I'm going to get ahead of
16  myself right now and we are going to talk about when this
17  incident actually occurred. I saw from some of the
18  statements that Chief Brister was applying, what he
19  claims, to be a headlock on Mr. Jones. Is that fair?
20    A. Yes.
21    Q. Do you recall that?
22    A. Yeah, I do recall it. Yeah.
23    Q. Okay. Did you actually see the headlock, as he
24  claims, being applied to Mr. Jones?
25    A. Yes.

54

1  Q. Okay. Could you describe that particular
2  headlock?
3     A. There was so much movement, I couldn't be able to
4  tell you exactly where he was located. I know that
5  Mr. Jones was screaming and hollering and breathing
6  while he was -- while he was holding him. So, I know he
7  wasn't choking him because he was -- he was speaking.
8     Q. Okay.
9     A. But there was so much -- he was moving around so
10  much it would be hard to say -- for me to be able to say
11  where he actually had it.
12    Q. Okay. And you say that's pretty much the entire
13  time when the headlock was being applied he was moving
14  around and screaming?
15    A. Yes.
16    Q. Okay. When he stopped moving around and
17  screaming, did that happen, like, almost all at once?
18    A. Yes.
19    Q. And what I mean by that is, he was moving around,
20  you know, like you said, breathing, screaming, or
21  whatever, and then -- one second and almost the next
22  second it just kind of stopped?
23    A. Yes.
24    Q. Okay. And, so, are you able to tell where exactly
25  Chief Brister's forearm and bicep was? Was it around his

55

1  neck? Were you able to tell that?
2     A. No, sir.
3     Q. Okay. Now, in a headlock, is it -- are you
4  supposed to grab -- grab your -- your other wrist when
5  it's around or -- does it matter or (indicating)...
6     A. I don't -- I don't really know.
7     Q. Okay.
8     A. It's not something that I trained on, was
9  giving -- putting a headlock on somebody.
10    Q. Okay.
11    A. It would depend on the circumstance, I would
12  guess, how big the person was, how small they were, where
13  you were at the time.
14    Q. And because -- and is it your understanding that
15  Kirbyville -- it was against Kirbyville's customs and
16  policies to use a choke hold?
17    A. Yes.
18    Q. Okay. And because of that, they never showed you
19  how to put -- put somebody in a choke hold?
20    A. From as far back as I can remember during
21  training, we were told not to use a choke hold, not just
22  Kirbyville.
23    Q. And, so, I guess the answer to my question is,
24  yes, they never showed you how to use a choke hold --
25    A. No.

56

1  Q. Okay. Okay. I want to make sure I got this -- I
2  think you said -- I want to make sure I got that clear.
3  The main -- really, the main difference between a choke
4  hold and a headlock is that a choke hold cuts off air and
5  circulation?
6     A. As far as I know, yes.
7     Q. Okay. Okay. As far as you know, have you ever
8  had any complaints filed against you while you've been
9  with Kirbyville?
10    A. No, sir.
11    Q. As far as you know has Chief Brister ever had any
12  complaints filed against him while he's been at
13  Kirbyville?
14    A. No, sir.
15    Q. Have you ever, in your history of -- in your
16  police career, have you ever had to use deadly force?
17    A. No, sir.
18    Q. Have you ever -- and, obviously, this time is
19  included. Have you ever, in the process of detaining or
20  arresting somebody, cause that person's death?
21    A. No, sir.
22    Q. Do you know if Chief Brister has ever, in the
23  process of arresting or detaining somebody, caused their
24  death?
25    A. As far as I know, no.

57

Q. Okay. Okay. Okay. I want to just talk about your time at Kirbyville now. I'm going to ask you this question, if you can answer, answer. If you can't, you can't. I understand.

But could you give me an estimate of how many times you've had -- you have had to use force in order to effectuate an arrest during your time at Kirbyville?

**A. I couldn't tell you. I don't know.**

Q. Okay.

**A. It wouldn't be a very high number.**

Q. Have you ever?

**A. Had to use force?**

Q. In order to -- in order to, yeah, make an arrest?

**A. Well, yes. Yes.**

Q. Okay. Okay. Do you know about how many arrests you made during your time at Kirbyville?

**A. I couldn't tell you.**

Q. Okay. Could you give me a percentage? You say -- you know, maybe 10 percent of the arrests you have made or, you know...

**A. Not accurately I wouldn't be able to give you a percentage.**

Q. Okay.

**A. Majority of the time, no, I don't have to use force.**

58

Q. Okay. Would you say it was less than 10 percent of the time?

**A. I would hate to tell you that and it be wrong.**

Q. Okay. It's my understanding that if you have to use -- let's see. Let me -- let me look here.

That -- that if you have to use nondeadly force with Kirbyville, that you have to fill out a use-of-force report form. Have you ever had to fill one of those out before?

**A. A use-of-force form?**

Q. Report form.

**A. It depends on what use of force it is.**

Q. Okay.

**A. We have -- we have use-of-force forms for our Tasers.**

Q. Okay.

**A. And we have -- the guys have to fill them out. I can't recall that I have ever had to fill one out because -- I think this is one of the few times I've actually reported it and I didn't have contact.**

Q. And is it your understanding that the use-of-force report form is only for Tasers?

**A. Depending on the use of the force. There would be -- we would document it. I don't believe we have an actual form for it.**

59

Q. Okay. How would you document -- let me pause.

Are we just talking about Tasers right now or are we talking about all use of force?

**A. No, all uses of force.**

Q. Okay. How would you document it?

**A. In our incident reports.**

Q. Okay. Prior to this incident, when was the last time you had to use force in order to effect an arrest?

**A. I can't -- I can't remember.**

Q. Okay. Would that inci- -- information would be in your incident report forms?

**A. Yes, sir, it should.**

Q. Okay. Got this. Got this. That's good.

Did you ever know Mr. Jones before this specific incident?

**A. No, sir.**

Q. Had you ever met him before?

**A. No, sir.**

Q. Do you know if Chief Brister had known him?

**A. No, sir, not that I know of.**

Q. Did you know anybody at the scene before this incident had took place?

**A. Yes, sir.**

Q. Who did you know?

**A. The guy that was there that had the camper**

60

trailer. We call him "BB," but his name is Arthur Breed. I've known him for a few years.

Q. Okay. How did you know Arthur Breed?

**A. Well, Arthur has been in and out of jail. He -- he stayed in trouble. We try to keep him out of trouble. We try to make sure he doesn't commit any crimes and try and help him out.**

Q. Okay. What type of crimes did Arthur Breed have a tendency to commit?

**A. Arthur is a thief. He likes to steal stuff.**

Q. Okay. How long had you known Arthur Breed prior to?

**A. A couple of years.**

Q. Had you met her -- had you known Shawntel Breed prior to this?

**A. Not that I know of. I don't remember.**

Q. Okay.

**A. I may have met her before. I talk to so many people. It's hard for me to keep up with everybody.**

Q. The location where you guys went to make the arrest, you had been to that location before?

**A. Yes.**

Q. Several times or a few times?

**A. Are you asking just going there or actually for incidents or for offenses?**

61

Q. Well, just in general.

A. Just in general, yes, several times.

Q. Okay. Okay. You are familiar with -- with the area where this whole incident occurred?

A. At Chestnut and MLK? Yes, sir.

Q. Yeah. Very familiar?

A. Yes, sir. I drive through there every day.

Q. And just so we have an idea, how many people are in Kirbyville?

A. I think the last census count was 2181.

Q. 2,181, approximately?

A. I think that was the last count that I had from the census.

Q. How many people do y'all have at the Kirbyville Police Department?

A. Now?

Q. At the time.

A. At the time. Myself, the Chief, and two officers. So, four.

Q. Were you the only patrol sergeant at that time?

A. Was I the only?

Q. Were you the only patrol sergeant --

A. Yes.

Q. -- in Kirbyville at the time?

A. Yes, sir. We only have one.

62

Q. Now, I asked you about complaints that you knew of for Chief Brister and for yourself. What about these other two officers? Do you know of any complaints lodged against them prior to this incident?

