EXHIBIT "B"

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF
 2                 BEAUMONT DIVISION

 3  SHAWNTEL BREED,            )
    INDIVIDUALLY AND AS        )
 4  REPRESENTATIVE OF THE      )
    ESTATE OF DUSTIN KEITH     )
 5  JONES, DECEASED, AND AS    )
    NEXT FRIEND OF DJ AND CJ,  )
 6  MINOR CHILDREN             )
         Plaintiff            )
 7                             )
    VS.                        )  CIVIL ACTION NO. 1:15-cv-190
 8                             )  JURY DEMANDED
    CITY OF KIRBYVILLE, CHIEF  )
 9  PAUL BRISTER, AND OFFICER  )
    JOSH HANCOCK OF THE CITY   )
10  OF KIRBYVILLE POLICE       )
    DEPARTMENT, INDIVIDUALLY,  )
11  AND IN THEIR OFFICIAL      )
    CAPACITIES                 )
12       Defendants.           )

13

14  *********************************************************

15        ORAL AND VIDEOTAPED DEPOSITION OF

16           CHIEF ROBERT PAUL BRISTER

17                March 18, 2016

18  *********************************************************

19

20     ORAL AND VIDEOTAPED DEPOSITION OF CHIEF ROBERT PAUL
    BRISTER, produced as a witness at the instance of the
21  Plaintiff and duly sworn, was taken in the above-styled
    and numbered cause on the 18th day of March, 2016, from
22  9:05 a.m. to 11:59 a.m., Janie P. Trapp, RPR, CSR
    No. 6789, in and for the State of Texas, reported by
23  computerized stenotype machine at the offices of Nell
    McCallum & Associates, Inc., 2615 Calder Avenue, Suite
24  111, Beaumont, Texas, pursuant to the Federal Rules of
    Civil Procedure and the provisions stated on the record.
25
```

09b1111b-d4a2-4676-9c2d-36c94b28ada4

**Page 2**

1  A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4    Mr. Ronnie Turner, Jr.
     SBOT No. 24075533
5  PROVOST UMPHREY LAW FIRM, L.L.P.
     490 Park Street
6    Beaumont, Texas 77701
7  FOR THE DEFENDANTS:
8    Mr. Frank D. Calvert
     SBOT No. 03667700
9  CALVERT, EAVES, CLARKE & STELLY, L.L.P.
     2615 Calder, Suite 1070
10   Beaumont, Texas 77702
11 FOR THE DEPONENT:
12   Mr. Paul A. Robbins
     SBOT No. 24002849
13 LAW OFFICE OF PAUL A. ROBBINS
     116 East Lufkin Avenue
14   P. O. Box 487
     Lufkin, Texas 75902
15
16          *****
17
18
19
20 ALSO PRESENT:
21   Mr. Paul Robichau, Videographer
     COMPLETE LITIGATION SUPPORT
22   490 Park Street, Suite 205
     Beaumont, Texas 77701
23
24
25

**Page 3**

1          I N D E X
2
                      PAGE
3  Appearances ...................................... 2
4  Stipulations ...................................... 4
5  CHIEF ROBERT PAUL BRISTER
6    Examination by Mr. Turner ................... 4
7  Changes and Signature Pages ...................... 91
8  Reporter's Certificate ............................ 93
9          E X H I B I T S
10 NO. DESCRIPTION       IDENTIFIED/MARKED - PAGE
11 1.  Plaintiff's Second Amended Notice of
       Intention to Take the Oral And Videotaped
12     Deposition of Chief Paul Brister With
       Subpoena Duces Tecum ...................... 4
13
     2.  Objections to Plaintiffs' Subpoena Duces
14     Tecum Attached to Second Amended Notice of
       Intent to Take Oral and Videotaped
15     Deposition of Chief Paul Brister ............ 4
16          *****
17
18
19
20
21
22
23
24
25

**Page 4**

1          (EXHIBIT NOS. 1 AND 2 WERE MARKED)
2          (The deposition was taken pursuant to the
3  Federal Rules of Civil Procedure. Witness will read and
4  sign.)
5          THE VIDEOGRAPHER: We're on the record at
6  9:05.
7          (WITNESS SWORN)
8          MR. CALVERT: Just for purposes of the
9  record, we filed an objection to the subpoena duces
10 tecum that was filed with the notice of deposition.
11 Chief Brister is here to answer questions about those
12 documents, but we did file a objection to that because
13 of the -- and have attached it as an exhibit to the
14 deposition.
15         MR. TURNER: Okay.
16         CHIEF ROBERT PAUL BRISTER,
17 having been first duly sworn, testified as follows:
18         EXAMINATION
19 BY MR. TURNER (9:05 A.M.):
20   Q.  Could you please state your full name for the
21 record?
22   A.  Robert Paul Brister.
23   Q.  What's your current occupation --
24   A.  I'm a --
25   Q.  -- Mr. Brister?

**Page 5**

1    A.  -- police officer, chief of police with the
2  Kirbyville Police Department.
3    Q.  Is it okay if I call you "Chief Brister"
4  throughout your deposition?
5    A.  You can call me "Paul." Yes, sir.
6    Q.  Okay. Chief, have you ever given a deposition
7  before?
8    A.  No, sir.
9    Q.  Okay. Since you haven't, let me just go over a
10 couple of ground rules. And I'm sure your attorney has
11 gone over these with you, but everything that we --
12 that's being said today, both my questions, your
13 answers, are being written down -- or typed out by our
14 court reporter today.
15       So, she asks us to do a couple of things to
16 help her out. One thing is really hard is for her to
17 type two people talking at the same time. So, if we
18 could make an agreement that I'll allow you to finish
19 your full answer and you'll allow me to fully finish my
20 full question; is that fair?
21   A.  Yes, sir.
22   Q.  Okay. Also, you know, "uh-huhs" and "huh-uhs"
23 really don't come out well for the -- on the transcript.
24 So, if you can answer verbally -- you've been doing a
25 great job so far -- verbal answers "yeses" or "noes,"

**Page 6**

1  that would be great.
2    A. Yes, sir.
3    Q. Also, you know, I've asked bad questions
4  before; and I'm sure I'll ask bad questions again. So,
5  if I ever ask a question you don't understand what
6  I'm -- what I'm asking, just ask me to rephrase. I'll
7  be happy to do that.
8    A. Yes, sir, I will.
9    Q. Okay. In the same vein, if you don't ask me to
10  rephrase, I'm going to assume that you understood what I
11  was talking about.
12    A. Yes, sir.
13    Q. Okay. Are you aware that you just took an
14  oath?
15    A. Yes, sir.
16    Q. And you know what that oath means?
17    A. Yes, sir, I do.
18    Q. Okay. I like to give deponents just a general
19  idea of where we're going to go in the deposition so you
20  have an idea of where we're at. The first thing we'll
21  do, we'll just talk about a little bit of your
22  background, you know -- you know, your family, stuff
23  like that, just to find out, you know, who you know in
24  Beaumont or in Jefferson County. Then we'll talk about
25  occupation, education, just, again, background stuff.

**Page 7**

1    After that, we'll talk about just, you know,
2  some general rules of, you know, policing. I'll try to
3  get some definitions for you so I get a better
4  understanding. After that, we'll talk about this
5  specific incident that happened on May 14th, 2013; and
6  then we'll be through, maybe a couple of questions after
7  that; okay?
8    A. Yes, sir.
9    Q. All right. Let's start off with the easy part,
10  the background. Where are you from, sir?
11    A. I grew up in Beaumont, graduated from high
12  school in Anderson, Texas, and have been living in the
13  Jasper County area since 1991.
14    Q. Okay. What's your date of birth?
15    A. ▮▮▮▮▮▮▮▮▮▮
16    Q. So, you moved to Anderson while you were in
17  high school?
18    A. Yes, sir.
19    Q. Okay. And you were going to -- you said you
20  were going to Beaumont High School?
21    A. I went to Beaumont High School, yes, sir.
22    Q. Okay.
23    A. I went to -- started out in Milliard
24  Elementally. Went to Dick Dowling. Then went to
25  Beaumont High. Then we -- then we moved off to the area

**Page 8**

1  up around Roans Prairie; and I graduated from Anderson,
2  Texas.
3    Q. Is the high school named "Anderson High"?
4    A. Anderson High, yes, sir.
5    Q. Okay. Did you do any college degree work?
6    A. No, sir.
7    Q. Okay. Are you currently married?
8    A. Yes, sir.
9    Q. What's your wife's name?
10    A. Wanda.
11    Q. Do you have any kids with Wanda?
12    A. We have one together, yes, sir.
13    Q. Currently do you have any kids that are minors?
14    A. No, sir.
15    Q. Do you have any relatives in Jefferson,
16  Hardin -- Jefferson or Hardin or Orange County with a
17  last name other than Brister?
18    A. No, sir -- well, yes, I have a niece that's
19  married to a Woods.
20    Q. And the reason why I ask that question is --
21    A. Yes, sir.
22    Q. -- you know, in case this case goes to a jury,
23  we just want to make sure --
24    A. Right.
25    Q. -- they're not your family members.

**Page 9**

1    Do you recall -- do you recall what year you
2  graduated from high school?
3    A. I do. 1970.
4    Q. 1970.
5    Okay. What did you do after high school?
6    A. Went into construction work. I was a painter.
7    Q. Okay. When's the first time that you had a job
8  related to law enforcement?
9    A. 1982.
10    Q. And what was that job?
11    A. It was -- I started at the jail in Orange
12  County.
13    Q. Okay. How long did you have that job?
14    A. In the jail, approximately -- I don't know --
15  about six months. At that time, you could -- you could
16  be a patrol officer on the street for a year before you
17  had to go to the academy. So, I worked a year; and then
18  I went to the academy.
19    Q. Okay. And where were you a patrol officer for?
20    A. In Orange County --
21    Q. Orange County.
22    A. -- sheriff's office.
23    Q. Did you do any kind of training prior to
24  becoming a patrol officer with Orange County?
25    I guess -- let me ask you a different question.

1 Did they give you any type of in-house training for your
2 job as a patrol officer for Orange County?
3 A. As -- as a jailer, we were required to go to a
4 jail -- a jail school. I went to that. And then --
5 then they put me on the street and I worked a year on
6 the street and then I started the academy in Jefferson
7 County.
8 Q. Okay. And what was the school name that you
9 went to the academy at?
10 A. It was Jefferson County Sheriff's Academy.
11 Q. Okay. Did you complete the academy?
12 A. Yes, sir.
13 Q. While you were at the academy, did you earn any
14 type of awards or anything like that, awards or --
15 A. No, sir. I graduated second in the class.
16 Didn't get an award for it, though.
17 Q. Okay. And this is always a hard question.
18 What type of training did you receive at the academy at
19 that time?
20 A. They --
21 Q. Just give me an overview, if you could.
22 A. They cover any -- anything from constitutional
23 law. We went through the Penal Code, the Code of
24 Criminal Procedure. We had traffic training, a little
25 bit of investigative training. Just basic police

10

1 techniques.
2 Q. Okay. And is that the purpose of the academy,
3 to give you the basic skills you need --
4 A. Yes, sir.
5 Q. -- to be a patrol officer?
6 A. Yes, sir.
7 Q. Okay. And then after you completed your time
8 at the academy, what did you do next?
9 A. I con--- I continued working for the Orange
10 County Sheriff's Office. I did most everything there
11 was to do in the -- in the sheriff's office. I worked
12 as an investigator, a -- civil process division and in
13 the warrant division.
14 Q. Okay. Let's talk about a patrol officer for a
15 second. What are the job duties of a patrol officer, or
16 responsibilities?
17 A. Well, it's to -- it's to patrol neighborhoods,
18 make sure that residential areas, business areas are
19 safe. You answer calls that range anywhere from
20 disturbances, burglaries, robberies, whatever --
21 whatever you're called to do.
22 With the sheriff's office, with the City, you
23 throw in traffic enforcement then. Sheriff's office
24 doesn't really like you doing a lot of traffic
25 enforcement.

11

1 Q. You said that you were an investigator. You
2 worked in the civil process and the warrant division, as
3 well?
4 A. Warrant division, yes, sir.
5 Q. Did your job title change as you moved into
6 those different divisions, or were you still considered
7 a patrol officer?
8 A. Well, I was considered an investigator. I
9 think they gave you a little title that said "sergeant";
10 and then from there on, the -- the other divisions, you
11 kind of carried that through with you.
12 Q. Okay. Do you recall when you became a sergeant
13 with Orange County?
14 A. No, sir, I don't. I worked there from '82 to
15 '84, and it was sometime in -- during that -- during
16 that time frame.
17 Q. Okay. What did you move to, what occupa- --
18 what job did you have after you left Orange County
19 Sheriff's Department?
20 A. I went to the West Orange Police Department.
21 Q. And was this the first time you ever were a --
22 you worked for a city as a police officer?
23 A. Yes, sir.
24 Q. And is it true what you said earlier, that with
25 the city you had to do traffic enforcement, as well?

12

1 A. Yes, sir.
2 Q. When you moved to West Orange, did you retain
3 your title as a sergeant or --
4 A. No. No, sir. I was just a patrol officer.
5 Q. Okay. How long were you a patrol officer with
6 West Orange?
7 A. From '84 till '95.
8 Q. Okay. Let's talk about your time with Orange
9 County Sheriff's Department. Did you -- do you recall
10 or do you know if you ever received any complaints while
11 you were at the Orange County Sheriff's Office?
12 A. No, sir, I did not.
13 Q. Is this case the first time you've ever had a
14 lawsuit filed against you in relation to your duties --
15 A. Yes, sir --
16 Q. -- as a police officer?
17 A. -- it is.
18 Q. You said you worked at West Orange Police
19 Department from '84 to '95?
20 A. Yes, sir.
21 Q. And were you a patrol officer during that whole
22 time?
23 A. Yes, sir.
24 Q. So, I guess my question is: You never moved up
25 ranks during West Orange, your time at West Orange?

13

**Page 14**

1    A.  There was patrol officers and the chief of
2 police. There was no rank.
3    Q.  Okay. And you never became the chief of police
4 for West Orange?
5    A.  No, sir.
6    Q.  During your time at West Orange, West Orange
7 Police Department, do you know if you ever received any
8 complaints?
9    A.  I did not.
10   Q.  Okay. During your time at West Orange Police
11 Department, were there ever any times where a suspect
12 received injuries while you were trying to either detain
13 or arrest that suspect?
14   A.  Not that I recall.
15   Q.  Were there times where you had to use force to
16 detain or arrest a suspect?
17   A.  Yes, sir.
18   Q.  Was there ever a time where you had to use
19 deadly force to detain or arrest a suspect during your
20 time at West Orange?
21   A.  No, sir.
22   Q.  During your time at West Orange or for Orange
23 County, did you ever have to use your firearm in order
24 to -- in order to complete an arrest or a detention?
