IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| SHAWNTEL BREED, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF DUSTIN KEITH JONES, DECEASED, AND AS NEXT FRIEND OF DJ AND CJ, MINOR CHILDREN | § § § § § | |
| Plaintiff | § § | CIVIL ACTION NO: 1:15-cv-190 |
| v. | § § | JURY DEMANDED |
| CITY OF KIRBYVILLE, CHIEF PAUL BRISTER, AND OFFICER JOSH HANCOCK OF THE CITY OF KIRBYVILLE POLICE DEPARTMENT, INDIVIDUALLY, AND IN THEIR OFFICIAL CAPACITIES | § § § § § § § | |
| Defendants. | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants' Motion for Summary Judgment. [Doc. #38]. For the many reasons that follow, the Court **must deny** the motion.

## I.
## RESPONSE TO STATEMENT OF ISSUES

Defendants' Motion for Summary Judgment presents two primary issues: (1) whether Officer Hancock and Chief Brister are entitled to qualified immunity; and (2) whether the City of Kirbyville is shielded by the doctrine of municipal liability.

Plaintiff will demonstrate that neither Officer Hancock nor Chief Brister is entitled to qualified immunity based on the facts of this case; and the City of Kirbyville cannot rely on the doctrine of municipal liability because Chief Brister, who is a policymaker, took an unconstitutional action.

# II.
## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A. SOMETIME BEFORE 8:47 A.M. AND 18 SECONDS**[1]

On May 14, 2013, sometime before 8:47 a.m., Officer Joshua Hancock of the City of Kirbyville Police Department received a call from dispatch concerning the possible whereabouts of Plaintiff's husband, Dustin Keith Jones, who had outstanding warrants issued in Jefferson County. [Doc. #38-3 at 5 ¶¶ 1–2, at 9 ¶¶ 1–2]. Having been advised that Mr. Jones was within his jurisdiction, Officer Hancock contacted Chief of Police Paul Brister, to assist in arresting Mr. Jones. [Doc. #38-3 at 5 ¶ 3, at 9 ¶¶ 1–2]. Officer Hancock and Chief Brister located Mr. Jones at approximately 9:04 a.m., at the home of his father-in-law, Arthur Breed, who lived on Chestnut Street off Martin Luther King Street.[2] [Doc. #38-3 at 5 ¶3, at 9 ¶¶ 1–2].

When Officer Hancock and Chief Brister arrived at Breed's residence, Breed was standing outside and Mr. Jones was in the trailer house. [Doc. #38-3 at 5 ¶5, at 9 ¶ 4]. Officer Hancock and Chief Brister were both very familiar with Breed, as well as the area in which he lived—both had multiple contacts with Breed in the past. *See* Exhibit "A" at 54:10–21 (Deposition of Chief Paul Brister); *See* Ex. B at 60:21–62:5 (Deposition of Officer Josh Hancock). Officer Hancock and Chief Brister briefly chatted with Breed before calling out to Mr. Jones and asking him to come outside and speak with them. [Doc. #38-3 at 5 ¶¶ 5–6, at 9 ¶¶ 5]; *See* Ex. B at 69:25–71:16. Mr. Jones complied with the request by exiting the home and identifying himself. [Doc. #38-3 at 5 ¶ 6, at 9 ¶ 5]; *See* Ex. B at 69:25–71:16.

---

[1] Officer Hancock and Chief Brister both provided affidavits stating that the initial contact with Mr. Jones happened at approximately 8:50 a.m. [Doc. #38-3 at 5 ¶¶ 1–2, at 9 ¶¶ 1–2]. However, in the 911-dispatch audio recorded on May 14, 2013, at 8:47 a.m. and 18 seconds, Officer Hancock indicates that Mr. Jones began running about 5 seconds into the audio recording, meaning the foot pursuit began at 8:47 a.m. and 23 seconds. *See* Ex. D at 5-14-2013_08.47.18.7a_-_(Voice)_TS.WAV. This means that the initial arrival at the Breed residence happened sometime before 8:47 a.m. and 18 seconds.

[2] This irony of Mr. Jones dying at the hands of law enforcement so near the street memorializing one of America's greatest champions for civil rights has not escaped Mr. Jones's bereaved children, widow, and family.

According to Officer Hancock's deposition testimony, he and Chief Brister next "advised [Mr. Jones] of his warrants [and] asked him to place his hands on the side of the trailer." *See* Ex. B at 73:4–73:5. Mr. Jones complied with the instruction, placing his hands on the trailer, and Officer Hancock began a pat down search. *Id*. at 73:10–15. Sometime during the pat down search, Mr. Jones advised Officer Hancock that he might have a knife in his pocket. *Id*. at 73:17–18. However, Officer Hancock did not find a knife in Mr. Jones's possession during the pat down, nor did he later find one in Mr. Jones's possession. *Id*. at 73:19–22. Importantly, Officer Hancock testified that he **completed the pat down search** of Mr. Jones and **did not find any weapons in his possession**. *Id*. at 73:23–74:4. After Officer Hancock completed the pat down search of Mr. Jones, he attempted to cuff Mr. Jones's hands behind his back. *Id*. at 74:5–11. While Officer Hancock attempted to engage the cuffs, Mr. Jones turned around, pushed Officer Hancock into Chief Brister, and took off running towards Martin Luther King Street. *Id*. at 74:12–75:9.

**B.** **AFTER 8:47 A.M. AND 18 SECONDS**

At 8:47 a.m. and 23 seconds the foot chase ensued,[3] which according to Officer Hancock spanned a couple hundred yards. *Id*. at 76:7–76:17. Chief Brister did not join in the foot pursuit because he "ran back to get a car because [he] knew there was no sense in [him] trying to chase." *See* Ex. A at 64:25–65:2. At some point during the chase, Officer Hancock dropped the cuffs he had been trying to put on Mr. Jones. *Id*. at 75:17–76:6. Similarly, during the chase Officer Hancock fired his Taser and missed Mr. Jones. *Id*. at 82:6–17; *See* Ex. A at 64:11–65:2. Officer Hancock lost the Taser sometime shortly after firing it. *Id*.

---

[3] *See supra* note 1.

## C.   A<small>PPROXIMATELY</small> 8:47 <small>A.M. AND</small> 53 S<small>ECONDS</small>

At approximately 8:47 a.m. and 53 seconds, Officer Hancock caught up with Mr. Jones and an altercation ensued.[4] Officer Hancock described the sequence of events as follows:

> I caught up to him. I was able to grab him from behind. I was on his back. I realized I had no handcuffs, realized I didn't have my Taser. Just holding onto him was a fight in itself. I grabbed my radio. I keyed up my radio to call for assistance. I don't remember exactly what got out. I know there is a recording of what I said for it. And about the time that I got what I was saying, he stripped the radio out of my hand and throwed (sic) it across the yard. In the struggle, I ended up on my back on the ground with him on top of me.

