# EXHIBIT "A"

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF
 2                      BEAUMONT DIVISION

 3   SHAWNTEL BREED,              )
     INDIVIDUALLY AND AS          )
 4   REPRESENTATIVE OF THE        )
     ESTATE OF DUSTIN KEITH       )
 5   JONES, DECEASED, AND AS      )
     NEXT FRIEND OF DJ AND CJ,    )
 6   MINOR CHILDREN               )
         Plaintiff                )
 7                                )
     VS.                          )  CIVIL ACTION NO. 1:15-cv-190
 8                                )  JURY DEMANDED
     CITY OF KIRBYVILLE, CHIEF    )
 9   PAUL BRISTER, AND OFFICER    )
     JOSH HANCOCK OF THE CITY     )
10   OF KIRBYVILLE POLICE         )
     DEPARTMENT, INDIVIDUALLY,    )
11   AND IN THEIR OFFICIAL        )
     CAPACITIES                   )
12       Defendants.              )

13

14  ***********************************************************

15             ORAL AND VIDEOTAPED DEPOSITION OF

16                CHIEF ROBERT PAUL BRISTER

17                    March 18, 2016

18  ***********************************************************

19

20      ORAL AND VIDEOTAPED DEPOSITION OF CHIEF ROBERT PAUL
     BRISTER, produced as a witness at the instance of the
21   Plaintiff and duly sworn, was taken in the above-styled
     and numbered cause on the 18th day of March, 2016, from
22   9:05 a.m. to 11:59 a.m., Janie P. Trapp, RPR, CSR
     No. 6789, in and for the State of Texas, reported by
23   computerized stenotype machine at the offices of Nell
     McCallum & Associates, Inc., 2615 Calder Avenue, Suite
24   111, Beaumont, Texas, pursuant to the Federal Rules of
     Civil Procedure and the provisions stated on the record.
25
```

```
 1  Sheriff's?
 2    A.  For eight years.
 3    Q.  So, till about 2005?
 4    A.  2004.
 5    Q.  2004.
 6    A.  Yes, sir -- 2005.  You're right.  I'm sorry.
 7    Q.  Okay.  And in 2005, what was your job title?
 8    A.  Still chief deputy.
 9    Q.  Still chief deputy.  For who?
10    A.  Oh, you mean after I left Jasper?
11    Q.  After you left Jasper.
12    A.  Okay.  I went to work for A. W. Davis at the
13  Newton County District Attorney's Office.
14    Q.  Okay.  And what was your job title?
15    A.  I was a district attorney investigator, D.A.
16  investigator.
17    Q.  And what were your job duties or
18  responsibilities as a D.A. investigator?
19    A.  To review cases and make sure that we had
20  everything that we needed in order to be able to take
21  that case to a trial should it -- should it become
22  necessary.  What the officers may have left out in their
23  case, it was my responsibility to track down and find
24  it.
25    Q.  So, would I be correct in saying in your job as
                                                            22
```

```
 1  a D.A. investigator, you weren't involved in the
 2  day-to-day law enforcement?
 3    A.  You would be correct, yes, sir.
 4    Q.  Okay.  And how long did you hold that job for?
 5    A.  About a year.
 6    Q.  Let's go back.  Was -- the time that you spent
 7  as a reserve officer, was that basically time to heal
 8  from the incident --
 9    A.  Yes, sir.
10    Q.  -- you told me about?
11        What was your reason for moving from the Jasper
12  Sheriff's Office to becoming an investigator for the
13  D.A.?
14    A.  We -- while at the Jasper Sheriff's Office, we
15  were involved in a lot of -- a lot of high, high profile
16  cases, the James Byrd case.  We had several other
17  murders.  The sheriff was tired and ready to move on;
18  and, so, when he decided to go, I decided to go.
19    Q.  Okay.  And, so, after about your year of work
20  at the -- the D.A. investigator, where did you work at
21  next?
22    A.  I had the opportunity to go to work for
23  Kirbyville, City of Kirbyville.
24    Q.  And Kirbyville is who you currently work for?
25    A.  Yes, sir.
                                                            23
```

```
 1    Q.  When you first went to Kirbyville, what was
 2  your job title?
 3    A.  Chief of police.
 4    Q.  Who did you replace as chief of police?
 5    A.  Clarence Williams.
 6    Q.  How long did you work for -- as chief of police
 7  for Kirbyville after 2007?
 8    A.  I went to work in Kirbyville in --
 9    Q.  2007?
10    A.  Okay.  I went to work in Kirbyville in 2005.  I
11  believe it was October --
12    Q.  Okay.  I'm sorry.
13    A.  -- in 2005.  And then I worked there till 2008.
14    Q.  What was your next job -- well, first of all
15  let's talk about -- I'm sorry.  Let me talk about this
16  for a second.  Okay.  What were your job duties as chief
17  of police with Kirbyville from 2005 to 2008?
18    A.  Pretty much as they are now, just to oversee
19  the operations of the police department, scheduling,
20  making sure that the officers receive their training
21  hours.  Just pretty much seeing the overall operations
22  of the -- of the police department.
23    Q.  Do you control the overall operations of the
24  police department as the chief of police for Kirbyville?
25    A.  It's according to what you mean by "control."
                                                            24
```

```
 1  I am the chief of police, and they do work for me.  I
 2  don't have complete control as -- per se, as for
 3  purchasing and stuff like that.  It goes through the
 4  city secretary, things like that.  Raises, I don't have
 5  control over -- over raises.  That's the city council's.
 6    Q.  But as far as the day-to-day --
 7    A.  Day-to- --
 8    Q.  -- operations and policy of Kirbyville Police
 9  Department, you do have control?
10    A.  Day-to-day operations, I have -- I have
11  control.  I supervise their activities.
12    Q.  And, so, when you say you supervise their
13  activities, you were supervi- -- you were supervising
14  them to make sure that they were following the rules and
15  regulations of the Kirbyville Police Department?
16    A.  Yes, sir.
17    Q.  And you said earlier that you made sure that
18  they completed their training hours.  Did you also --
19  was it also your responsibility -- or strike that.  Let
20  me ask it a different way.
21        Was also one of your powers to tell them what
22  additional training they might need to have?
23    A.  It's -- not to tell them what tra- -- it's my
24  duty to make sure that they receive the TCOLE
25  requirements for training.
                                                            25
```