A. I would have to actually go back and see which two officers it was.

Q. Okay. Do you have an idea of either one of the two?

A. I don't. I don't. We had a few officers come through during that time.

Q. Okay. Okay. I think we are ready now. Okay. Let's -- let's talk about the day of this incident. Okay?

A. Okay.

Q. All right. Tell me how you were -- you first became aware of -- of Dustin Jones. You said -- you said you had never known Dustin Jones --

A. Right.

Q. -- before this occasion. Okay. So --

A. First time I heard his name, we received a call from the Jasper dispatch that -- from what I can understand, I was told was that they had received a call from Jefferson County about the location of a wanted suspect. They called me, told me what his name was, and told me the location where he was at, told me that he had

63

some felony warrants and that Jefferson County had confirmed the warrants and they wanted us to pick him up.

Q. Okay. Thanks.

How often do you get calls like this, you know, to ask you to pick up somebody from, I guess, another district that you are aware of -- that they are aware of being in your jurisdiction?

A. How many calls a month? Are we talking about a year?

Q. You can tell me a month.

A. In a month we may get one or two.

Q. Okay. And the call from Jasper dispatch, they gave you the location?

A. Yes, sir.

Q. And the name?

A. Yes, sir.

Q. Did he tell you what the warrants were for?

A. Yes, sir.

Q. What were the warrants for?

A. I don't recall exactly what they were. I was told that it was three felony warrants. I believe they were some aggravated charges, but I don't remember exactly which ones they were. Just from memory, I want to say one of them was an aggravated sexual assault and then one aggravated assault, but I don't remember exactly what the

64

third one was.

Q. Okay. Do you know if these three felony warrants were for probation violations?

A. No, sir, I don't.

Q. Okay.

A. I don't recall.

Q. Okay. Okay. So, after you got the -- well, let's just talk about this. When you get a call like this, they give you the location, the name, and the -- you know, the warrants.

Generally speaking -- not necessarily on this specific occasion, but generally speaking, what's the next thing that you would do?

A. Depending on the circumstance. With -- with this, they also told us that he was possibly armed and that he was standing in the front yard. I knew the location, I knew the residence. So, I called the Chief to go with me --

Q. Okay.

A. -- just -- just in case.

Q. Okay. Is that something that you would normally do?

A. Yes.

Q. If -- if the suspect was armed?

A. Yes.

65

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

**66**

1   Q. Okay. Does Kirbyville have any type of policy
2 about how many officers needs to go to serve these type
3 of warrants?
4   **A. Not that I'm aware of.**
5   Q. Okay. First of all, generally speaking, when you
6 get a call like this and they tell you that they have,
7 you know, aggravated assault, you know, some felony
8 warrants, do you -- do you inquire into, you know, the
9 situations involved in each one or do you just -- I guess
10 that's my question.
11      Do you inquire into the situation?
12   **A. Of what the warrants are based on?**
13   Q. Uh-huh.
14   **A. No. No, sir, not usually.**
15   Q. In this case, did you? Did you ask, you know,
16 what was this sexual assault about or --
17   **A. No, sir. I knew our dispatch wouldn't know**
18 **because it was from Jefferson County.**
19   Q. Okay. Okay. Did you ever contact with -- anybody
20 from Jefferson County to see, you know, the -- I guess
21 the story behind each of those warrants?
22   **A. No, sir.**
23   Q. Okay. These were, am I right to call, arrest
24 warrants?
25   **A. Yes, sir.**

**67**

1   Q. Okay. Arrest warrants are just based on probable
2 cause to arrest somebody; is that correct?
3   **A. Yes, sir.**
4   Q. Okay. It's not -- arrest warrants don't mean that
5 a person is actually guilty of whatever the crime that
6 warrant is out for, is that true?
7   **A. Yeah. It does not mean they are guilty of the**
8 **crime, just arrest warrant.**
9   Q. Okay. So, you said on this occasion you decided
10 to call Chief Brister. Why did you decide to call
11 Chief Brister?
12   **A. Normally on felony warrants, we don't go alone.**
13   Q. Okay.
14   **A. We normally at least have one officer -- one other**
15 **officer with us.**
16   Q. Okay. Okay. Do you recall about what time you
17 received the phone call?
18   **A. No, sir, I don't.**
19   Q. Okay. Okay. So, what was the next thing you did
20 after -- after you informed Chief Brister about the --
21 the felony warrants?
22   **A. We went to the residence.**
23   Q. Okay. Did you have any information about who
24 called in to let them know that he was at that specific
25 residence?

**68**

1   **A. No, sir.**
2   Q. Is it your understanding that this was a tip from
3 somebody?
4   **A. That was our understanding later that it was a**
5 **Crime Stoppers tip.**
6   Q. Okay. Okay. How far is the residence from the
7 police office driving, driving time?
8   **A. Driving time? No more than five minutes, I would**
9 **think.**
10   Q. Okay. When you guys -- did y'all drive in the
11 same vehicle or did y'all take separate vehicles?
12   **A. Separate vehicles.**
13   Q. Okay. Were you the lead vehicle or was
14 Chief Brister the lead vehicle?
15   **A. I was the lead vehicle.**
16   Q. Okay. What type of vehicle were you driving?
17   **A. A Ford Explorer.**
18   Q. Okay. And what type of vehicle was Chief Brister
19 driving?
20   **A. A Crown Vic.**
21   Q. Okay. As you arrived to the scene, what did you
22 see?
23   **A. As far as I can remember Arthur Breed being in the**
24 **yard.**
25   Q. Did you see anybody else in the yard?

**69**

1   **A. No, sir.**
2   Q. Okay. So, next y'all pull up to the residence, I
3 assume?
4   **A. Yes, sir.**
5   Q. Okay. Y'all get out?
6   **A. Yes, sir.**
7   Q. And what's the next thing y'all did after that?
8 Do you and -- I'm sorry. Not to cut you off, I'm sorry.
9      Did you and Chief Brister, did y'all have any
10 conversation before y'all went up to the residence?
11   **A. Between me and the Chief?**
12   Q. Uh-huh.
13   **A. No, sir.**
14   Q. Okay. I assume that y'all had a conversation
15 before y'all drove -- left -- left the office to drive to
16 the scene?
17   **A. Yes, sir.**
18   Q. Tell me about that conversation.
19   **A. I told him what we had, that we had a -- a tip**
20 **from the Sheriff's Office that this man was at this**
21 **location and that he had felony warrants and they would**
22 **like for us to pick him up.**
23   Q. Okay. All right. Did he say anything to you?
24   **A. No, sir.**
25   Q. Okay. Okay. All right. All right. So, tell me

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

**Page 70**

```
 1   what happened after you walked up to the residence.
 2      A.  I talked to Arthur Breed for a minute and I asked
 3   him if there was anybody else in the -- in the residence.
 4   And I believe he told me that his daughter was in there
 5   and her husband.
 6         I asked who it was.  I don't remember if he
 7   told me her husband's name or not.  But I do remember the
 8   door being open and I -- I called into the trailer.  I
 9   asked for Dustin, that was the name I called.
10         And he said, Yeah.
11         And he come outside and we verified that he
12   was Dustin Jones.
13      Q.  Okay.  Let me take this a little bit...
14      A.  Okay.
15      Q.  Okay.  So, you went up and talked to Arthur Breed
16   outside?
17      A.  Uh-huh.
18      Q.  You asked him was there anybody else in the
19   residence?
20      A.  Correct.
21      Q.  Okay.  And he told you that his daughter was and
22   her husband?
23      A.  Yeah.  As far as I remember, that's the way the
24   conversation went, yes, sir.
25      Q.  Okay.  Or son-in-law, something like that?
```

70

**Page 71**

```
 1      A.  Something like that, yes, sir.
 2      Q.  He indicated that there was somebody else besides
 3   his daughter in the residence?
 4      A.  Yes, sir.
 5      Q.  Did you ask anything else of Arthur Breed before
 6   you called into the residence?
 7      A.  Not that I recall.
 8      Q.  Okay.  But the next thing you did, you called and
 9   asked for Dustin?
10      A.  Yes.
11      Q.  And Dustin answered?
12      A.  Yes.
13      Q.  Okay.  What was the next thing you did?
14      A.  We asked him to step outside.
15      Q.  Did he comply?
16      A.  He did.
17      Q.  Okay.  When you saw Dustin -- can you tell me when
18   you first saw him, what did he look at, what was his
19   appearance?
20         I guess, what did he -- did he have a shirt
21   on?
22      A.  Yeah.  He had a shirt on, pants on.
23      Q.  Okay.  Was it a T-shirt, do you recall, or...
24      A.  I don't remember exactly.
25      Q.  Do you know if it was jeans or pants?
```