25   A.  No, sir.

**Page 16**

1    Q.  Was Tony Taylor in charge of disciplining the
2 officers at West Orange, as well?
3    A.  Yes, sir.
4    Q.  Did he -- did he have the ability to choose
5 what additional training officers had to go through?
6    A.  He did.
7    Q.  Was it his responsibility, as you understand,
8 to investigate complaints or concerns with officers?
9    A.  It was, yes, sir.
10   Q.  Do you know if you ever were under
11 investigation by Tony Taylor?
12   A.  I was not.
13   Q.  Okay. So, where was the next place where you
14 worked after you worked for Orange -- or West Orange
15 Police Department?
16   A.  From the West Orange Police Department, I went
17 back to the sheriff's office in Orange County as chief
18 deputy for Huel Fontenot.
19   Q.  Chief deputy for -- what was the last part?
20   A.  For the sheriff, Huel Fontenot.
21   Q.  How do you spell that?
22   A.  "Huel" is H-u-e-l. "Fontenot" --
23   Q.  I got "Fontenot."
24   A.  Okay.
25   Q.  So, what does that mean? What does it mean to

**Page 15**

1    Q.  Do you recall anytime when you were at West
2 Orange or at Orange County where you had to use your
3 Taser in order to arrest or detain a suspect?
4    A.  I don't even think they had Tasers back then.
5    Q.  So, I take that as a "no."
6       What kind of police equipment did y'all have
7 in -- at that time, I guess, from '84 to '95?
8    A.  We had --
9    Q.  What was your, I guess, standard police --
10   A.  We had our duty weapon.
11   Q.  And what was that at the time? Do you recall?
12   A.  It was a -- it was a revolver, a .357 Magnum
13 Smith & Wesson --
14   Q.  Okay. Your revolver.
15   A.  -- and handcuffs and a baton.
16   Q.  And as far as what your -- what would be the
17 technical name for that, the equipment that you have to
18 keep with you?
19   A.  Your duty belt.
20   Q.  Duty -- duty belt?
21   A.  Yes, sir.
22   Q.  Who determined what all was, you know, required
23 equipment for your duty belt at West Orange?
24   A.  At West Orange would be the chief of police,
25 Tony Taylor.

**Page 17**

1 be a chief deputy?
2    A.  You're -- you're under the sheriff. You're the
3 next in command under the sheriff. Carry out his
4 orders.
5    Q.  It's like being a first mate, kind of?
6    A.  Yes, sir.
7    Q.  What extra responsibilities did you have as
8 chief deputy as opposed to your time as just a patrol
9 officer?
10   A.  They -- as chief deputy, you were -- you were
11 kind of in charge under the sheriff overseeing the
12 entire operation of the sheriff's office, each division,
13 the jail division, and carrying out whatever orders he
14 may give you to do.
15   Q.  So, he would kind of delegate some of his
16 powers to you?
17   A.  He would delegate it, yes, sir.
18   Q.  Specifically during this time, can you recall
19 what powers he delegated to you?
20   A.  No.
21   Q.  Can you recall any of them?
22   A.  Not -- not really, other than just -- you know,
23 just -- just maybe having meetings and going over --
24 over certain problems that he -- that he would have with
25 maybe some of the patrol officers, the investigators

1 were doing. Having me to find out what kind of
2 equipment they may be in need of. Is -- is things going
3 well for him, you know, just stuff like that.
4 Q. And how long were you chief deputy for?
5 A. Till '97 -- well, no, till about '96.
6 Q. And what'd you do then?
7 A. After -- I -- I went as a reserve officer
8 for -- for Sheriff Fontenot until 1997.
9 Q. Reserve officer. What is a reserve officer?
10 A. It's just an auxiliary officer. You come in
11 and just ride or do whatever they -- the department
12 needs you to do.
13 Q. I see. Is that kind of like a part-time job
14 or --
15 A. It's -- it doesn't pay.
16 Q. Okay.
17 A. It's a volunteer -- it's a volunteer job. You
18 volunteer your time.
19 Q. What was the reason why you left -- originally
20 left Orange County Sheriff's Department to go to West
21 Orange?
22 A. I had -- I had gotten hurt doing a -- what they
23 call a "ropes course" with some kids and was -- I had
24 hurt my neck, messed up two discs in my neck; and I
25 just -- I just was unable really to go and perform what

18

1 I needed to do.
2 Q. And, so, was the West Orange -- as a police
3 officer for West Orange, was that job less physical, I
4 guess, less physically stressing?
5 A. No.
6 Q. Okay.
7 A. No, it was about the same. Actually the chief
8 deputy job was probably more stressful than the patrol
9 job, so many more responsibilities.
10 Q. Uh-huh. So, I'm just trying to figure out --
11 you said that you left Orange County because of -- you
12 know, because of the problems with your -- the discs in
13 your back. Did you -- I guess, did you allow yourself
14 to heal, and then you got the job at West
15 Orange-Stark -- West Orange?
16 A. No, I left the sheriff's office to go to work
17 for West Orange.
18 Q. Okay. So --
19 A. And then I left West Orange and went back to
20 the sheriff's office as Sheriff Fontenot's chief deputy.
21 Q. Okay. And, so, the reason why you left West
22 Orange to go back to Orange County was because of the
23 ropes course incident?
24 A. No, sir, I got hurt on the ropes course after
25 I'd went back to the sheriff's office working for

19

1 Sheriff Fontenot. That's the reason I left --
2 Q. That's when you --
3 A. -- the sheriff's --
4 Q. -- went to reserve?
5 A. Yes. Yes.
6 Q. Okay. Okay. Well, let me ask you: What is
7 the reason why you left Orange County originally to go
8 to West Orange, West Orange Police Department?
9 A. West Orange paid more money; and also the
10 sheriff that I had worked for was leaving office and
11 they pretty much secured this job for me there, helped
12 me get this job at West Orange.
13 Q. And, so, what was your reason for leaving West
14 Orange and then going -- and then becoming a chief
15 deputy at Orange County?
16 A. To -- just to become the chief deputy at Orange
17 County. It's just kind of a promotion-type thing.
18 Q. During your time as chief deputy at Orange --
19 with Orange County, do you ever recall any complaints
20 being lodged against you by citizens?
21 A. No, sir.
22 Q. Do you recall ever being investigated by the --
23 by the sheriff --
24 A. No, sir.
25 Q. -- would it be?

20

1 Did you ever use your revolver in any incidents
2 while you were a chief deputy with Orange County?
3 A. No, sir.
4 Q. I assume -- well, let me just ask you: Did you
5 ever use deadly force while you were a chief deputy with
6 Orange County?
7 A. No, sir.
8 Q. So, you say you were a reserve officer. Was it
9 for about a year or less than a year?
10 A. Probably a little less than a year, yes, sir.
11 Q. Okay. Did you have any other jobs at that
12 time?
13 A. No, sir.
14 Q. Okay. And, so, you said you did that from '96
15 to somewhere in '97. Do you recall what's the next job
16 you had in '97?
17 A. Yes, sir. I went to work at the Jasper
18 Sheriff's Office for Sheriff Billy Rowles.
19 Q. What was your job title when you started
20 working for --
21 A. Chief deputy.
22 Q. Were your job duties essentially the same as
23 they were with Orange County Sheriff's?
24 A. Yes, sir.
25 Q. How long were you a chief deputy with Jasper

21

| | |
|---|---|
| 1 Sheriff's? | 1   Q. When you first went to Kirbyville, what was |
| 2   A. For eight years. | 2 your job title? |
| 3   Q. So, till about 2005? | 3   A. Chief of police. |
| 4   A. 2004. | 4   Q. Who did you replace as chief of police? |
| 5   Q. 2004. | 5   A. Clarence Williams. |
| 6   A. Yes, sir -- 2005. You're right. I'm sorry. | 6   Q. How long did you work for -- as chief of police |
| 7   Q. Okay. And in 2005, what was your job title? | 7 for Kirbyville after 2007? |
| 8   A. Still chief deputy. | 8   A. I went to work in Kirbyville in -- |
| 9   Q. Still chief deputy. For who? | 9   Q. 2007? |
| 10   A. Oh, you mean after I left Jasper? | 10   A. Okay. I went to work in Kirbyville in 2005. I |
| 11   Q. After you left Jasper. | 11 believe it was October -- |
| 12   A. Okay. I went to work for A. W. Davis at the | 12   Q. Okay. I'm sorry. |
| 13 Newton County District Attorney's Office. | 13   A. -- in 2005. And then I worked there till 2008. |
| 14   Q. Okay. And what was your job title? | 14   Q. What was your next job -- well, first of all |
| 15   A. I was a district attorney investigator, D.A. | 15 let's talk about -- I'm sorry. Let me talk about this |
| 16 investigator. | 16 for a second. Okay. What were your job duties as chief |
| 17   Q. And what were your job duties or | 17 of police with Kirbyville from 2005 to 2008? |
| 18 responsibilities as a D.A. investigator? | 18   A. Pretty much as they are now, just to oversee |
| 19   A. To review cases and make sure that we had | 19 the operations of the police department, scheduling, |
| 20 everything that we needed in order to be able to take | 20 making sure that the officers receive their training |
| 21 that case to a trial should it -- should it become | 21 hours. Just pretty much seeing the overall operations |
| 22 necessary. What the officers may have left out in their | 22 of the -- of the police department. |
| 23 case, it was my responsibility to track down and find | 23   Q. Do you control the overall operations of the |
| 24 it. | 24 police department as the chief of police for Kirbyville? |
| 25   Q. So, would I be correct in saying in your job as | 25   A. It's according to what you mean by "control." |
| 22 | 24 |

| | |
|---|---|
| 1 a D.A. investigator, you weren't involved in the | 1 I am the chief of police, and they do work for me. I |
| 2 day-to-day law enforcement? | 2 don't have complete control as -- per se, as for |
| 3   A. You would be correct, yes, sir. | 3 purchasing and stuff like that. It goes through the |
| 4   Q. Okay. And how long did you hold that job for? | 4 city secretary, things like that. Raises, I don't have |
| 5   A. About a year. | 5 control over -- over raises. That's the city council's. |
| 6   Q. Let's go back. Was -- the time that you spent | 6   Q. But as far as the day-to-day -- |
| 7 as a reserve officer, was that basically time to heal | 7   A. Day-to-- |
| 8 from the incident -- | 8   Q. -- operations and policy of Kirbyville Police |
| 9   A. Yes, sir. | 9 Department, you do have control? |
| 10   Q. -- you told me about? | 10   A. Day-to-day operations, I have -- I have |
| 11     What was your reason for moving from the Jasper | 11 control. I supervise their activities. |
| 12 Sheriff's Office to becoming an investigator for the | 12   Q. And, so, when you say you supervise their |
| 13 D.A.? | 13 activities, you were supervi-- you were supervising |
| 14   A. We -- while at the Jasper Sheriff's Office, we | 14 them to make sure that they were following the rules and |
| 15 were involved in a lot of -- a lot of high, high profile | 15 regulations of the Kirbyville Police Department? |
| 16 cases, the James Byrd case. We had several other | 16   A. Yes, sir. |
| 17 murders. The sheriff was tired and ready to move on; | 17   Q. And you said earlier that you made sure that |
| 18 and, so, when he decided to go, I decided to go. | 18 they completed their training hours. Did you also -- |
| 19   Q. Okay. And, so, after about your year of work | 19 was it also your responsibility -- or strike that. Let |
| 20 at the -- the D.A. investigator, where did you work at | 20 me ask it a different way. |
| 21 next? | 21     Was also one of your powers to tell them what |
| 22   A. I had the opportunity to go to work for | 22 additional training they might need to have? |
| 23 Kirbyville, City of Kirbyville. | 23   A. It's -- not to tell them what tra-- it's my |
| 24   Q. And Kirbyville is who you currently work for? | 24 duty to make sure that they receive the TCOLE |
| 25   A. Yes, sir. | 25 requirements for training. |
| 23 | 25 |

**Page 26**

1    Q.  Okay.  Could you say, "Well, Officer" -- you
2  know, "Officer A, you know, I think you need to go to
3  this other training on this particular thing"?
4    A.  If there's a specialized training that I would
5  like to see them get, yes, sir, I can -- I can ask that
6  they attend that.
7    Q.  Okay.
8    A.  But my main concern with such a small
9  department, we don't have the luxury of really
10 specializing in a lot of things.
11   Q.  Uh-huh.
12   A.  We just need to get what -- what we need to
13 keep our license good.
14   Q.  How many officers did you have working at the
15 Kirbyville Police Department during -- from 2005 to
16 2008?
17   A.  At that time, we had -- we had four patrolmen,
18 myself, and we did have a school resource officer.
19   Q.  So, including yourself, there would be --
20   A.  There was six of us --
21   Q.  -- six?
22   A.  -- yes, sir.
23   Q.  Okay.  And you say you left Kirbyville as
24 police office- -- police chief in 2008?
25   A.  2008, yes, sir.

26

**Page 27**

1    Q.  And what did you do once you left Kirbyville?
2    A.  I had -- I had went into the constru- -- back
3  into construction as a safety -- safety man.
4    Q.  I forgot -- I'm sorry.  I forgot to ask you.
5  During your time as chief of police during 2005-2008,
6  would y'all have -- would y'all have like, I guess,
7  safety meetings or -- you know, in the morning or
8  anything like that?
9    A.  No, sir.
10   Q.  Okay.  Did you ever have times where y'all
11 would meet as a police department and kind of discuss
12 issues?
13   A.  We did -- we did have meetings and stuff like
14 where we -- where we would discuss operations.  Once
15 again, discussed if officers had any complaints; what
16 they might need, if we were able to get it, that would
17 make their job easier, meetings as that such.
18   Q.  I see.  Did you lead those meetings?
19   A.  Yes, sir.
20   Q.  During your time as chief of police, was it
21 your job to investigate complaints against your
22 officers?
23   A.  Yes, sir.
24   Q.  Did you have -- was it your job to discipline
25 officers if it was necessary?

27

**Page 28**

1    A.  Yes, sir.
2    Q.  And as far as other entities' involvement in
3  the Kirbyville Police Department at that time, you said
4  that the city secretary, she would set the budget?
5    A.  The city council sets the budget.  In order for
6  us to do any purchasing or anything, we have to fill out
7  requisitions, present them to the mayor.  He will sign
8  those requisitions and approve them; and at that point,
9  we can go get the items that we requested.
10   Q.  Okay.  Did the city council have any other
11 responsibilities with regard to, you know, the
12 Kirbyville Police Department aside from that?
13   A.  I'm certain -- yes, sir, I worked for the mayor