*Id.* at 77:20–78:5; *see also Id.* at 78:6–80:3. On the ground, Officer Hancock wrapped his legs around Mr. Jones's legs to prevent him from fleeing. *Id.* at 80:9–81:1. It was during that time that Mr. Jones allegedly began to hit Officer Hancock in his chest.[5] *Id.*

Elsewhere, Chief Brister searched for Officer Hancock and Mr. Jones in his police vehicle. *See* Ex. A at 65:12–17. Chief Brister testified that he could not immediately locate Officer Hancock and Mr. Jones, but acting on a tip from a "nosey cow," he eventually located them on Henry Robinson Street. *Id.* at 65:12–66:1, 66:17–23. When Chief Brister located the pair, he found Mr. Jones, unarmed and struggling on top of Officer Hancock. *Id.* at 66:24–68:12. Chief Brister further testified that he could not tell if Mr. Jones was punching Officer Hancock, but he insisted that Mr. Jones could have fled if he wanted to. *Id.* at 68:13–22. Of course, Officer Hancock's testimony that he had Mr. Jones's legs wrapped with his own legs contradicts Chief Brister's testimony regarding Mr. Jones's ability to flee. *Compare* Ex. B at 80:9–81:1 *with*

---

[4] In the 911-dispatch audio recorded on May 14, 2013, at 8:47 a.m. and 18 seconds, Officer Hancock indicates that "he has caught up to Jones about at the 35 second mark." [Doc. #38 at ¶ 44]; Ex. D at 5-14-2013_08.47.18.7a_-_(Voice)_TS.WAV.

[5] Officer Hancock was unable to recall the exact nature of the force Mr. Jones allegedly applied to his chest. When directly asked if Mr. Jones was punching him, Office Hancock stated, "I don't know if he was actually beating on me or if he was trying to get off of me or what he was trying to do, but he was hitting me in the chest and it wasn't very comfortable." *See* Ex. B at 81:5–8.

Ex. A at 68:13–22. Chief Brister later testified that he did not see the leg hold Officer Hancock applied to Mr. Jones. Ex. A at 68:23–69:2.

As Chief Brister approached Officer Hancock and Mr. Jones, Officer Hancock allegedly told Chief Brister that he was having difficulty breathing. *See* Ex. B at 81:15–82:1 and Ex. A at 69:23–70:4. Chief Brister then used his flashlight like a baton and began "hitting [Mr. Jones] in the head and shoulders with [the] flashlight." *See* Ex. A at 70:5–9. Chief Brister admits that he was "hitting [Mr. Jones in his head and shoulders] **pretty hard**," but he insists that Mr. Jones had absolutely no reaction to being hit in the head. *Id.* at 70:18–25 (emphasis added).

Based on his perception that Mr. Jones was not affected by the flashlight beating, Chief Brister threw his flashlight out of the way, "reached down, got [Mr. Jones] in a headlock, and rolled [Mr. Jones] back off of Josh." *Id.* at 71:6–14. Although Officer Hancock claims to have seen Chief Brister applying a "headlock" to Mr. Jones, he was curiously unable to describe the hold.[6] *See* Ex. B at 55:15–56:17. Regarding his exact hold, Chief Brister explained:

> I had -- my left arm was around his chin. And what I was trying to do was I was holding his head back up against my body where he couldn't headbutt me because he was trying to punch me with his fist, and I knew if I -- if I let go of his head, he'd try to headbutt me; and I had it below his mouth where he couldn't bite me. … And I was just -- I locked my legs around him where I could get him in a -- get him contained where he couldn't go nowhere and I could hang on until backup arrived.

*See* Ex. A at 71:17–72:2. While holding Mr. Jones, Chief Brister was laying on his "side with … the right cheek of [his] butt and [his] right shoulder was kind of on the ground and [Mr. Jones] was kind of half on top of [Chief Brister] and half on his side, too." *Id.* at 72:23–73:1. Chief Brister next asked Officer Hancock to "'Hold [Mr. Jones's] – get [Mr. Jones's] hands and hold them'; and [Officer Hancock] did." *Id.* at 73:17–21. To do so, Officer Hancock positioned

---

[6] Whether the hold employed by Chief Brister was a neck hold, chokehold, or headlock is ultimately immaterial to Plaintiff's constitutional claim. This is so because any force applied to Mr. Jones while he was unresponsive and not resisting is sufficient to demonstrate a constitutional violation.

himself "behind [Chief Brister], lean[ed] over [Chief Brister], and had Mr. Jones's hands with both of his," "holding them on – onto the ground." *Id*. at 74:11–18. Officer Hancock also testified that he might have been lying on Mr. Jones's ribs and torso. *See* Ex. B at 92:4–93:2.

These combined holds were extremely effective, as Chief Brister testified that Officer Hancock was able to "successfully prevent" Mr. Jones from moving his hands, and he considered Mr. Jones "secured" and "in [his] custody." *See* Ex. A at 74:19–21; 75:19–24. To be clear, the struggle on the ground was very low intensity. Chief Brister described the struggle as Mr. Jones "kicking, trying to get his hands loose, squirming." *See* Ex. A at 77:12–14; *see also* Ex. B at 95:8–12. Krissy Thomas-Adams, a witness who captured some of the incident on video with her cellphone camera, described Mr. Jones as "tussling on the ground … hip thrusting … it was like jerking." *See* Ex. C at 109:14–17 (Adams Depo).

Officer Hancock testified similarly concerning the holds that he and Chief Brister applied to Mr. Jones:

> Whenever -- whenever they rolled off of me, I was able to get up. I could hear them still fighting to my right and Dustin was screaming some things and I -- whenever I looked, Paul had his legs wrapped around him and had his arms wrapped around him and was holding him and he was -- I could tell that Paul was just about give out because he was losing control and he was -- he was at the point where he was about to get -- get free again. So, I laid over the top of Paul onto Dustin and grabbed both of his arms and was holding onto his arms to keep him from hitting or getting free from us. And we just laid there waiting on backup to get to us.

*See* Ex. B at 85:21–86:7. During this time, Officer Hancock was laying on the left side of both Chief Brister and Mr. Jones. *Id*. at 92:4–16. However, Officer Hancock admits that he took every precaution not to rest his weight on Chief Brister because Chief Brister had indicated, "he was having trouble breathing." *Id*. at 92:17–93:6. Officer Hancock also testified that while he

and Chief Brister were holding Mr. Jones he was not in imminent fear of serious bodily harm or injury. *Id*. at 102:17–103:10.