```
 1    Q.  Okay.  Could you say, "Well, Officer" -- you
 2  know, "Officer A, you know, I think you need to go to
 3  this other training on this particular thing"?
 4    A.  If there's a specialized training that I would
 5  like to see them get, yes, sir, I can -- I can ask that
 6  they attend that.
 7    Q.  Okay.
 8    A.  But my main concern with such a small
 9  department, we don't have the luxury of really
10  specializing in a lot of things.
11    Q.  Uh-huh.
12    A.  We just need to get what -- what we need to
13  keep our license good.
14    Q.  How many officers did you have working at the
15  Kirbyville Police Department during -- from 2005 to
16  2008?
17    A.  At that time, we had -- we had four patrolmen,
18  myself, and we did have a school resource officer.
19    Q.  So, including yourself, there would be --
20    A.  There was six of us --
21    Q.  -- six?
22    A.  -- yes, sir.
23    Q.  Okay.  And you say you left Kirbyville as
24  police office- -- police chief in 2008?
25    A.  2008, yes, sir.
                                                      26
```

```
 1    Q.  And what did you do once you left Kirbyville?
 2    A.  I had -- I had went into the constru- -- back
 3  into construction as a safety -- safety man.
 4    Q.  I forgot -- I'm sorry.  I forgot to ask you.
 5  During your time as chief of police during 2005-2008,
 6  would y'all have -- would y'all have like, I guess,
 7  safety meetings or -- you know, in the morning or
 8  anything like that?
 9    A.  No, sir.
10    Q.  Okay.  Did you ever have times where y'all
11  would meet as a police department and kind of discuss
12  issues?
13    A.  We did -- we did have meetings and stuff like
14  where we -- where we would discuss operations.  Once
15  again, discussed if officers had any complaints; what
16  they might need, if we were able to get it, that would
17  make their job easier, meetings as that such.
18    Q.  I see.  Did you lead those meetings?
19    A.  Yes, sir.
20    Q.  During your time as chief of police, was it
21  your job to investigate complaints against your
22  officers?
23    A.  Yes, sir.
24    Q.  Did you have -- was it your job to discipline
25  officers if it was necessary?
                                                      27
```

```
 1    A.  Yes, sir.
 2    Q.  And as far as other entities' involvement in
 3  the Kirbyville Police Department at that time, you said
 4  that the city secretary, she would set the budget?
 5    A.  The city council sets the budget.  In order for
 6  us to do any purchasing or anything, we have to fill out
 7  requisitions, present them to the mayor.  He will sign
 8  those requisitions and approve them; and at that point,
 9  we can go get the items that we requested.
10    Q.  Okay.  Did the city council have any other
11  responsibilities with regard to, you know, the
12  Kirbyville Police Department aside from that?
13    A.  I'm certain -- yes, sir, I worked for the mayor
14  and the city council.  So, any -- any suggestions they
15  have, they'll certainly come to me with them.
16    Q.  Okay.  Well, would I be correct in saying as
17  far as the day-to-day work of and policy of Kirbyville
18  Police Department, that was -- that was something that
19  the chief of police was responsible for?
20        MR. CALVERT:  Object to the form.
21    A.  I'm sorry.  What do I do?
22    Q.  (BY MR. TURNER) You can answer.
23        MR. CALVERT:  You can answer --
24        THE WITNESS:  Okay.
25        MR. CALVERT:  -- if you can.
                                                      28
```

```
 1    A.  Yes, sir, I would say that that would be
 2  correct.
 3    Q.  (BY MR. TURNER) Okay.  And you said you went
 4  back in 2008 to work in construction as a safety --
 5    A.  Safety man.
 6    Q.  Was there any particular reason why you left
 7  Kirbyville Police Department in 2008?
 8    A.  There -- there was a little bit going on there.
 9  The officers -- it had to do with some hours that were
10  cut, and they weren't happy.  They all left and found
11  new jobs.  I kind of became disgusted, and the
12  opportunity came; so, I took it.
13    Q.  So, officers were upset that they weren't
14  getting enough hours or too many?
15    A.  No, they had cut their hours.
16    Q.  During your time as police chief of --
17        MR. TURNER:  How long have we been going
18  for?
19        THE REPORTER:  45 minutes, roughly.
20    Q.  (BY MR. TURNER) During your time as police --
21  Kirbyville Police Department -- chief of police for
22  Kirbyville Police Department during 2005-2008, did you
23  ever have any complaints for any of your officers from
24  citizens?
25    A.  I don't recall any formal complaints, no, sir.
                                                      29
```

```
 1   Q.  What about informal complaints?
 2   A.  Well, you know, there's -- a lot of times
 3  there's people come in and complaining because they were
 4  speeding and got a traffic citation.  Just mainly
 5  gripes, but nothing -- nothing formal.
 6   Q.  Okay.  Any informal complaints concerning use
 7  of --
 8   A.  No.
 9   Q.  -- force?
10   A.  No, sir.
11       MR. CALVERT:  Please wait until he
12  finishes asking --
13   A.  I'm sorry.
14       MR. CALVERT:  -- before you answer.
15   Q.  (BY MR. TURNER) During this time as chief of
16  police, did any of your officers ever use deadly force
17  in order to effect an arrest or detention?
18   A.  No, sir.
19   Q.  Any informal or formal complaints regarding the
20  way that you were doing your job as chief of police,
21  that you're aware of, during this time period?
22   A.  No, sir.
23   Q.  The officers that were disgruntled because of
24  the hours situation, were they upset at you, as well?
25   A.  No, sir.
                                                    30
```

```
 1   Q.  Okay.  I guess I'm just trying to -- my
 2  question is:  That situation wasn't caused by anything
 3  you did, to your -- to your knowledge?
 4   A.  No, sir.
 5   Q.  Okay.  I'm going to skip back for just a
 6  second.  During your time as chief deputy with Jasper
 7  Sheriff -- Sheriff's Office, did you receive any
 8  complaints -- are you aware of any complaints lodged
 9  against you for excessive use of force?
10   A.  No, sir.
11   Q.  How long were you a safety man in construction
12  again?
13   A.  Until 2009.
14   Q.  So, just about a year?
15   A.  Yes, sir.
16   Q.  What construction company did you work for?
17   A.  STI out of Bridge City.
18   Q.  And what did you do after -- after that job?
19   A.  In 2009 I went to work for the Newton County
20  Sheriff's Office as chief deputy for Sheriff Joe Walker.
21   Q.  And how long were you chief deputy in Newton?
22   A.  From 2009 till 2011, which time I went back to
23  work for the City of Kirbyville.
24   Q.  Back again as chief of police?
25   A.  Yes, sir.
                                                    31
```