71

**Page 72**

```
 1      A.  Well, I call that the same thing.
 2      Q.  I guess -- do you know if -- I guess that's a fair
 3   answer.
 4         Do you know if it was jeans or I guess, like,
 5   cotton pants or --
 6      A.  Oh, I don't recall that.
 7      Q.  Okay.
 8      A.  No, sir.
 9      Q.  Okay.  Okay.  As a police officer, y'all are
10   taught in training how to, you know, basically, assess a
11   person's dimensions based on looking at them, I assume?
12      A.  To a point.
13      Q.  To a point.
14         Could you just give me -- you know, how tall
15   did he look to you when you -- when you first saw him?
16      A.  About my height.
17      Q.  Okay.  And what would you say his weight was, if
18   you had to guess?
19      A.  Over 200.
20      Q.  Would you say he's closer -- would you say he's
21   closer to 200 or closer to 300?
22      A.  200.
23      Q.  So, just a little bit over 200?
24      A.  I don't know exactly how much.  I just --
25   guesstimate, he would be over 200 pounds.
```

72

**Page 73**

```
 1      Q.  Okay.  Okay.  So, he complies with you guys.
 2   Ordered to come out.
 3         What's the next thing that happened?
 4      A.  We advised him of his warrants, asked him to place
 5   his hands on the side of the trailer.
 6      Q.  Okay.  You asked him to place his hands on the
 7   side of the trailer and then advised him of his warrants
 8   or...
 9      A.  I believe we advised him before.
10      Q.  Okay.  You advised him of his warrants.
11         When you asked him to place his hands on the
12   trailer, did he do so?
13      A.  Yes, sir.
14      Q.  Okay.  Okay.  What's the next thing that you did?
15      A.  I started a pat search.
16      Q.  Okay.
17      A.  And he advised me that he had a knife in his
18   pocket.
19      Q.  Okay.  Okay.  Did you find the knife when you did
20   the pat search?
21      A.  No, sir, not that I can recall, that I ever found
22   a knife on him.
23      Q.  Okay.  Did you complete your pat search?
24      A.  As much as possible, yes, sir.
25      Q.  Okay.  And the point of the pat search is to make
```

73

19

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

**Page 74**

1  sure that they don't have any deadly weapons on them?
2  A. Yes, sir.
3  Q. Okay. And you didn't find any?
4  A. Not on the pat search, no, sir.
5  Q. Okay. All right. Okay. So, what's the next
6  thing that happened after you finished your pat search?
7  A. I pulled my handcuffs out to -- to handcuff him.
8  I reached to grab one of his arms -- I don't remember
9  whether it was right or left -- to place him in
10  restraints. Whenever I did, he turned and struck me in
11  the chest, knocking me into Chief Brister.
12  Q. Okay. Okay. So, after your pat search was
13  completed, you pulled out your handcuffs and reached for
14  one arm to began handcuffing him?
15  A. Yes, sir.
16  Q. Okay. He was facing away from you at that time?
17  A. Yes, sir.
18  Q. Okay. But once you did that -- was there any
19  conversation between you-all during that time period, I
20  guess?
21  A. No, sir.
22  Q. Okay. You said he turned and he struck you in
23  your chest?
24  A. Yes, sir.
25  Q. When you say he "struck" you, did he punch you,

74

**Page 75**

1  did he elbow you, push you? Do you know?
2  A. It happened so quick. I don't know. I don't know
3  how he struck me.
4  Q. Okay. And Chief Brister was directly behind you?
5  A. Yes, sir.
6  Q. Okay. And he pushed you into Chief Brister?
7  A. Yes, sir.
8  Q. Okay. Okay. What happened next?
9  A. He took off running towards MLK.
10  Q. Was he fast?
11  A. He was pretty quick.
12  Q. And what did you do in response?
13  A. I began foot pursuit of him.
14  Q. Okay. When you began that foot pursuit, did you
15  still have your handcuffs?
16  A. No, I did not.
17  Q. Okay. So, when he, as you claim, struck you, you
18  dropped your handcuffs, or do you know when?
19  A. I don't know when.
20  Q. But at some point between when the foot
21  pursuit started and when he -- I guess when you got
22  there, you lost your handcuffs?
23  A. Yes, sir.
24  Q. Okay. Well, at some point -- let me say this: At
25  some point between when you tried to handcuff him

75

**Page 76**

1  when the foot pursuit began, you lost your handcuffs?
2  A. I don't know exactly when.
3  Q. Okay.
4  A. Some time between the time the foot pursuit began
5  and whenever I caught him was whenever I lost the
6  handcuffs.
7  Q. Okay. Okay. You said you began your foot
8  pursuit. Did you eventually catch Mr. Jones?
9  A. Yes, sir.
10  Q. Okay. Can you give me your best estimate of how
11  far it was before you actually caught him?
12  A. Best estimate is a couple of hundred yards.
13  Q. So, would you say more or less than the length of
14  a football field?
15  A. It would be more, a couple of hundred.
16  Q. So, maybe about two football fields long?
17  A. Possibly.
18  Q. Okay. Are you aware of what Chief Brister was
19  doing at the time when the foot pursuit began?
20  A. No, sir. We was quite a bit faster than he was.
21  Q. Okay. Okay. Okay. And about where was the
22  location that you were at, as best as you can describe
23  it, when you actually caught up to -- Mr. Jones?
24  A. From where we began?
25  Q. Well, I guess, you know, y'all began at

76

**Page 77**

1  Arthur Breed's house?
2  A. Correct.
3  Q. And at the location when you kind of finally
4  caught up to him, you know, could you tell me about where
5  that location was, as best you can describe it?
6  A. Well, it was a block away. It was down off of --
7  we call it Henry Robinson, but it's actually Avenue A.
8  It's -- there's a church there.
9  Q. Okay.
10  A. It was on the -- it was on the west side of the
11  church in between -- there's an old -- old building
12  that was there -- it's on the property of the church --
13  we were in between the two buildings.
14  Q. Okay.
15  A. I say "in between." It was more out away from it,
16  but, you know, in that general area between.
17  Q. I see. Okay.
18  Now, what happened once you caught up with
19  Mr. Jones?
20  A. I caught up to him. I was able to grab him from
21  behind. I was on his back. I realized I had no
22  handcuffs, realized I didn't have my Taser. Just holding
23  onto him was a fight in itself. I grabbed my radio. I
24  keyed up my radio to call for assistance. I don't
25  remember exactly what got out. I know there is a

77

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1 recording of what I said for it.
2 And about the time that I got what I was
3 saying, he stripped the radio out of my hand and throwed
4 it across the yard. In the struggle, I ended up on my
5 back on the ground with him on top of me.
6 Q. Okay. You said you were able to grab him from
7 behind while he was running?
8 A. Uh-huh.
9 Q. Do you recall what part of his body you grabbed?
10 A. I was around his back and I -- I was, more or
11 less, holding onto him, almost like I was riding his back
12 because he was trying to run with me on him.
13 Q. Okay. And, eventually, you were able to get him
14 to the ground?
15 A. Both of us went to the ground.
16 Q. Right.
17 A. Me on my back and him on top.
18 Q. Okay. Okay. So, when you were able to -- when
19 you tried to grab the radio and call for assistance, were
20 you still standing up or were you still holding onto him,
21 I guess?
22 A. I was -- I was holding onto him.
23 Q. Okay. So, you were on two feet at that point
24 still?
25 A. Yes.