14 and the city council.  So, any -- any suggestions they
15 have, they'll certainly come to me with them.
16   Q.  Okay.  Well, would I be correct in saying as
17 far as the day-to-day work of and policy of Kirbyville
18 Police Department, that was -- that was something that
19 the chief of police was responsible for?
20       MR. CALVERT:  Object to the form.
21   A.  I'm sorry.  What do I do?
22   Q.  (BY MR. TURNER) You can answer.
23       MR. CALVERT:  You can answer --
24       THE WITNESS:  Okay.
25       MR. CALVERT:  -- if you can.

28

**Page 29**

1    A.  Yes, sir, I would say that that would be
2  correct.
3    Q.  (BY MR. TURNER) Okay.  And you said you went
4  back in 2008 to work in construction as a safety --
5    A.  Safety man.
6    Q.  Was there any particular reason why you left
7  Kirbyville Police Department in 2008?
8    A.  There -- there was a little bit going on there.
9  The officers -- it had to do with some hours that were
10 cut, and they weren't happy.  They all left and found
11 new jobs.  I kind of became disgusted, and the
12 opportunity came; so, I took it.
13   Q.  So, officers were upset that they weren't
14 getting enough hours or too many?
15   A.  No, they had cut their hours.
16   Q.  During your time as police chief of --
17       MR. TURNER:  How long have we been going
18 for?
19       THE REPORTER:  45 minutes, roughly.
20   Q.  (BY MR. TURNER) During your time as police --
21 Kirbyville Police Department -- chief of police for
22 Kirbyville Police Department during 2005-2008, did you
23 ever have any complaints for any of your officers from
24 citizens?
25   A.  I don't recall any formal complaints, no, sir.

29

**Page 30**

1  Q. What about informal complaints?

2  A. Well, you know, there's -- a lot of times

3  there's people come in and complaining because they were

4  speeding and got a traffic citation. Just mainly

5  gripes, but nothing -- nothing formal.

6  Q. Okay. Any informal complaints concerning use

7  of --

8  A. No.

9  Q. -- force?

10  A. No, sir.

11      MR. CALVERT: Please wait until he

12  finishes asking --

13      A. I'm sorry.

14      MR. CALVERT: -- before you answer.

15  Q. (BY MR. TURNER) During this time as chief of

16  police, did any of your officers ever use deadly force

17  in order to effect an arrest or detention?

18  A. No, sir.

19  Q. Any informal or formal complaints regarding the

20  way that you were doing your job as chief of police,

21  that you're aware of, during this time period?

22  A. No, sir.

23  Q. The officers that were disgruntled because of

24  the hours situation, were they upset at you, as well?

25  A. No, sir.

---

**Page 31**

1  Q. Okay. I guess I'm just trying to -- my

2  question is: That situation wasn't caused by anything

3  you did, to your -- to your knowledge?

4  A. No, sir.

5  Q. Okay. I'm going to skip back for just a

6  second. During your time as chief deputy with Jasper

7  Sheriff -- Sheriff's Office, did you receive any

8  complaints -- are you aware of any complaints lodged

9  against you for excessive use of force?

10  A. No, sir.

11  Q. How long were you a safety man in construction

12  again?

13  A. Until 2009.

14  Q. So, just about a year?

15  A. Yes, sir.

16  Q. What construction company did you work for?

17  A. STI out of Bridge City.

18  Q. And what did you do after -- after that job?

19  A. In 2009 I went to work for the Newton County

20  Sheriff's Office as chief deputy for Sheriff Joe Walker.

21  Q. And how long were you chief deputy in Newton?

22  A. From 2009 till 2011, which time I went back to

23  work for the City of Kirbyville.

24  Q. Back again as chief of police?

25  A. Yes, sir.

---

**Page 32**

1  Q. During this time in Newton, was that when you

2  first met Officer Josh Hancock?

3  A. Yes, sir.

4  Q. Okay. And at that time, Officer Hancock, he

5  was a patrol officer?

6  A. He was a patrol deputy, yes, sir.

7  Q. Okay. Same question: During your time as

8  chief deputy in Two Thousand- -- from 2009 to 2011 at

9  Newton County, did you have any, whether formal or

10  informal, complaints lodged against you for excessive

11  use of force?

12  A. No, sir.

13  Q. During your time as chief of policy for

14  Kirbyville from 2005 to 2008, did you still do, I guess,

15  patrolman work? I don't know what the correct

16  terminology is; but did you still go out and patrol the

17  streets, as well?

18  A. I still answered calls, yes, sir.

19  Q. Okay. Okay. In 2011 you went back to

20  Kirbyville -- Kirbyville to be the chief of police, and

21  you've held that job all the way up until the present?

22  A. Yes, sir.

23  Q. Is there any changes between your work as chief

24  of police from 2005 to 2008 to your working

25  responsibilities from --

---

**Page 33**

1      (CELL PHONE SOUNDING)

2  A. I apologize.

3  Q. (BY MR. TURNER) That's fine.

4      -- from 2011 to the present?

5  A. No, sir.

6      MR. TURNER: This would probably be a good

7  time to take a break if you want to, or we can keep on

8  going.

9      MR. CALVERT: Whatever you want to do.

10      THE WITNESS: It's fine with me.

11      MR. TURNER: You want to keep going?

12      MR. CALVERT: We can take a short break.

13      THE VIDEOGRAPHER: We're off the record at

14  9:54.

15      (RECESS FROM 9:54 A.M. TO 10:04 A.M.)

16      THE VIDEOGRAPHER: Back on the record at

17  10:04.

18  Q. (BY MR. TURNER) Chief Brister, we took a quick

19  break.

20  A. Yes, sir.

21  Q. Okay. I think we were talking about you had

22  just came back as chief of police with Kirbyville Police

23  Department in 2011?

24  A. Yes, sir.

25  Q. Okay. Can you tell me how, if at all, the city

**34**

1  council, mayor, or city manager are involved in the
2  internal policies of the Kirbyville Police Department,
3  if they are?
4      A.  They -- they have say-so, and they approve our
5  policies.
6      Q.  What do you mean when you say that?
7      A.  I mean they have -- they have to approve -- I
8  can't just go in and make up any kind of off-the-wall
9  policy that I want to make.  It has to be something
10  that -- that's approved by the mayor and the council,
11  something that they are -- that they're fairly certain
12  is not going to get them in trouble or -- or the police
13  department in trouble.
14      Q.  Okay.  Have you ever presented policies for
15  them to -- for their approval since you've been chief of
16  police?
17      A.  No, sir, never written policies to the -- to
18  the council.
19      Q.  But as far as writing a policy, would that be
20  the job of the chief of police?
21      A.  It would be, yes, sir.
22      Q.  And is it also your job to enforce the
23  policies?
24      A.  Yes, sir.
25      Q.  Do you set goals for your police officers?

**35**

1      A.  I don't actually set a goal and say, "Here's
2  what I want you to do."  I talk with them on a daily
3  basis about how they act and react with the public, what
4  I expect of them.  My main -- my main priority is
5  professionalism, courtesy, and respect.  I won't
6  tolerate -- I let them know that we're not bullies and
7  we're not going to be bullies.
8          That's the type of goals that I set for them.
9      Q.  Okay.
10      A.  As far as advancement in the department, we
11  have a sergeant's position; and after that, there's just
12  not a whole lot of advancement unless they take my job;
13  so...
14      Q.  Who currently holds the sergeant position?
15      A.  Josh Hancock.
16      Q.  When you came back to Kirbyville as chief of
17  police, did Josh Hancock come with you?
18      A.  He came later on --
19      Q.  Okay.
20      A.  -- yes, sir.  I think I got there in '11; and I
21  believe he came in like maybe '12 or something like
22  that.
23      Q.  And did you kind of bring him over there?
24      A.  Yes, sir.  I brought him once I had an opening,
25  I didn't -- I didn't run nobody off to bring him, but I

**36**

1  had an opening and he was available; so, I asked him to
2  take it.
3      Q.  Okay.  And I for- -- I forgot to tell you at
4  the beginning.  I -- you know, I represent Shawntel
5  Breed and her family in a lawsuit that's filed against
6  you and the City of Kirbyville involving the death of
7  her husband.  Are you aware of that fact?
8      A.  Yes, sir.
9      Q.  And, so, at least for the purposes of this
10  deposition, you're aware that we're on opposite sides?
11      A.  Yes, sir, I do.
12      Q.  Okay.  All right.  And you were aware of that
13  the whole deposition?  I just forgot to tell you at the
14  beginning.
15      A.  I am aware of that, yes, sir.
16      Q.  All right.  And, so, when I say the inci- --
17  this incident, you will know that I'm talking about the
18  arrest, detention, and eventual death of Mr. Dustin
19  Jones?
20      A.  That's correct.
21      Q.  Okay.  All right.  So, at the time of this
22  incident, could you tell me -- or I don't think it's
23  changed much.  How about this:  How tall a man are you?
24      A.  I'm about five eleven.
25      Q.  And at the time of this incident, do you recall

**37**

1  how much you weighed approximately?
2      A.  About what I do now, around 205.
3      Q.  What equipment do you currently require for a
4  Kirbyville police officer to wear?
5      A.  I don't really require any.  They at least have
6  to have a duty weapon, a Taser, set of handcuffs, and a
7  flashlight.  Some of them want more, and that's fine as
8  long as it's an approved item.
9      Q.  Okay.  On the day in question, what equipment
10  did you have with you?
11      A.  Me?
12      Q.  Uh-huh.
13      A.  I had a gun on.
14      Q.  Okay.  No Taser?  No handcuffs?
15      A.  No, sir.
16      Q.  And I know eventually you had a flashlight.
17  Did you pick that up later at some point?
18      A.  Yes, sir, I picked that up out of the car as I
19  was exiting to go help Josh.
20      Q.  Okay.  What rules have you set for your police
21  officers with regard to use of force in arrests and
22  detentions?
23      A.  The least amount necessary.  Like I say, I
24  don't want -- I don't want bullies.  Won't have a bully.
25  You go treat people professionally and courteous and let

09b1111b-d4a2-4676-9c2d-36c94b28ada4

**38**

1   them escalate the conflict. We're not going to do that.
2   That's something that we discuss the first day that they
3   hire in, and we discuss it pretty much every day from
4   then on.
5      Q.  And is that one of your standard orders for
6   your police officers?
7      A.  Yes, sir.
8      Q.  All right. Now we're to the point where I'm
9   going to start asking you definitions -- okay? -- just
10  so I get a better understanding.
11     Well, first of all, let me ask you this
12  question: Is there any better person to talk to than
13  you about what the internal policies are of Kirby --
14  Kirbyville Police Department?
15     A.  I would be the one that you could talk to.
16     Q.  Okay. Okay. What is the difference between a
17  detention and an arrest? And I guess just to add on:
18  When does a detention become an arrest, if that's the
19  way it works?
20     A.  When you -- when you restrict the person's
21  ability to leave the scene, it becomes an arrest. When
22  they no longer have the opportunity to leave.
23     Q.  And is it your understanding that an arrest
24  constitutionally is the seizure of a person?
25     A.  Yes, sir.

**39**

1      Q.  Are you familiar with the phrase "imminent
2  threat of serious bodily injury or death"?
3     A.  Yes, sir.
4     Q.  Okay. We'll break that down a little bit. In
5  that phrase, what does the word "imminent" mean to you?
6     A.  Something's going to happen.
7     Q.  Is there a time limitation with that? Is it --
8     A.  Not necessarily, no, sir.
9     Q.  Would you consider imminent if it was going to
10  happen 12 hours from now? Would you consider that
11  imminent?
12     A.  It could be, yes, sir.
13     Q.  Okay. In what situation?
14     A.  Hostage situation.
15     Q.  Would you agree with me that generally
16  "imminent" is talking about something that's going to
17  happen fairly soon?
18     A.  Well, it depends. It could be. It could be
19  fairly soon. It could be 15, 20 minutes from now.
20     Q.  What would you consider to be serious bodily
21  injury?
22     A.  Serious bodily injury is disfigurement, limbs
23  that are no longer of use.
24     Q.  Now, we all know what death is; right?
25     A.  What?

**40**

1      Q.  We all know what death is?
2     A.  Yes, sir.
3     Q.  Yeah. What factors -- and let's go back to the
4  whole phrase again. What factors should a police
5  officer use in determining whether or not there is an
6  imminent threat of serious bodily injury or death?
7     A.  The -- the suspect you're dealing with, the
8  threats that are being made, the ability to carry out
9  those threats.
10     Q.  And when you say "the suspect," are you
11  referring to -- were some of the things that you would
12  look at -- and you tell me if I'm right or wrong --
13  would be maybe the past criminal history of the suspect?
14  Would that be a factor in your determination of whether
15  or not there's imminent threat of --
16     A.  Not -- not necessarily because when we go on
17  something, I most of the time don't know the past
18  history of a -- of a person. It's -- it's the per- --
19  it's the actor that we're there dealing with --
20     Q.  So, the actions --
21     A.  -- at the time.
22     Q.  So, I'm correct in saying when you -- when you
23  say "the suspect," you're talking about the actions that
24  the suspects are taking at the time?
25     A.  The actor -- the reason that we're called to a

**41**

1  scene, the actor in that scene.
2     Q.  Okay.
3     A.  The one that's causing the problem.
4     Q.  I would assume that you factor in the actions
5  of the suspect while you guys are actually on the scene
6  in determining whether or not they pose an imminent
7  threat of serious bodily injury or death?
8     A.  That is taken into consideration, also along
9  with the facts that we receive, en route to the scene,
10  what's been said why we're going there and then what we
11  observe while we're there.
12     Q.  Is it possible during the course of an arrest
13  for a person to at one point be an imminent threat -- or
14  at one point -- let me try to think. Scratch that
15  question. Let me -- let me try this again.
16     Is it possible during the course of an arrest
17  for a person at one point to pose an imminent threat of
18  serious bodily injury or death and at another point in
19  that same arrest not pose a serious -- not pose an