Chief Brister and Officer Hancock did not have much conversation during the struggle on the ground. In fact, according to Officer Hancock, the only conversation that took place was Chief Brister instructing him "'Don't turn [Mr. Jones] loose.'" *Id*. at 93:24–95:1. Officer Hancock followed Chief Brister's instruction, replying "Okay." *Id*. at 94:4–22.

According to Officer Hancock, after vowing not to let Mr. Jones loose, Mr. Jones suddenly stopped moving and trying to get loose. *See* Ex. B at 95:13–15, 95:24–96:2. Ms. Adams corroborates this by testifying that she noticed from 30ft to 50ft away, **while videoing the incident**, that Mr. Jones had stopped moving and "things got real serious real quick." *See* Ex. C. at 109:9–112:12. Ms. Adams did not stand idly by; rather, she screamed out to the officers that Mr. Jones was not moving. *Id*. at 113:20–114:1, 115:6–17. Ms. Adams testified that she then approached the officers, while calling 911, and again told Officer Hancock and Chief Brister that Mr. Jones was not moving.[7] *Id*. at 39:3–10, 114:2–6, 115:18–21, 171:9–17. Ms. Adams testified that based on what she witnessed from 30ft to 50ft away, she did not believe that Mr. Jones was faking an injury. *See* Ex. C at 113:18–19.

### 1. *Ms. Adams' Cellphone Video: IMG_0578 (3)*

IMG_0578 (3) is one of the videos recorded by Ms. Adams before she approached Officer Hancock and Chief Brister. [Doc. # 38-3 at Exhibit C-3]. The video begins with Officer Hancock and Chief Brister holding Mr. Jones on the ground. *Id*. At approximately the one (1) second mark, either the person holding the phone (Ms. Adams) or someone nearby (Anonymous

---

[7] In Ms. Adams' sworn Witness Statement, executed three days after the incident, Ms Adams states that after approaching Officer Hancock and Chief Brister, she heard one of the officers ask Mr. Jones "do you give up!" [Doc. #38-3 at 21]. Ms. Adams understandably did not indicate that she heard a response from Mr. Jones, who was already unresponsive at that time.

Witness) states, "Crazy … [unintelligible]." *Id*. At the two (2) second mark, either Ms. Adams or Anonymous Witness states, "Yeah, I know." *Id*. At the six (6) second mark, one of the officers can be heard stating, "Hancock … [unintelligible]" *Id*. At the eight to nine (8-9) second marks, the other officer states, "I know." *Id*. Importantly, at the ten (10) second mark, Mr. Jones's legs kick for the final time. *Id*. After the kick at the 10-second mark, Officer Hancock and Chief Brister continue to hold Mr. Jones's motionless and unresponsive body for an additional 42 seconds before the video abruptly ends. *Id*. Importantly, throughout the video very little sound can be heard coming from Officer Hancock, Chief Brister, and Mr. Jones; in fact, so quiet is the scene that the sound of birds chirping and a small dog barking are among the loudest sources of audio in the recording. *Id*.

### 2. *Ms. Adams' Cellphone Video: IMG_0578 (4)*

IMG_0578 (4) is another one of the videos recorded by Ms. Adams before she approached Officer Hancock and Chief Brister. [Doc. # 38-3 at Exhibit C-3]. The video begins with Officer Hancock and Chief Brister holding Mr. Jones on the ground. *Id*. At approximately the fifteen (15) second mark, either the person holding the phone (Adams) or someone nearby (Anonymous Witness) states, "Crazy … [unintelligible]." *Id*. At the sixteen (16) second mark, either Adams or Anonymous Witness states, "Yeah, I know." *Id*. At the twenty (20) second mark, one of the officers can be heard stating, "Hancock … [unintelligible]"[8] *Id*. At the twenty-one to twenty-two (21-22) second marks, the other officer states, "I know." *Id*. Importantly, at the twenty-three (23) second mark, Mr. Jones's legs kick for the final time. *Id*. After the kick at the 23-second mark, Officer Hancock and Chief Brister continue to hold Mr. Jones's motionless and unresponsive body for an additional 31 seconds before the video abruptly ends. *Id*.

---

[8] As discussed in Plaintiff's Response to Defendants' Motion to Abate, IMG_0578 (3) and IMG_0578 (4) contain overlapping footage, which suggests both videos were clipped from some longer video. [Doc. #44].

Importantly, throughout the video very little sound can be heard coming from Officer Hancock, Chief Brister, and Mr. Jones; in fact, so quiet is the scene that the sound of birds chirping and a small dog barking are among the loudest sources of audio in the recording.  *Id*.

## D.    APPROXIMATELY 8:51 A.M. AND 40 SECONDS[9]

Notwithstanding Ms. Adams's statements to Officer Hancock and Chief Brister that Mr. Jones was not moving, the officers continued to hold and restrain Mr. Jones's unresponsive body.  *See* Ex. C at 114:2–6, 115:6–21.  Officer Hancock testified that when Ms. Adams approached him on the ground, he sent her to his patrol car to retrieve a bag containing his cuffs.  *See* Ex. B at 95:17–23.  "At [that] time [Officer Hancock] observed that Jones was not breathing and advised Chief Brister."  [Doc. #38-3 at 6, ¶ 16].  Importantly, Ms. Adams testified that she did not see Officer Hancock and Chief Brister release their holds on Mr. Jones until after she returned with the handcuffs and Officer Hancock told Chief Brister that Mr. Jones was not breathing.  *See* Ex. C at 114:25–121:15, 208:25–209:17.  This account is supported by Chief Brister's testimony that he and Officer Hancock did not release their hold on Mr. Jones until after Officer Hancock told him that Mr. Jones was no longer breathing.  *See* Ex. A at 77:18–78:5, 79:13–80:7.