```
 1   Q.  During this time in Newton, was that when you
 2  first met Officer Josh Hancock?
 3   A.  Yes, sir.
 4   Q.  Okay.  And at that time, Officer Hancock, he
 5  was a patrol officer?
 6   A.  He was a patrol deputy, yes, sir.
 7   Q.  Okay.  Same question:  During your time as
 8  chief deputy in Two Thousand- -- from 2009 to 2011 at
 9  Newton County, did you have any, whether formal or
10  informal, complaints lodged against you for excessive
11  use of force?
12   A.  No, sir.
13   Q.  Okay.  During your time as chief of policy for
14  Kirbyville from 2005 to 2008, did you still do, I guess,
15  patrolman work?  I don't know what the correct
16  terminology is; but did you still go out and patrol the
17  streets, as well?
18   A.  I still answered calls, yes, sir.
19   Q.  Okay.  Okay.  In 2011 you went back to
20  Kirbyville -- Kirbyville to be the chief of police, and
21  you've held that job all the way up until the present?
22   A.  Yes, sir.
23   Q.  Is there any changes between your work as chief
24  of police from 2005 to 2008 to your working
25  responsibilities from --
                                                    32
```

```
 1       (CELL PHONE SOUNDING)
 2   A.  I apologize.
 3   Q.  (BY MR. TURNER) That's fine.
 4       -- from 2011 to the present?
 5   A.  No, sir.
 6       MR. TURNER:  This would probably be a good
 7  time to take a break if you want to, or we can keep on
 8  going.
 9       MR. CALVERT:  Whatever you want to do.
10       THE WITNESS:  It's fine with me.
11       MR. TURNER:  You want to keep going?
12       MR. CALVERT:  We can take a short break.
13       THE VIDEOGRAPHER:  We're off the record at
14  9:54.
15       (RECESS FROM 9:54 A.M. TO 10:04 A.M.)
16       THE VIDEOGRAPHER:  Back on the record at
17  10:04.
18   Q.  (BY MR. TURNER) Chief Brister, we took a quick
19  break.
20   A.  Yes, sir.
21   Q.  Okay.  I think we were talking about you had
22  just came back as chief of police with Kirbyville Police
23  Department in 2011?
24   A.  Yes, sir.
25   Q.  Okay.  Can you tell me how, if at all, the city
                                                    33
```

```
 1   council, mayor, or city manager are involved in the
 2   internal policies of the Kirbyville Police Department,
 3   if they are?
 4      A.  They -- they have say-so, and they approve our
 5   policies.
 6      Q.  What do you mean when you say that?
 7      A.  I mean they have -- they have to approve -- I
 8   can't just go in and make up any kind of off-the-wall
 9   policy that I want to make.  It has to be something
10   that -- that's approved by the mayor and the council,
11   something that they are -- that they're fairly certain
12   is not going to get them in trouble or -- or the police
13   department in trouble.
14      Q.  Okay.  Have you ever presented policies for
15   them to -- for their approval since you've been chief of
16   police?
17      A.  No, sir, never written policies to the -- to
18   the council.
19      Q.  But as far as writing a policy, would that be
20   the job of the chief of police?
21      A.  It would be, yes, sir.
22      Q.  And is it also your job to enforce the
23   policies?
24      A.  Yes, sir.
25      Q.  Do you set goals for your police officers?
                                                         34
```

```
 1   had an opening and he was available; so, I asked him to
 2   take it.
 3      Q.  Okay.  And I for- -- I forgot to tell you at
 4   the beginning.  I -- you know, I represent Shawntel
 5   Breed and her family in a lawsuit that's filed against
 6   you and the City of Kirbyville involving the death of
 7   her husband.  Are you aware of that fact?
 8      A.  Yes, sir.
 9      Q.  And, so, at least for the purposes of this
10   deposition, you're aware that we're on opposite sides?
11      A.  Yes, sir, I do.
12      Q.  Okay.  All right.  And you were aware of that
13   the whole deposition?  I just forgot to tell you at the
14   beginning.
15      A.  I am aware of that, yes, sir.
16      Q.  All right.  And, so, when I say the inci- --
17   this incident, you will know that I'm talking about the
18   arrest, detention, and eventual death of Mr. Dustin
19   Jones?
20      A.  That's correct.
21      Q.  Okay.  All right.  So, at the time of this
22   incident, could you tell me -- or I don't think it's
23   changed much.  How about this:  How tall a man are you?
24      A.  I'm about five eleven.
25      Q.  And at the time of this incident, do you recall
                                                         36
```

```
 1      A.  I don't actually set a goal and say, "Here's
 2   what I want you to do."  I talk with them on a daily
 3   basis about how they act and react with the public, what
 4   I expect of them.  My main -- my main priority is
 5   professionalism, courtesy, and respect.  I won't
 6   tolerate -- I let them know that we're not bullies and
 7   we're not going to be bullies.
 8          That's the type of goals that I set for them.
 9      Q.  Okay.
10      A.  As far as advancement in the department, we
11   have a sergeant's position; and after that, there's just
12   not a whole lot of advancement unless they take my job;
13   so...
14      Q.  Who currently holds the sergeant position?
15      A.  Josh Hancock.
16      Q.  When you came back to Kirbyville as chief of
17   police, did Josh Hancock come with you?
18      A.  He came later on --
19      Q.  Okay.
20      A.  -- yes, sir.  I think I got there in '11; and I
21   believe he came in like maybe '12 or something like
22   that.
23      Q.  And did you kind of bring him over there?
24      A.  Yes, sir.  I brought him once I had an opening.
25   I didn't -- I didn't run nobody off to bring him, but I
                                                         35
```