78

1 Q. Okay. Two feet kind of behind him, if I
2 understand?
3 A. We were leaning forward going to the ground and --
4 if you can imagine him knelt down with me behind him with
5 one arm wrapped around his body trying to hold onto him
6 so he can't run, grabbed my radio, and -- and -- I didn't
7 really have a good hold of him because I was trying to
8 get ahold of my radio, too, at the same time.
9 Q. Okay. You say you don't recall how much -- you
10 don't know how much of what your call got out?
11 A. I don't remember exactly what all was said.
12 Q. All right. But at some point you said he -- he
13 was able to get the radio and strip it from you and throw
14 it?
15 A. Yes, sir.
16 Q. Okay. When he was able to strip it -- could you
17 tell me what position y'all were in when he was able to
18 get that radio from you?
19 A. I cannot recall. I was trying to talk and trying
20 to look at the radio at the same time, making sure I was
21 on the right frequency and holding onto him. It was a
22 lot to do at one time. And I don't remember -- I don't
23 even remember how I got on my back. It all happened so
24 fast.
25 Q. Okay. That was going to be my next question.

79

1 But somehow throughout the struggle you lost
2 your radio and you were on your back?
3 A. Yes, sir.
4 Q. Okay. Do you know about how much time had passed
5 between the -- when the foot -- when the foot chase
6 started to when you were on your -- on your back on the
7 ground?
8 A. No, sir.
9 Q. Okay. Once you were on your back on the ground,
10 what was happening, what happened next?
11 A. I was still trying to effect an arrest. I wrapped
12 my -- my legs around his legs and was holding on. At
13 that time, he started beating on my chest, which was
14 knocking the wind out of me. It had gotten to the point
15 where I was unable to breathe.
16 Q. Okay. Okay. So, at this point you were still
17 trying to -- you were still trying to effect the arrest?
18 A. Yes, sir.
19 Q. Okay. You said you had your legs wrapped around
20 him?
21 A. Around his legs, yes, sir.
22 Q. To keep him from -- from -- from moving try to
23 leave again; right?
24 A. Yes, sir.
25 Q. You said he was beating on your chest.

80

1 A. Yes, sir.
2 Q. Okay. How was he doing that? Was he just
3 punching your chest or...
4 A. That's another thing that I don't -- I don't
5 recall completely. I don't know if he was actually
6 beating on me or if he was trying to get off of me or
7 what he was trying to do, but he was hitting me in the
8 chest and it wasn't very comfortable.
9 Q. Okay. Okay. Do you recall how long this was
10 going on as far as him beating on your chest and trying
11 to get off, or whatever it was --
12 A. No, sir.
13 Q. -- do you know how long this went on for?
14 A. No, sir.
15 Q. Okay. What happened next, to your memory? At
16 this point, I think you said that you were starting to
17 lose some breath?
18 A. I was. I was to the point where I couldn't
19 breathe very good. Paul, he found us. He pulled up in
20 my patrol car and come running up. I was able to get out
21 that I couldn't breathe. That was about what I could get
22 out with all the oxygen that I had left and Paul run up
23 and he -- I don't know if he knew what was going on, or
24 what, but he -- he could see the guy on top of me and
25 knew that I was in trouble and began striking him with a

81

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

**82**

1  flashlight.
2     Q.  Okay.  At any point since you did the pat down,
3  did you ever see that knife or did he ever pull the knife
4  out?
5     A.  No, sir.
6     Q.  Okay.  Now, there's something that I think I read
7  it, but I don't think it's been mentioned yet.  When you
8  first started that chase, did you try to shoot him with
9  your Taser?
10     A.  I did.
11     Q.  Okay.  But you missed?
12     A.  Initially.  Whenever I squeezed the trigger it
13  failed, the Taser failed.  I turned it off, turned it
14  back on, and whenever I did, I fired in his direction.
15  He tripped in the ditch, and whenever he did, the Taser
16  leads went over him.  That's where I think that I lost my
17  Taser is in that ditch because I fell, too.
18     Q.  Do you know whether or not -- let me ask
19  you this question:  Per Kirbyville's policy and customs,
20  is it okay to use deadly force on a suspect that is
21  fleeing?
22     A.  A fleeing suspect?  Depends on the circumstance.
23     Q.  Okay.  Under what circumstances would it be okay?
24     A.  Well, if he is fleeing and he is armed and he is a
25  threat to other people, then yes.

**83**

1     Q.  Okay.  Okay.  And, so, then I would assume the
2  reverse is true, if he is fleeing but he is unarmed and
3  is not a threat to other people, then it's not okay to
4  use deadly force.  Is that a true statement?
5     A.  Well, it would depend, too.  You are saying he's
6  unarmed?  Depending on how that he's acting as well.  I
7  mean, if he had fists and he could still hurt somebody,
8  then it would depend.  I don't think so, no.  We normally
9  wouldn't use deadly force on that situation.
10     Q.  Okay.
11     A.  I mean, it all depends on the circumstance,
12  though, if he's a threat to somebody else.
13     Q.  Okay.  And i guess that's my question.  If he was
14  unarmed and there had been no determination or, you know,
15  evidence to show that he was a threat to himself or to
16  other people, under Kirbyville's policy or customs, would
17  it be okay to use deadly force against a suspect like
18  that?
19     A.  No.
20     Q.  Okay.  At any time prior to -- strike that.  Okay.
21  I'm sorry.  I got to get back.
22     A.  That's fine.
23     Q.  You said that Chief Brister pulled up in your
24  police car?
25     A.  Yes, sir.

**84**

1     Q.  You were able to get out that you were having
2  trouble breathing?
3     A.  Yes, sir.
4     Q.  And -- I'm sorry.  So, tell me what the next thing
5  that happened again after that was.
6     A.  Chief Brister struck him with a flashlight.
7     Q.  Do you recall where Chief Brister struck
8  him at?
9     A.  First time, my hand.
10     Q.  First time he hit your hand?
11     A.  Yes, sir.
12     Q.  Okay.  What about after that?
13     A.  I don't recall exactly where.  Between the head
14  and shoulders.
15     Q.  And what was Mr. Jones' reaction to being hit
16  between the head and the shoulders with the flashlight?
17     A.  I didn't look like it phased him at all.
18     Q.  Do you recall how many times Chief Brister struck
19  him?
20     A.  I do not.
21     Q.  More than once?
22     A.  Oh, sure.  Yeah.  He hit me the first time.
23     Q.  Was it your right hand or left hand, do you
24  recall?
25     A.  (Indicating)

**85**

1     Q.  Left?
2     A.  (Nodding head up and down)
3     Q.  Is that a "yes"?
4     A.  Yes.  I'm sorry.  Yes.
5     Q.  Okay.  Okay.  So, what happened next after
6  Chief Brister, I guess, finished hitting him with the
7  flashlight?
8     A.  Well, seeing that it was -- it was not -- it
9  wasn't working, he -- it wasn't phasing him at all, he
10  was -- he got around his back and at one point, they were
11  on top of me, both of them, and they rolled over and the
12  Chief was actually able to roll him off of the top of me
13  where I could -- I could breathe again.
14     Q.  Okay.  Do you -- do you recall what technique, if
15  any, the Chief used to roll him off of you?
16     A.  No, sir, I don't.
17     Q.  Okay.  And after he rolled him off of you, at this
18  point you were able to breathe?
19     A.  Yes, sir.
20     Q.  What's the next thing you recall happening?
21     A.  Whenever -- whenever they rolled off of me, I was
22  able to get up.  I could hear them still fighting to my
23  right and Dustin was screaming some things and I --
24  whenever I looked, Paul had his legs wrapped around him
25  and had his arms wrapped around him and was holding him

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1 and he was -- I could tell that Paul was just about give
2 out because he was losing control and he was -- he was at
3 the point where he was about to get -- get free again.
4    So, I laid over the top of Paul onto Dustin
5 and grabbed both of his arms and was holding onto his
6 arms to keep him from hitting or getting free from us.
7 And we just laid there waiting on backup to get to us.
8    Q. Okay. Okay. After Chief Brister rolled Dustin
9 off of -- off of you, did you take a second to catch your
10 breath?
11    A. It took me a second.
12    Q. And you said that you still kind of heard a
13 struggle going on?
14    A. Yes, sir.
15    Q. It's not something you saw, it's something you
16 heard?
17    A. Initially, yes, sir.
18    Q. Okay. And you said that you heard Dustin
19 screaming something?
20    A. Yes, sir.
21    Q. Do you recall what he was screaming?
22    A. No, sir.
23    Q. Okay. Okay. And when you finally were able to
24 look back over there, you said you saw Dustin was on top
25 of Chief Brister?