20  imminent threat to serious bodily injury or death?
21     A.  I suppose it's possible, yes, sir.
22     Q.  Resisting arrest, when is a person actually
23  resisting arrest?
24     A.  Person's informed they're under arrest, there's
25  certain things that they need to comply to. They need

09b1111b-d4a2-4676-9c2d-36c94b28ada4

**42**

1    to -- your -- you generally ask them to turn around,
2    place your hands behind your back. You reach for them
3    or grab them, they turn around and start fighting you,
4    that could be resisting arrest.
5    Q.  Okay.
6    A.  Any attempt to make the officer that's trying
7    to make -- anything to -- what's the word I'm trying to
8    say...? Anything to prevent the officer from making the
9    arrest --
10    Q.  Okay.
11    A.  -- as far as an aggressive action toward the
12    officer.
13    Q.  Okay. Would you agree -- okay. So, would you
14    agree -- would this be a good definition: Any attempt
15    to physically prevent the officer from making the
16    arrest?
17    A.  That could be a good definition, yes, sir.
18    Q.  Okay. What is your definition of "excessive
19    force"?
20    A.  Any force beyond that that's necessary to --
21    to -- to --
22    Q.  Effectuate --
23    A.  Anything beyond -- beyond what you would need
24    to do to do whatever you're doing.
25    Q.  Okay. In the case of an arrest, any force

**43**

1    beyond what's necessary to effectuate --
2    A.  To effect --
3    Q.  -- the arrest.
4    A.  -- the arrest, yeah.
5    Q.  What's your definition of "deadly force"?
6    A.  That's force that the actor intends or knows
7    will cause serious bodily injury or death.
8    Q.  Are you aware of what the -- what an impact
9    weapon is?
10    A.  Yes, sir.
11    Q.  Okay. What is an impact weapon?
12    A.  Like a baton or -- I don't know what these
13    little things -- the --
14    Q.  The (indicating) --
15    A.  -- baton. Baton, yes, sir, it's an impact
16    weapon.
17    Q.  Is -- the standard flashlight y'all have is an
18    SL-K?
19    A.  SL-20.
20    Q.  SL-20?
21    A.  Yes, sir.
22    Q.  Would that be considered an impact weapon?
23    A.  It's not created for that purpose.
24    Q.  Could it be an impact weapon?
25    A.  It could be, if necessary.

**44**

1    Q.  When is -- when is it okay to use deadly force
2    to effectuate an arrest?
3    A.  Protection of -- in my opinion, in the
4    protection of someone's life or your own life.
5    Q.  As chief of police, do you require any training
6    on use of force?
7    A.  I don't require it, no, sir.
8    Q.  Is that -- but is it part of the standard --
9    A.  It's part of the standard operations of a
10    police officer. He's -- he's -- he knows when the --
11    when the -- when a situation will require deadly force.
12    Q.  As chief of police, is it your rule that your
13    police officers try to arrest or detain suspects in as
14    safe a manner as possible?
15    A.  Yes, sir.
16    Q.  And it's your understanding that even -- that
17    even suspects are -- at the time when they're arrested,
18    are still innocent of the crime that they were charged
19    with?
20    A.  Absolutely.
21    Q.  What rules do you give your police officers as
22    far as use of force on a fleeing suspect?
23    A.  On a fleeing suspect?
24    Q.  Uh-huh.
25    A.  That -- that depends. That pretty much depends

**45**

1    on what the situation is and what it involves. It
2    could -- just -- there's no certain answer that I could
3    give you for that. It depends on each scenario.
4    Q.  As far as the rules that you give your police
5    officers, when do you think it would be okay to use
6    deadly force on a fleeing suspect?
7    A.  If he poses an immediate threat to the -- to
8    the community, someone in the community. It also
9    depends on what crime he has committed. I'd have to
10    know more than just that. But if he poses an immediate
11    threat to someone in the area or something, that could
12    be justified.
13    Q.  Can you tell me some of the factors you rely
14    upon to make the determination that a fleeing suspect
15    might pose an immediate or imminent threat to some
16    civilian or --
17    A.  Well, that also depends, too, where we're at
18    and what's going on, you know.
19    Q.  So --
20    A.  I can't really answer it unless I -- unless I
21    really know the facts of the situation that we're in.
22    Q.  Okay. And so, I'm just asking for some of the
23    factors. So, would one of the factors be, you know,
24    where you're at, the location?
25    A.  The location would -- would be in effect, who's

**46**

1 in the location.
2    Q. Uh-huh.
3    A. What has -- what has the suspect done.
4    Q. When you say what has -- what has he done, do
5 you mean what is he being charged with?
6    A. What -- what crime has he committed.
7    Q. Would you consider --
8    A. Does he -- does he pose a continuing threat to
9 the -- to someone in the area.
10    Q. Would one factor be whether or not he verbally
11 threatens somebody or physically threatens somebody
12 prior to your arrival? Would that be a factor, or would
13 you take that in consideration?
14    A. That could be something that you could take
15 into consideration; but, there again, it would defend
16 on -- depend on other facts at the case.
17    Q. What about his demeanor while your police
18 officers are trying to make the arrest, would that be
19 something that they would take into consideration in
20 determining whether or not a fleeing suspect posed an
21 imminent threat to the public, in general, or to your
22 officers?
23    A. That could be a determining factor.
24    Q. Whether or not the suspect had a weapon, would
25 that be a -- would that be a factor?

**47**

1    A. That definitely would be a consideration, yes,
2 sir.
3    Q. Can you think of any other factors that you
4 would evaluate to --
5    A. There's just so many, I can't think. I'd just
6 need to know -- I'd just need to know the scenario, and
7 give me -- give me a scenario with all the facts
8 involved, and I'll tell you would I use deadly force or
9 not.
10    Q. Okay. Would you agree with me that if a
11 sus- -- well, okay.
12      Suppose with me that the only way that you
13 could arrest or detain a suspect is by use of deadly
14 force. Would you agree with me that if there's no
15 indication or few indications that that suspect poses an
16 imminent threat of serious bodily harm to himself or to
17 other people, in that situation, do you think it would
18 be better to let him -- let him -- let him flee as
19 opposed to using deadly force to arrest him?
20      MR. CALVERT: Object to the form.
21    A. I'm going to have to get you to repeat that
22 question. I really don't understand it.
23    Q. (BY MR. TURNER) Okay. Suppose with me that the
24 only way to effect an arrest of this individual suspect,
25 Suspect A, is to use deadly force.

**48**

1    A. If the only way to arrest him is to use deadly
2 force?
3    Q. Right. Suppose with me, also, that there's no
4 indication that you have that he poses an imminent
5 threat of serious bodily injury or death to anybody.
6 Okay. In that situation, would it be better or would
7 you direct your officers to just let him go as opposed
8 to, you know, using deadly force to arrest him?
9      MR. CALVERT: Object to the form.
10    A. Well, that -- that depends. I don't -- I don't
11 know of a -- if the only way to arrest him is by using
12 deadly force and he doesn't pose a threat to anyone in
13 the community, well, I would probably -- I would
14 probably not shoot him.
15    Q. (BY MR. TURNER) Yeah. I mean, because you
16 understand that you'll probably have the opportunity
17 later to arrest him?
18    A. We could catch him later, yeah.
19    Q. Uh-huh. Okay. Could you take me through the
20 basic procedure -- I mean, I asked you so general a
21 question.
22      Okay. For the Kirbyville Police Department,
23 for most of your arrests and detentions, are those maybe
24 calls that y'all get or are they tips that you get from
25 another police department or is it just a matter of just

**49**

1 riding down the street and, you know, you see something
2 going on?
3    A. No, we have -- a lot of our arrests are made on
4 traffic stops, just patrol stops that officers have
5 made. We have a warrant list that the officers can look
6 at; and if they know where a certain person is, they can
7 go there and get him.
8    Q. Uh-huh.
9    A. Sometimes we receive calls from the -- from the
10 sheriff's dispatch that, "Such-and-such is wanted, and
11 he's at such-and-such place. Would you try to make --
12 make contact."
13    Q. Okay.
14    A. There's just different ways that arrests occur.
15    Q. Would you say the majority of your arrests
16 occur as a result of traffic stops?
17    A. I would say a big portion of our arrests occur
18 as a -- as a result of a traffic stop.
19    Q. Well, at least you could say that you -- well,
20 you tell me if this is true. You have more arrests as a
21 result of traffic stops than you do the warrant list or
22 the sheriff's dispatch?
23    A. Well, not necessarily. We -- we make a big
24 portion of our arrests at traffic stops; but we also
25 receive calls for family disturbances, neighborhood

**Page 50**

1 disturbances. Just -- just whatever -- whatever comes
2 up, we respond; and we -- and we go from there.
3 Q. Okay. Let's say you make a traffic stop and
4 when you make the traffic stop, let's say you found --
5 find some illicit drugs on the person. I'm just trying
6 to get an idea of, like: What's the average time from
7 the traffic stop and you finding, you know, the
8 substance to the time where they're actually charged in
9 you guys's system?
10 A. In us -- I don't understand us "guys a system"?
11 What?
12 Q. Let me see. The district attorney's office
13 charges a suspect. Is that a correct statement? Or
14 does the police depart- -- police department charge a
15 suspect?
16 A. When we make -- when we make an arrest, an
17 on-view arrest, we charge the suspect. We do the -- we
18 work the case up and then we take it to the district
19 attorney's office and he decides if he's going to accept
20 the charge, prosecute it, or what.
21 Q. Okay. And when you say you make the charge, is
22 that certain paperwork that y'all have to fill out?
23 A. Yes, sir.
24 Q. Okay. What paperwork is that? Is there a
25 title to it?

50

**Page 51**

1 A. There's a -- there's a report that we have to
2 do. There's an affidavit of probable cause that we have
3 to do. There's -- there's evidence collection forms in
4 case any evidence is collected.
5 Q. Generally how long does it take to go through
6 that, I'll say, charge process?
7 A. It depends on what he's arrested for. It's --
8 it's -- an arrest is made, and then it's probably
9 another hour doing the paperwork and stuff like that.
10 Q. So, generally people are charged within an
11 hour?
12 A. Time you get him arrested in the vehicle, if
13 he's in; and the vehicle's towed. If not, if he's not
14 in a vehicle, you've just got the paperwork to do after
15 the arrest is made.
16 Q. So, would you say on hour -- it takes about an
17 hour to charge somebody after the arrest?
18 A. It -- there again, it depends on the case, on
19 what -- what the arrest -- what the arrest involves.
20 It's according to what the inrest -- the arrest
21 involves.
22 Q. Well, what arrests take longer -- takes longer
23 to charge a person for?
24 A. If you -- if you pull over a guy and he's got
25 a -- I don't know, he's wanted for something. You pick

51

**Page 52**

1 him up. You have his car towed. You take him to the
2 jail. If you pull him over and he's got a large amount
3 of drugs, then you've got to -- you've got to inventory
4 the drugs. You've got to inventory the car, wait on
5 the -- wait on the wrecker to get the car. You've got
6 to get him to the jail. Then you've got to do your
7 paperwork, which involves a lot more in-depth process
8 because there's other things to do. You've got to
9 photograph certain evidence.
10 Q. How long would that take if it was like a large
11 drug arrest like this?
12 A. It could take -- it could take hours.
13 Q. It's my understanding that on this particular
14 arrest, that -- well, it wasn't from your warrant list.
15 Was it a call from dispatch?
16 A. We received a call from Jasper County Dispatch
17 that Jefferson County had called and said they had
18 received a Crime Stoppers tip that Mr. Jones was at a
19 certain residence on Chestnut Street.
20 Q. And it was my understanding that Officer
21 Hancock actually got the call?
22 A. The -- the dispatcher called Officer Hancock,
23 yes, sir. Then he called me.
24 Q. When Officer Hancock talked to you, what did he
25 tell you?

52

**Page 53**

1 A. He was -- asked me to meet him on Martin Luther
2 King; and when I pulled in there, he was sitting on the
3 side of the road, putting on a vest. Told me -- told me
4 what I had just told you about Crime Stoppers calling in
5 and said that Dustin Jones was at this resident (sic)
6 and that they wanted us to go get him.
7 Q. Did he inform you of what the warrants were for
8 at that time?
9 A. He did tell me what they were for. There
10 was -- it was -- I believe it was a probation violation
11 for ag assault and ag robbery, and then he also had a
12 warrant for sexual assault with a child.
13 Q. Were all of these -- all three of these
14 warrants were out of Jefferson County?
15 A. Yes, sir.
16 Q. Okay. Did you have any more information about
17 that sexual assault with a child?
18 A. Did not.
19 Q. Okay. Do you have now?
20 A. Do not.
21 Q. Is that standard procedure for if a person is,
22 you know, serving a probation warrant or serving a
23 warrant generally, to have two officers there? Is there
24 any -- do you have any type of rule about that at
25 Kirbyville?

53

09b1111b-d4a2-4676-9c2d-36c94b28ada4

**54**

1    A.  We just -- we just go a lot of times with what
2 we can get.  Sometimes there's -- we'll call in the
3 assistance of the sheriff's office; but, you know, a lot
4 of times we're there and we -- we just have to do what
5 we have to do.
6    Q.  Now, is it your understanding that the
7 residence that you guys were going to on this occasion
8 was Arthur Breed's residence?
9    A.  Yes, sir.
10    Q.  Do you know who Arthur Breed is?
11    A.  I do.
12    Q.  Okay.  Had you had dealings with Arthur Breed
13 prior to this incident?
14    A.  Yes, sir.
15    Q.  What type of dealings have you had with Arthur
16 Breed?
17    A.  He -- we've had a lot of dealings with Arthur