### 1.    911 Dispatch Audio: 5-14-2013_08.51.40.5a_-_911-1_-_33_(Voice)_TS.WAV

The audio begins at 8:51 a.m. and 40 seconds.  Ex. D at 5-14-2013_08.51.40.5a_-_911-1_-_33_(Voice)_TS.WAV.  Ms. Adams can be heard reporting that an officer is trying to subdue

---

[9] Ms. Adams phone call to 911 was recorded.  According to the dispatch audio, 911 received and began recording Ms. Adams call on May 14, 2013, at 8:51 a.m. and 40 seconds.  *See* Ex. D at 5-14-2013_08.51.40.5a_-_911-1_-_33_(Voice)_TS.WAV.  According to Ms. Adams testimony, Mr. Jones was not moving before she approached Officer Hancock and Chief Brister.  *See* Ex. C. at 109:9–112:12.  And the officers were still applying their holds to Mr. Jones when Ms. Adams got near them.  *See* Ex. C at 114:2–6, 115:6–21.  These facts, combined with Ms. Adams testimony that she called 911 while approaching the officers means Officer Hancock and Chief Brister were applying their holds to Mr. Jones, who was then-motionless, when the second audio recording began.  [*See* Doc. #38-3 at 21 (explaining she dialed 911 dispatch after approaching the officers)].

a citizen and attempting to report their location at the 12-35 second mark. *Id.* At the 35-51 second mark, Officer Hancock can be heard instructing Ms. Adams to retrieve a belt or bag from out of his vehicle and bring it to him. *Id.* At the 1:00 to 1:40 minute mark, Officer Hancock can be heard requesting Ms. Adams to go to the back of the police unit, lift the back, locate a bag, and bring it to him. *Id.* Crucially, "**at the 2 minute and 40-45 second mark [Officer] Hancock states [Mr.] Jones is not breathing**." [Doc. #38 at ¶ 44]; *Id.* (emphasis added). Importantly, throughout the three-plus minutes of audio, Mr. Jones never makes a single sound. *See* Ex. D at 5-14-2013_08.51.40.5a_-_911-1_-_33_(Voice)_TS.WAV.

### E.    MR. JONES DIES

After Officer Hancock and Chief Brister finally released Mr. Jones—who had been unresponsive for nearly 3.5 minutes at that point—they then flipped Mr. Jones on his face or side and applied the handcuffs. *See* Ex. B at 97:20–98:7. Officer Hancock obviously then checked Mr. Jones's neck and wrist for a pulse. *Id.* at 98:8–17. Officer Hancock did not locate a pulse. *Id.* Thereafter, Ms. Adams and Officer Hancock began CPR on Mr. Jones. *Id.* at 98:15–22. The CPR continued until backup arrived, but Mr. Jones did not become responsive. *Id.* at 103:11–104:1.

Ultimately, an ambulance arrived and took over. [Doc. #38-5]. Thereafter, Mr. Jones regained a pulse, remained unresponsive, and suffered brain death. [Doc. #38-7]; [Doc. #38-3 at 24–74]. Mr. Jones died on May 15, 2013. [Doc. #38-4 at 7–11]. Although Mr. Jones died as a result of his interaction with Kirbyville Police Department, both Officer Hancock and Chief Brister escaped with no injuries or bruises caused by Mr. Jones, and neither required any follow-up medical treatment after the date of the incident. *See* Ex. B at 104:12–105:6.

### 1. The Medical Examiner

Dr. John W. Ralston performed Mr. Jones's autopsy. [Doc. #38-4 at 7–11]. Dr. Ralston concluded that Mr. Jones died "due to myocardial infarction due to hypertensive cardiovascular disease" and "[a] significant contributing factor in his death is synthetic cannabinoid intoxication."[10] *Id.* at 11.

### 2. Dr. Nizam Peerwani: Plaintiffs' Medical Expert[11]

Dr. Nizam Peerwani disagrees with Dr. Ralston's cause of death finding. [Doc. #38-14 at 2–22]. After reviewing the documents identified on page one of his report—including all medical records and the depositions of Officer Hancock, Chief Brister, Ms. Adams, and Dr. Ralston—Dr. Peerwani concluded that Mr. Jones's death "was due to asphyxiation." *Id.* at 8. Dr. Peerwani masterfully explains the many deficiencies contained in Dr. Ralston's autopsy. For example, Dr. Ralston failed to perform histology to distinguish between "a focal area of hemorrhage"—which is "frequently observed in patients who have undergone vigorous and aggressive resuscitation as Mr. Jones did"— and an isolated papillary muscle infarction—which is "extremely rare." *Id.* at 6–7. Dr. Peerwani also notes that although Dr. Ralston claims that Mr. Jones was intoxicated on XLR-11, Dr. Ralston only obtained a qualitative analysis of Mr. Jones's blood, meaning Dr. Ralston did not possess any information indicating the amount of XLR-11 in Mr. Jones's blood stream. *Id.* at 7; *see also* Ex. G.

---

[10] The person who had the most exposure to Mr. Jones on the day of the incident, Officer Hancock, undercuts Dr. Ralston's "intoxication" finding. Specifically, Officer Hancock "Admitted" that "Decedent was **not intoxicated** at the time of the arrest." Ex. H at Request 7 (emphasis added).

[11] Based on Dr. Peerwani's anticipated testimony, a reasonable juror could conclude that Dr. Ralston's conclusions are incorrect. And because Defendants' medical expert relies almost exclusively on Dr. Ralston's alleged "intoxication" finding, a reasonable juror could also discount the findings of Defendants' medical expert.

### 3.     *Dr. Robert C. Bux: Defendants' Medical Expert*

Dr. Robert C. Bux concluded that "Mr. Jones died as the result of an excited delirium occurring during a violent struggle due to XLR-11 intoxication. Given the scenario of a several block foot chase and resultant violent struggle. Mr. Jones would have had a sudden discharge of adrenalin causing extremely elevated levels of adrenalin circulating in his blood and coupled with the violent struggle in the presence of the synthetic cannabinoid XLR-11 resulted in a sudden cardiac arrhythmia. There is a massive discharge of adrenalin which occurs in acute, heavy exertion such as a foot chase over several blocks and resultant violent struggle with the two police officers. The maximum vulnerability for the heart to develop a significant to lethal cardiac arrhythmia occurs from about 8 to 10 minutes after initiation of the exertions and begins to subside after about 15 minutes." [Doc. #38-12 at 5].[12]

## F.     IRREGULARITIES

In an abundance of caution, Plaintiff identifies at least two irregularities for the Court that may be relevant to the Court's determination of this motion. Ms. Adams, who witnessed the incident, has provided several sworn statements concerning the events of May 14, 2013. On May 17, 2013, only three days after the incident, Ms. Adams typed out a sworn statement for the Texas Rangers. [Doc. #38-3 at 21–23]; *See* Ex. C at 24:7–25:4. Some three years later, after having a private meeting with defense counsel, Ms. Adams executed a sworn affidavit that was typed up by defense counsel. [Doc. #38-11 at 47–49]; *See* Ex. C at 51:13–72:14. The two sworn statements, one typed by the witness herself three days after the incident and the other by defense