```
 1   how much you weighed approximately?
 2      A.  About what I do now, around 205.
 3      Q.  What equipment do you currently require for a
 4   Kirbyville police officer to wear?
 5      A.  I don't really require any.  They at least have
 6   to have a duty weapon, a Taser, set of handcuffs, and a
 7   flashlight.  Some of them want more, and that's fine as
 8   long as it's an approved item.
 9      Q.  Okay.  On the day in question, what equipment
10   did you have with you?
11      A.  Me?
12      Q.  Uh-huh.
13      A.  I had a gun on.
14      Q.  Okay.  No Taser?  No handcuffs?
15      A.  No, sir.
16      Q.  And I know eventually you had a flashlight.
17   Did you pick that up later at some point?
18      A.  Yes, sir, I picked that up out of the car as I
19   was exiting to go help Josh.
20      Q.  Okay.  What rules have you set for your police
21   officers with regard to use of force in arrests and
22   detentions?
23      A.  The least amount necessary.  Like I say, I
24   don't want -- I don't want bullies.  Won't have a bully.
25   You go treat people professionally and courteous and let
                                                         37
```

**Page 54**

1  A.  We just -- we just go a lot of times with what
2  we can get.  Sometimes there's -- we'll call in the
3  assistance of the sheriff's office; but, you know, a lot
4  of times we're there and we -- we just have to do what
5  we have to do.
6      Q.  Now, is it your understanding that the
7  residence that you guys were going to on this occasion
8  was Arthur Breed's residence?
9      A.  Yes, sir.
10     Q.  Do you know who Arthur Breed is?
11     A.  I do.
12     Q.  Okay.  Had you had dealings with Arthur Breed
13  prior to this incident?
14     A.  Yes, sir.
15     Q.  What type of dealings have you had with Arthur
16  Breed?
17     A.  He -- we've had a lot of dealings with Arthur
18  Breed.  He likes to steal, but he's the most honest
19  crook I've ever met in my life.  He can't lie to you.
20  You ask him, he'll tell you.  He's just a -- he's
21  just -- he's just Arthur Breed.
22     Q.  Had you ever had the opportunity to meet his
23  daughter, Shawntel Breed?
24     A.  Never had met her, no, sir.
25     Q.  How many people -- how many people are there in

**Page 55**

1  Kirbyville?
2      A.  There's probably 1800, 2,000 people.
3      Q.  At the time of this incident, how many officers
4  did you have working at Kirbyville Police Department?
5      A.  There was five of us.
6      Q.  And aside from you and Officer Hancock, can you
7  tell me the other names of the officers?
8      A.  We were the only two on duty, but I have -- at
9  that time, we had -- at that time, I believe Jay
10  Matthews worked there.  Trying to think.  I can't
11  remember who worked there then.
12     Q.  It's okay if you can't remember.
13     A.  I really can't -- can't be absolutely certain
14  who they were.  I know Jeffrey Blewett.  That's the only
15  ones I can tell you for certain.
16     Q.  Okay.  How far is Arthur Breed's residence
17  from -- from the police station?
18     A.  Couple miles, maybe.
19     Q.  So, you said at the scene is where Officer
20  Hancock kind of told you what y'all was doing, what the
21  warrants were, and --
22     A.  Not at that -- no, sir, not at that scene.  We
23  met on MLK.
24     Q.  Okay.
25     A.  But probably -- probably about halfway between

**Page 56**

1  our office and where Arthur Breed lives.
2      Q.  How long was that conversation that you and
3  Officer Hancock had, about?
4      A.  Three, four, five minutes, maybe.
5      Q.  And then y'all left MLK and then went to the --
6  to Arthur Breed's house?
7      A.  To the resident (sic), yes, sir.
8      Q.  What was the first thing y'all did once y'all
9  arrived at Arthur Breed's house?
10     A.  We got out of the -- out of our vehicles and
11  approached the residence.
12     Q.  Did y'all take the same vehicle?
13     A.  No, sir, we was in two vehicles.
14     Q.  What vehicle were you in?
15     A.  I was in one of the patrol units, for some
16  reason.  I don't know if my car was being worked on or
17  whatever, but I was in one of the -- one of the SUV
18  patrol vehicles we have.
19     Q.  Who was lead vehicle out of you and
20  Mr. Hancock?
21     A.  Hancock was the lead vehicle to the residence.
22     Q.  But obviously you were the officer with the
23  most authority on the scene?
24     A.  Yes, sir.
25     Q.  Okay.  Y'all got out of y'all's vehicles, and

**Page 57**

1  what'd y'all do next?
2      A.  Walked up, approached the residence.
3      Q.  Okay.  And after you approached the residence,
4  once you got up to the door -- I'm sorry.  I'm sorry.
5  I'll ask you about that.  So, let me ask a different
6  question.
7          It's my understanding that the information
8  y'all received was that Dustin Jones was outside the
9  residence.  Do you know whether or not that's true or
10  not?
11     A.  I don't remember receiving that residence
12  (sic).  All I know, that he was supposed to be at the
13  residence.  I don't know.
14     Q.  Okay.  Once y'all pulled up to the residence,
15  did y'all see anybody outside the residence?
16     A.  Yes, sir, BB -- Arthur Breed was outside.
17     Q.  Do y'all have a nickname for Arthur Breed?
18     A.  "BB."
19     Q.  Do you know where that comes from?
20     A.  I really don't.
21     Q.  Okay.  And, so, as y'all approached the
22  residence, did y'all talk to Arthur Breed?
23     A.  Yes, sir.
24     Q.  What was the conversation?
25     A.  Josh asked him who was in the residence and he

```
 1      A.  Yes --
 2      Q.  Okay.
 3      A.  -- uh-huh.
 4      Q.  And, so, at this point, your role was mainly
 5  super- -- supervisory?
 6      A.  My role is mainly just there.
 7      Q.  Okay.  Okay.  And you said that when Josh asked
 8  him to come over to the side, he complied?
 9      A.  Uh-huh.
10      Q.  And he told him that there were warrants?
11      A.  Uh-huh.
12          MR. CALVERT:  You need to say "yes" or
13  "no."
14      Q.  (BY MR. TURNER) Is that a "yes"?
15      A.  Yes, sir.  I'm sorry.  I apologize.
16          MR. CALVERT:  No problem.
17      Q.  (BY MR. TURNER) And when Josh asked him to put
18  his hands on the side of the trailer, he complied, as
19  well; is that correct?
20      A.  Yes, sir.
21      Q.  And I assume that that was because Josh wanted
22  to pat him down?
23      A.  Yes, sir.
24      Q.  Okay.  Did Josh do that?
25      A.  I think he started to.
                                                      62
```