86

1 arms?
2    A. As best as I could there. There wasn't no
3 technique in it. I was trying to hold on with my hands
4 initially, but with sweat and everything and as strong as
5 he was, I couldn't hold him with just my hands. I ended
6 up having to wrap my arms around his -- his hands and
7 arms to pull them to me.
8    Q. Okay. So, when you wrapped your arms around his
9 hands and legs, were -- were your arms wrapped around
10 both Chief Brister and him or --
11       MR. CALVERT: Object to the form.
12       Go ahead.
13    A. Not around his -- not around his legs, just his --
14 just his hands and arms.
15    Q. (BY MR. TURNER) Okay. While your -- while your
16 arms -- your arms -- while you were wrapped around his
17 hands and arms, were your arms wrapped around both he and
18 Chief Brister or was it just -- just around him?
19       In my mind, I am envisioning that you were
20 just hugging him and his arms were kind -- that's not
21 right?
22    A. No, sir. Initially, whenever I had his arms, he
23 had them out. He was trying to get free. Well, I was
24 able to grab ahold of him. Well, I was not able to
25 control him.

88

1    A. No, sir, not on top. They were laying on their
2 side.
3    Q. They were on their sides --
4    A. Yes, sir.
5    Q. -- when you first saw them?
6       Okay. And Chief Brister had his legs wrapped
7 around Dustin?
8    A. Yes, sir.
9    Q. Okay. And he had -- he was holding him somehow?
10    A. Yes, sir.
11    Q. Okay. Do you recall where his arm was at that
12 point where he was holding him?
13    A. No, sir.
14    Q. Okay. Okay. And you said that it looked like to
15 you that Dustin was still struggling?
16    A. Yes, sir.
17    Q. And, so, at that point you got on top of both of
18 them?
19    A. I was on my knees and I laid across Paul. Paul
20 was in between me and Dustin. So, I was more laying on
21 Paul than I was on Dustin. I reached over the top and
22 was holding onto his arms to keep him from hitting or
23 getting free. They were both laying on their right side
24 and I was behind Paul laying over.
25    Q. Okay. Okay. How did you grab his hands -- his

87

1    Q. Were you grabbing his wrists or --
2    A. Yes, sir, his wrists.
3    Q. Okay.
4    A. Whenever he had extended them out -- and I don't
5 recall exactly what happened, details about what
6 happened. I just know that he had gotten to a point
7 where I was able to get my arms around him and hold onto
8 him --
9    Q. Okay.
10    A. -- and pull them to me.
11    Q. Okay. So, was it kind of like one of your arms
12 was around both of his arms?
13    A. Yes, sir.
14    Q. Okay. Okay. And at this point, you are still
15 laid across both Chief Brister and Mr. Jones?
16    A. Yes, sir.
17    Q. Okay. And at this point, are they -- are
18 you-all -- are both of them still on their right side?
19    A. Yes, sir.
20    Q. Okay. So, if I'm thinking about this correctly,
21 both Chief Brister and Mr. Jones, according to you, were
22 on their right side.
23       And, so, if this is a -- I won't use that
24 analogy. But they were both on their right sides, with
25 Mr. Jones in front of Chief Brister?

89

1    A. Yes, sir.
2    Q. Okay. And you were laid over -- over -- across
3  both of them holding Mr. Jones' arms?
4    A. Yes, sir.
5    Q. Okay. Your thighs would have been close to the
6  back of Chief Brister?
7    A. It would have been against his back. Yes, sir.
8    Q. Okay. Was there ever a time period during this
9  struggle where -- where you were holding onto Mr. Jones'
10  arms and Mr. Jones was on top of Chief Brister, that you
11  recall?
12    A. I remember the Chief saying he couldn't breathe at
13  one point. I don't know if that was because I was on top
14  of him or he was on top of him. I don't recall.
15    Q. Okay. Okay. And, so, we talked about that
16  position.
17       Tell me the position that you were in. You
18  said that after that happened y'all kind of stayed in a
19  singletary (sic) position to wait for the -- the backup
20  to arrive?
21    A. Yes, sir.
22    Q. What was the position y'all were in at that point?
23    A. Just like I told you, with him on his side, me
24  over the top of them.
25    Q. At any point during this struggle did you see

90

1  where Chief Brister's arms were --
2    A. No, sir.
3    Q. -- while he was holding onto Mr. Jones?
4    A. No, sir.
5    Q. Okay.
6       MR. CALVERT: We have been going about an
7  hour. Can we take a short break?
8       MR. TURNER: I wondering if it had been about
9  an hour. Yeah, that's fine. Yeah.
10       THE VIDEOGRAPHER: Off the record at 12:17.
11       (RECESS TAKEN FROM 12:17 P.M. TO 12:33 P.M.)
12       THE VIDEOGRAPHER: We're back on the record
13  at 12:33.
14    Q. (BY MR. TURNER) Okay. Again, took another break?
15    A. Yes.
16    Q. Ready to go?
17    A. Ready to go.
18    Q. Okay. I'll just tell you, I don't think I'm going
19  to be here too much longer. Now, don't quote me on that.
20  I know -- sometimes I sound like a preacher because I say
21  we are going to end early, but I don't think we are going
22  to be here too much longer. Okay?
23    A. Okay.
24    Q. So, I just wanted to let you know. All right.
25       When we left off, I think we were -- I asked

91

1  you, you know, what was the position that you were in
2  while y'all were waiting for backup to come?
3    A. Yes.
4    Q. Okay. Let me ask you a little more specific
5  question. So, you were kind of laying across both --
6  from what I -- from what I -- my understanding of what
7  you are saying, you were kind of laying across both
8  Chief Brister and Mr. Jones?
9    A. Yes, sir.
10    Q. You had been laying on both of their left sides?
11    A. Yes, sir.
12    Q. So, would you kind of have been laying on
13  where their left ribs would be, would that be the area?
14    A. Yes, sir.
15    Q. Okay. Left torso?
16    A. Yes, sir.
17    Q. Okay. And your -- your arm that was holding his
18  arms, would that have been on Mr. Jones' left ribs or
19  would that have been in front of his body or...
20    A. I was trying as much as possible to stay off of
21  the top of him because the Chief had already said he was
22  having trouble breathing.
23    Q. Okay.
24    A. So, I was trying as much as I could to stay off of
25  him. I don't recall exactly where my -- you know, my

92

1  elbows and my arms was, but I was doing my best to stay
2  off the top of the Chief.
3    Q. Okay. Now, you -- you said that during this time
4  period Chief had indicated to you that he was having a
5  hard time breathing?
6    A. Yes, sir.
7    Q. Okay. Did you guys have any other conversation
8  between the three of you guys at all?
9    A. Not really a conversation going on at that point.
10    Q. Okay. Okay. Do you recall any conversation at
11  this point between the Chief and Mr. Jones?
12    A. No, sir.
13    Q. Okay. When you -- when the Chief kind of let you
14  know -- did he tell you verbally that he was having a
15  hard time breathing or was that something that you just
16  know of --
17    A. I think he said he was -- he couldn't breathe. I
18  don't remember exactly how he said it or how he put it,
19  but it was directed at me because I think I was on him.
20    Q. Okay. Did you refer to him -- I'm sorry. Did you
21  reply to him?
22    A. No. My reply was to get off of him as much as I
23  could.
24    Q. Okay. Okay. Did you personally reply to any
25  comment that the Chief made during this time period, that

93

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

**Page 94**

1  you could recall?
2  A. At one point he said, "Don't turn him loose."
3  Q. Okay.
4  A. And I think that was about all -- and I told him,
5  "Okay." I think -- that's all I can remember that was
6  said during that.
7  Q. Do you know why the Chief said, "Don't turn him
8  loose," or what prompted him to say it?
9  A. I believe it was because he was running out of
10  energy.
11  Q. Okay. He was running out of energy and he said
12  "don't," as in "do not" turn him loose?
13  A. Correct.
14  Q. Okay. Okay. And what did you say? Did you say
15  anything or reply to that?
16  A. I believe I did. I believe it was more along the
17  lines of "okay," or just acknowledging that I wasn't
18  going to let go.
19  Q. Okay. Maybe, like, I wasn't going to -- I am not
20  going to let go, or something like that?
21  A. It probably wasn't that detailed. It was probably
22  "okay."
23  Q. Okay. All right. But as far as conversation,
24  that's -- that's all you recall?
25  A. We didn't have enough breath to hold a