18 Breed.  He likes to steal, but he's the most honest
19 crook I've ever met in my life.  He can't lie to you.
20 You ask him, he'll tell you.  He's just a -- he's
21 just -- he's just Arthur Breed.
22    Q.  Had you ever had the opportunity to meet his
23 daughter, Shawntel Breed?
24    A.  Never had met her, no, sir.
25    Q.  How many people -- how many people are there in

**55**

1 Kirbyville?
2    A.  There's probably 1800, 2,000 people.
3    Q.  At the time of this incident, how many officers
4 did you have working at Kirbyville Police Department?
5    A.  There was five of us.
6    Q.  And aside from you and Officer Hancock, can you
7 tell me the other names of the officers?
8    A.  We were the only two on duty, but I have -- at
9 that time, we had -- at that time, I believe Jay
10 Matthews worked there.  Trying to think.  I can't
11 remember who worked there then.
12    Q.  It's okay if you can't remember.
13    A.  I really can't -- can't be absolutely certain
14 who they were.  I know Jeffrey Blewett.  That's the only
15 ones I can tell you for certain.
16    Q.  Okay.  How far is Arthur Breed's residence
17 from -- from the police station?
18    A.  A couple miles, maybe.
19    Q.  So, you said at the scene is where Officer
20 Hancock kind of told you what y'all was doing, what the
21 warrants were, and --
22    A.  Not at that -- no, sir, not at that scene.  We
23 met on MLK.
24    Q.  Okay.
25    A.  But probably -- probably about halfway between

**56**

1 our office and where Arthur Breed lives.
2    Q.  How long was that conversation that you and
3 Officer Hancock had, about?
4    A.  Three, four, five minutes, maybe.
5    Q.  And then y'all left MLK and then went to the --
6 to Arthur Breed's house?
7    A.  To the resident (sic), yes, sir.
8    Q.  What was the first thing y'all did once y'all
9 arrived at Arthur Breed's house?
10    A.  We got out of the -- out of our vehicles and
11 approached the residence.
12    Q.  Did y'all take the same vehicle?
13    A.  No, sir, we was in two vehicles.
14    Q.  What vehicle were you in?
15    A.  I was in one of the patrol units, for some
16 reason.  I don't know if my car was being worked on or
17 whatever, but I was in one of the -- one of the SUV
18 patrol vehicles we have.
19    Q.  Who was lead vehicle out of you and
20 Mr. Hancock?
21    A.  Hancock was the lead vehicle to the residence.
22    Q.  But obviously you were the officer with the
23 most authority on the scene?
24    A.  Yes, sir.
25    Q.  Okay.  Y'all got out of y'all's vehicles, and

**57**

1 what'd y'all do next?
2    A.  Walked up, approached the residence.
3    Q.  Okay.  And after you approached the residence,
4 once you got up to the door -- I'm sorry.  I'm sorry.
5 I'll ask you about that.  So, let me ask a different
6 question.
7       It's my understanding that the information
8 y'all received was that Dustin Jones was outside the
9 residence.  Do you know whether or not that's true or
10 not?
11    A.  I don't remember receiving that residence
12 (sic).  All I know, that he was supposed to be at the
13 residence.  I don't know.
14    Q.  Okay.  Once y'all pulled up to the residence,
15 did y'all see anybody outside the residence?
16    A.  Yes, sir, BB -- Arthur Breed was outside.
17    Q.  Do y'all have a nickname for Arthur Breed?
18    A.  "BB."
19    Q.  Do you know where that comes from?
20    A.  I really don't.
21    Q.  Okay.  And, so, as y'all approached the
22 residence, did y'all talk to Arthur Breed?
23    A.  Yes, sir.
24    Q.  What was the conversation?
25    A.  Josh asked him who was in the residence and he

told him that his daughter was in there and then Josh
asked who else and he told him that Dustin was there,
Dustin Jones was in there.

Q. Did you talk to Arthur Breed at all at that
time?

A. I didn't, no, sir.

Q. And then once y'all got that information -- or
once Josh got that information from Arthur Breed, what's
the next thing that y'all did?

A. We approached the door to the -- it was a
little -- it's a little camper trailer. We approached
the door to the little camper trailer. Josh went to the
door. I went around to the end where I could see
through the -- through the camper trailer.

Q. So, this camper trailer, do you -- had you ever
been inside that camper trailer?

A. I've never been inside it, no, sir.

Q. Okay. How long would you say it is?

A. Probably from where you're sitting to that
(indicating) wall. I don't know.

Q. And how wide --

A. Very --

Q. -- would you say it is?

A. -- very little.
       It's -- you could -- it's not even as wide as

58

this. Probably from the window to -- I don't know.
It's probably 10, 12 foot wide.

Q. 10, 12 foot wide.

A. Very small.

Q. And you said you went to the side so that you
could see through it?

A. I went around, yes, sir, to the -- to the front
of the -- front of the thing but to the end where I
could -- where I could see through the -- through the
door what was going on --

Q. On that --

A. -- and Josh was at the door.

Q. Okay. On that camper trailer, is the door
located on the long side or the short side, if that
makes any sense?

A. I don't understand --

Q. It doesn't make any sense?

A. -- what the "long side" means.

Q. Okay.

A. It's located on the end -- the end of the
trailer.

Q. Okay. So, we're thinking of the trailer as a
rectangle. It would be the short side of the rectangle,
like --

A. It's -- no, it's not a -- it's not really a

59

rectangle. It's one of these kind that slopes down. It
kind of --

Q. And it --

A. -- kind of slopes, yeah, and kind of
(indicating) --

Q. Okay.

A. So, that type of -- that type of deal. It's
not a square deal.

Q. I see. And when you went to the side of it,
could you see through the trailer?

A. I could. I could see. It was real dark in
there, but I could see.

Q. Okay. Were you able to see Dustin Jones?

A. I did see him coming down the -- whatever that
would be. I don't --

Q. Hallway? Walkway?

A. -- know if you'd want to call it a hallway or
the walkway or whatever.

Q. Was there anything in particular that you
noticed about Dustin Jones when you saw him?

A. No, sir, not -- not anything in particular.

Q. Okay. So, you said Josh walked to the door.

A. Uh-huh.

Q. You walked to the side.

A. Uh-huh.

60

Q. What happened next?

A. Josh called for him, told him, "Dustin, come
out here and talk to me a minute"; and he complied, he
came out.

Q. And Dustin came out without no incidence?

A. Yes, sir, uh-huh.

Q. Okay. So, after he got outside, what's the
next thing that happened?

A. Walked him -- Josh told him, "Walk over here.
Put your hands on the trailer," told him that we had
warrants out of Jefferson County for him; and he even
did that (indicating), put his hands on it. And then --

Q. Well, let me stop you real quick. Let me ask a
question. When he walked over, did they walk over to
where you were at?

A. No.

Q. Okay.

A. They walked down -- down to the side of the
trailer.

Q. Okay. And did you go over there where they
were at?

A. I went over there. I followed in and got
behind Josh.

Q. Were you kind of trying to let Josh go ahead
and effect this arrest?

61

09b1111b-d4a2-4676-9c2d-36c94b28ada4

**Page 62**

1    A.   Yes --
2    Q.   Okay.
3    A.   -- uh-huh.
4    Q.   And, so, at this point, your role was mainly
5    super-- supervisory?
6    A.   My role is mainly just there.
7    Q.   Okay.  Okay.  And you said that when Josh asked
8    him to come over to the side, he complied?
9    A.   Uh-huh.
10   Q.   And he told him that there were warrants?
11   A.   Uh-huh.
12        MR. CALVERT:  You need to say "yes" or
13   "no."
14   Q.   (BY MR. TURNER) Is that a "yes"?
15   A.   Yes, sir.  I'm sorry.  I apologize.
16        MR. CALVERT:  No problem.
17   Q.   (BY MR. TURNER) And when Josh asked him to put
18   his hands on the side of the trailer, he complied, as
19   well; is that correct?
20   A.   Yes, sir.
21   Q.   And I assume that that was because Josh wanted
22   to pat him down?
23   A.   Yes, sir.
24   Q.   Okay.  Did Josh do that?
25   A.   I think he started to.

**Page 63**

1    Q.   Okay.  Did you have any information about
2    whether or not Mr. Jones was supposed to have a weapon
3    on him or not?
4    A.   I didn't have any information other than what
5    Josh had told me.  I didn't talk to anyone else.
6    Q.   And that's what you told us earlier y'all
7    conversation was?
8    A.   Yes, sir.
9    Q.   Okay.  So, you said Josh started to do the
10   pat-down.  What happened next?
11   A.   He -- I think Josh told him to put his -- put
12   his hands behind his back, that he had the warrants and
13   he was going to take him to the Jasper jail.
14   Q.   Okay.  Did he comply this time?
15   A.   No.  Josh -- I heard -- I heard the handcuffs
16   click.  I guess Josh was opening his handcuffs.  As soon
17   as that click happened, he hit Josh and knocked Josh
18   back into me and took off running out toward MLK.
19   Q.   Did you see him hit Josh?
20   A.   Yes.  And he knocked him -- knocked him back
21   into me.
22   Q.   Okay.  Was that hit -- was it a push or was it
23   a punch or do you know?
24   A.   I don't know if -- I don't know if -- I can't
25   say if it was a hit or a push, if he ran over Josh or

**Page 64**

1    whatever; but I know he knocked him into me.
2    Q.   Okay.  Did you guys fall over?
3    A.   Didn't fall down.  We stumbled backwards.  It
4    was a -- it was a surprise.
5    Q.   Uh-huh.  At this point when Mr. Hancock -- I'm
6    sorry.  "Mr. Hancock."
7         At this point when Mr. Jones began to run, did
8    you feel like he posed an imminent threat of serious
9    bodily injury or death to anybody?
10   A.   Not at that point.
11   Q.   So, Mr. Jones begins to run, according to you,
12   knocks down Officer Hancock into yourself.  What's the
13   next thing that happens?
14   A.   They ran out onto MLK.  Josh was chasing behind
15   him.  I ran toward MLK; and at that point, Josh shot at
16   him with a Taser.
17   Q.   Were you able to see whether or not he actually
18   hit him with the Taser or not?
19   A.   I was able to see that he missed.
20   Q.   How many shots do you get with a Taser?
21   A.   You get one, and then you have to change
22   cartridges and put another one in.
23   Q.   And, so, after Josh missed with the Taser, what
24   was the next thing that you saw he did?
25   A.   I didn't really see anything after that because

**Page 65**

1    I ran back to get a car because I knew there was no
2    sense in me trying to chase.
3    Q.   And I'll tell you, during his deposition, Josh
4    alluded to the fact that he might have been a little
5    faster than you were.
6    A.   Oh, he was a lot faster than I was and a lot
7    better shape than I was.  Be like a dog chasing a car.
8    Q.   All right.  And, so, you went back to your
9    patrol vehicle?
10   A.   I went back to the patrol vehicle I was in,
11   yes, sir.
12   Q.   Okay.  When's the next time you came back in
13   contact with Josh -- Officer Hancock and Dustin Jones?
14   A.   I backed out onto MLK and turned the direction
15   that I figured they would be going, but they were --
16   they were gone.  They were out of sight.  I had no idea
17   where they were.  And I know -- I may not ought to tell
18   this, but I found them by looking at a cow.  The cow was
19   running toward them with their -- cows are nosy -- with
20   their head up looking.  So, I knew they had to be that
21   way.  So, I turned down Henry Robinson; and I could see
22   them down there.
23   Q.   That's interesting.  I did not know that cows
24   were nosy.
25   A.   They're very nosy to a -- to a commotion.  They

Page 66

1 will run to a commotion.
2 Q. Okay. So, could you -- could you estimate for
3 me about how long Officer Hancock and Dustin Jones were
4 out of sight?
5 A. No, sir, I can't -- I can't tell you a time.
6 Q. Okay. Probably not more than a few minutes?
7 A. No, it wouldn't -- it wouldn't have been -- I
8 don't guess it would've been minutes.
9 Q. Okay.
10 A. I don't think it would've been minutes.
11 Q. Okay.
12 A. It would've been a minute -- maybe minutes, two
13 minutes, maybe.
14 Q. Okay. But probably less than at least two
15 minutes; right?
16 A. Yeah, probab--- less than five.
17 Q. Okay. And so, tell me again where you were at
18 when you -- when you noticed Mr. Hancock and Dustin
19 again.
20 A. I was at the -- I was at the corner of -- when
21 I saw where the cow was going, I turned down Henry
22 Robinson; and when I turned down and started driving
23 down Henry Robinson, I could -- I saw them there.
24 Q. Okay. And I assume the first time you saw
25 them, you were still in your car?

Page 67

1 A. I was, yes, sir.
2 Q. Okay. And what did you see happening while
3 you -- going on while you were --
4 A. I saw them on the ground fighting; and, of
5 course, when I turned on the corner and it took -- it
6 took a second to get to them, maybe, second or two to
7 get to them because I -- the car, I was -- I was going
8 hard.
9 Q. Uh-huh. What position were they in on the
10 ground?
11 A. When I -- when I got to them, Josh was on the
12 ground on his back; and Mr. Jones was on top of him.
13 Q. Okay. And when you say when you got to them,
14 do you mean when you were outside of your police car
15 and you made it to them?
16 A. When I -- when I pulled up to them in my police
17 car and opened the door to exit, Josh was on his back on
18 the ground; and Dustin was on top of him.
19 Q. Okay. Was that the same position that they
20 were in when you initially saw them in your police
21 vehicle or was it a different position or do you
22 remember?
23 A. From the time I initially saw them till I got
24 to them, it was -- it was just a -- I don't know, it
25 was -- it was so quick. I can't tell you how quick it

Page 68

1 was, but yes.
2 Q. When you saw Dustin Jones on top of Officer
3 Hancock, as far as you could see, did -- did Dustin
4 Jones have any weapon?
5 A. I couldn't -- I couldn't tell. I couldn't
6 tell.
7 Q. But you didn't see any weapon at that time?
8 A. I did not. I didn't see any.
9 Q. Okay. And you said that Dustin was on top of
10 Josh. Did you -- were you able to tell what was going
11 on between the two, what was happening?
12 A. They were struggling.
13 Q. Was Dustin punching Officer Hancock?
14 A. I -- I can't tell you that. I don't know.
15 Q. Did it look to you like he was trying to beat
16 up Officer Hancock -- and when I say "he," Dustin was
17 trying to beat up Officer Hancock -- or did it look like
18 to you that he was struggling, still trying to flee?
19 A. No, he was in a position that had he wanted to