---

[12] Importantly, Dr. Bux, like Dr. Peerwani, did not concur with the findings of Dr. Ralston. That said, Dr. Bux's findings are even less credible given that, as explained by Dr. Peerwani, Dr. Ralston failed to perform a qualitative analysis on Mr. Jones's blood. In other words, no record evidence supports Dr. Bux's finding that relies almost totally on a finding of XLR-11 intoxication. Similarly, as described herein, the struggle between the officers and Mr. Jones lasted no more than 3 minutes and 47 seconds. *See infra* note 18. Three minutes and forty-seven seconds is well short of the 8 minutes that Dr. Bux's report deems critical to his finding. Therefore, a reasonable juror could choose to disregard Dr. Bux's testimony.

counsel almost three years later, contain vastly different accounts of the events of May 14, 2013. *Compare* [Doc #38-3 at 21–23] *with* [Doc #38-11 at 47–49]. Most troubling, the more recent statement seems to contain new facts, and nearly every one of those new facts seems troublingly slanted in favor of the Defendants. *Id.* For example, Ms. Adams new and improved statement contains repeated statements that Mr. Jones was "winning the fight" and her newly formed opinion that the "officers did not use more force than necessary to control" Mr. Jones. [Doc #38-11 at 47–49]. The undersigned questioned Ms. Adams extensively concerning the various inconsistencies between the two statements, and Ms. Adams acknowledged that the two statements are inconsistent. *See* Ex. C at 209:18–212:11.

During the deposition of Ms. Adams, which was only a few weeks after Ms. Adams privately met with defense counsel, Ms. Adams testified that defense counsel recorded their private conversation. *Id.* at 9:5–10:18, 70:12–71:8. In Plaintiff's Second Request for Production, the undersigned requested the recording device and audio that Ms. Adams swore she saw used during her meeting with defense counsel. *See* Ex. J at Requests 1–2. Defendants replied, "None." *Id.* Of course, Ms. Adams's sworn statement and Defendants discovery responses cannot both be true; and probably more important, if Ms. Adams fudged her recollection dating back a few weeks, a fact finder would likely not trust her recollection of events dating back nearly three years.

In other words, these two irregularities provide ample room for Plaintiff to challenge Ms. Adams's trustworthiness. Thus, to the extent that Defendants rely on Ms. Adams's testimony in support of their motion, the Court should deny the motion to allow the fact finder to resolve the credibility issues that will undoubtedly bubble up during live testimony.

### III.
### SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009). However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted). "'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Salazar-Limon v. City of Houston*, 826 F.3d 272, 274 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986)).

### IV.
### DISCUSSION

On May 13, 2015, Plaintiff filed suit under 42 U.S.C. § 1983 against Defendants, alleging that Officer Hancock and Chief Brister violated Mr. Jones's Fourth Amendment rights when they applied a combination of holds and force to Mr. Jones while he was on the ground motionless and unresponsive, causing Mr. Jones to die of asphyxiation. [Doc. #1]. Defendants have moved for summary judgment on two grounds: (1) the doctrine of qualified immunity mandates summary judgment in favor of Officer Hancock and Chief Brister;[13] and (2) the facts of the case

---

[13] *See* [Doc. #38 at ¶¶ 82–100].

are insufficient to support a finding of municipal liability against the City of Kirbyville.[14] Plaintiff vehemently disagrees with both of Defendants' arguments and will address each in turn.

## A.    <u>Qualified Immunity[15]</u>

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, ___U.S.___, 136 S.Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Court must assess the reasonableness of each defendant's actions separately, even if those defendants acted in unison. *See Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007). However, "[s]eparate consideration does not require courts to conduct a separate analysis for each officer in those cases where their actions are materially indistinguishable, it merely requires them to consider each officer's actions." *Id.* at 422 n.3.

When evaluating a qualified immunity defense, the Court conducts a "well-known" two-prong inquiry. *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 490 (5th Cir. 2001). "In order to overcome a qualified immunity defense, a plaintiff must allege a violation of a constitutional right, and then must show that 'the right was clearly established ... in light of the specific context of the case.'" *Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Furthermore, the Court "may address these two elements in either

---

[14] *Id.* at ¶¶ 101–136.

[15] Defendant City of Kirbyville has admitted that at the time of the incident Defendants Chief Brister and Officer Hancock were acting in their official capacities under color of the laws of the State of Texas. *See* Ex. I at Requests 13–14.

order, and need not proceed to the second where the first is resolved in the negative." *Id*. (citations omitted).

### 1. *Constitutional Violation: Excessive Force*

"In the Fifth Circuit, to succeed on an excessive force claim, the plaintiff bears the burden of showing: (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016) (citation and internal quotation marks omitted).

"Plaintiff … [is] not required to present evidence that Defendants' use of excessive force was the *exclusive* cause of her [husband's] death; so long as the injury resulted from 'clearly excessive and objectively unreasonable' force, her claim is actionable." *Bailey v. Quiroga*, 517 F. App'x 268, 268 (5th Cir. 2013) (quoting *Mouille v. City of Live Oak*, 918 F.2d 548, 553 (5th Cir. 1990)) (emphasis in original). "[A]lthough a *de minimis* injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is 'directly related to the amount of force that is constitutionally permissible under the circumstances.'" *Brown v. Lynch*, 524 F. Appx. 69, 79 (5th Cir. 2013) (quoting *Ikerd v. Blair*, 101 F.3d 430, 434–35 (5th Cir. 1996) and *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)). "Any force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Id*. (citing *Ikerd*, 101 F.3d at 434 n. 9). "Thus, only one inquiry is required to determine whether an officer used excessive force in violation of the Fourth Amendment. And as long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when

resulting from an officer's unreasonably excessive force." *Id.* (internal quotations marks, footnotes, and citations omitted).

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on "the facts and circumstances of each particular case." *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). Under *Graham v. Connor*, relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. Because law enforcement officers must make split-second decisions in difficult and potentially dangerous situations, the Court must evaluate the reasonableness of the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Applying the *Graham* factors to this case, the Court must find that a reasonable juror could conclude that Officer Hancock's and Chief Brister's application of force to Mr. Jones after he ceased movement and was incapable of resisting arrest was clearly excessive and unreasonable.