```
 1      Q.  Okay.  Did you have any information about
 2  whether or not Mr. Jones was supposed to have a weapon
 3  on him or not?
 4      A.  I didn't have any information other than what
 5  Josh had told me.  I didn't talk to anyone else.
 6      Q.  And that's what you told us earlier y'all
 7  conversation was?
 8      A.  Yes, sir.
 9      Q.  Okay.  So, you said Josh started to do the
10  pat-down.  What happened next?
11      A.  He -- I think Josh told him to put his -- put
12  his hands behind his back, that he had the warrants and
13  he was going to take him to the Jasper jail.
14      Q.  Okay.  Did he comply this time?
15      A.  No.  Josh -- I heard -- I heard the handcuffs
16  click.  I guess Josh was opening his handcuffs.  As soon
17  as that click happened, he hit Josh and knocked Josh
18  back into me and took off running out toward MLK.
19      Q.  Did you see him hit Josh?
20      A.  Yes.  And he knocked him -- knocked him back
21  into me.
22      Q.  Okay.  Was that hit -- was it a push or was it
23  a punch or do you know?
24      A.  I don't know if -- I don't know if -- I can't
25  say if it was a hit or a push, if he ran over Josh or
                                                      63
```

```
 1  whatever; but I know he knocked him into me.
 2      Q.  Okay.  Did you guys fall over?
 3      A.  Didn't fall down.  We stumbled backwards.  It
 4  was a -- it was a surprise.
 5      Q.  Uh-huh.  At this point when Mr. Hancock -- I'm
 6  sorry.  "Mr. Hancock."
 7          At this point when Mr. Jones began to run, did
 8  you feel like he posed an imminent threat of serious
 9  bodily injury or death to anybody?
10      A.  Not at that point.
11      Q.  So, Mr. Jones begins to run, according to you,
12  knocks down Officer Hancock into yourself.  What's the
13  next thing that happens?
14      A.  They ran out onto MLK.  Josh was chasing behind
15  him.  I ran toward MLK; and at that point, Josh shot at
16  him with a Taser.
17      Q.  Were you able to see whether or not he actually
18  hit him with the Taser or not?
19      A.  I was able to see that he missed.
20      Q.  How many shots do you get with a Taser?
21      A.  You get one, and then you have to change
22  cartridges and put another one in.
23      Q.  And, so, after Josh missed with the Taser, what
24  was the next thing that you saw he did?
25      A.  I didn't really see anything after that because
                                                      64
```

```
 1  I ran back to get a car because I knew there was no
 2  sense in me trying to chase.
 3      Q.  And I'll tell you, during his deposition, Josh
 4  alluded to the fact that he might have been a little
 5  faster than you were.
 6      A.  Oh, he was a lot faster than I was and a lot
 7  better shape than I was.  Be like a dog chasing a car.
 8      Q.  All right.  And, so, you went back to your
 9  patrol vehicle?
10      A.  I went back to the patrol vehicle I was in,
11  yes, sir.
12      Q.  Okay.  When's the next time you came back in
13  contact with Josh -- Officer Hancock and Dustin Jones?
14      A.  I backed out onto MLK and turned the direction
15  that I figured they would be going, but they were --
16  they were gone.  They were out of sight.  I had no idea
17  where they were.  And I know -- I may not ought to tell
18  this, but I found them by looking at a cow.  The cow was
19  running toward them with their -- cows are nosy -- with
20  their head up looking.  So, I knew they had to be that
21  way.  So, I turned down Henry Robinson; and I could see
22  them down there.
23      Q.  That's interesting.  I did not know that cows
24  were nosy.
25      A.  They're very nosy to a -- to a commotion.  They
                                                      65
```

**Page 66**

1  will run to a commotion.
2  Q. Okay. So, could you -- could you estimate for
3  me about how long Officer Hancock and Dustin Jones were
4  out of sight?
5  A. No, sir, I can't -- I can't tell you a time.
6  Q. Okay. Probably not more than a few minutes?
7  A. No, it wouldn't -- it wouldn't have been -- I
8  don't guess it would've been minutes.
9  Q. Okay.
10 A. I don't think it would've been minutes.
11 Q. Okay.
12 A. It would've been a minute -- maybe minutes, two
13 minutes, maybe.
14 Q. Okay. But probably less than at least two
15 minutes; right?
16 A. Yeah, probab- -- less than five.
17 Q. Okay. And, so, tell me again where you were at
18 when you -- when you noticed Mr. Hancock and Dustin
19 again.
20 A. I was at the -- I was at the corner of -- when
21 I saw where the cow was going, I turned down Henry
22 Robinson; and when I turned down and started driving
23 down Henry Robinson, I could -- I saw them there.
24 Q. Okay. And I assume the first time you saw
25 them, you were still in your car?

**Page 67**

1  A. I was, yes, sir.
2  Q. Okay. And what did you see happening while
3  you -- going on while you were --
4  A. I saw them on the ground fighting; and, of
5  course, when I turned on the corner and it took -- it
6  took a second to get to them, maybe, second or two to
7  get to them because I -- the car, I was -- I was going
8  hard.
9  Q. Uh-huh. What position were they in on the
10 ground?
11 A. When I -- when I got to them, Josh was on the
12 ground on his back; and Mr. Jones was on top of him.
13 Q. Okay. And when you say when you got to them,
14 do you mean when you were outside of your police car and
15 you made it to them?
16 A. When I -- when I pulled up to them in my police
17 car and opened the door to exit, Josh was on his back on
18 the ground; and Dustin was on top of him.
19 Q. Okay. Was that the same position that they
20 were in when you initially saw them in your police
21 vehicle or was it a different position or do you
22 remember?
23 A. From the time I initially saw them till I got
24 to them, it was -- it was just a -- I don't know, it
25 was -- it was so quick. I can't tell you how quick it

**Page 68**

1  was, but yes.
2  Q. When you saw Dustin Jones on top of Officer
3  Hancock, as far as you could see, did -- did Dustin
4  Jones have any weapon?
5  A. I couldn't -- I couldn't tell. I couldn't
6  tell.
7  Q. But you didn't see any weapon at that time?
8  A. I did not. I didn't see any.
9  Q. Okay. And you said that Dustin was on top of
10 Josh. Did you -- were you able to tell what was going
11 on between the two, what was happening?
12 A. They were struggling.
13 Q. Was Dustin punching Officer Hancock?
14 A. I -- I can't tell you that. I don't know.
15 Q. Did it look to you like he was trying to beat
16 up Officer Hancock -- and when I say "he," Dustin was
17 trying to beat up Officer Hancock -- or did it look like
18 to you that he was struggling, still trying to flee?
19 A. No, he was in a position that had he wanted to
20 flee, he could have fled. He was -- he was on top.
21 Josh was on his back. He could have ran. He could have
22 left.
23 Q. And I'll tell you, during Officer Hancock's
24 deposition, he said that while they were in that
25 position, that he had his legs wrapped around Dustin.

**Page 69**

1  Did you see that?
2  A. No.
3       MR. CALVERT: Object to the form.
4  Q. (BY MR. TURNER) Okay. So, now we can finally
5  get to this point. You see him on the ground. What do
6  you do next?
7  A. I -- I exit the patrol vehicle, grab a
8  flashlight that was -- that was there in the light
9  holder, and I run to them.
10 Q. Why'd you grab the flashlight?
11 A. Because that's all I had other than my gun.
12 Q. Okay. And when you come to the scene and you
13 see the situation that they're in, is this a situation
14 where it would be okay for you to discharge a weapon?
15 A. If it wouldn't have -- if Josh wouldn't have
16 been where he was, I might have done that; but he was --
17 it was too dangerous for me to try to shoot with Josh
18 where he was. So, the only other alternative I had was
19 a flashlight.
20 Q. If you had a Taser, would you have used the
21 Taser?
22 A. Yes.
23 Q. Okay. Okay. So, you grab the flashlight. You
24 run to him. What's the next thing that happens?
25 A. I could see Josh that was in -- was in much