**Page 95**

1  conversation, brother. I'm sorry.
2  Q. Okay. Approximately how long were you guys in
3  that situation that we've been kind of describing?
4  A. I don't know. I don't know. Whenever you are in
5  it, it seems like it is forever.
6  Q. To you it seemed like it was forever?
7  A. Yes, sir.
8  Q. And per your testimony earlier, Mr. Jones was
9  still moving around, resisting, struggling at this point?
10  A. Yes. Yes, sir.
11  Q. Trying to get loose?
12  A. Yes, sir.
13  Q. And you said at some point suddenly he just
14  stopped?
15  A. Yes, sir, just instantly.
16  Q. And what did you do once he stopped?
17  A. The witness, Ms. Adams, I believe is what her name
18  is, she come up and asked if we needed any help. I sent
19  her to my patrol car where I keep a bag. It had some
20  medical supplies in it and had an Ambu bag and a set of
21  handcuffs, she brought it to me. We rolled him and
22  handcuffed him, rolled him back to his back, checked for
23  a pulse, and then began CPR.
24  Q. Okay. Okay. You said that you noticed that --
25  you stopped -- he instantly stopped moving and stopped

**Page 96**

1  trying to get loose?
2  A. Yes, sir.
3  Q. And then once you noticed that, you said you sent
4  the witness to the patrol car?
5  A. Yes, sir.
6  Q. Okay. Why -- how long did it take for her to get
7  to the patrol car and back?
8  A. Not long. Patrol car was parked pretty close to
9  us.
10  Q. While she went to the patrol car, were you
11  still in the same position you were before?
12  A. Yes, sir.
13  Q. Okay. Was Chief Brister still in the same
14  position he was before?
15  A. Yes, sir.
16  Q. Okay. Okay. And, so, when she got back, she had
17  the handcuffs with her?
18  A. They were in the bag.
19  Q. They were in the bag?
20  A. Yes, sir.
21  Q. I guess when she -- she got the handcuffs
22  from the car and she came back or did she have the
23  handcuffs?
24  A. I told her where my bag was. I keep a bag in the
25  back of my car --

**Page 97**

1  Q. Oh, okay.
2  A. -- that has -- it has supplies in it, as well as
3  an extra set of handcuffs. She brought me the entire
4  bag.
5  Q. Okay. Where was the bag located in your car?
6  A. At the time I believe it was in the back. It was
7  in the -- the rear hatch of the vehicle.
8  Q. Do you know whether or not she had any trouble
9  finding it?
10  A. No. It was laying right there on the -- it's my
11  go-bag. It's pretty easy to find. It sits right on the
12  very rear of the vehicle.
13  Q. Okay. And, so, what happened once she got back
14  with the bag?
15  A. We rolled him, put the handcuffs on him. We
16  didn't know if he was just holding his breath or faking
17  or what was going on. Once I rolled him back to his
18  back, I checked for a pulse and I couldn't find one.
19  That was whenever I started CPR.
20  Q. Okay. Okay. Would you say almost as soon as she
21  got back, y'all went ahead and released y'all's hold on
22  him?
23  A. Yes.
24  Q. Okay. And you said that you rolled him onto his
25  back or on his stomach first?

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR
f6ec5a66-e853-4d7a-83ed-8e47e3baf653

**98**

1   A. At first we rolled him to his side so we could
2   handcuff him to where we could get both arms behind him.
3   Q. Okay.
4   A. It could have been -- it could have been to his --
5   to his face. I don't recall exactly where we rolled him.
6   Just enough that we could get the handcuffs on him and
7   then roll him back to his back and start CPR.
8   Q. Okay. Okay. And after you rolled him back on his
9   back, you said you checked for a pulse?
10  A. Yes.
11  Q. Did you find one?
12  A. No.
13  Q. How did you check for the pulse?
14  A. In his neck and his wrist.
15  Q. Okay. And then after you found no -- no -- no
16  pulse, you started the CPR?
17  A. Yes, sir.
18  Q. Okay. Were you helping do the CPR?
19  A. Yes, sir, I was.
20  Q. Okay.
21  A. I was doing chest compressions and Ms. Adams was
22  giving breath through an Ambu bag.
23  Q. Okay. What was Chief Brister doing at this point?
24  A. He was out of breath. He was on his back on his
25  cell phone calling 911 for an ambulance.

**99**

1   Q. Okay. Did Chief Brister ever come back and assist
2   with the CPR?
3   A. He -- he didn't have to. The -- while we were
4   doing CPR and he was making the phone call to dispatch to
5   get us an ambulance to us, an additional unit, that 614,
6   showed up and he relieved me for CPR doing chest
7   compressions; and then following that, other units
8   arrived that relieved the other people that were
9   assisting in the CPR.
10  Q. Okay. The unit that you are talking about -- so,
11  614, they arrived?
12  A. Yes, sir.
13  Q. And one of the guys relieved you?
14  A. 6 -- 614, it's one unit. It's only just one
15  person. He relieved me doing chest compressions.
16  Q. And he relieved you.
17      And then you said later on another -- was it
18  another unit or was it this the EMS that came?
19  A. Another -- another unit showed up, arrived on
20  scene. Actually, several more units arrived on scene.
21  Once they heard the call for help, that I called and
22  needed additional units, nearly everybody that was out
23  was coming to us.
24  Q. Okay. Okay. At the time when 614 arrived -- do
25  you know what that officer's name is?

**100**

1   A. Amon Cathey, A-M-O-N C-A-T-H-E-Y.
2   Q. Cathey?
3   A. Cathey, C-A-T-H-E-Y.
4   Q. Okay. When Officer Cathey arrived, you guys had
5   already released your hold and were in process of doing
6   CPR?
7   A. Yes, sir.
8   Q. Okay. Now, was the first time that you noticed
9   Krissy Adams was when she asked you if y'all needed any
10  help?
11  A. Yes, sir.
12  Q. Okay. So, you -- before that point, you didn't
13  know that there was a witness on scene?
14  A. No, sir, not that I recall. I don't recall seeing
15  anybody.
16  Q. Okay. Do you recall who the other officer was
17  that relieved -- because my understanding is
18  Officer Cathey came and he relieved you and then somebody
19  else came later and they relieved Ms. Adams?
20  A. I don't recall exactly which one -- which one it
21  was. I know it's in the -- I know it's in the call notes
22  from dispatch. The ones I can recall was there was a
23  highway patrol, Eric Dunn, that there, lieutenant of
24  narcotics, Scotty Duncan was there, and I believe a few
25  more.

**101**

1   Q. Okay. Okay. Okay. How -- how long after this
2   second unit arrived did the EMS people arrive on scene?
3   A. I don't remember.
4   Q. Okay. But it was after the second unit that the
5   EMS people arrived?
6   A. I know it was after Deputy Cathey showed up that
7   EMS arrived. I don't remember how -- how long it was,
8   though, or if they arrived after or before the additional
9   units got there.
10  Q. Okay. Did -- did you ever talk to the -- first of
11  all, did you know the EMS people who were -- who arrived
12  on scene? Had you ever --
13  A. I'm sure I did. I know all of them.
14  Q. Okay.
15  A. I don't recall which ones it was that was on the
16  ambulance. I was still trying to catch my breath --
17  Q. I see.
18  A. -- whenever they got there.
19  Q. Did you ever get a chance to talk with them and --
20  and tell them what had happened and what had transpired?
21  A. No.
22  Q. No.
23      Do you know if any officer talked to the EMS
24  and let them know what -- what had transpired?
25  A. I believe that the other officers that were there

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1 did.
2    Q. Okay.
3    A. I believe they talked to them.
4    Q. Do you know if the Chief did?
5    A. I don't know. I don't know if he did or not.
6    Q. Okay. Were you ever -- were y'all ever able to
7 resuscitate Mr. Jones on scene -- let me -- when I say
8 "resuscitate," what I mean, were you ever able to get a
9 pulse from him?
10    A. As far as I know, the last I heard was they had
11 got a pulse whenever they were loading him in the
12 ambulance.
13    Q. And this is the EMS who got a pulse from him or
14 one of the officers?
15    A. Well, EMS was on scene. As far as I know, it was
16 them.
17    Q. Okay. Now, during the time period where you say
18 that they were both on their sides and you were laying
19 over Mr. Jones and Chief Brister, at that time period you
20 weren't in imminent fear of serious bodily harm or
21 injury, were you, for yourself?
22    A. Well, if he had got free and continued to do what
23 he was doing before, then, yes.
24    Q. I mean --
25    A. At the time, was I? No, not at that -- that