20 flee, he could have fled. He was -- he was on top.
21 Josh was on his back. He could have ran. He could have
22 left.
23 Q. And I'll tell you, during Officer Hancock's
24 deposition, he said that while they were in that
25 position, that he had his legs wrapped around Dustin.

Page 69

1 Did you see that?
2 A. No.
3 MR. CALVERT: Object to the form.
4 Q. (BY MR. TURNER) Okay. So, now we can finally
5 get to this point. You see him on the ground. What do
6 you do next?
7 A. I -- I exit the patrol vehicle, grab a
8 flashlight that was -- that was there in the light
9 holder, and I run to them.
10 Q. Why'd you grab the flashlight?
11 A. Because that's all I had other than my gun.
12 Q. Okay. And when you come to the scene and you
13 see the situation that they're in, is this a situation
14 where it would be okay for you to discharge a weapon?
15 A. If it wouldn't have -- if Josh wouldn't have
16 been where he was, I might have done that; but he was --
17 it was too dangerous for me to try to shoot with Josh
18 where he was. So, the only other alternative I had was
19 a flashlight.
20 Q. If you had a Taser, would you have used the
21 Taser?
22 A. Yes.
23 Q. Okay. Okay. So, you grab the flashlight. You
24 run to him. What's the next thing that happens?
25 A. I could see Josh that was in -- was in much

**Page 70**

1　distress. He -- he tried to tell me that he couldn't
2　breathe, but he couldn't even talk it out. He just kind
3　of had to whisper it out, told me, "Paul, I can't
4　breathe"; and he was in -- he was in quite a bind.
5　　　Q. Okay. And, so, what did you do?
6　　　A. I didn't know had he been stabbed. I didn't
7　know had he gotten Josh's gun and shot him. So, I start
8　hitting him in the head and shoulders with that
9　flashlight.
10　　　Q. Would you consider -- hitting him in the head
11　and shoulders with that flashlight, would you have
12　considered that use of deadly force?
13　　　A. I -- I wasn't thinking at that time. I didn't
14　care. I wanted him off Josh.
15　　　Q. Looking back hindsight, would you consider that
16　using deadly force?
17　　　A. Could be.
18　　　Q. And you started hitting him on the head and
19　shoulders --
20　　　A. Uh-huh.
21　　　Q. -- with the flashlight. I assume you were
22　hitting him pretty hard?
23　　　A. I was hitting him pretty hard, yes, sir.
24　　　Q. Okay. What was his reaction to that?
25　　　A. None.

70

**Page 71**

1　　　Q. Do you recall how many times you hit him on the
2　head and shoulders with the flashlight?
3　　　A. Well, I swung it two or three times; but I
4　think one time I got Josh. So, probably a couple of
5　times.
6　　　Q. Okay. And after hitting him a couple of times,
7　what's the next thing that you did?
8　　　A. I saw that was having absolutely no effect; so,
9　I threw the flashlight out of the way where he couldn't
10　get to it in case -- case I couldn't handle him.
11　　　Q. Uh-huh.
12　　　A. Threw it out of the way. So, I reached down
13　and got him in a headlock and rolled him back off of
14　Josh.
15　　　Q. Can you describe for me the headlock that you
16　put him in?
17　　　A. I had -- my left arm was around his chin. And
18　what I was trying to do was I was holding his head back
19　up against my body where he couldn't headbutt me because
20　he was trying to punch me with his fist, and I knew if
21　I -- if I let go of his head, he'd try to headbutt me;
22　and I had it below his mouth where he couldn't bite me.
23　　　Q. Okay.
24　　　A. And I was just -- I locked my legs around him
25　where I could get him in a -- get him contained where he

71

**Page 72**

1　couldn't go nowhere and I could hang on until backup
2　arrived.
3　　　Q. You said you had your arm around his chin, the
4　lower part of his chin?
5　　　A. My left arm, yes --
6　　　Q. Left arm?
7　　　A. -- yeah --
8　　　Q. And what --
9　　　A. -- up under his -- up under his chin and jaw,
10　and I was holding it like this (indicating) back up
11　against me where he couldn't headbutt me.
12　　　Q. Okay. And while you had your left arm under
13　his chin and jaw, were you holding your arm with the
14　right --
15　　　A. Uh-huh, I had him like this (indicating) --
16　　　Q. Okay.
17　　　A. -- uh-huh, what -- what I could get there. I
18　was -- I was kind of on my side and he was, too, and I
19　was just holding him up against me.
20　　　Q. Were you fully on your side or kind of on your
21　side?
22　　　A. I wasn't -- I wasn't laying on my side. I was
23　kind of on -- I was on this (indicating) side with
24　the -- with, I don't know, the right cheek of my butt
25　and my right shoulder was kind of on the ground and he

72

**Page 73**

1　was kind of half on top of me and half on his side, too.
2　　　Q. Okay. And you said that you had your legs
3　wrapped around his torso?
4　　　A. Kind of wrapped around his waist and his thighs
5　here (indicating) -- or around his waist because he was
6　kicking and hitting, and I was just trying to -- I was
7　just trying to hang on, but I did have my legs wrapped
8　around him. I just don't know where exactly.
9　　　Q. Okay. And I assume that you were holding onto
10　him pretty tightly?
11　　　A. Yes, sir.
12　　　Q. Okay. At this time, were you -- you put him in
13　a headlock. You grabbed him, and you pulled him off of
14　Officer Hancock; and you have his -- you have your legs
15　around him. What is -- what is Officer Hancock doing?
16　Do you know?
17　　　A. Well, as soon -- soon as I got him off and
18　down, Officer Hancock got up and came around. And
19　Mr. Jones was trying to hit me with his fist. So, I
20　told Josh, I said, "Hold his -- get his hands and hold
21　them"; and he did.
22　　　Q. Now I want to talk about the time period right
23　before you asked Officer Hancock to grab his hands. At
24　that time period, were you in imminent fear of serious
25　bodily injury or death?

73

**Page 74**

1     A. I wasn't, but I was afraid Josh was.
2     Q. Okay. And, so, you asked Officer Hancock to
3 hold his hands. Was --
4     A. Yes, sir.
5     Q. -- he able to do that?
6     A. Sir?
7     Q. Was he able to do that?
8     A. Yes, sir.
9     Q. Okay. Could you tell me the position that
10 Officer Hancock was in when he held his hands?
11     A. He was behind me, leaning over me, and had
12 Mr. Jones's hands with both of his.
13     Q. Was he holding them out like this (indicating)
14 or --
15     A. He had them -- he had them over us and was
16 holding them on -- onto the ground --
17     Q. Okay.
18     A. -- yeah.
19     Q. Did he successfully prevent Mr. -- Mr. Jones
20 from moving his hands?
21     A. Yes, sir.
22     Q. And you said earlier that the plan was for you
23 to be in that position until backup arrived. Had you
24 called for backup?
25     A. I didn't call for backup. But Officer Hancock,

**Page 76**

1 did Mr. Jones pose an imminent threat of serious bodily
2 injury or death to you or Officer Hancock?
3     A. At that time, I was -- I was still pretty
4 concerned, yes, sir.
5     Q. Okay. Why were you concerned?
6     A. If he broke loose or tore loose, I didn't know
7 what was going to happen then. So, I was -- I was
8 still -- I was still quite -- quite nervous about the
9 situation.
10     Q. And, so, I guess what serious bodily injury
11 were you concerned about, if any?
12     A. Any kind that he could inflict. All of it.
13 I -- you know --
14     Q. Okay.
15     A. -- I had a -- I had a hold on him, but I didn't
16 know how long my hold was going to last. I was fading
17 pretty quick myself.
18     Q. So, it's not necessarily that you thought he
19 posed a serious threat of bodily injury or death to
20 yourself at that point; but maybe if he were to be let
21 go, he might?
22     A. If he -- if he were to break loose, yes, sir,
23 he could have -- he could have at that point posed a
24 threat of serious bodily injury.
25     Q. Do you have any idea how long y'all were in

**Page 75**

1 when the pursuit started, he checked in pursuit; and at
2 that point, we knew backup was coming. We just didn't
3 know where or how long they were.
4     MR. CALVERT: We've been going a little
5 over an hour. Can we take a short break?
6     MR. TURNER: (Gesturing)
7     THE VIDEOGRAPHER: We're off the record at
8 11:16.
9     (RECESS FROM 11:16 A.M. TO 11:30 A.M.)
10     THE VIDEOGRAPHER: Back on the record at
11 11:30.
12     Q. (BY MR. TURNER) I think when we left off,
13 Chief, we were -- you were -- you were -- you were kind
14 of on your side -- you know, kind of on your side, kind
15 of on your back holding Dustin in a headlock and Officer
16 Hancock was kind of laying over the top of both of you
17 guys holding Dustin's hands forward?
18     A. Yes, sir.
19     Q. Okay. At that time, did y'all have him pretty
20 secured?
21     A. I think so, yes, sir.
22     Q. Would you consider him as being in you guys'
23 custody at that time period?
24     A. Yes, sir, he was in my custody.
25     Q. Okay. At that time point, did -- in your view,

**Page 77**

1 that situation for, that position for?
2     A. No, sir, I don't. It felt like forever, but I
3 don't know. I don't know. I can't tell you how long.
4     Q. Would you say it was more or less than five
5 minutes?
6     A. I couldn't say.
7     Q. Okay.
8     A. I couldn't say one way or the other. It
9 just -- it just felt like forever.
10     Q. And for however long that y'all were in this
11 position, what was Mr. Jones doing?
12     A. He was -- he was still fighting. He was still
13 fighting. He was kicking, trying to get his hands
14 loose, squirming.
15     Q. So, you wouldn't be able to tell me -- well,
16 let me scratch that question. I know you can't tell me
17 that.
18     At some point -- well, what's the next -- how
19 about I just ask. What's the next significant thing
20 that happened, to your memory, involving this incident?
21     A. After the hold, the next significant thing I
22 remember is Josh told me he wasn't breathing.
23     Q. And what'd you do once Officer Hancock informed
24 you he wasn't breathing?
25     A. Turned him loose. We rolled him onto his

**Page 78**

1  stomach, got his hands -- I got his hands out from under
2  him, and Josh put handcuffs on him. And at that point,
3  we turned him back over; and after that, I don't
4  remember much. I was -- I was crawling away, and I
5  dialed 9-1-1 at that point.
6    Q.  While y'all were in that position on the
7  ground, do you recall saying anything to Mr. Jones?
8    A.  I told -- I told him one time that backup was
9  going to have to hurry up and get there because I can't
10  hold on much longer.
11    Q.  And I assume you told that to Officer Hancock?
12    A.  I did tell that to Officer Hancock.
13    Q.  Do you recall saying anything to Mr. Jones
14  while y'all were in that position?
15    A.  I didn't say -- I wasn't talking to Mr. Jones.
16  I didn't say anything to him.
17    Q.  You don't recall ever asking him if he gives
18  up?
19    A.  No.
20    Q.  Would it be fair to say that you didn't
21  initially notice, yourself, that Mr. Jones wasn't
22  breathing?
23    A.  I didn't notice, no, sir.
24    Q.  You're aware that we took the deposition of
25  Officer Hancock prior to your deposition?

**Page 79**

1    A.  Yes, sir.
2    Q.  And I forgot to ask you. What did you do to
3  prepare for your deposition today, if anything? Did you
4  review any documents, look at anything?
5    A.  I reviewed my statement.
6    Q.  Okay.
7    A.  I looked over my statement.
8    Q.  Did you talk to Officer Hancock about his
9  deposition?
10    A.  Yeah, I tried to.
11    Q.  Okay.
12    A.  He couldn't remember anything.
13    Q.  Okay. I'll tell you, during his -- during his
14  deposition, he said that Mr. Jones was struggling,
15  struggling, struggling and then it seemed like
16  all of the sudden, he just stopped struggling.
17    A.  Uh-huh.
18    Q.  That's when he noticed that he wasn't
19  breathing. Does -- does that sound about right to you?
20    A.  Yes, sir.
21    Q.  Is it fair to say that pretty immediately once
22  you guys noticed that he wasn't moving or breathing that
23  y'all went ahead and released the hold?
24    A.  As soon as Josh told me, he -- as soon as Josh said
25  "Paul, he's not breathing"; and as soon as Josh said

**Page 80**

1  that, I released the hold. We rolled him onto his
2  stomach, cuffed him, and then rolled him back over.
3    Q.  Do you recall where y'all got those handcuffs
4  from?
5    A.  Some -- some lady that was there, I think -- I
6  don't know if she got them or if Josh ran and got them.
7  I don't know.
8    Q.  Okay.
9    A.  I don't know who got them.
10    Q.  What's the difference between a headlock and a
11  chokehold, Chief?
12    A.  A headlock just secures the head. A chokehold
13  cuts off the airflow.
14    Q.  Are chokeholds okay in the Kirbyville Police
15  Department?
16    A.  No, they're not.
17    Q.  Did you guys ever find a weapon on Mr. Jones?
18    A.  I couldn't -- I don't know, sir. I don't know.
19  I didn't.
20    Q.  Is it your understanding that at some point
21  prior to this incident, Mr. Jones had been using
22  synthetic marijuana; or do you know?
23    A.  I -- I had -- I don't know. I had heard that
24  Arthur Breed had told -- I thought he told Josh that
25  they had been smoking all that night --

**Page 81**

1    Q.  Okay.
2    A.  -- but I don't know that.
3    Q.  Is there anoth-- -- do you know what the other
4  names for synthetic marijuana are?
5    A.  K2, I guess. I think they call it "K2," but I
6  don't know -- I don't know much about that stuff --
7    Q.  Okay.
8    A.  -- very little.
9    Q.  Okay. So, you said that -- after they turned
10  him over, the handcuffs, you said that you kind of
11  didn't know what happened from that point because --
12  tell me again what you did afterwards. You crawled and
13  called 9-1-1?
14    A.  I -- all I was able to do is crawl away, call
15  9-1-1; and I just kind of laid down on the ground. I
16  was -- I was ruined. I was spent, but I did manage to
17  call 9-1-1 and get an am-- -- get an ambulance en route
18  for him.
19    Q.  Did you participate -- it's my understanding
20  that -- well, do you -- do you know if people were
21  trying to resuscitate Mr. Jones?
22    A.  I know Josh was, and there was -- there was
23  another lady there that was trying to help, and then
24  once the -- once the other officers got there, they took
25  over the C.P.R.

**Page 82**

1   Q. But you didn't participate in that process?
2   A. No, sir, I wasn't able.
3   Q. We know at some point while you and Officer
4   Hancock were holding Jones up, he became unresponsive.
5   Do you know if he ever became responsive again at any
6   point after that?
7   A. I had heard that before they left in the
8   ambulance with him, that they did -- that they did get a