The record evidence indicates that Officer Hancock and Chief Brister were arresting Mr. Jones based on warrants issued for the offenses of aggravated assault, aggravated robbery, and sexual assault. [Doc. #38-4 at 65–68]. Plaintiff concedes that each of those offenses are serious and, coupled with the alleged report that Mr. Jones was known to carry a weapon, Officer Hancock and Chief Brister could have initially believed that first contact with Mr. Jones might pose a real and immediate danger. However, the record evidence demonstrates that Mr. Jones was initially compliant with Officer Hancock and Chief Brister. In fact, Mr. Jones submitted to a pat down search by Officer Hancock. And Officer Hancock testified that he completed the pat

down search without incident and did not locate any weapons, meaning neither Officer Hancock nor Chief Brister could have reasonably believed that Mr. Jones was in possession of any dangerous weapons. *See Brown*, 524 F. App'x at 80 ("Even if the officer[s'] training and experience had led him to be concerned that [Mr. Jones] … might be armed, those suspicions should have dissipated after [Officer Hancock] extensively frisked [Mr. Jones].").

Mr. Jones attempted to flee after Officer Hancock completed the pat down search. Based on the 911 audio time stamps identified above, Officer Hancock chased Mr. Jones for approximately 30 seconds before tackling him. According to Officer Hancock and Chief Brister, some sort of struggle thereafter ensued. Because Mr. Jones is deceased, Plaintiff cannot challenge Officer Hancock's and Chief Brister's testimony concerning the specifics of the *entire* struggle.[16] However, the video footage captured by Ms. Adams and the testimony of Chief Brister are sufficient to create a fact issue concerning whether Mr. Jones resisted Officer Hancock and Chief Brister throughout the entire struggle on the ground.

In IMG_0578 (4), which lasts 54 seconds, Mr. Jones can be seen merely moving his legs for approximately the first 22 seconds of the video. During that time, Chief Brister is holding Mr. Jones between his legs and Officer Hancock is seemingly leaning over Chief Brister and pressing down on Mr. Jones's chest. Notably, the footage captured on the video is rather low intensity and the scene is particularly quiet—Mr. Jones does not make any audible noise in the video. This is contrary to Officer Hancock's testimony that "Mr. Jones was screaming and hollering and breathing while he was -- while [Chief Brister] was holding him. So, I know he wasn't choking him because he was -- he was speaking." *See* Ex. B at 55:5–7. Also notable is Chief Brister's testimony that Officer Hancock was able to "successfully prevent" Mr. Jones

---

[16] For this reason, Plaintiff does not contend that her excessive force claim relates to Chief Brister striking Mr. Jones with his metal flashlight.

from moving his hands, and he considered Mr. Jones "secured" and "in [his] custody"; and Officer Hancock's testimony that while he and Chief Brister were holding Mr. Jones, he was not in imminent fear of serious bodily harm or injury.  *See* Ex. A at 74:19–21, 75:19–24; *See* Ex. B at 102:17–103:10.

A reasonable juror viewing the video, in conjunction with the testimony of Chief Brister and Officer Hancock could conclude that Mr. Jones ceased his resistance prior to the beginning of the footage, since the footage does not appear to contain the type of active resistance courts in the Fifth Circuit recognize.[17]  *See Poole v. City of Shreveport*, 691 F.3d 624, 641 (5th Cir. 2012) (collecting cases); *see also Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012). ("We must view the severe force that officers used on Phillips in light of the fact that any threat she presented had already been substantially contained.").

Even if Mr. Jones's minimal movements at the beginning of IMG_0578 (4) are considered active resistance, a reasonable juror could conclude that Officer Hancock's and Chief Brister's continued holds were excessive and unreasonable after Mr. Jones ceased all movement at the 23 second mark in the video.  As explained above, IMG_0578 (3) contains footage of Officer Hancock and Chief Brister applying their holds on Mr. Jones's nonresponsive body for at least 42 seconds.  According to the combined testimony of Ms. Adams and Chief Brister, in conjunction with Ms. Adams's 911 audio, Officer Hancock and Chief Brister continued to apply

---

[17] As the Fifth Circuit explained in *Carnaby v. City of Houston:*

> Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.  A court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider "the facts in the light depicted by the videotape."

636 F.3d 183, 187 (5th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).  To the extent such footage is open to multiple interpretations, the Court must interpret the video in the light most favorable to the non-movant.

their holds to Mr. Jones's motionless body ***an additional*** 2 minutes and 40 seconds—i.e., when Officer Hancock verbally stated that Mr. Jones was not breathing. This means that the record evidence indicates that Officer Hancock and Chief Brister applied force, in the form of their holds, to Mr. Jones for at least 3 minutes and 22 seconds—i.e., the 42 seconds captured on IMG_0578 (3), plus the 2 minutes and 40 seconds described above.[18] The dangerousness of Officer Hancock's and Chief Brister's holds is supported by Plaintiff's medical expert, Dr. Nizam Peerwani, who concluded that Chief Brister's application of a chokehold, in conjunction with overlay caused Mr. Jones to die from asphyxiation.[19] [Doc. #38-14 at 8–9]. In addition to Dr. Peerwani's report, Officer Hancock's testimony also indicates the danger of the holds that he and Chief Brister were applying. Specifically, Officer Hancock testified that Chief Brister, who was lying in a manner similar to Mr. Jones, was having trouble breathing with his weight pressing down on him. *See* Ex. B at 92:17–93:6. Similarly, Dr. Ralston testified that a hold involving "one person that is using their legs to compress a person's torso and another person laying over them" could cause death by overlay. *See* Ex. F at 90:24–91:19.

---

[18] If Chief Brister caught up to Mr. Jones at 8:47 a.m. and 53 seconds, and Mr. Jones had ceased movement by the time Ms. Adams called 911 at 8:51 a.m. and 40 seconds, the entirety of the ground struggle could have lasted no more than 3 minutes and 47 seconds. *See supra* notes 4 & 9. Shockingly, this means Officer Hancock and Chief Brister applied their holds to Mr. Jones's motionless and unresponsive body for almost the same amount of time that the entire struggle could have lasted, and possibly even as long as they planned out how to affect the arrest. *See* [Doc. #38 at ¶ 13 (discussing a 3-5 minute pre-arrest meeting)].

[19] Defendants seem to argue that the record evidence does not support the asphyxiation finding of Dr. Peerwani because Mr. Jones's body did not have visible injuries or marks. This argument ignores the fact that federal courts have long recognized that not every injury results in lasting marks. *See Scott v. Hanson*, CIV.A. 04-0460-P, 2006 WL 1523189, at *4 (W.D. La. May 26, 2006) ("There are many forms of force, such as choking, use of electric shock or beating a person on the head with a phone book, that leave no lasting marks or visible injuries but may nonetheless support an excessive force claim."). Moreover, Defendants ignore that the medical reasoning employed by Dr. Peerwani is perfectly consistent with the reasoning described in the Reference Manual on Scientific Evidence. *See* Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 704–05,715–716 (3d ed.2011) (describing the type of medical reasoning often employed by doctors). Further, this ignores Dr. Ralston's testimony that it is uncommon to see physical effects or marks on the neck if the application of pressure is wide like when a person uses their forearm and bicep against the neck, even in a manner that can cause unconsciousness or death. *See* Ex. F at 126:2–127:1.