```
 1   distress.  He -- he tried to tell me that he couldn't
 2   breathe, but he couldn't even talk it out.  He just kind
 3   of had to whisper it out, told me, "Paul, I can't
 4   breathe"; and he was in -- he was in quite a bind.
 5       Q.  Okay.  And, so, what did you do?
 6       A.  I didn't know had he been stabbed.  I didn't
 7   know had he gotten Josh's gun and shot him.  So, I start
 8   hitting him in the head and shoulders with that
 9   flashlight.
10       Q.  Would you consider -- hitting him in the head
11   and shoulders with that flashlight, would you have
12   considered that use of deadly force?
13       A.  I -- I wasn't thinking at that time.  I didn't
14   care.  I wanted him off Josh.
15       Q.  Looking back hindsight, would you consider that
16   using deadly force?
17       A.  Could be.
18       Q.  And you started hitting him on the head and
19   shoulders --
20       A.  Uh-huh.
21       Q.  -- with the flashlight.  I assume you were
22   hitting him pretty hard?
23       A.  I was hitting him pretty hard, yes, sir.
24       Q.  Okay.  What was his reaction to that?
25       A.  None.
                                                          70
```

```
 1       Q.  Do you recall how many times you hit him on the
 2   head and shoulders with the flashlight?
 3       A.  Well, I swung it two or three times; but I
 4   think one time I got Josh.  So, probably a couple of
 5   times.
 6       Q.  Okay.  And after hitting him a couple of times,
 7   what's the next thing that you did?
 8       A.  I saw that was having absolutely no effect; so,
 9   I threw the flashlight out of the way where he couldn't
10   get to it in case -- case I couldn't handle him.
11       Q.  Uh-huh.
12       A.  Threw it out of the way.  So, I reached down
13   and got him in a headlock and rolled him back off of
14   Josh.
15       Q.  Can you describe for me the headlock that you
16   put him in?
17       A.  I had -- my left arm was around his chin.  And
18   what I was trying to do was I was holding his head back
19   up against my body where he couldn't headbutt me because
20   he was trying to punch me with his fist, and I knew if
21   I -- if I let go of his head, he'd try to headbutt me;
22   and I had it below his mouth where he couldn't bite me.
23       Q.  Okay.
24       A.  And I was just -- I locked my legs around him
25   where I could get him in a -- get him contained where he
                                                          71
```

```
 1   couldn't go nowhere and I could hang on until backup
 2   arrived.
 3       Q.  You said you had your arm around his chin, the
 4   lower part of his chin?
 5       A.  My left arm, yes --
 6       Q.  Left arm?
 7       A.  -- yeah --
 8       Q.  And what --
 9       A.  -- up under his -- up under his chin and jaw,
10   and I was holding it like this (indicating) back up
11   against me where he couldn't headbutt me.
12       Q.  Okay.  And while you had your left arm under
13   his chin and jaw, were you holding your arm with the
14   right --
15       A.  Uh-huh, I had him like this (indicating) --
16       Q.  Okay.
17       A.  -- uh-huh, what -- what I could get there.  I
18   was -- I was kind of on my side and he was, too, and I
19   was just holding him up against me.
20       Q.  Were you fully on your side or kind of on your
21   side?
22       A.  I wasn't -- I wasn't laying on my side.  I was
23   kind of on -- I was on this (indicating) side with
24   the -- with, I don't know, the right cheek of my butt
25   and my right shoulder was kind of on the ground and he
                                                          72
```

```
 1   was kind of half on top of me and half on his side, too.
 2       Q.  Okay.  And you said that you had your legs
 3   wrapped around his torso?
 4       A.  Kind of wrapped around his waist and his thighs
 5   here (indicating) -- or around his waist because he was
 6   kicking and hitting, and I was just trying to -- I was
 7   just trying to hang on, but I did have my legs wrapped
 8   around him.  I just don't know where exactly.
 9       Q.  Okay.  And I assume that you were holding onto
10   him pretty tightly?
11       A.  Yes, sir.
12       Q.  Okay.  At this time, were you -- you put him in
13   a headlock.  You grabbed him, and you pulled him off of
14   Officer Hancock; and you have his -- you have your legs
15   around him.  What is -- what is Officer Hancock doing?
16   Do you know?
17       A.  Well, as soon -- soon as I got him off and
18   down, Officer Hancock got up and came around.  And
19   Mr. Jones was trying to hit me with his fist.  So, I
20   told Josh, I said, "Hold his -- get his hands and hold
21   them"; and he did.
22       Q.  Now I want to talk about the time period right
23   before you asked Officer Hancock to grab his hands.  At
24   that time period, were you in imminent fear of serious
25   bodily injury or death?
                                                          73
```