102

1 moment.
2    Q. Okay. Okay. And, obviously, if he were to get
3 free and he had a knife or had a gun --
4    A. Right.
5    Q. -- then at that point, you would have been in
6 fear?
7    A. Yes.
8    Q. But at this specific time, you weren't in imminent
9 fear?
10    A. No, sir.
11    Q. Okay. And, so, about how long do you recall the
12 EMS coming -- well, let me rephrase the question.
13       About how long was it that the EMS were on
14 the scene prior to them taking Mr. Jones for treatment,
15 do you recall?
16    A. No, sir.
17    Q. Okay. And, now, while you heard -- you heard that
18 they got a pulse from him. From your observation was
19 Mr. Jones ever responsive after you and Chief Brister
20 released your restraints from him?
21    A. No, sir.
22    Q. To your knowledge, did he ever become
23 responsive again after that?
24    A. I don't know.
25    Q. Okay.

103

1    A. I didn't hear anything after that.
2    Q. I mean -- and you do understand that Mr. Jones
3 passed away --
4    A. Yeah.
5    Q. -- later on that next day?
6    A. Yes, sir.
7    Q. Okay. Was there any type of animosity between the
8 EMS people and the Kirbyville police officers?
9    A. No, sir.
10    Q. Y'all generally work hand in hand?
11    A. Yes, sir.
12    Q. After the EMS took Mr. Jones, what did you do
13 next?
14    A. I don't remember exactly what I done. I know I
15 had to go to the hospital to get my -- my hands x-rayed.
16    Q. Okay. And that was from the -- when Chief Brister
17 hit you with the flashlight?
18    A. Yes, sir.
19    Q. Okay. Did you have any other bruises or anything
20 like that?
21    A. My right hand was -- was swollen a little bit.
22    Q. Okay.
23    A. I don't know where it come from. I don't know if
24 it was during the altercation or -- or how that it
25 actually happened.

104

1    Q. Okay. Did you have to go seek any treatment
2 passed that first checkup?
3    A. No, sir.
4    Q. Okay. What about Chief Brister? Do you know if
5 he had to seek any treatment?
6    A. No, sir, he didn't.
7    Q. Okay. Throughout this whole incident, you and
8 Chief Brister never found a weapon on him --
9    A. No, sir.
10    Q. -- Mr. Jones?
11    A. No, sir.
12    Q. Okay. Is it your understanding that -- well,
13 first, let me ask you this: Do you have any knowledge or
14 training on the effects of synthetic marijuana on the
15 body?
16    A. I have a little knowledge of it, yes, sir.
17    Q. Okay. Why don't you tell me what you know.
18    A. Most of what I just hear from other people. It
19 causes problems with your brain and your heart. I talked
20 to a few people and researched it a little bit online.
21    Q. Okay. At the time when this happened, was
22 synthetic marijuana, was it illegal?
23    A. Yes, I believe it was.
24    Q. Okay. Do you know what its effect is on a person
25 who is using it? To -- to get some type of high, I

105

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1  guess?
2  A. As far as I know, yes, sir. Just supposed to be a
3  high like you would off of marijuana.
4  Q. Okay. About the same?
5  A. I don't know. I couldn't tell you.
6  Q. Okay. From -- but from your understanding, is it
7  about the same?
8  A. Yes, sir.
9  MR. TURNER: Are you guys going to have any
10  questions?
11  MR. CALVERT: Maybe one or two, but that's
12  all.
13  MR. TURNER: Okay.
14  Q. (BY MR. TURNER) Okay. When you guys arrived on
15  the scene, Mr. Jones, he wasn't in the act of harming
16  another person at that point, that you know of?
17  A. Not that I know of, no, sir.
18  Q. Okay. And at the time when you guys arrived, did
19  you have any indication that he had just committed a
20  crime involving a threat of violence to another person or
21  himself?
22  A. No, sir.
23  Q. Did you ever hear Ms. Adams try to make a phone
24  call to -- to dispatch while you guys were on the ground?
25  A. I don't remember. I don't -- I don't recall if

                                        106

1  she did or not.
2  Q. Okay.
3  MR. TURNER: Can we take a quick break, let
4  me look and see if I have any more notes, unless you want
5  to ask questions and then I could just come back. It's
6  up to you.
7  MR. CALVERT: However you want to do it.
8  MR. TURNER: You want to ask your questions?
9  MR. CALVERT: I can.
10  MR. TURNER: Okay.
11  EXAMINATION
12  (12:57 P.M.)
13  BY MR. CALVERT:
14  Q. Sergeant Hancock, I just have a couple of
15  questions. With regard to the warrants for Mr. Jones, if
16  the records indicate that Arrest Warrant 14643 for sexual
17  assault of a child was one of the warrants; another
18  warrant was Warrant 10-09856 for the offense of
19  aggravated assault; and the other warrant was Warrant
20  10-10523 for the offense of aggravated robbery, would you
21  have any reason to disagree that those were the warrants
22  that y'all were serving on that occasion?
23  A. No, sir, I wouldn't.
24  Q. Now, you indicated before the handcuffs were
25  placed on Mr. Jones -- or before you attempted to place

                                        107

1  the handcuffs on Mr. Jones, that you had advised him he
2  had warrants. Tell me, as best you recall, what exactly
3  you said then.
4  A. I advised him of his warrants out of
5  Jefferson County and advised him that he would be placed
6  under arrest and transported to the Jasper County Jail.
7  MR. CALVERT: Okay. I believe that's all the
8  questions I have.
9  MR. TURNER: I thought it would give me a
10  little more time.
11  Can we take a quick break?
12  MR. CALVERT: Sure.
13  THE VIDEOGRAPHER: Off the record at 12:57.
14  (RECESS TAKEN FROM 12:57 P.M. TO 1:04 P.M.)
15  THE VIDEOGRAPHER: We're back on the record
16  at 1:04.
17  REEXAMINATION
18  (1:04 P.M.)
19  BY MR. TURNER:
20  Q. Okay. Back on the record. Okay.
21  I got about eight more questions for you.
22  A. Give them to me.
23  Q. If Chief Brister, in his statement, said that two
24  of the arrest warrants were for probation violations,
25  would you disagree with that?

                                        108

1  A. I can't really recall exactly what they are for.
2  A lot of times in the offense, it will come in and it
3  will say it's for -- like what he was saying -- you know,
4  sexual assault or aggravated robbery or something, and
5  they don't tell us that it's a probation violation. They
6  just tell us what the original offense title was.
7  So, he may have seen something that I didn't
8  and it may have been for probation violations, but I
9  don't know.
10  Q. Okay. Do you recall writing a statement after
11  these events?
12  A. I'm sorry?
13  Q. Do you recall writing a statement after these
14  events?
15  A. Yes.
16  Q. Okay. And that statement was as true as you could
17  be about what happened during --
18  A. Yes, sir.
19  Q. Okay. What's your understanding of what was the
20  cause of death for Mr. Jones?
21  A. I've -- I've heard excited delirium and heart
22  attack.
23  Q. What was the first one?
24  A. Excited delirium.
25  Q. What's "excited delirium"?

                                        109

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1   A. I don't know. That would be something to ask the
2 doctors.
3   Q. Excited delirium. Okay.
4     Do you think that any of your actions or the
5 actions of Chief Brister contributed to his death?
6   A. I don't see how they could. I don't -- I don't.
7   Q. Okay. Okay. Last thing, I'm just going to read
8 two statements to you and I just want to know if you
9 agree or disagree with those statements.
10    The first one is (reading): No greater force
11 however, shall be resorted to than is reasonable and
12 necessary to secure the arrest and detention of the
13 accused?
14   A. Yes.
15   Q. Did you agree with that?
16   A. Yes, sir.
17   Q. Okay. I guess, specifically, I'm going to ask
18 you: Do you agree that no greater force shall be
19 resorted to than as reasonably necessary to secure
20 detention -- arrest and detention of the accused?
21   A. Yes.
22   Q. Any time the level of resistance by a person is
23 increased or decreased, the officer must adjust his level
24 of response accordingly?
25   A. Yes.