9   pulse back.
10  Q. Do you know if he ever became responsive as far
11  as moving or talking again after that?
12  A. No, sir, I don't know.
13  Q. Was it your intent to use deadly force to
14  effectuate this arrest?
15  A. No, sir, we didn't go there to kill him.
16  Q. Do you have an understanding what was the cause
17  of Mr. Jones's death?
18  A. No, sir, not really, I don't.
19  Q. As you sit here today, do you believe that the
20  hold that both you and Officer Hancock placed on him
21  contributed to his death?
22  A. Do I believe that it did? No, sir, I don't.
23  Q. And you said at some point you initially
24  thought that Officer Hancock might have been shot or
25  stabbed. Is it your understanding as you sit here today

**Page 83**

1   that he was neither shot nor stabbed during that
2   incident?
3   A. I didn't say I thought he was. I said I didn't
4   know, he could have been. He was not, no, sir, either.
5   Q. Did you -- is it my understanding at some point
6   a Unit 641 came?
7   A. Sir?
8   Q. A Unit 641 came to help y'all, do you know?
9   A. I don't know. There was -- there was several
10  units there.
11  Q. Okay. Were all the units that were there there
12  from Kirbyville Police Department?
13  A. No, they were from the sheriff's office. The
14  only --
15  Q. Jasper?
16  A. -- the only two Kirbyville officers there were
17  us, myself and Josh.
18  Q. So, were you sent out a -- I forgot what you --
19  what you called it.
20  A. She check- -- he checked in pursuit over radio
21  to the Jasper County Dispatch.
22  Q. Okay.
23  A. And at that point, she sent anybody she could
24  find to us.
25  Q. Do y'all work closely with Jasper County?

**Page 84**

1   A. Yes, sir.
2   Q. And, so, your radio is -- well, when they --
3   when they send it out, it goes to Kirbyville Police
4   Department, as well as Jasper, or --
5   A. It goes to Jasper. They dispatch for us. We
6   dispatch through Jasper Sheriff's Office.
7   Q. Would you agree with me that the amount of
8   force used to effectuate arrest should be equal to the
9   amount of force used to resist arrest?
10  A. I'm sorry. Say it one more time.
11  Q. Right. Would you agree with me that the amount
12  of force used to effectuate arrest should be equal or
13  comparable to the amount of force that a person's using
14  to resist the arrest?
15  A. I believe that the amount of force necessary to
16  effect an arrest should be used. I can't say it should
17  be equal to, but you should use the amount of force
18  necessary to effect the arrest. No greater force than
19  that, though.
20  Q. Would you agree with me that when a person
21  stops resisting arrest, then use of force is no longer
22  necessary?
23  A. Not necessarily.
24  Q. And what circumstances can you think that --
25  A. I want -- I want to make sure that the person

**Page 85**

1   that is -- that has stopped risting -- resisting arrest
2   is -- intends to remain that way before I turn loose of
3   my advantage.
4   Q. And that makes a lot of sense.
5   A. Yeah.
6   Q. Would you agree with me that if a person
7   becomes nonresponsive or stops breathing, whatever force
8   is being used to effectuate the arrest should stop
9   immediately?
10  A. If he becomes nonresponsive?
11  Q. Or he stops breathing.
12  A. Stops breathing? Yes, yes, I agree. But I'm
13  still going to remain cautious just in case he's -- he's
14  trying to pull one.
15  Q. So far the parts of the conversation while
16  y'all were holding Mr. Jones on the ground that you told
17  me about between yourself and Officer Hancock was first
18  you told him to grab his arms --
19  A. Uh-huh.
20  Q. -- and later on -- I forgot. What -- you told
21  him something else later on, Officer Hancock?
22  A. I told him that back- -- I made the statement
23  that backup needed to hurry up and get there because I
24  didn't know how much longer I could go.
25  Q. Okay. Was there any other statement that you

1 recall making to Officer Hancock during that time?
2 A. No, sir.
3 Q. Did you ever talk to any of the -- it's my
4 understanding that eventually an ambulance came to the
5 scene --
6 A. Yes, sir.
7 Q. -- EMS?
8 Did you ever talk to any of the EMS folks?
9 A. They came over and checked me out.
10 Q. Okay.
11 A. Just -- but I never talked to them about
12 Mr. Jones.
13 Q. Okay. Or about what happened in the situation?
14 A. No. No.
15 Q. Do you know if Officer Hancock ever talked to
16 them?
17 A. I don't know.
18 Q. Did you ever visit Mr. Jones while he was in
19 the hospital?
20 A. No, sir.
21 Q. Or talk to the physicians at the hospital?
22 A. No, sir. I stayed in contact with the -- with
23 the lieutenant at Jefferson County, the sheriff's
24 office. He kept me updated as to his -- his condition.
25 MR. TURNER: Can we go off the record real

86

1 quick?
2 MR. CALVERT: Sure.
3 THE VIDEOGRAPHER: Off the record at
4 11:52.
5 (RECESS FROM 11:52 A.M. TO 11:55 A.M.)
6 THE VIDEOGRAPHER: We're back on the
7 record at 11:55.
8 Q. (BY MR. TURNER) Would you agree with the
9 statement that the amount of force that should be used
10 is that which is necessary to overcome an actor's
11 physical resistance?
12 A. Yes, sir.
13 Q. Would you agree with this statement: No
14 greater force, however, shall be resorted to than is
15 reasonable and necessary to secure arrest and detention
16 of the accused?
17 A. Yes, sir.
18 Q. You are aware and were aware before this
19 incident that if you restrict a suspect's ability to
20 dreathe -- to breathe, that that could cause serious
21 bodily injury or death?
22 A. I -- I would know that, yes, sir.
23 Q. In discovery, your -- your attorneys gave me
24 what says "Kirbyville Police Department General Orders."
25 Okay. Would this have been something that was written

87

1 or promulgated by a previous chief of police?
2 A. Yes.
3 Q. Okay. Have you -- have you ever -- have you
4 talked to Arthur Breed since this incident about what
5 happened?
6 A. I've talked to Arthur Breed but not about this
7 incident. I've seen him many times.
8 Q. Have you seen or talked to Shawntel Breed?
9 A. No, sir.
10 Q. How about anybody else in Mr. Jones's family,
11 have you seen or talked to them about this incident?
12 A. I've talked to Arthur Breed's girlfriend.
13 Q. Okay. About this incident?
14 A. No, no, no. I've talked to no one about this
15 incident.
16 Q. As police chief, you have the power to place
17 employees on administrative leave?
18 A. I do.
19 Q. And is your job to investigate the use of
20 deadly force?
21 A. Yes, sir --
22 Q. Did you --
23 A. -- but --
24 Q. Did you do any type of investigation --
25 A. -- my --

88

1 Q. -- in this case?
2 A. My policy is if it happens in our department,
3 I'm going to call in an outside investigative agency.
4 Q. Did you call in an outside investigative --
5 A. I did --
6 Q. -- agency?
7 A. -- yes, sir.
8 Q. And who was that outside agency?
9 A. Texas Rangers.
10 MR. TURNER: Do you have any questions,
11 Frank?
12 MR. CALVERT: No.
13 Q. (BY MR. TURNER) Chief, this is my -- this is my
14 only chance to talk with you, you know, prior to trial,
15 if there is a trial in this case; and sometimes, you
16 know, there are questions that I maybe didn't ask but
17 you were, like, "Well, if he would have asked this
18 question, then -- then I would have had, you know,
19 something to say or, you know, that he probably should
20 know related to this incident."
21 I'll just give you the chance right now if
22 there's something that you feel like, you know, I missed
23 during my questioning; or do you think we've got
24 everything?
25 MR. CALVERT: Object to the form.

89

**Page 90 (top left):**

1   A. I don't have anything to say, no, sir. I'm

2 good.

3   Q. (BY MR. TURNER) Okay. Have my questions been

4 clear, for at least the most part?

5   A. For the most part, yes, sir.

6   Q. Okay. And if there was a time where you were

7 unclear about it, you asked me to rephrase it?

8   A. Yes, sir.

9   Q. Okay. I was polite and courteous?

10   A. Yes, sir.

11       MR. TURNER: Okay. I'll -- we'll pass the

12 witness.

13       MR. CALVERT: We'll reserve our questions.

14       THE VIDEOGRAPHER: We're off the record at

15 11:59 a.m.

16     (THE ORAL AND VIDEOTAPED DEPOSITION WAS CONCLUDED)

17         \*\*\*\*

18

19

20

21

22

23

24

25

                          90

---

**Page 91 (bottom left):**

1         CHANGES AND SIGNATURE

2 DEPOSITION OF: CHIEF ROBERT PAUL BRISTER, March 18, 2016

3 PAGE LINE CHANGE         REASON

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 Signature:_____ Date:_____

                          91

---

**Page 92 (top right):**

1     I, CHIEF ROBERT PAUL BRISTER, have read the

2 foregoing deposition and hereby affix my signature that

3 same is true and correct, except as noted above.

4

5         CHIEF ROBERT PAUL BRISTER

6

7 THE STATE OF _____)

8 COUNTY OF _____)

9

10     Before me, _____, on this day

11 personally appeared CHIEF ROBERT PAUL BRISTER, known to

12 me or proved to me on the oath of

13 _____ or through

14 _____ (description of identity

15 card or other document) to be the person whose name is

16 subscribed to the foregoing instrument and acknowledged

17 to me that he/she executed the same for the purpose and

18 consideration therein expressed.

19     Given under my hand and seal of office on this

20 \_\_\_\_\_ day of _____, \_\_\_\_\_.

21

22

23         NOTARY PUBLIC IN AND FOR

24         THE STATE OF _____

25 My Commission Expires: _____

                          92

---

**Page 93 (bottom right):**

1       IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF

3 SHAWNTEL BREED,     )    BEAUMONT DIVISION

    INDIVIDUALLY AND AS   )

4 REPRESENTATIVE OF THE   )

    ESTATE OF DUSTIN KEITH   )

5 JONES, DECEASED, AND AS   )

    NEXT FRIEND OF DJ AND CJ, )

6 MINOR CHILDREN     )

      Plaintiff     )

7             )

    VS.         ) CIVIL ACTION NO. 1:15-cv-190

8             ) JURY DEMANDED

    CITY OF KIRBYVILLE, CHIEF )

9 PAUL BRISTER, AND OFFICER )

    JOSH HANCOCK OF THE CITY )

10 OF KIRBYVILLE POLICE   )

    DEPARTMENT, INDIVIDUALLY, )

11 AND IN THEIR OFFICIAL   )

    CAPACITIES     )

12     Defendants.   )

13

14 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

15

16       REPORTER'S CERTIFICATE

17     ORAL AND VIDEOTAPED DEPOSITION OF

18     CHIEF ROBERT PAUL BRISTER

19         March 18, 2016

20

21 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

22

23     I, Janie P. Trapp, Certified Shorthand Reporter in

24 and for the State of Texas, hereby certify to the

25 following:

                          93

09b1111b-d4a2-4676-9c2d-36c94b28ada4

1    That the witness, CHIEF ROBERT PAUL BRISTER, was
2  duly sworn and that the transcript of the deposition is
3  a true record of the testimony given by the witness;
4    That the deposition transcript was duly submitted on
5  _____ to the witness or to the attorney
6  for the witness for examination, signature, and return
7  to the offices of Nell McCallum & Associates, Inc.,
8  by _____.
9    That the amount of time used by each attorney
10 at the time of the deposition is as follows:
11 MR. TURNER - 2 hours, 27 minutes,
12   That pursuant to information given to the deposition
13 officer at the time said testimony was taken, the
14 following includes all parties of record:
15 FOR THE PLAINTIFF:
16   Mr. Ronnie Turner, Jr.
       SBOT No. 24075533
17   PROVOST UMPHREY LAW FIRM, L.L.P.
     490 Park Street
18   Beaumont, Texas 77701
19 FOR THE DEFENDANTS:
20   Mr. Frank D. Calvert
       SBOT No. 03667700
21   CALVERT, EAVES, CLARKE & STELLY, L.L.P.
     2615 Calder, Suite 1070
22   Beaumont, Texas 77702
23   I further certify that I am neither counsel for,
24 related to, nor employed by any of the parties in the
25 action in which this proceeding was taken, and further

94

1  that I am not financially or otherwise interested in the
2  outcome of this action.
3    Further certification requirements pursuant to
4  Federal Rules of Civil Procedure will be complied with
5  after they have occurred.
6    Certified to by me on this _____ day of
7  _____, _____.
8
9
10       Janie P. Trapp, CSR, RPR
         Texas CSR No. 6789
11       Expiration: 12/31/2017
         Nell McCallum & Associates, Inc.
12       Firm Registration No. 143
         2615 Calder Avenue, Suite 111
13       Beaumont, Texas 77702
         (409)838-0333/Fax(409)832-4501
14
15       REPORTING FIRM'S FURTHER CERTIFICATION
16
17   The Changes and Signature page were/were not
18 returned to the deposition officer on _____.
19   If returned, the attached Changes and Signature page
20 contain(s) any changes and the reasons therefor.
21   The original deposition was delivered to Mr. Ronnie
22 Turner, Jr., Attorney for Plaintiff, Custodial Attorney,
23 for safekeeping on _____;
24   That a copy of this certificate was served on all
25 parties shown herein.

95

1  Certified to by me on this _____ day of
2  _____, _____.
3
4
5
6        Janie P. Trapp, CSR, RPR
         Texas CSR No. 6789
7        Expiration: 12/31/2017
         Nell McCallum & Associates, Inc.
8        Firm Registration No. 143
         2615 Calder Avenue, Suite 111
9        Beaumont, Texas 77702
         (409)838-0333/Fax(409)832-4501
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

96

NELL MCCALLUM & ASSOCIATES
Janie P. Trapp, CSR, RPR

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF
 2                    BEAUMONT DIVISION

 3    SHAWNTEL BREED,              )
      INDIVIDUALLY AND AS          )
 4    REPRESENTATIVE OF THE        )
      ESTATE OF DUSTIN KEITH       )
 5    JONES, DECEASED, AND AS      )
      NEXT FRIEND OF DJ AND CJ,    )
 6    MINOR CHILDREN               )
           Plaintiff              )
 7                                 )
      VS.                          )  CIVIL ACTION NO. 1:15-cv-190
 8                                 )  JURY DEMANDED
      CITY OF KIRBYVILLE, CHIEF    )
 9    PAUL BRISTER, AND OFFICER    )
      JOSH HANCOCK OF THE CITY     )
10    OF KIRBYVILLE POLICE         )
      DEPARTMENT, INDIVIDUALLY,    )
11    AND IN THEIR OFFICIAL        )
      CAPACITIES                   )
12         Defendants.             )

13

14    ************************************************

15

16                 REPORTER'S CERTIFICATE

17          ORAL AND VIDEOTAPED DEPOSITION OF

18              CHIEF ROBERT PAUL BRISTER

19                   March 18, 2016

20

21    ************************************************

22

23        I, Janie P. Trapp, Certified Shorthand Reporter in

24    and for the State of Texas, hereby certify to the

25    following:
```