The Fifth Circuit has repeatedly explained that the Court must consider an officer's use of force "at each stage of the encounter," recognizing that officers must adjust their use of force when resistance ends. *See Anderson v. McCaleb*, 480 F. App'x 768, 773 (5th Cir. 2012) (holding that officer "should have known that he could not continue to shock [plaintiff] with the taser after he was no longer resisting arrest"); *Aguilar v. Robertson*, 512 F. App'x 444, 450 (5th Cir. 2013) ("[T]the law is clear that once the plaintiff stops resisting or is in the deputy's control, the permissible degree of force lessens. In *Bush*, [which was decided in 2008,] the court reasoned that the force used after the plaintiff ceased resisting was excessive.") (internal citations omitted). A fact finder can reasonably conclude, based on Officer Hancock's, Chief Brister's, and Ms. Adams's accounts and the audio and video evidence, that Officer Hancock and Chief Brister unnecessarily and unreasonably applied force (in the form of a dangerous combination of holds) to Mr. Jones for nearly 3.5 minutes while he was unresisting and nonresponsive. This use of force clearly exceeds that which a reasonable officer would deem warranted. *See Escobar v. Montee*, 3:15-CV-1962-D, 2016 WL 397087, at *9 (N.D. Tex. Feb. 2, 2016) (holding officer used excessive force where dog permitted to bite suspect for 60 seconds after fleeing suspect ceased resistance).

Under the totality of these summary judgment facts, Officer Hancock's and Chief Brister's use of force is clearly excessive and unreasonable as a matter of law.[20] *See, e.g., Staten v. Tatom*, 465 F. App'x 353, 359 (5th Cir. 2012) (finding summary judgment inappropriate when the parties "present[ed] a number of disputes of material fact, including, objectively, whether or how much Plaintiff was resisting, the amount of force Defendant actually used at each stage of the encounter, and whether that force was reasonable.").

---

[20] Despite the curiously defense-friendly change in Ms Adams's testimony, even she admits that it is "excessive to continue to hold a person down on the ground even when they're not moving anymore." *See* Ex. C at 153:5–9.

## 2. *Clearly Established*

Under the second prong of the qualified immunity analysis, courts consider "whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident." *Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008); *see also Wood v. Moss*, ___U.S.___, 134 S.Ct. 2056, 2067 (2014) ("The dispositive inquiry, we have said, is whether it would have been clear to a reasonable officer in the [defendant's] position that [his] conduct was unlawful in the situation [he] confronted." (quoting *Saucier*, 533 U.S. at 202) (internal quotation marks and brackets omitted)); *Castillo v. City of Weslaco*, 369 F.3d 504, 506 (5th Cir. 2004) (per curiam) ("The court must first identify the relevant clearly established law [and t]hen...determine whether the defendant's actions were objectively reasonable." (citing *Petta v. Rivera*, 133 F.3d 330, 334 (5th Cir. 1998))).

> To make this determination, the court must ask whether the law so clearly and unambiguously prohibited [the defendant's] conduct that every reasonable official would understand that what he is doing violates the law. To answer that question in the affirmative, [the court] must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity.

*Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011) (en banc) (brackets and internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2084 (2011)). While "a case directly on point" is not required for the court to conclude that the law is clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S.Ct. at 2083. Moreover, a court may not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Richard*, ___ U.S. ___, 134 S.Ct. 2012, 2023 (2014) (internal quotation marks and citation omitted). The Fifth Circuit has explained that "[t]he central concept is that of 'fair warning: The

law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (internal quotation marks and citation omitted).

"At the time of the incident, the law was clearly established in this circuit that [applying force to] a non-resisting suspect is excessive and unreasonable force." *Brown*, 524 F. App'x at 81 (footnote omitted); *see also Breed v. City of Kirbyville*, 1:15-CV-190, 2015 WL 11112538, at *6 (E.D. Tex. July 24, 2015) ("[T]he continued use of a headlock or chokehold … after Jones ceased movement and became unresponsive would not appear to be "objectively reasonable" conduct on the part of Hancock and Brister."); *Anderson*, 480 F. App'x at 772–73 (holding that officer "should have known that he could not continue to shock Anderson with the taser after he was no longer resisting arrest"); *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) ("The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive.");*Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (holding that an officer had used excessive force when he slammed a suspect's face into a vehicle after she had ceased resisting arrest); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (officers violated clearly established right when they tackled assault suspect, breaking his shoulder, after he pulled his arm away from grabbing officer and took few steps backward); *Newman v. Guedry*, 703 F.3d 757, 762-63 (5th Cir. 2012) (denying qualified immunity where officers immediately resorted to using nightstick and taser where suspect did not pose threat to officers' safety and did not resist officers or attempt to flee).  This authority clearly establishes the law because:

[t]he Fifth Circuit has clearly held that "[l]awfulness of force...does not depend on the precise instrument used to apply it," and that "[q]ualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel."

*Escobar*, 2016 WL 397087, at *9 n.17 (quoting *Newman*, 703 F.3d at 763.

## B.   MUNICIPAL LIABILITY

It is well established that a city is not liable under § 1983 on the theory of respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A municipality is liable only for acts directly attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken "pursuant to an official municipal policy." *See Monell*, 436 U.S. at 691. The Fifth Circuit has summarized the elements required for a *Monell* claim as "a policymaker; an official policy [or custom]; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578 (citation omitted).

### 1.   *Policymaker*

The existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority. *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003). "[A] single decision by a policymaker may, under certain circumstances, constitute a policy for which a [municipality] may be liable." *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000). However, this "single incident exception" is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker. *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)). The trial judge is to determine the identity of a municipality's final policymaker by "reviewing the

relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989) (internal quotation marks, alteration, and citation omitted). "A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010).

In this case, contrary to Defendants arguments, Chief Brister had policymaking authority both explicitly through the City's written ordinances and implicitly because of the delegation of authority and the customs and practices of the City of Kirbyville City Council.