```
 1    A.  I wasn't, but I was afraid Josh was.
 2    Q.  Okay.  And, so, you asked Officer Hancock to
 3  hold his hands.  Was --
 4    A.  Yes, sir.
 5    Q.  -- he able to do that?
 6    A.  Sir?
 7    Q.  Was he able to do that?
 8    A.  Yes, sir.
 9    Q.  Okay.  Could you tell me the position that
10  Officer Hancock was in when he held his hands?
11    A.  He was behind me, leaning over me, and had
12  Mr. Jones's hands with both of his.
13    Q.  Was he holding them out like this (indicating)
14  or --
15    A.  He had them -- he had them over us and was
16  holding them on -- onto the ground --
17    Q.  Okay.
18    A.  -- yeah.
19    Q.  Did he successfully prevent Mr. -- Mr. Jones
20  from moving his hands?
21    A.  Yes, sir.
22    Q.  And you said earlier that the plan was for you
23  to be in that position until backup arrived.  Had you
24  called for backup?
25    A.  I didn't call for backup.  But Officer Hancock,
                                                         74
```

```
 1  when the pursuit started, he checked in pursuit; and at
 2  that point, we knew backup was coming.  We just didn't
 3  know where or how long they were.
 4        MR. CALVERT:  We've been going a little
 5  over an hour.  Can we take a short break?
 6        MR. TURNER:  (Gesturing)
 7        THE VIDEOGRAPHER:  We're off the record at
 8  11:16.
 9        (RECESS FROM 11:16 A.M. TO 11:30 A.M.)
10        THE VIDEOGRAPHER:  Back on the record at
11  11:30.
12    Q.  (BY MR. TURNER) I think when we left off,
13  Chief, we were -- you were -- you were -- you were kind
14  of on your side -- you know, kind of on your side, kind
15  of on your back holding Dustin in a headlock and Officer
16  Hancock was kind of laying over the top of both of you
17  guys holding Dustin's hands forward?
18    A.  Yes, sir.
19    Q.  Okay.  At that time, did y'all have him pretty
20  secured?
21    A.  I think so, yes, sir.
22    Q.  Would you consider him as being in you guys'
23  custody at that time period?
24    A.  Yes, sir, he was in my custody.
25    Q.  Okay.  At that time point, did -- in your view,
                                                         75
```

```
 1  did Mr. Jones pose an imminent threat of serious bodily
 2  injury or death to you or Officer Hancock?
 3    A.  At that time, I was -- I was still pretty
 4  concerned, yes, sir.
 5    Q.  Okay.  Why were you concerned?
 6    A.  If he broke loose or tore loose, I didn't know
 7  what was going to happen then.  So, I was -- I was
 8  still -- I was still quite -- quite nervous about the
 9  situation.
10    Q.  And, so, I guess what serious bodily injury
11  were you concerned about, if any?
12    A.  Any kind that he could inflict.  All of it.
13  I -- you know --
14    Q.  Okay.
15    A.  -- I had a -- I had a hold on him, but I didn't
16  know how long my hold was going to last.  I was fading
17  pretty quick myself.
18    Q.  So, it's not necessarily that you thought he
19  posed a serious threat of bodily injury or death to
20  yourself at that point; but maybe if he were to be let
21  go, he might?
22    A.  If he -- if he were to break loose, yes, sir,
23  he could have -- he could have at that point posed a
24  threat of serious bodily injury.
25    Q.  Do you have any idea how long y'all were in
                                                         76
```

```
 1  that situation for, that position for?
 2    A.  No, sir, I don't.  It felt like forever, but I
 3  don't know.  I don't know.  I can't tell you how long.
 4    Q.  Would you say it was more or less than five
 5  minutes?
 6    A.  I couldn't say.
 7    Q.  Okay.
 8    A.  I couldn't say one way or the other.  It
 9  just -- it just felt like forever.
10    Q.  And for however long that y'all were in this
11  position, what was Mr. Jones doing?
12    A.  He was -- he was still fighting.  He was still
13  fighting.  He was kicking, trying to get his hands
14  loose, squirming.
15    Q.  So, you wouldn't be able to tell me -- well,
16  let me scratch that question.  I know you can't tell me
17  that.
18        At some point -- well, what's the next -- how
19  about I just ask.  What's the next significant thing
20  that happened, to your memory, involving this incident?
21    A.  After the hold, the next significant thing I
22  remember is Josh told me he wasn't breathing.
23    Q.  And what'd you do once Officer Hancock informed
24  you he wasn't breathing?
25    A.  Turned him loose.  We rolled him onto his
                                                         77
```

Page 78:

1  stomach, got his hands -- I got his hands out from under
2  him, and Josh put handcuffs on him.  And at that point,
3  we turned him back over; and after that, I don't
4  remember much.  I was -- I was crawling away, and I
5  dialed 9-1-1 at that point.
6     Q.  While y'all were in that position on the
7  ground, do you recall saying anything to Mr. Jones?
8     A.  I told -- I told him one time that backup was
9  going to have to hurry up and get there because I can't
10 hold on much longer.
11    Q.  And I assume you told that to Officer Hancock?
12    A.  I did tell that to Officer Hancock.
13    Q.  Do you recall saying anything to Mr. Jones
14 while y'all were in that position?
15    A.  I didn't say -- I wasn't talking to Mr. Jones.
16 I didn't say anything to him.
17    Q.  You don't recall ever asking him if he gives
18 up?
19    A.  No.
20    Q.  Would it be fair to say that you didn't
21 initially notice, yourself, that Mr. Jones wasn't
22 breathing?
23    A.  I didn't notice, no, sir.
24    Q.  You're aware that we took the deposition of
25 Officer Hancock prior to your deposition?

Page 79:

1     A.  Yes, sir.
2     Q.  And I forgot to ask you.  What did you do to
3  prepare for your deposition today, if anything?  Did you
4  review any documents, look at anything?
5     A.  I reviewed my statement.
6     Q.  Okay.
7     A.  I looked over my statement.
8     Q.  Did you talk to Officer Hancock about his
9  deposition?
10    A.  Yeah, I tried to.
11    Q.  Okay.
12    A.  He couldn't remember anything.
13    Q.  Okay.  I'll tell you, during his -- during his
14 deposition, he said that Mr. Jones was struggling,
15 struggling, struggling and then to him it seemed like
16 all of the sudden, he just stopped struggling.
17    A.  Uh-huh.
18    Q.  That's when he noticed that he wasn't
19 breathing.  Does -- does that sound about right to you?
20    A.  Yes, sir.
21    Q.  Is it fair to say that pretty immediately once
22 you guys noticed that he wasn't moving or breathing that
23 y'all went ahead and released the hold?
24    A.  As soon as Josh told me, he -- Josh said,
25 "Paul, he's not breathing"; and as soon as Josh said

Page 80:

1  that, I released the hold.  We rolled him onto his
2  stomach, cuffed him, and then rolled him back over.
3     Q.  Do you recall where y'all got those handcuffs
4  from?
5     A.  Some -- some lady that was there, I think -- I
6  don't know if she got them or if Josh ran and got them.
7  I don't know.
8     Q.  Okay.
9     A.  I don't know who got them.
10    Q.  What's the difference between a headlock and a
11 chokehold, Chief?
12    A.  A headlock just secures the head.  A chokehold
13 cuts off the airflow.
14    Q.  Are chokeholds okay in the Kirbyville Police
15 Department?
16    A.  No, they're not.
17    Q.  Did you guys ever find a weapon on Mr. Jones?
18    A.  I couldn't -- I don't know, sir.  I don't know.
19 I didn't.
20    Q.  Is it your understanding that at some point
21 prior to this incident, Mr. Jones had been using
22 synthetic marijuana; or do you know?
23    A.  I -- I had -- I don't know.  I had heard that
24 Arthur Breed had told -- I thought he told Josh that
25 they had been smoking all that night --

Page 81:

1     Q.  Okay.
2     A.  -- but I don't know that.
3     Q.  Is there anoth- -- do you know what the other
4  names for synthetic marijuana are?
5     A.  K2, I guess.  I think they call it "K2," but I
6  don't know -- I don't know much about that stuff --
7     Q.  Okay.
8     A.  -- very little.
9     Q.  Okay.  So, you said that -- after they turned
10 him over, the handcuffs, you said that you kind of
11 didn't know what happened from that point because --
12 tell me again what you did afterwards.  You crawled and
13 called 9-1-1?
14    A.  I -- all I was able to do is crawl away, call
15 9-1-1; and I just kind of laid down on the ground.  I
16 was -- I was ruined.  I was spent, but I did manage to
17 call 9-1-1 and get an am- -- get an ambulance en route
18 for him.
19    Q.  Did you participate -- it's my understanding
20 that -- well, do you -- do you know if people were
21 trying to resuscitate Mr. Jones?
22    A.  I know Josh was, and there was -- there was
23 another lady there that was trying to help, and then
24 once the -- once the other officers got there, they took
25 over the C.P.R.