110

1   Q. Okay. So, meaning, if the accused ramps up his
2 level of resistance, than the officer can ramp up his
3 level of force used?
4   A. Yes.
5   Q. But, Officer, is it always true that if the
6 accused decreases their level of resistance, then the
7 officer shall also decrease the level of force they are
8 using?
9   A. Depending on the circumstance. I would have to
10 say that if they were -- if a man was holding a gun, it
11 would be different. It just depends on the circumstance
12 on that --
13   Q. Okay.
14   A. -- whether you would go back instead of forward.
15   Q. Is there any other -- is there anything else that
16 you recall, either yourself or Chief Brister, saying to
17 Mr. Jones during the time period y'all were trying to
18 effect this arrest that we haven't talked about yet?
19   A. Not that I can recall. I don't -- I don't
20 remember.
21   Q. Okay. Do you agree with me that this is a
22 pretty -- I mean, this is not something that happens
23 every day in your career?
24   A. No, sir, it's not.
25   Q. So, this situation is pretty memorable?

111

1   A. Yes, sir.
2   Q. Have you understood all my questions that you've
3 answered today?
4   A. I was a little confused about a couple of them,
5 but I think I understood them for the most part.
6   Q. Well, the ones that you were confused about, did
7 you ask me to rephrase those questions?
8   A. I believe I did.
9   Q. Okay. All right. And was I polite today?
10   A. Yes, sir, you were.
11   Q. Okay.
12   MR. TURNER: With that, I will pass the
13 witness.
14   MR. CALVERT: We will reserve our questions.
15   THE VIDEOGRAPHER: Off the record at 1:09.
16   THE REPORTER: Would you like him to read and
17 sign?
18   MR. CALVERT: Please.
19   (VIDEO DEPOSITION CONCLUDED AT 1:09 P.M.)
20
21
22
23
24
25

112

1     ERRATA SHEET
2  DEPOSITION OF: OFFICER JOSHUA C. HANCOCK, MARCH 1, 2016
3  PAGE LINE CHANGE     REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Signature:_____ Date:_____

113

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1 I, OFFICER JOSHUA C. HANCOCK, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5 _____
6 OFFICER JOSHUA C. HANCOCK
7
8 THE STATE OF _____ )
9 COUNTY OF _____ )
10 Before me, _____, on this day
11 personally appeared OFFICER JOSHUA C. HANCOCK, known to
12 me (or proved to me under oath or through
13 _____) (description of identity card or
14 other document) to be the person whose name is subscribed
15 to the foregoing instrument and acknowledged to me that
16 they executed the same for the purposes and consideration
17 therein expressed.
18 Given under my hand and seal of office this____
19 day of _____, 2016.
20
21 _____
22 NOTARY PUBLIC IN AND FOR
23 THE STATE OF _____
24
25

114

1 Witness;
2 That the original deposition was delivered to
3 MR. RONNIE TURNER, JR.;
4 That the amount of time used by each party at the
5 deposition is as follows:
6 MR. TURNER: (02 HOURS:13 MINUTES)
7 MR. CALVERT: (01 MINUTE)
8 That $_____ is the deposition officer's charge
9 to the PLAINTIFF for preparing the original deposition
10 transcript and any copies of exhibits.
11 That pursuant to information given to the deposition
12 officer at the time said testimony was taken, the
13 following includes all parties of record:
14 FOR THE PLAINTIFF:
15 Mr. Ronnie Turner, Jr.
16 SBOT NO. 24075533
17 PROVOST * UMPHREY LAW FIRM, L.L.P.
18 490 Park Street
19 Beaumont, Texas 77701
20 FOR THE DEFENDANTS:
21 Mr. Frank D. Calvert
22 SBOT NO. 03667700
23 CALVERT EAVES CLARKE & STELLY, L.L.P.
24 2615 Calder Avenue, Suite 1070
25 Beaumont, Texas 77702

116

1 IN THE UNITED STATES DISTRICT COURT
2 FOR THE EASTERN DISTRICT OF TEXAS
3 BEAUMONT DIVISION
4 SHAWNTEL BREED, )
INDIVIDUALLY AND AS )
5 REPRESENTATIVE OF THE )
ESTATE OF DUSTIN )
6 KEITH JONES, )
DECEASED, AND AS NEXT )
7 FRIEND OF DJ AND CJ, )
MINOR CHILDREN )
8 )
Plaintiff )
9 )
VS. ) CIVIL ACTION NO: 1:15-CV-190
10 )
CITY OF KIRBYVILLE, ) JURY DEMANDED
11 CHIEF PAUL BRISTER, )
AND OFFICER JOSH )
12 HANCOCK OF THE CITY )
OF KIRBYVILLE POLICE )
13 DEPARTMENT, )
INDIVIDUALLY, AND IN )
14 THEIR OFFICIAL )
CAPACITIES )
15 )
Defendants. )
16
17 REPORTER'S CERTIFICATION
18 DEPOSITION OF OFFICER JOSHUA C. HANCOCK
19 MARCH 1, 2016
20 I, CARLY MICHELLE BARTON, Certified Shorthand Reporter
21 in and for the State of Texas, hereby certify to the
22 following:
23 That the Witness, OFFICER JOSHUA C. HANCOCK, was duly
24 sworn by the officer and that the transcript of the oral
25 deposition is a true record of the testimony given by the

115

1 I further certify that I am neither counsel for,
2 related to, nor employed by any of the parties or
3 attorneys in the action in which this proceeding was
4 taken, and further that I am not financially or otherwise
5 interested in the outcome of the action.
6 Further certification requirements pursuant to the
7 Federal Rules of Civil Procedure will be certified to
8 after they have occurred.
9 SWORN TO AND SUBSCRIBED by me in Beaumont, Texas, on
10 this _____ day of _____, 2016.
11
12 _____
13 CARLY MICHELLE BARTON
14 Texas CSR No. 8985/Louisiana CCR No. 2015004
15 Expiration Date: December 31, 2016
16 Nell McCallum & Associates, Inc.
17 Firm Registration No. 143
18 2615 Calder Avenue, Suite 111
19 Beaumont, Texas 77702
20 (409) 838-0333/(409) 832-4501
21
22
23
24
25

117

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

1    I, OFFICER JOSHUA C. HANCOCK, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5                                   _____

6                                   OFFICER JOSHUA C. HANCOCK

7

8   THE STATE OF *Texas*    )

9   COUNTY OF *Jasper*   )

10      Before me, *Officer Joshua C. Hancock*, on this day

11  personally appeared OFFICER JOSHUA C. HANCOCK, known to

12  me (or proved to me under oath or through

13  *Drivers License*   ) (description of identity card or

14  other document) to be the person whose name is subscribed

15  to the foregoing instrument and acknowledged to me that

16  they executed the same for the purposes and consideration

17  therein expressed.

18      Given under my hand and seal of office this *18th*

19  day of *April*          , 2016.

20

21

22  NOTARY PUBLIC IN AND FOR

23  THE STATE OF *Texas*

24

25

TONJA STOCKMAN
Notary Public, State of Texas
My Commission Expires
March 1, 2018

1       ERRATA SHEET

2   DEPOSITION OF:  OFFICER JOSHUA C. HANCOCK, MARCH 1, 2016

3   PAGE   LINE   CHANGE              REASON

4   ____   ____   _____

5   ____   ____   _____

6   ____   ____   _____

7   ____   ____   _____

8   ____   ____   _____

9   ____   ____   _____

10  ____   ____   _____

11  ____   ____   _____

12  ____   ____   _____

13  ____   ____   _____

14  ____   ____   _____

15  ____   ____   _____

16  ____   ____   _____

17  ____   ____   _____

18  ____   ____   _____

19  ____   ____   _____

20  ____   ____   _____

21  ____   ____   _____

22  ____   ____   _____

23  ____   ____   _____

24  ____   ____   _____

25  Signature: _____  Date: 4-18-16 _____