1    That the witness, CHIEF ROBERT PAUL BRISTER, was

2  duly sworn and that the transcript of the deposition is

3  a true record of the testimony given by the witness;

4    That the deposition transcript was duly submitted on

5  March 24, 2016    to the witness or to the attorney

6  for the witness for examination, signature, and return

7  to the offices of Nell McCallum & Associates, Inc.,

8  by  April 24, 2016    .

9    That the amount of time used by each attorney

10 at the time of the deposition is as follows:

11   MR. TURNER - 2 hours, 27 minutes,

12   That pursuant to information given to the deposition

13 officer at the time said testimony was taken, the

14 following includes all parties of record:

15 FOR THE PLAINTIFF:

16    Mr. Ronnie Turner, Jr.
      SBOT No. 24075533
17    PROVOST UMPHREY LAW FIRM, L.L.P.
      490 Park Street
18    Beaumont, Texas  77701

19 FOR THE DEFENDANTS:

20    Mr. Frank D. Calvert
      SBOT No. 03667700
21    CALVERT, EAVES, CLARKE & STELLY, L.L.P.
      2615 Calder, Suite 1070
22    Beaumont, Texas  77702

23   I further certify that I am neither counsel for,

24 related to, nor employed by any of the parties in the

25 action in which this proceeding was taken, and further

NELL McCALLUM & ASSOCIATES, INC.
Janie P. Trapp, CSR, RPR

1  that I am not financially or otherwise interested in the

2  outcome of this action.

3      Further certification requirements pursuant to

4  Federal Rules of Civil Procedure will be complied with

5  after they have occurred.

6      Certified to by me on this ___10___ day of

7  ___May___, 2016.

8

9  _____

10  Janie P. Trapp, CSR, RPR
    Texas CSR No. 6789

11  Expiration: 12/31/2017
    Nell McCallum & Associates, Inc.

12  Firm Registration No. 143
    2615 Calder Avenue, Suite 111

13  Beaumont, Texas 77702
    (409)838-0333/Fax(409)832-4501

14

15  **REPORTING FIRM'S FURTHER CERTIFICATION**

16

17      The Changes and Signature page were/were not

18  returned to the deposition officer on ___April 24___.

19      If returned, the attached Changes and Signature page

20  contain(s) any changes and the reasons therefor.

21      The original deposition was delivered to Mr. Ronnie

22  Turner, Jr., Attorney for Plaintiff, Custodial Attorney,

23  for safekeeping on ___May 10, 2016___;

24      That a copy of this certificate was served on all

25  parties shown herein.

Certified to by me on this ___10___ day of

_____May_____ , 2016.



Janie P. Trapp, CSR, RPR
Texas CSR No. 6789
Expiration: 12/31/2017
Nell McCallum & Associates, Inc.
Firm Registration No. 143
2615 Calder Avenue, Suite 111
Beaumont, Texas 77702
(409)838-0333/Fax(409)832-4501