Pursuant to Article 8.602(c) of Kirbyville Code of Ordinances, the City of Kirbyville City Council expressly provided that "[i]n the prevention and suppression of crime and arrest of offenders, the chief of police *shall have, possess and execute like power, authority and jurisdiction as the sheriff*." Ex. E at § 8.602(c) (emphasis added). In other words, within the City of Kirbyville, the Chief of Police is empowered to exercise the same power, authority, and jurisdiction that a sheriff can exercise within his county. This is sufficient to make Chief Brister a policymaker concerning law enforcement within the City of Kirbyville because "[i]n this circuit, it has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement …." *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996).

Moreover, the customs and practices of the City of Kirbyville City Council also militate in favor of recognizing Chief Brister as a policymaker. According to Chief Brister's deposition testimony, he: (1) is in charge of the day-to-day operations of the Kirbyville Police Department; (2) oversees the operations of the entire police department; (3) controls scheduling; (4) makes

sure officers receive their necessary training; (5) ensures that officers are following department rules and regulations; (6) requires officers to receive specialized training when he deems it necessary or desirable; (7) leads meetings with subordinate officers concerning issues within the department; (8) investigates complaints against officers; (9) disciplines officers when he deems it necessary; and (10) is responsible for writing and enforcing policies (though he never wrote any) *See* Ex. A at 24:14–26:7; 27:10–28:1; 33:25–34:24. Chief Brister also testified that it would be correct to say that he was responsible for the day-to-day work and policy of the Kirbyville Police Department. *Id.* at 28:16–29:2. Chief Brister further testified that he set goals for his officers. *Id.* at 35:1–8 ("I talk with them on a daily basis about how they act and react with the public, what I expect of them. My main -- my main priority is professionalism, courtesy, and respect. I won't tolerate -- I let them know that we're not bullies and we're not going to be bullies. That's the type of goals that I set for them."). Officer Hancock testified similarly, indicating that Chief Brister ran the police department (except for budgetary issues), oversaw all police officers, and he set the department's policies. *See* Ex. B at 28:17–30:11.

Regarding the City Council's involvement in police affairs, Chief Brister testified that City Council controls the power of purse and has "say-so, and they approve our policies." *See* Ex. A at 24:14–25:5, 28:2–9, 33:25–34:13. The Fifth Circuit has clearly explained

> An official may be termed a policymaker even if the municipality retains the prerogative of the purse and final legal control by which it may limit or revoke the authority of the official. Further, the subject matter of administrative review must be precise in order to attach the presumption against policymaking. The mere existence of oversight, however, is not enough; the oversight must pertain to the area of authority in question.

*Zarnow*, 614 F.3d at 168 (internal quotation marks and citations omitted).

For these reasons, Chief Brister is a policymaker in the area of law enforcement. *See Kincheloe v. Caudle*, A-09-CA-010 LY, 2009 WL 3381047, at *18 (W.D. Tex. Oct. 16, 2009)

("Courts have consistently found that chiefs of police are official law enforcement policymakers for the purposes of municipal liability under § 1983.") (collecting cases); *Backe v. City of Galveston*, Tex., 2 F. Supp. 3d 988, 1000 (S.D. Tex. 2014)(holding that Chief of the Galveston Police Department was policymaker where the chief decided the goals for a particular city function—i.e., transparent reporting of police activity—and devised the means of achieving those goals).

### 2. Policy

Upon finding a policymaker, the Court must next consider whether the allegedly unconstitutional action constitutes a "custom or policy" of the municipality. *Zarnow*, 614 F.3d at 168. "A plaintiff may prove the existence of a "custom or policy" in one of two ways. First, a pattern of unconstitutional conduct may be shown on the part of municipal actors or employees. A pattern of conduct is necessary only where the municipal actors are not policymakers. Alternatively, it may be shown that a final policymaker took a single unconstitutional action." *Id*. at 169 (citations omitted).

The summary judgment evidence clearly demonstrates that Chief Brister maintained his hold and continued applying force to Mr. Jones well after he ceased movement and could no longer resist. The act of applying the hold for nearly 3.5 minutes to an unresponsive person is clearly unconstitutional.

### 3. Causation

The third prong requires a plaintiff to prove "moving force" causation. To succeed, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). That is, "the

plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411. Deliberate indifference is a high standard—"a showing of simple or even heightened negligence will not suffice." *Piotrowski*, 237 F.3d at 579 (quoting *Brown*, 520 U.S. at 407).

The summary judgment evidence demonstrates that around the time Mr. Jones ceased resisting and Chief Brister considered him secured and in his custody, Chief Brister directed Officer Hancock not to turn Mr. Jones loose.[21] *See* Ex. B at 93:24–95:1. Officer Hancock was carrying out that directive when he continued to hold Mr. Jones after he ceased all movement.[22] *Id.* at 94:4–22. On these facts, Chief Brister's directive to Officer Hancock is sufficient to satisfy the third prong. *See Briseno v. County of El Paso, Texas*, EP-11-CV-54-PRM, 2011 WL 4626002, at *7 n.13 (W.D. Tex. Sept. 30, 2011) (quoting *Pembaur*, 475 U.S. at 474 and *Brown*, 520 U.S. at 407) ("[W]here a policymaker 'commanded' or 'told' deputy sheriffs to 'go in [to a locked portion of an office] and get' witnesses, in violation of the witnesses's Fourth Amendment rights, the municipality can be held liable based upon the single incident exception. In such situation, no 'question of fault or causation' can arise because the policymaker 'specifically directed the action resulting in the deprivation of petitioner's rights.'").

## V.
## CONCLUSION

For all of the reasons explained above, the Court must DENY Defendants' Motion for Summary Judgment in its entirety.

---

[21] Again, the footage capture by Ms. Adams seems to indicate that Mr. Jones's active resistance ended before he ceased all movement.

[22] A reasonable juror could believe as much based on the testimony of Chief Brister and Officer Hancock.

Respectfully submitted,

**PROVOST UMPHREY LAW FIRM, L.L.P.**
490 Park Street
P.O. Box 4905
Beaumont, Texas  77704
(409) 835-6000
Telefax: (409) 813-8605

By: _____
     RONNIE TURNER, JR.
     State Bar No. 24075533
     rturner@pulf.com
     JAMES E. PAYNE
     State Bar No. 00788171
     jpayne@pulf.com

     ATTORNEYS FOR PLAINTIFF

**Of Counsel:**
Tyrone L. Haynes
State Bar No.:  24076430
Telephone:  (713) 659-2600
Facsimile:  (713) 659-2601
thaynes@steele-law-group.com
STEELE LAW GROUP, PLLC
One Allen Center, Penthouse
500 Dallas, Suite 3440
Houston, Texas 77002

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was furnished to all counsel of record via electronic filing on this the 6th day of September, 2016.

_____
RONNIE TURNER, JR.