```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF
                          BEAUMONT DIVISION

SHAWNTEL BREED,                  )
INDIVIDUALLY AND AS              )
REPRESENTATIVE OF THE            )
ESTATE OF DUSTIN KEITH           )
JONES, DECEASED, AND AS          )
NEXT FRIEND OF DJ AND CJ,        )
MINOR CHILDREN                   )
     Plaintiff                   )
                                 )
VS.                              )   CIVIL ACTION NO. 1:15-cv-190
                                 )   JURY DEMANDED
CITY OF KIRBYVILLE, CHIEF        )
PAUL BRISTER, AND OFFICER        )
JOSH HANCOCK OF THE CITY         )
OF KIRBYVILLE POLICE             )
DEPARTMENT, INDIVIDUALLY,        )
AND IN THEIR OFFICIAL            )
CAPACITIES                       )
     Defendants.                 )
```

**************************************************************

### REPORTER'S CERTIFICATE

### ORAL AND VIDEOTAPED DEPOSITION OF

### CHIEF ROBERT PAUL BRISTER

March 18, 2016

**************************************************************

   I, Janie P. Trapp, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

NELL McCALLUM & ASSOCIATES, INC.
Janie P. Trapp, CSR, RPR

```
 1      That the witness, CHIEF ROBERT PAUL BRISTER, was
 2  duly sworn and that the transcript of the deposition is
 3  a true record of the testimony given by the witness;
 4      That the deposition transcript was duly submitted on
 5  _____ to the witness or to the attorney
 6  for the witness for examination, signature, and return
 7  to the offices of Nell McCallum & Associates, Inc.,
 8  by _____.
 9      That the amount of time used by each attorney
10  at the time of the deposition is as follows:
11      MR. TURNER - 2 hours, 27 minutes,
12      That pursuant to information given to the deposition
13  officer at the time said testimony was taken, the
14  following includes all parties of record:
15  FOR THE PLAINTIFF:
16      Mr. Ronnie Turner, Jr.
        SBOT No. 24075533
17      PROVOST UMPHREY LAW FIRM, L.L.P.
        490 Park Street
18      Beaumont, Texas   77701
19  FOR THE DEFENDANTS:
20      Mr. Frank D. Calvert
        SBOT No. 03667700
21      CALVERT, EAVES, CLARKE & STELLY, L.L.P.
        2615 Calder, Suite 1070
22      Beaumont, Texas   77702
23      I further certify that I am neither counsel for,
24  related to, nor employed by any of the parties in the
25  action in which this proceeding was taken, and further
```

1  that I am not financially or otherwise interested in the
2  outcome of this action.
3      Further certification requirements pursuant to
4  Federal Rules of Civil Procedure will be complied with
5  after they have occurred.
6      Certified to by me on this _____ day of
7  _____, _____.

8

9  _____
10  Janie P. Trapp, CSR, RPR
    Texas CSR No. 6789
11  Expiration: 12/31/2017
    Nell McCallum & Associates, Inc.
12  Firm Registration No. 143
    2615 Calder Avenue, Suite 111
13  Beaumont, Texas 77702
    (409)838-0333/Fax(409)832-4501
14

15          **REPORTING FIRM'S FURTHER CERTIFICATION**

16

17      The Changes and Signature page were/were not
18  returned to the deposition officer on _____.
19      If returned, the attached Changes and Signature page
20  contain(s) any changes and the reasons therefor.
21      The original deposition was delivered to Mr. Ronnie
22  Turner, Jr., Attorney for Plaintiff, Custodial Attorney,
23  for safekeeping on _____;
24      That a copy of this certificate was served on all
25  parties shown herein.

```
 1     Certified to by me on this _____ day of
 2     _____, _____.
 3
 4
 5                                    _____
 6                                    Janie P. Trapp, CSR, RPR
                                      Texas CSR No. 6789
 7                                    Expiration: 12/31/2017
                                      Nell McCallum & Associates, Inc.
 8                                    Firm Registration No. 143
                                      2615 Calder Avenue, Suite 111
 9                                    Beaumont, Texas 77702
                                      (409)838-0333/Fax(409)832-4501
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```