# EXHIBIT "B"

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE EASTERN DISTRICT OF TEXAS
 3                       BEAUMONT DIVISION
 4   SHAWNTEL BREED,          )
     INDIVIDUALLY AND AS      )
 5   REPRESENTATIVE OF THE    )
     ESTATE OF DUSTIN         )
 6   KEITH JONES,             )
     DECEASED, AND AS NEXT    )
 7   FRIEND OF DJ AND CJ,     )
     MINOR CHILDREN           )
 8                            )
          Plaintiff           )
 9                            )
     VS.                      )  CIVIL ACTION NO: 1:15-CV-190
10                            )
     CITY OF KIRBYVILLE,      )  JURY DEMANDED
11   CHIEF PAUL BRISTER,      )
     AND OFFICER JOSH         )
12   HANCOCK OF THE CITY      )
     OF KIRBYVILLE POLICE     )
13   DEPARTMENT,              )
     INDIVIDUALLY, AND IN     )
14   THEIR OFFICIAL           )
     CAPACITIES               )
15                            )
          Defendants.         )
16
     * * * * * * * * * * * * * * * * * * * * * * * * * *
17              ORAL AND VIDEOTAPED DEPOSITION OF
18                 OFFICER JOSHUA C. HANCOCK
19                       MARCH 1, 2016
20   * * * * * * * * * * * * * * * * * * * * * * * * * *
21      ORAL AND VIDEOTAPED DEPOSITION OF
22   OFFICER JOSHUA C. HANCOCK, produced as a witness at the
23   instance of the PLAINTIFF, and duly sworn, was taken in
24   the above-styled and numbered cause on MARCH 1, 2016,
25   from 10:05 A.M. to 1:09 P.M., before Carly Michelle
```

**Page 26**

1  A. No, sir.
2  Q. Okay. When you began working for Kirbyville, what
3  was your job title?
4  A. I was just a patrol officer.
5  Q. Patrol officer.
6     And your duties as a patrol officer for
7  Kirbyville, were they about the same as your job duties
8  for -- as a patrol officer with Newton County?
9  A. Well, the only addition was that we -- we enforced
10 the traffic code more in Kirbyville. We write more
11 tickets than we did in Newton County.
12 Q. And why is that? Why -- why is that? I mean, was
13 that something that somebody told you-all to do or was
14 that just a part of the policy in Kirbyville or...
15 A. Well, we don't have a policy for writing tickets.
16 It's just one of our job duties.
17 Q. Do you feel like there were more traffic
18 infringements in Kirbyville than there were in Newton?
19 A. I do.
20 Q. Okay. Okay. How long were you a -- how long were
21 you a patrol officer with Kirbyville Police Department?
22 A. I don't remember exactly how long.
23 Q. Okay. Did you eventually move to another
24 position?
25 A. To patrol sergeant.

**Page 27**

1  Q. Okay. As patrol sergeant with Kirbyville, how
2  many officers were you -- well, let me ask you this
3  first: Were the job duties as a patrol sergeant in
4  Kirbyville about the same as they were in Newton or were
5  they different?
6  A. Whenever it come to dealing with employees with
7  the -- the other officers, yes. I have more office
8  duties with Kirbyville than I had with Newton.
9  Q. When you say "office duties," what do you mean?
10 A. I keep up with the Uniform Crime Report for
11 Kirbyville, as well as the evidence room. I did not have
12 that in Newton County.
13 Q. Okay. As patrol sergeant were you still
14 responsible for patrol officers?
15 A. Yes.
16 Q. Okay. How many patrol officers were you
17 responsible for at Kirbyville?
18 A. Now in Kirbyville?
19 Q. Well, let's -- let's say on May 14th, 2013.
20 A. Just two at the time.
21 Q. Two.
22    And tell me again what your responsibilities
23 were with regard to those two officers.
24 A. Made sure that they keep their cases. I would put
25 their cases together and bring them to the District

**Page 28**

1  Attorney's office. I kept up with their equipment in
2  their vehicles. I made sure their vehicles were running
3  properly. If they had any issues that they needed to be
4  addressed with equipment or vehicles or work, then they
5  would come to me for -- if they had any problems that
6  they didn't know how to deal with, they would come to me
7  for it.
8  Q. How does one move from a patrol officer to a
9  patrol sergeant in Kirbyville? Does somebody have to
10 nominate you or, you know, or is that an appointed job or
11 is that just a natural -- that just happens after so many
12 years?
13 A. It's -- it's selected by the Chief.
14 Q. Okay. And who was the Chief that selected you to
15 be a patrol sergeant?
16 A. Paul Brister.
17 Q. Okay. What is your understanding of the duties of
18 the Police Chief of Kirbyville?
19 A. Well, I don't understand your question.
20 Q. Okay. What is your understanding of the
21 responsibilities that the Police Chief has, I guess, as
22 opposed to, say, a patrol sergeant or a patrol officer?
23 What extra responsibilities, is it your understanding,
24 that the Police Chief has at Kirbyville?
25 A. He's responsible for the whole department.

**Page 29**

1  Q. He oversees all the officers?
2  A. Yes, sir.
3  Q. Set -- does he set the policies?
4  A. Yes, sir.
5  Q. Is he in charge of training the officers?
6  A. He's in charge of making sure that we have
7  training.
8  Q. Does he choose what training that y'all have to
9  undergo and which ones y'all don't?
10 A. Well, he's -- he doesn't select. We have
11 mandatory training that we are required by TCOLE that we
12 are to take yearly. So -- but any other training the
13 officers may want then, yes, he would send them to.
14 Q. Is it fair to say with regard to, you know, all
15 the officers at Kirbyville Police Department that, you
16 know, he has the ultimate say in what goes on?
17 A. It depends on the situation.
18 Q. Okay. And what situations do you feel like he
19 wouldn't or -- or would, whichever one? I'm just trying
20 to get a more -- a better understanding.
21    So, when wouldn't he have the ultimate say
22 and when would he?
23 A. Well, there were certain -- certain things with
24 the police department that the city council would have to
25 approve.

```
 1    Q.  Okay.  Is there anything you can think of off the
 2  top of your head that the city council would have to
 3  approve?
 4    A.  I can't -- I know purchasing is one.  I can't
 5  think of all of them.
 6    Q.  So, maybe more budgetary concerns?
 7    A.  Some of them, yes, sir.
 8    Q.  Okay.  I guess but with how the actual police
 9  department is -- is ran, that's something that
10  Chief Brister would have the most say over?
11    A.  Correct.
12    Q.  Okay.  At the time when this incident happened on
13  May 14th of 2013, you were a patrol sergeant?
14    A.  Yes, sir.
15    Q.  Okay.  Excuse me.  When you moved from
16  Newton County to Kirbyville, did you have to go -- did
17  you have to undergo any special or additional training?
18    A.  The move from the sheriff's office to the police
19  department?
20    Q.  The move from Newton County to Kirbyville.  Did
21  Kirbyville require you to do any additional training?
22    A.  No, sir.
23    Q.  Okay.  Let's talk about the training that you did
24  while you were at Newton.  You talked -- you talked about
25  you had some use of force -- wait.  Hold on.  Let's talk
                                                          30
```

```
 1  about training.
 2       Could you tell me what type of training --
 3  well, first of all, when you went to Newton County, did
 4  you undergo any special training outside of what you had
 5  underwent at LIT at the police academy?
 6    A.  No, sir.
 7    Q.  Okay.  So, what did the -- what do you recall
 8  about what the police academy trained -- trained you with
 9  regard to use of force?  And we will -- I will limit it
10  down to use of force while attempting to make an arrest.
11    A.  I don't understand your question exactly.  Are you
12  wanting the entire for use of force?  It would all depend
13  on the situation.
14    Q.  Okay.  Let's -- let's do it like this.  I might --
15  I think that I might be a little bit off on some -- some
16  definitions.  So, let's -- let's -- we'll go through it
17  like that.  Okay?
18    A.  Okay.
19    Q.  What is the difference between a detention and an
20  arrest, or is there a difference?
21    A.  Well, yes.  Detention, if you were being
22  stopped -- if you were being pulled over on the side of
23  the road, say, for a traffic offense, that's a detention.
24  An arrest would be if I was to take you into custody for
25  an offense that occurred.
                                                          31
```

```
 1    Q.  Okay.  And at what point would you say somebody is
 2  in custody?  When the handcuffs are put on them?  When,
 3  you know -- I guess, how do you know when somebody is in
 4  custody as opposed to just being detained?
 5    A.  If I -- if I've told you "I'm placing you under
 6  arrest," I would consider that, that you are in custody.
 7    Q.  Okay.  Okay.  And I want to talk to you about use
 8  of force, but I am going to break this down in two
 9  different categories:  Just use of force and then use of
10  deadly force.  Okay?
11       Is that a fair separation?
12    A.  Yes.
13    Q.  Okay.  When is it your understanding that officers
14  are allowed to -- to use force in order to help them
15  either detain or -- well, let me ask you this first --
16  strike that.
17       Let me ask you this question first:  Are you
18  guys allowed to use force in order to detain a suspect?
19    A.  Depending on the detention.
20    Q.  Okay.  Why don't you tell me about that?
21    A.  Well, there's such a wide range.  It would depend
22  on the circumstance, would be what I'm referring to.
23    Q.  Okay.
24    A.  Just detaining somebody on a traffic stop?  No, we
25  wouldn't use force for that.
                                                          32
```

```
 1    Q.  Okay.
 2    A.  It would just depend.
 3    Q.  Okay.  So, generally -- in which we are talking in
 4  generalities, right, unless something crazy happened,
 5  right, unless somebody at a traffic stop pulled out a
 6  knife, or something like that.  Generally when you are
 7  just trying to detain somebody, use of force is generally
 8  not necessary.  Is that -- is that a fair statement?
 9    A.  Yes.
10    Q.  Okay.  Okay.  And, so, generally, use of force in
11  a traffic stop would not be okay, you know, with
12  Kirbyville Police Department?
13    A.  Yes.
14    Q.  Okay.  So, now, when it comes to arrests, again,
15  you, obviously, you don't want to -- is it fair to say
16  you obviously don't want to use force, unless you have
17  to, to make an arrest.  Is that a fair statement?
18    A.  Yes.
19    Q.  Okay.  But -- but it's more allowable, I guess, to
20  use force in an arrest than just than while -- while a
21  person is under detention.  Is that fair?
22    A.  I don't understand your question --
23    Q.  Okay.
24    A.  -- what your...
25    Q.  It might have been a bad question.
                                                          33
```

**Page 54**

1  understand, is just meant to hold that person's head in
2  one single position? Is that the purpose or the goal of
3  it?
4      A. Yes, more or less. Yes. It would depend on the
5  way that that person is moving around, whether you are
6  going to be able to hold them in one spot or not.
7      Q. Is the difference between -- can you have a
8  headlock where a person -- a person's arm is around the
9  person's neck?
10     A. I'm sure it's possible.
11     Q. Right. As long as you are not -- I guess the
12 difference is, is that whether or not you were squeezing
13 tight or whether or not it was looser?
14     A. Right. Applying force, yes.
15     Q. Okay. Okay. Now, I'm going to get ahead of
16 myself right now and we are going to talk about when this
17 incident actually occurred. I saw from some of the
18 statements that Chief Brister was applying, what he
19 claims, to be a headlock on Mr. Jones. Is that fair?
20     A. Yes.
21     Q. Do you recall that?
22     A. Yeah, I do recall it. Yeah.
23     Q. Okay. Did you actually see the headlock, as he
24 claims, being applied to Mr. Jones?
25     A. Yes.

**Page 55**

1      Q. Okay. Could you describe that particular
2  headlock?
3      A. There was so much movement, I couldn't be able to
4  tell you exactly where he was located. I know that
5  Mr. Jones was screaming and hollering and breathing
6  while he was -- while he was holding him. So, I know he
7  wasn't choking him because he was -- he was speaking.
8      Q. Okay.
9      A. But there was so much -- he was moving around so
10 much it would be hard to say -- for me to be able to say
11 where he actually had it.
12     Q. Okay. And you say that's pretty much the entire
13 time when the headlock was being applied he was moving
14 around and screaming?
15     A. Yes.
16     Q. Okay. When he stopped moving around and
17 screaming, did that happen, like, almost all at once?
18     A. Yes.
19     Q. And what I mean by that is, he was moving around,
20 you know, like you said, breathing, screaming, or
21 whatever, and then -- one second and almost the next
22 second it just kind of stopped?
23     A. Yes.
24     Q. Okay. And, so, are you able to tell where exactly
25 Chief Brister's forearm and bicep was? Was it around his

**Page 56**

1  neck? Were you able to tell that?
2      A. No, sir.
3      Q. Okay. Now, in a headlock, is it -- are you
4  supposed to grab -- grab your -- your other wrist when
5  it's around or -- does it matter or (indicating)...
6      A. I don't -- I don't really know.
7      Q. Okay.
8      A. It's not something that I trained on, was
9  giving -- putting a headlock on somebody.
10     Q. Okay.
11     A. It would depend on the circumstance, I would
12 guess, how big the person was, how small they were, where
13 you were at at the time.
14     Q. And because -- and is it your understanding that
15 Kirbyville -- it was against Kirbyville's customs and
16 policies to use a choke hold?
17     A. Yes.
18     Q. Okay. And because of that, they never showed you
19 how to put -- put somebody in a choke hold?
20     A. From as far back as I can remember during
21 training, we were told not to use a choke hold, not just
22 Kirbyville.
23     Q. And, so, I guess the answer to my question is,
24 yes, they never showed you how to use a choke hold --
25     A. No.

**Page 57**

1      Q. Okay. Okay. I want to make sure I got this -- I
2  think you said -- I want to make sure I got that clear.
3  The main -- really, the main difference between a choke
4  hold and a headlock is that a choke hold cuts off air and
5  circulation?
6      A. As far as I know, yes.
7      Q. Okay. Okay. As far as you know, have you ever
8  had any complaints filed against you while you've been
9  with Kirbyville?
10     A. No, sir.
11     Q. As far as you know has Chief Brister ever had any
12 complaints filed against him while he's been at
13 Kirbyville?
14     A. No, sir.
15     Q. Have you ever, in your history of -- in your
16 police career, have you ever had to use deadly force?
17     A. No, sir.
18     Q. Have you ever -- and, obviously, this time is
19 included. Have you ever, in the process of detaining or
20 arresting somebody, cause that person's death?
21     A. No, sir.
22     Q. Do you know if Chief Brister has ever, in the
23 process of arresting or detaining somebody, caused their
24 death?
25     A. As far as I know, no.

**Page 58**

1    Q. Okay. Okay. Okay. I want to just talk about
2  your time at Kirbyville now. I'm going to ask you this
3  question, if you can answer, answer. If you can't, you
4  can't. I understand.
5        But could you give me an estimate of how many
6  times you've had -- you have had to use force in order to
7  effectuate an arrest during your time at Kirbyville?
8    A. I couldn't tell you. I don't know.
9    Q. Okay.
10   A. It wouldn't be a very high number.
11   Q. Have you ever?
12   A. Had to use force?
13   Q. In order to -- in order to, yeah, make an arrest?
14   A. Well, yes. Yes.
15   Q. Okay. Okay. Do you know about how many arrests
16  you made during your time at Kirbyville?
17   A. I couldn't tell you.
18   Q. Okay. Could you give me a percentage? You say --
19  you know, maybe 10 percent of the arrests you have made
20  or, you know...
21   A. Not accurately I wouldn't be able to give you a
22  percentage.
23   Q. Okay.
24   A. Majority of the time, no, I don't have to use
25  force.

**Page 59**

1    Q. Okay. Would you say it was less than 10 percent
2  of the time?
3    A. I would hate to tell you that and it be wrong.
4    Q. Okay. It's my understanding that if you have to
5  use -- let's see. Let me -- let me look here.
6        That -- that if you have to use nondeadly
7  force with Kirbyville, that you have to fill out a
8  use-of-force report form. Have you ever had to fill one
9  of those out before?
10   A. A use-of-force form?
11   Q. Report form.
12   A. It depends on what use of force it is.
13   Q. Okay.
14   A. We have -- we have use-of-force forms for our
15  Tasers.
16   Q. Okay.
17   A. And we have -- the guys have to fill them out. I
18  can't recall that I have ever had to fill one out
19  because -- I think this is one of the few times I've
20  actually reported it and I didn't have contact.
21   Q. And is it your understanding that the use-of-force
22  report form is only for Tasers?
23   A. Depending on the use of the force. There would
24  be -- we would document it. I don't believe we have an
25  actual form for it.

**Page 60**

1    Q. Okay. How would you document -- let me pause.
2        Are we just talking about Tasers right now or
3  are we talking about all use of force?
4    A. No, all uses of force.
5    Q. Okay. How would you document it?
6    A. In our incident reports.
7    Q. Okay. Prior to this incident, when was the last
8  time you had to use force in order to effect an arrest?
9    A. I can't -- I can't remember.
10   Q. Okay. Would that inci- -- information would be in
11  your incident report forms?
12   A. Yes, sir, it should.
13   Q. Okay. Got this. Got this. That's good.
14       Did you ever know Mr. Jones before this
15  specific incident?
16   A. No, sir.
17   Q. Had you ever met him before?
18   A. No, sir.
19   Q. Do you know if Chief Brister had known him?
20   A. No, sir, not that I know of.
21   Q. Did you know anybody at the scene before this
22  incident had took place?
23   A. Yes, sir.
24   Q. Who did you know?
25   A. The guy that was there that had the camper

**Page 61**

1  trailer. We call him "BB," but his name is Arthur Breed.
2  I've known him for a few years.
3    Q. Okay. How did you know Arthur Breed?
4    A. Well, Arthur has been in and out of jail. He --
5  he stayed in trouble. We try to keep him out of trouble.
6  We try to make sure he doesn't commit any crimes and try
7  and help him out.
8    Q. Okay. What type of crimes did Arthur Breed have a
9  tendency to commit?
10   A. Arthur is a thief. He likes to steal stuff.
11   Q. Okay. How long had you known Arthur Breed prior
12  to?
13   A. A couple of years.
14   Q. Had you met her -- had you known Shawntel Breed
15  prior to this?
16   A. Not that I know of. I don't remember.
17   Q. Okay.
18   A. I may have met her before. I talk to so many
19  people. It's hard for me to keep up with everybody.
20   Q. The location where you guys went to make the
21  arrest, you had been to that location before?
22   A. Yes.
23   Q. Several times or a few times?
24   A. Are you asking just going there or actually for
25  incidents or for offenses?

**Page 62**

1  Q. Well, just in general.
2  A. Just in general, yes, several times.
3  Q. Okay. Okay. You are familiar with -- with the
4  area where this whole incident occurred?
5  A. At Chestnut and MLK? Yes, sir.
6  Q. Yeah. Very familiar?
7  A. Yes, sir. I drive through there every day.
8  Q. And just so we have an idea, how many people are
9  in Kirbyville?
10  A. I think the last census count was 2181.
11  Q. 2,181, approximately?
12  A. I think that was the last count that I had from
13  the census.
14  Q. How many people do y'all have at the
15  Kirbyville Police Department?
16  A. Now?
17  Q. At the time.
18  A. At the time. Myself, the Chief, and two officers.
19  So, four.
20  Q. Were you the only patrol sergeant at that time?
21  A. Was I the only?
22  Q. Were you the only patrol sergeant --
23  A. Yes.
24  Q. -- in Kirbyville at the time?
25  A. Yes, sir. We only have one.

**Page 63**

1  Q. Now, I asked you about complaints that you knew of
2  for Chief Brister and for yourself. What about these
3  other two officers? Do you know of any complaints lodged
4  against them prior to this incident?
5  A. I would have to actually go back and see which two
6  officers it was.
7  Q. Okay. Do you have an idea of either one of the
8  two?
9  A. I don't. I don't. We had a few officers come
10  through during that time.
11  Q. Okay. Okay. I think we are ready now. Okay.
12  Let's -- let's talk about the day of this incident.
13  Okay?
14  A. Okay.
15  Q. All right. Tell me how you were -- you first
16  became aware of -- of Dustin Jones. You said -- you said
17  you had never known Dustin Jones --
18  A. Right.
19  Q. -- before this occasion. Okay. So --
20  A. First time I heard his name, we received a call
21  from the Jasper dispatch that -- from what I can
22  understand, I was told was that they had received a call
23  from Jefferson County about the location of a wanted
24  suspect. They called me, told me what his name was, and
25  told me the location where he was at, told me that he had

**Page 64**

1  some felony warrants and that Jefferson County had
2  confirmed the warrants and they wanted us to pick him up.
3  Q. Okay. Thanks.
4  How often do you get calls like this, you
5  know, to ask you to pick up somebody from, I guess,
6  another district that you are aware of -- that they are
7  aware of being in your jurisdiction?
8  A. How many calls a month? Are we talking about a
9  year?
10  Q. You can tell me a month.
11  A. In a month we may get one or two.
12  Q. Okay. And the call from Jasper dispatch, they
13  gave you the location?
14  A. Yes, sir.
15  Q. And the name?
16  A. Yes, sir.
17  Q. Did he tell you what the warrants were for?
18  A. Yes, sir.
19  Q. What were the warrants for?
20  A. I don't recall exactly what they were. I was told
21  that it was three felony warrants. I believe they were
22  some aggravated charges, but I don't remember exactly
23  which ones they were. Just from memory, I want to say
24  one of them was an aggravated sexual assault and then one
25  aggravated assault, but I don't remember exactly what the

**Page 65**

1  third one was.
2  Q. Okay. Do you know if these three felony warrants
3  were for probation violations?
4  A. No, sir, I don't.
5  Q. Okay.
6  A. I don't recall.
7  Q. Okay. Okay. So, after you got the -- well, let's
8  just talk about this. When you get a call like this,
9  they give you the location, the name, and the -- you
10  know, the warrants.
11  Generally speaking -- not necessarily on this
12  specific occasion, but generally speaking, what's the
13  next thing that you would do?
14  A. Depending on the circumstance. With -- with this,
15  they also told us that he was possibly armed and that he
16  was standing in the front yard. I knew the location, I
17  knew the residence. So, I called the Chief to go with
18  me --
19  Q. Okay.
20  A. -- just -- just in case.
21  Q. Okay. Is that something that you would normally
22  do?
23  A. Yes.
24  Q. If -- if the suspect was armed?
25  A. Yes.

```
 1    Q. Okay.  Does Kirbyville have any type of policy
 2  about how many officers needs to go to serve these type
 3  of warrants?
 4    A. Not that I'm aware of.
 5    Q. Okay.  First of all, generally speaking, when you
 6  get a call like this and they tell you that they have,
 7  you know, aggravated assault, you know, some felony
 8  warrants, do you -- do you inquire into, you know, the
 9  situations involved in each one or do you just -- I guess
10  that's my question.
11         Do you inquire into the situation?
12    A. Of what the warrants are based on?
13    Q. Uh-huh.
14    A. No.  No, sir, not usually.
15    Q. In this case, did you?  Did you ask, you know,
16  what was this sexual assault about or --
17    A. No, sir.  I knew our dispatch wouldn't know
18  because it was from Jefferson County.
19    Q. Okay.  Okay.  Did you ever contact with -- anybody
20  from Jefferson County to see, you know, the -- I guess
21  the story behind each of those warrants?
22    A. No, sir.
23    Q. Okay.  These were, am I right to call, arrest
24  warrants?
25    A. Yes, sir.
                                                          66
```

```
 1    A. No, sir.
 2    Q. Is it your understanding that this was a tip from
 3  somebody?
 4    A. That was our understanding later that it was a
 5  Crime Stoppers tip.
 6    Q. Okay.  Okay.  How far is the residence from the
 7  police office driving, driving time?
 8    A. Driving time?  No more than five minutes, I would
 9  think.
10    Q. Okay.  When you guys -- did y'all drive in the
11  same vehicle or did y'all take separate vehicles?
12    A. Separate vehicles.
13    Q. Okay.  Were you the lead vehicle or was
14  Chief Brister the lead vehicle?
15    A. I was the lead vehicle.
16    Q. Okay.  What type of vehicle were you driving?
17    A. A Ford Explorer.
18    Q. Okay.  And what type of vehicle was Chief Brister
19  driving?
20    A. A Crown Vic.
21    Q. Okay.  As you arrived to the scene, what did you
22  see?
23    A. As far as I can remember Arthur Breed being in the
24  yard.
25    Q. Did you see anybody else in the yard?
                                                          68
```

```
 1    Q. Okay.  Arrest warrants are just based on probable
 2  cause to arrest somebody; is that correct?
 3    A. Yes, sir.
 4    Q. Okay.  It's not -- arrest warrants don't mean that
 5  a person is actually guilty of whatever the crime that
 6  warrant is out for, is that true?
 7    A. Yeah.  It does not mean they are guilty of the
 8  crime, just arrest warrant.
 9    Q. Okay.  So, you said on this occasion you decided
10  to call Chief Brister.  Why did you decide to call
11  Chief Brister?
12    A. Normally on felony warrants, we don't go alone.
13    Q. Okay.
14    A. We normally at least have one officer -- one other
15  officer with us.
16    Q. Okay.  Okay.  Do you recall about what time you
17  received the phone call?
18    A. No, sir, I don't.
19    Q. Okay.  Okay.  So, what was the next thing you did
20  after -- after you informed Chief Brister about the --
21  the felony warrants?
22    A. We went to the residence.
23    Q. Okay.  Did you have any information about who
24  called in to let them know that he was at that specific
25  residence?
                                                          67
```

```
 1    A. No, sir.
 2    Q. Okay.  So, next y'all pull up to the residence, I
 3  assume?
 4    A. Yes, sir.
 5    Q. Okay.  Y'all get out?
 6    A. Yes, sir.
 7    Q. And what's the next thing y'all did after that?
 8  Do you and -- I'm sorry.  Not to cut you off, I'm sorry.
 9         Did you and Chief Brister, did y'all have any
10  conversation before y'all went up to the residence?
11    A. Between me and the Chief?
12    Q. Uh-huh.
13    A. No, sir.
14    Q. Okay.  I assume that y'all had a conversation
15  before y'all drove -- left -- left the office to drive to
16  the scene?
17    A. Yes, sir.
18    Q. Tell me about that conversation.
19    A. I told him what we had, that we had a -- a tip
20  from the Sheriff's Office that this man was at this
21  location and that he had felony warrants and they would
22  like for us to pick him up.
23    Q. Okay.  All right.  Did he say anything to you?
24    A. No, sir.
25    Q. Okay.  Okay.  All right.  All right.  So, tell me
                                                          69
```

NELL MCCALLUM & ASSOCIATES
CARLY MICHELLE BARTON, CSR

f6ec5a66-e853-4d7a-83ed-8e47e3baf653

**Page 70**

1  what happened after you walked up to the residence.
2  A. I talked to Arthur Breed for a minute and I asked
3  him if there was anybody else in the -- in the residence.
4  And I believe he told me that his daughter was in there
5  and her husband.
6      I asked who it was. I don't remember if he
7  told me her husband's name or not. But I do remember the
8  door being open and I -- I called into the trailer. I
9  asked for Dustin, that was the name I called.
10     And he said, Yeah.
11     And he come outside and we verified that he
12 was Dustin Jones.
13 Q. Okay. Let me take this a little bit...
14 A. Okay.
15 Q. Okay. So, you went up and talked to Arthur Breed
16 outside?
17 A. Uh-huh.
18 Q. You asked him was there anybody else in the
19 residence?
20 A. Correct.
21 Q. Okay. And he told you that his daughter was and
22 her husband?
23 A. Yeah. As far as I remember, that's the way the
24 conversation went, yes, sir.
25 Q. Okay. Or son-in-law, something like that?

**Page 71**

1  A. Something like that, yes, sir.
2  Q. He indicated that there was somebody else besides
3  his daughter in the residence?
4  A. Yes, sir.
5  Q. Did you ask anything else of Arthur Breed before
6  you called into the residence?
7  A. Not that I recall.
8  Q. Okay. But the next thing you did, you called and
9  asked for Dustin?
10 A. Yes.
11 Q. And Dustin answered?
12 A. Yes.
13 Q. Okay. What was the next thing you did?
14 A. We asked him to step outside.
15 Q. Did he comply?
16 A. He did.
17 Q. Okay. When you saw Dustin -- can you tell me when
18 you first saw him, what did he look at, what was his
19 appearance?
20     I guess, what did he -- did he have a shirt
21 on?
22 A. Yeah. He had a shirt on, pants on.
23 Q. Okay. Was it a T-shirt, do you recall, or...
24 A. I don't remember exactly.
25 Q. Do you know if it was jeans or pants?

**Page 72**

1  A. Well, I call that the same thing.
2  Q. I guess -- do you know if -- I guess that's a fair
3  answer.
4      Do you know if it was jeans or I guess, like,
5  cotton pants or --
6  A. Oh, I don't recall that.
7  Q. Okay.
8  A. No, sir.
9  Q. Okay. Okay. As a police officer, y'all are
10 taught in training how to, you know, basically, assess a
11 person's dimensions based on looking at them, I assume?
12 A. To a point.
13 Q. To a point.
14     Could you just give me -- you know, how tall
15 did he look to you when you -- when you first saw him?
16 A. About my height.
17 Q. Okay. And what would you say his weight was, if
18 you had to guess?
19 A. Over 200.
20 Q. Would you say he's closer -- would you say he's
21 closer to 200 or closer to 300?
22 A. 200.
23 Q. So, just a little bit over 200?
24 A. I don't know exactly how much. I just --
25 guesstimate, he would be over 200 pounds.

**Page 73**

1  Q. Okay. Okay. So, he complies with you guys.
2  Ordered to come out.
3      What's the next thing that happened?
4  A. We advised him of his warrants, asked him to place
5  his hands on the side of the trailer.
6  Q. Okay. You asked him to place his hands on the
7  side of the trailer and then advised him of his warrants
8  or...
9  A. I believe we advised him before.
10 Q. Okay. You advised him of his warrants.
11     When you asked him to place his hands on the
12 trailer, did he do so?
13 A. Yes, sir.
14 Q. Okay. Okay. What's the next thing that you did?
15 A. I started a pat search.
16 Q. Okay.
17 A. And he advised me that he had a knife in his
18 pocket.
19 Q. Okay. Okay. Did you find the knife when you did
20 the pat search?
21 A. No, sir, not that I can recall, that I ever found
22 a knife on him.
23 Q. Okay. Did you complete your pat search?
24 A. As much as possible, yes, sir.
25 Q. Okay. And the point of the pat search is to make

```
 1  sure that they don't have any deadly weapons on them?
 2     A.  Yes, sir.
 3     Q.  Okay.  And you didn't find any?
 4     A.  Not on the pat search, no, sir.
 5     Q.  Okay.  All right.  Okay.  So, what's the next
 6  thing that happened after you finished your pat search?
 7     A.  I pulled my handcuffs out to -- to handcuff him.
 8  I reached to grab one of his arms -- I don't remember
 9  whether it was right or left -- to place him in
10  restraints.  Whenever I did, he turned and struck me in
11  the chest, knocking me into Chief Brister.
12     Q.  Okay.  Okay.  So, after your pat search was
13  completed, you pulled out your handcuffs and reached for
14  one arm to began handcuffing him?
15     A.  Yes, sir.
16     Q.  Okay.  He was facing away from you at that time?
17     A.  Yes, sir.
18     Q.  Okay.  But once you did that -- was there any
19  conversation between you-all during that time period, I
20  guess?
21     A.  No, sir.
22     Q.  Okay.  You said he turned and he struck you in
23  your chest?
24     A.  Yes, sir.
25     Q.  When you say he "struck" you, did he punch you,
                                                          74
```

```
 1  did he elbow you, push you?  Do you know?
 2     A.  It happened so quick.  I don't know.  I don't know
 3  how he struck me.
 4     Q.  Okay.  And Chief Brister was directly behind you?
 5     A.  Yes, sir.
 6     Q.  Okay.  And he pushed you into Chief Brister?
 7     A.  Yes, sir.
 8     Q.  Okay.  Okay.  What happened next?
 9     A.  He took off running towards MLK.
10     Q.  Was he fast?
11     A.  He was pretty quick.
12     Q.  And what did you do in response?
13     A.  I began foot pursuit of him.
14     Q.  Okay.  When you began that foot pursuit, did you
15  still have your handcuffs?
16     A.  No, I did not.
17     Q.  Okay.  So, when he, as you claim, struck you, you
18  dropped your handcuffs, or do you know when?
19     A.  I don't know when.
20     Q.  Okay.  But at some point between when the foot
21  pursuit started and when he -- I guess when you got
22  there, you lost your handcuffs?
23     A.  Yes, sir.
24     Q.  Okay.  Well, at some point -- let me say this:  At
25  some point between when you tried to handcuff him and
                                                          75
```

```
 1  when the foot pursuit began, you lost your handcuffs?
 2     A.  I don't know exactly when.
 3     Q.  Okay.
 4     A.  Some time between the time the foot pursuit began
 5  and whenever I caught him was whenever I lost the
 6  handcuffs.
 7     Q.  Okay.  Okay.  You said you began your foot
 8  pursuit.  Did you eventually catch Mr. Jones?
 9     A.  Yes, sir.
10     Q.  Okay.  Can you give me your best estimate of how
11  far it was before you actually caught him?
12     A.  Best estimate is a couple of hundred of yards.
13     Q.  So, would you say more or less than the length of
14  a football field?
15     A.  It would be more, a couple of hundred.
16     Q.  So, maybe about two football fields long?
17     A.  Possibly.
18     Q.  Okay.  Are you aware of what Chief Brister was
19  doing at the time when the foot pursuit began?
20     A.  No, sir.  We was quite a bit faster than he was.
21     Q.  Okay.  Okay.  Okay.  And about where was the
22  location that you were at, as best as you can describe
23  it, when you actually caught up to -- to Mr. Jones?
24     A.  From where we began?
25     Q.  Well, I guess, you know, y'all began at
                                                          76
```

```
 1  Arthur Breed's house?
 2     A.  Correct.
 3     Q.  And at the location when you kind of finally
 4  caught up to him, you know, could you tell me about where
 5  that location was, as best you can describe it?
 6     A.  Well, it was a block away.  It was down off of --
 7  we call it Henry Robinson, but it's actually Avenue A.
 8  It's -- there's a church there.
 9     Q.  Okay.
10     A.  It was on the -- it was on the west side of the
11  church in between -- there's an old -- an old building
12  that was there -- it's on the property of the church --
13  we were in between the two buildings.
14     Q.  Okay.
15     A.  I say "in between."  It was more out away from it,
16  but, you know, in that general area between.
17     Q.  I see.  Okay.
18         Now, what happened once you caught up with
19  Mr. Jones?
20     A.  I caught up to him.  I was able to grab him from
21  behind.  I was on his back.  I realized I had no
22  handcuffs, realized I didn't have my Taser.  Just holding
23  onto him was a fight in itself.  I grabbed my radio.  I
24  keyed up my radio to call for assistance.  I don't
25  remember exactly what got out.  I know there is a
                                                          77
```

Page 78:

1  recording of what I said for it.
2       And about the time that I got what I was
3  saying, he stripped the radio out of my hand and throwed
4  it across the yard.  In the struggle, I ended up on my
5  back on the ground with him on top of me.
6     Q.  Okay.  You said you were able to grab him from
7  behind while he was running?
8     A.  Uh-huh.
9     Q.  Do you recall what part of his body you grabbed?
10    A.  I was around his back and I -- I was, more or
11  less, holding onto him, almost like I was riding his back
12  because he was trying to run with me on him.
13    Q.  Okay.  And, eventually, you were able to get him
14  to the ground?
15    A.  Both of us went to the ground.
16    Q.  Right.
17    A.  Me on my back and him on top.
18    Q.  Okay.  Okay.  So, when you were able to -- when
19  you tried to grab the radio and call for assistance, were
20  you still standing up or were you still holding onto him,
21  I guess?
22    A.  I was -- I was holding onto him.
23    Q.  Okay.  So, you were on two feet at that point
24  still?
25    A.  Yes.

Page 79:

1     Q.  Okay.  Two feet kind of behind him, if I
2  understand?
3     A.  We were leaning forward going to the ground and --
4  if you can imagine him knelt down with me behind him with
5  one arm wrapped around his body trying to hold onto him
6  so he can't run, grabbed my radio, and -- and -- I didn't
7  really have a good hold of him because I was trying to
8  get ahold of my radio, too, at the same time.
9     Q.  Okay.  You say you don't recall how much -- you
10  don't know how much of what your call got out?
11    A.  I don't remember exactly what all was said.
12    Q.  All right.  But at some point you said he -- he
13  was able to get the radio and strip it from you and throw
14  it?
15    A.  Yes, sir.
16    Q.  Okay.  When he was able to strip it -- could you
17  tell me what position y'all were in when he was able to
18  get that radio from you?
19    A.  I cannot recall.  I was trying to talk and trying
20  to look at the radio at the same time, making sure I was
21  on the right frequency and holding onto him.  It was a
22  lot to do at one time.  And I don't remember -- I don't
23  even remember how I got on my back.  It all happened so
24  fast.
25    Q.  Okay.  That was going to be my next question.

Page 80:

1     Q.  But somehow throughout the struggle you lost
2  your radio and you were on your back?
3     A.  Yes, sir.
4     Q.  Okay.  Do you know about how much time had passed
5  between the -- when the foot -- when the foot chase
6  started to when you were on your -- on your back on the
7  ground?
8     A.  No, sir.
9     Q.  Okay.  Once you were on your back on the ground,
10  what was happening, what happened next?
11    A.  I was still trying to effect an arrest.  I wrapped
12  my -- my legs around his legs and was holding on.  At
13  that time, he started beating on my chest, which was
14  knocking the wind out of me.  It had gotten to the point
15  where I was unable to breathe.
16    Q.  Okay.  Okay.  So, at this point you were still
17  trying to -- you were still trying to effect the arrest?
18    A.  Yes, sir.
19    Q.  Okay.  You said you had your legs wrapped around
20  him?
21    A.  Around his legs, yes, sir.
22    Q.  To keep him from -- from -- from moving try to
23  leave again; right?
24    A.  Yes, sir.
25    Q.  You said he was beating on your chest.

Page 81:

1     A.  Yes, sir.
2     Q.  Okay.  How was he doing that?  Was he just
3  punching your chest or...
4     A.  That's another thing that I don't -- I don't
5  recall completely.  I don't know if he was actually
6  beating on me or if he was trying to get off of me or
7  what he was trying to do, but he was hitting me in the
8  chest and it wasn't very comfortable.
9     Q.  Okay.  Okay.  Do you recall how long this was
10  going on as far as him beating on your chest and trying
11  to get off, or whatever it was --
12    A.  No, sir.
13    Q.  -- do you know how long this went on for?
14    A.  No, sir.
15    Q.  Okay.  What happened next, to your memory?  At
16  this point, I think you said that you were starting to
17  lose some breath?
18    A.  I was.  I was to the point where I couldn't
19  breathe very good.  Paul, he found us.  He pulled up in
20  my patrol car and come running up.  I was able to get out
21  that I couldn't breathe.  That was about what I could get
22  out with all the oxygen that I had left and Paul run up
23  and he -- I don't know if he knew what was going on, or
24  what, but he -- he could see the guy on top of me and
25  knew that I was in trouble and began striking him with a

1  flashlight.
2     Q. Okay. At any point since you did the pat down,
3  did you ever see that knife or did he ever pull the knife
4  out?
5     A. No, sir.
6     Q. Okay. Now, there's something that I think I read
7  it, but I don't think it's been mentioned yet. When you
8  first started that chase, did you try to shoot him with
9  your Taser?
10    A. I did.
11    Q. Okay. But you missed?
12    A. Initially. Whenever I squeezed the trigger it
13 failed, the Taser failed. I turned it off, turned it
14 back on, and whenever I did, I fired in his direction.
15 He tripped in the ditch, and whenever he did, the Taser
16 leads went over him. That's where I think that I lost my
17 Taser is in that ditch because I fell, too.
18    Q. Okay. Do you know whether or not -- let me ask
19 you this question: Per Kirbyville's policy and customs,
20 is it okay to use deadly force on a suspect that is
21 fleeing?
22    A. A fleeing suspect? Depends on the circumstance.
23    Q. Okay. Under what circumstances would it be okay?
24    A. Well, if he is fleeing and he is armed and he is a
25 threat to other people, then yes.

82

1     Q. Okay. Okay. And, so, then I would assume the
2  reverse is true, if he is fleeing but he is unarmed and
3  is not a threat to other people, then it's not okay to
4  use deadly force. Is that a true statement?
5     A. Well, it would depend, too. You are saying he's
6  unarmed? Depending on how that he's acting as well. I
7  mean, if he had fists and he could still hurt somebody,
8  then it would depend. I don't think so, no. We normally
9  wouldn't use deadly force on that situation.
10    Q. Okay.
11    A. I mean, it all depends on the circumstance,
12 though, if he's a threat to somebody else.
13    Q. Okay. And i guess that's my question. If he was
14 unarmed and there had been no determination or, you know,
15 evidence to show that he was a threat to himself or to
16 other people, under Kirbyville's policy or customs, would
17 it be okay to use deadly force against a suspect like
18 that?
19    A. No.
20    Q. Okay. At any time prior to -- strike that. Okay.
21 I'm sorry. I got to get back.
22    A. That's fine.
23    Q. You said that Chief Brister pulled up in your
24 police car?
25    A. Yes, sir.

83

1     Q. You were able to get out that you were having
2  trouble breathing?
3     A. Yes, sir.
4     Q. And -- I'm sorry. So, tell me what the next thing
5  that happened again after that was.
6     A. Chief Brister struck him with a flashlight.
7     Q. Okay. Do you recall where Chief Brister struck
8  him at?
9     A. First time, my hand.
10    Q. First time he hit your hand?
11    A. Yes, sir.
12    Q. Okay. What about after that?
13    A. I don't recall exactly where. Between the head
14 and shoulders.
15    Q. And what was Mr. Jones' reaction to being hit
16 between the head and the shoulders with the flashlight?
17    A. I didn't look like it phased him at all.
18    Q. Do you recall how many times Chief Brister struck
19 him?
20    A. I do not.
21    Q. More than once?
22    A. Oh, sure. Yeah. He hit me the first time.
23    Q. Was it your right hand or left hand, do you
24 recall?
25    A. (Indicating)

84

1     Q. Left?
2     A. (Nodding head up and down)
3     Q. Is that a "yes"?
4     A. Yes. I'm sorry. Yes.
5     Q. Okay. Okay. So, what happened next after
6  Chief Brister, I guess, finished hitting him with the
7  flashlight?
8     A. Well, seeing that it was -- it was not -- it
9  wasn't working, he -- it wasn't phasing him at all, he
10 was -- he got around his back and at one point, they were
11 on top of me, both of them, and they rolled over and the
12 Chief was actually able to roll him off of the top of me
13 where I could -- I could breathe again.
14    Q. Okay. Do you -- do you recall what technique, if
15 any, the Chief used to roll him off of you?
16    A. No, sir, I don't.
17    Q. Okay. And after he rolled him off of you, at this
18 point you were able to breathe?
19    A. Yes, sir.
20    Q. Okay. What's the next thing you recall happening?
21    A. Whenever -- whenever they rolled off of me, I was
22 able to get up. I could hear them still fighting to my
23 right and Dustin was screaming some things and I --
24 whenever I looked, Paul had his legs wrapped around him
25 and had his arms wrapped around him and was holding him

85

**Page 86**

1  ==and he was -- I could tell that Paul was just about give==
2  ==out because he was losing control and he was -- he was at==
3  ==the point where he was about to get -- get free again.==
4  ==         So, I laid over the top of Paul onto Dustin==
5  ==and grabbed both of his arms and was holding onto his==
6  ==arms to keep him from hitting or getting free from us.==
7  ==And we just laid there waiting on backup to get to us.==
8  Q. Okay. Okay. After Chief Brister rolled Dustin
9  off of -- off of you, did you take a second to catch your
10 breath?
11 **A. It took me a second.**
12 Q. And you said that you still kind of heard a
13 struggle going on?
14 **A. Yes, sir.**
15 Q. It's not something you saw, it's something you
16 heard?
17 **A. Initially, yes, sir.**
18 Q. Okay. And you said that you heard Dustin
19 screaming something?
20 **A. Yes, sir.**
21 Q. Do you recall what he was screaming?
22 **A. No, sir.**
23 Q. Okay. Okay. And when you finally were able to
24 look back over there, you said you saw Dustin was on top
25 of Chief Brister?

**Page 87**

1  **A. No, sir, not on top. They were laying on their**
2  **side.**
3  Q. They were on their sides --
4  **A. Yes, sir.**
5  Q. -- when you first saw them?
6        Okay. And Chief Brister had his legs wrapped
7  around Dustin?
8  **A. Yes, sir.**
9  Q. Okay. And he had -- he was holding him somehow?
10 **A. Yes, sir.**
11 Q. Okay. Do you recall where his arm was at that
12 point where he was holding him?
13 **A. No, sir.**
14 Q. Okay. Okay. And you said that it looked like to
15 you that Dustin was still struggling?
16 **A. Yes, sir.**
17 Q. And, so, at that point you got on top of both of
18 them?
19 **A. I was on my knees and I laid across Paul. Paul**
20 **was in between me and Dustin. So, I was more laying on**
21 **Paul than I was on Dustin. I reached over the top and**
22 **was holding onto his arms to keep him from hitting or**
23 **getting free. They were both laying on their right side**
24 **and I was behind Paul laying over.**
25 Q. Okay. Okay. How did you grab his hands -- his

**Page 88**

1  arms?
2  **A. As best as I could there. There wasn't no**
3  **technique in it. I was trying to hold on with my hands**
4  **initially, but with sweat and everything and as strong as**
5  **he was, I couldn't hold him with just my hands. I ended**
6  **up having to wrap my arms around his -- his hands and**
7  **arms to pull them to me.**
8  Q. Okay. So, when you wrapped your arms around his
9  hands and legs, were -- were your arms wrapped around
10 both Chief Brister and him or --
11      MR. CALVERT: Object to the form.
12      Go ahead.
13 **A. Not around his -- not around his legs, just his --**
14 **just his hands and arms.**
15 Q. (BY MR. TURNER) Okay. While your -- while your
16 arms -- your arms -- while you were wrapped around his
17 hands and arms, were your arms wrapped around both he and
18 Chief Brister or was it just -- just around him?
19      In my mind, I am envisioning that you were
20 just hugging him and his arms were kind -- that's not
21 right?
22 **A. No, sir. Initially, whenever I had his arms, he**
23 **had them out. He was trying to get free. Well, I was**
24 **able to grab ahold of him. Well, I was not able to**
25 **control him.**

**Page 89**

1  Q. Were you grabbing his wrists or --
2  **A. Yes, sir, his wrists.**
3  Q. Okay.
4  **A. Whenever he had extended them out -- and I don't**
5  **recall exactly what happened, details about what**
6  **happened. I just know that he had gotten to a point**
7  **where I was able to get my arms around him and hold onto**
8  **him --**
9  Q. Okay.
10 **A. -- and pull them to me.**
11 Q. Okay. So, was it kind of like one of your arms
12 was around both of his arms?
13 **A. Yes, sir.**
14 Q. Okay. Okay. And at this point, you are still
15 laid across both Chief Brister and Mr. Jones?
16 **A. Yes, sir.**
17 Q. Okay. And at this point, are they -- are
18 you-all -- are both of them still on their right side?
19 **A. Yes, sir.**
20 Q. Okay. So, if I'm thinking about this correctly,
21 both Chief Brister and Mr. Jones, according to you, were
22 on their right side.
23      And, so, if this is a -- I won't use that
24 analogy. But they were both on their right sides, with
25 Mr. Jones in front of Chief Brister?

Page 90:

1   **A. Yes, sir.**
2   Q. Okay. And you were laid over -- over -- across
3   both of them holding Mr. Jones' arms?
4   **A. Yes, sir.**
5   Q. Okay. Your thighs would have been close to the
6   back of Chief Brister?
7   **A. It would have been against his back. Yes, sir.**
8   Q. Okay. Was there ever a time period during this
9   struggle where -- where you were holding onto Mr. Jones'
10   arms and Mr. Jones was on top of Chief Brister, that you
11   recall?
12   **A. I remember the Chief saying he couldn't breathe at**
13   **one point. I don't know if that was because I was on top**
14   **of him or he was on top of him. I don't recall.**
15   Q. Okay. Okay. And, so, we talked about that
16   position.
17   Tell me the position that you were in. You
18   said that after that happened y'all kind of stayed in a
19   singletary (sic) position to wait for the -- the backup
20   to arrive?
21   **A. Yes, sir.**
22   Q. What was the position y'all were in at that point?
23   **A. Just like I told you, with him on his side, me**
24   **over the top of them.**
25   Q. At any point during this struggle did you see

Page 91:

1   where Chief Brister's arms were --
2   **A. No, sir.**
3   Q. -- while he was holding onto Mr. Jones?
4   **A. No, sir.**
5   Q. Okay.
6   MR. CALVERT: We have been going about an
7   hour. Can we take a short break?
8   MR. TURNER: I wondering if it had been about
9   an hour. Yeah, that's fine. Yeah.
10   THE VIDEOGRAPHER: Off the record at 12:17.
11   (RECESS TAKEN FROM 12:17 P.M. TO 12:33 P.M.)
12   THE VIDEOGRAPHER: We're back on the record
13   at 12:33.
14   Q. (BY MR. TURNER) Okay. Again, took another break?
15   **A. Yes.**
16   Q. Ready to go?
17   **A. Ready to go.**
18   Q. Okay. I'll just tell you, I don't think I'm going
19   to be here too much longer. Now, don't quote me on that.
20   I know -- sometimes I sound like a preacher because I say
21   we are going to end early, but I don't think we are going
22   to be here too much longer. Okay?
23   **A. Okay.**
24   Q. So, I just wanted to let you know. All right.
25   When we left off, I think we were -- I asked

Page 92:

1   you, you know, what was the position that you were in
2   while y'all were waiting for backup to come?
3   **A. Yes.**
4   ==Q. Okay. Let me ask you a little more specific==
5   ==question. So, you were kind of laying across both --==
6   ==from what I -- from what I -- my understanding of what==
7   ==you are saying, you were kind of laying across both==
8   ==Chief Brister and Mr. Jones?==
9   ==**A. Yes, sir.**==
10   ==Q. You had been laying on both of their left sides?==
11   ==**A. Yes, sir.**==
12   ==Q. Okay. So, would you kind of have been laying on==
13   ==where their left ribs would be, would that be the area?==
14   ==**A. Yes, sir.**==
15   ==Q. Okay. Left torso?==
16   ==**A. Yes, sir.**==
17   ==Q. Okay. And your -- your arm that was holding his==
18   ==arms, would that have been on Mr. Jones' left ribs or==
19   ==would that have been in front of his body or...==
20   ==**A. I was trying as much as possible to stay off of**==
21   ==**the top of him because the Chief had already said he was**==
22   ==**having trouble breathing.**==
23   ==Q. Okay.==
24   ==**A. So, I was trying as much as I could to stay off of**==
25   ==**him. I don't recall exactly where my -- you know, my**==

Page 93:

1   ==**elbows and my arms was, but I was doing my best to stay**==
2   ==**off the top of the Chief.**==
3   ==Q. Okay. Now, you -- you said that during this time==
4   ==period Chief had indicated to you that he was having a==
5   ==hard time breathing?==
6   ==**A. Yes, sir.**==
7   Q. Okay. Did you guys have any other conversation
8   between the three of you guys at all?
9   **A. Not really a conversation going on at that point.**
10   Q. Okay. Okay. Do you recall any conversation at
11   this point between the Chief and Mr. Jones?
12   **A. No, sir.**
13   Q. Okay. When you -- when the Chief kind of let you
14   know -- did he tell you verbally that he was having a
15   hard time breathing or was that something that you just
16   know of --
17   **A. I think he said he was -- he couldn't breathe. I**
18   **don't remember exactly how he said it or how he put it,**
19   **but it was directed at me because I think I was on him.**
20   Q. Okay. Did you refer to him -- I'm sorry. Did you
21   reply to him?
22   **A. No. My reply was to get off of him as much as I**
23   **could.**
24   ==Q. Okay. Okay. Did you personally reply to any==
25   ==comment that the Chief made during this time period, that==

**Page 94**

1  you could recall?
2  A. At one point he said, "Don't turn him loose."
3  Q. Okay.
4  A. And I think that was about all -- and I told him,
5  "Okay." I think -- that's all I can remember that was
6  said during that.
7  Q. Do you know why the Chief said, "Don't turn him
8  loose," or what prompted him to say it?
9  A. I believe it was because he was running out of
10 energy.
11 Q. Okay. He was running out of energy and he said
12 "don't," as in "do not" turn him loose?
13 A. Correct.
14 Q. Okay. Okay. And what did you say? Did you say
15 anything or reply to that?
16 A. I believe I did. I believe it was more along the
17 lines of "okay," or just acknowledging that I wasn't
18 going to let go.
19 Q. Okay. Maybe, like, I wasn't going to -- I am not
20 going to let go, or something like that?
21 A. It probably wasn't that detailed. It was probably
22 "okay."
23 Q. Okay. All right. But as far as conversation,
24 that's -- that's all you recall?
25 A. We didn't have enough breath to hold a

**Page 95**

1  conversation, brother. I'm sorry.
2  Q. Okay. Approximately how long were you guys in
3  that situation that we've been kind of describing?
4  A. I don't know. I don't know. Whenever you are in
5  it, it seems like it is forever.
6  Q. To you it seemed like it was forever?
7  A. Yes, sir.
8  Q. And per your testimony earlier, Mr. Jones was
9  still moving around, resisting, struggling at this point?
10 A. Yes. Yes, sir.
11 Q. Trying to get loose?
12 A. Yes, sir.
13 Q. And you said at some point suddenly he just
14 stopped?
15 A. Yes, sir, just instantly.
16 Q. And what did you do once he stopped?
17 A. The witness, Ms. Adams, I believe is what her name
18 is, she come up and asked if we needed any help. I sent
19 her to my patrol car where I keep a bag. It had some
20 medical supplies in it and had an Ambu bag and a set of
21 handcuffs, she brought it to me. We rolled him and
22 handcuffed him, rolled him back to his back, checked for
23 a pulse, and then began CPR.
24 Q. Okay. Okay. You said that you noticed that --
25 you stopped -- he instantly stopped moving and stopped

**Page 96**

1  trying to get loose?
2  A. Yes, sir.
3  Q. And then once you noticed that, you said you sent
4  the witness to the patrol car?
5  A. Yes, sir.
6  Q. Okay. Why -- how long did it take for her to get
7  to the patrol car and back?
8  A. Not long. Patrol car was parked pretty close to
9  us.
10 Q. Okay. While she went to the patrol car, were you
11 still in the same position you were before?
12 A. Yes, sir.
13 Q. Okay. Was Chief Brister still in the same
14 position he was before?
15 A. Yes, sir.
16 Q. Okay. Okay. And, so, when she got back, she had
17 the handcuffs with her?
18 A. They were in the bag.
19 Q. They were in the bag?
20 A. Yes, sir.
21 Q. Okay. I guess when she -- she got the handcuffs
22 from the car and she came back or did she have the
23 handcuffs?
24 A. I told her where my bag was. I keep a bag in the
25 back of my car --

**Page 97**

1  Q. Oh, okay.
2  A. -- that has -- it has supplies in it, as well as
3  an extra set of handcuffs. She brought me the entire
4  bag.
5  Q. Okay. Where was the bag located in your car?
6  A. At the time I believe it was in the back. It was
7  in the -- the rear hatch of the vehicle.
8  Q. Do you know whether or not she had any trouble
9  finding it?
10 A. No. It was laying right there on the -- it's my
11 go-bag. It's pretty easy to find. It sits right on the
12 very rear of the vehicle.
13 Q. Okay. And, so, what happened once she got back
14 with the bag?
15 A. We rolled him, put the handcuffs on him. We
16 didn't know if he was just holding his breath or faking
17 or what was going on. Once I rolled him back to his
18 back, I checked for a pulse and I couldn't find one.
19 That was whenever I started CPR.
20 Q. Okay. Okay. Would you say almost as soon as she
21 got back, y'all went ahead and released y'all's hold on
22 him?
23 A. Yes.
24 Q. Okay. And you said that you rolled him onto his
25 back or on his stomach first?

**Page 98**

1    A. At first we rolled him to his side so we could
2    handcuff him to where we could get both arms behind him.
3    Q. Okay.
4    A. It could have been -- it could have been to his --
5    to his face. I don't recall exactly where we rolled him.
6    Just enough that we could get the handcuffs on him and
7    then roll him back to his back and start CPR.
8    Q. Okay. Okay. And after you rolled him back on his
9    back, you said you checked for a pulse?
10   A. Yes.
11   Q. Did you find one?
12   A. No.
13   Q. How did you check for the pulse?
14   A. In his neck and his wrist.
15   Q. Okay. And then after you found no -- no -- no
16   pulse, you started the CPR?
17   A. Yes, sir.
18   Q. Okay. Were you helping do the CPR?
19   A. Yes, sir, I was.
20   Q. Okay.
21   A. I was doing chest compressions and Ms. Adams was
22   giving breath through an Ambu bag.
23   Q. Okay. What was Chief Brister doing at this point?
24   A. He was out of breath. He was on his back on his
25   cell phone calling 911 for an ambulance.

**Page 99**

1    Q. Okay. Did Chief Brister ever come back and assist
2    with the CPR?
3    A. He -- he didn't have to. The -- while we were
4    doing CPR and he was making the phone call to dispatch to
5    get us an ambulance to us, an additional unit, that 614,
6    showed up and he relieved me for CPR doing chest
7    compressions; and then following that, other units
8    arrived that relieved the other people that were
9    assisting in the CPR.
10   Q. Okay. The unit that you are talking about -- so,
11   614, they arrived?
12   A. Yes, sir.
13   Q. And one of the guys relieved you?
14   A. 6 -- 614, it's one unit. It's only just one
15   person. He relieved me doing chest compressions.
16   Q. And he relieved you.
17       And then you said later on another -- was it
18   another unit or was it this the EMS that came?
19   A. Another -- another unit showed up, arrived on
20   scene. Actually, several more units arrived on scene.
21   Once they heard the call for help, that I called and
22   needed additional units, nearly everybody that was out
23   was coming to us.
24   Q. Okay. Okay. At the time when 614 arrived -- do
25   you know what that officer's name is?

**Page 100**

1    A. Amon Cathey, A-M-O-N C-A-T-H-E-Y.
2    Q. Cathey?
3    A. Cathey, C-A-T-H-E-Y.
4    Q. Okay. When Officer Cathey arrived, you guys had
5    already released your hold and were in process of doing
6    CPR?
7    A. Yes, sir.
8    Q. Okay. Now, was the first time that you noticed
9    Krissy Adams was when she asked you if y'all needed any
10   help?
11   A. Yes, sir.
12   Q. Okay. So, you -- before that point, you didn't
13   know that there was a witness on scene?
14   A. No, sir, not that I recall. I don't recall seeing
15   anybody.
16   Q. Okay. Do you recall who the other officer was
17   that relieved -- because my understanding is
18   Officer Cathey came and he relieved you and then somebody
19   else came later and they relieved Ms. Adams?
20   A. I don't recall exactly which one -- which one it
21   was. I know it's in the -- I know it's in the call notes
22   from dispatch. The ones I can recall was there was a
23   highway patrol, Eric Dunn, that was there, lieutenant of
24   narcotics, Scotty Duncan was there, and I believe a few
25   more.

**Page 101**

1    Q. Okay. Okay. Okay. How -- how long after this
2    second unit arrived did the EMS people arrive on scene?
3    A. I don't remember.
4    Q. Okay. But it was after the second unit that the
5    EMS people arrived?
6    A. I know it was after Deputy Cathey showed up that
7    EMS arrived. I don't remember how -- how long it was,
8    though, or if they arrived after or before the additional
9    units got there.
10   Q. Okay. Did -- did you ever talk to the -- first of
11   all, did you know the EMS people who were -- who arrived
12   on scene? Had you ever --
13   A. I'm sure I did. I know all of them.
14   Q. Okay.
15   A. I don't recall which ones it was that was on the
16   ambulance. I was still trying to catch my breath --
17   Q. I see.
18   A. -- whenever they got there.
19   Q. Did you ever get a chance to talk with them and --
20   and tell them what had happened and what had transpired?
21   A. No.
22   Q. No.
23       Do you know if any officer talked to the EMS
24   and let them know what -- what had transpired?
25   A. I believe that the other officers that were there

```
 1  did.
 2     Q. Okay.
 3     A. I believe they talked to them.
 4     Q. Do you know if the Chief did?
 5     A. I don't know. I don't know if he did or not.
 6     Q. Okay. Were you ever -- were y'all ever able to
 7  resuscitate Mr. Jones on scene -- let me -- when I say
 8  "resuscitate," what I mean, were you ever able to get a
 9  pulse from him?
10     A. As far as I know, the last I heard was they had
11  got a pulse whenever they were loading him in the
12  ambulance.
13     Q. And this is the EMS who got a pulse from him or
14  one of the officers?
15     A. Well, EMS was on scene. As far as I know, it was
16  them.
17     Q. Okay. Now, during the time period where you say
18  that they were both on their sides and you were laying
19  over Mr. Jones and Chief Brister, at that time period you
20  weren't in imminent fear of serious bodily harm or
21  injury, were you, for yourself?
22     A. Well, if he had got free and continued to do what
23  he was doing before, then, yes.
24     Q. I mean --
25     A. At the time, was I? No, not at that -- that
                                                            102
```

```
 1  moment.
 2     Q. Okay. Okay. And, obviously, if he were to get
 3  free and he had a knife or had a gun --
 4     A. Right.
 5     Q. -- then at that point, you would have been in
 6  fear?
 7     A. Yes.
 8     Q. But at this specific time, you weren't in imminent
 9  fear?
10     A. No, sir.
11     Q. Okay. And, so, about how long do you recall the
12  EMS coming -- well, let me rephrase the question.
13         About how long was it that the EMS were on
14  the scene prior to them taking Mr. Jones for treatment,
15  do you recall?
16     A. No, sir.
17     Q. Okay. And, now, while you heard -- you heard that
18  they got a pulse from him. From your observation was
19  Mr. Jones ever responsive after you and Chief Brister
20  released your restraints from him?
21     A. No, sir.
22     Q. Okay. To your knowledge, did he ever become
23  responsive again after that?
24     A. I don't know.
25     Q. Okay.
                                                            103
```

```
 1     A. I didn't hear anything after that.
 2     Q. I mean -- and you do understand that Mr. Jones
 3  passed away --
 4     A. Yeah.
 5     Q. -- later on that next day?
 6     A. Yes, sir.
 7     Q. Okay. Was there any type of animosity between the
 8  EMS people and the Kirbyville police officers?
 9     A. No, sir.
10     Q. Y'all generally work hand in hand?
11     A. Yes, sir.
12     Q. After the EMS took Mr. Jones, what did you do
13  next?
14     A. I don't remember exactly what I done. I know I
15  had to go to the hospital to get my -- my hands x-rayed.
16     Q. Okay. And that was from the -- when Chief Brister
17  hit you with the flashlight?
18     A. Yes, sir.
19     Q. Okay. Did you have any other bruises or anything
20  like that?
21     A. My right hand was -- was swollen a little bit.
22     Q. Okay.
23     A. I don't know where it come from. I don't know if
24  it was during the altercation or -- or how that it
25  actually happened.
                                                            104
```

```
 1     Q. Okay. Did you have to go seek any treatment
 2  passed that first checkup?
 3     A. No, sir.
 4     Q. Okay. What about Chief Brister? Do you know if
 5  he had to seek any treatment?
 6     A. No, sir, he didn't.
 7     Q. Okay. Throughout this whole incident, you and
 8  Chief Brister never found a weapon on him --
 9     A. No, sir.
10     Q. -- Mr. Jones?
11     A. No, sir.
12     Q. Okay. Is it your understanding that -- well,
13  first, let me ask you this: Do you have any knowledge or
14  training on the effects of synthetic marijuana on the
15  body?
16     A. I have a little knowledge of it, yes, sir.
17     Q. Okay. Why don't you tell me what you know.
18     A. Most of what I just hear from other people. It
19  causes problems with your brain and your heart. I talked
20  to a few people and researched it a little bit online.
21     Q. Okay. At the time when this happened, was
22  synthetic marijuana, was it illegal?
23     A. Yes, I believe it was.
24     Q. Okay. Do you know what its effect is on a person
25  who is using it? To -- to get some type of high, I
                                                            105
```

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
                       BEAUMONT DIVISION

SHAWNTEL BREED,              )
INDIVIDUALLY AND AS          )
REPRESENTATIVE OF THE        )
ESTATE OF DUSTIN             )
KEITH JONES,                 )
DECEASED, AND AS NEXT        )
FRIEND OF DJ AND CJ,         )
MINOR CHILDREN               )
                             )
     Plaintiff               )
                             )
VS.                          )   CIVIL ACTION NO: 1:15-CV-190
                             )
CITY OF KIRBYVILLE,          )   JURY DEMANDED
CHIEF PAUL BRISTER,          )
AND OFFICER JOSH             )
HANCOCK OF THE CITY          )
OF KIRBYVILLE POLICE         )
DEPARTMENT,                  )
INDIVIDUALLY, AND IN         )
THEIR OFFICIAL               )
CAPACITIES                   )
                             )
     Defendants.             )
```

REPORTER'S CERTIFICATION

DEPOSITION OF OFFICER JOSHUA C. HANCOCK

MARCH 1, 2016

I, CARLY MICHELLE BARTON, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the Witness, OFFICER JOSHUA C. HANCOCK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the

Witness;

That the original deposition was delivered to MR. RONNIE TURNER, JR.;

That the amount of time used by each party at the deposition is as follows:

MR. TURNER: (02 HOURS:13 MINUTES)

MR. CALVERT: (01 MINUTE)

That $_____ is the deposition officer's charge to the PLAINTIFF for preparing the original deposition transcript and any copies of exhibits.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

FOR THE PLAINTIFF:

Mr. Ronnie Turner, Jr.

SBOT NO. 24075533

PROVOST * UMPHREY LAW FIRM, L.L.P.

490 Park Street

Beaumont, Texas 77701

FOR THE DEFENDANTS:

Mr. Frank D. Calvert

SBOT NO. 03667700

CALVERT EAVES CLARKE & STELLY, L.L.P.

2615 Calder Avenue, Suite 1070

Beaumont, Texas 77702

NELL MCCALLUM & ASSOCIATES, INC.   409-838-0333
*CARLY MICHELLE BARTON, CSR*

```
 1      I further certify that I am neither counsel for,
 2   related to, nor employed by any of the parties or
 3   attorneys in the action in which this proceeding was
 4   taken, and further that I am not financially or otherwise
 5   interested in the outcome of the action.
 6      Further certification requirements pursuant to the
 7   Federal Rules of Civil Procedure will be certified to
 8   after they have occurred.
 9      SWORN TO AND SUBSCRIBED by me in Beaumont, Texas, on
10   this _____ day of _____, 2016.
11
12                    _____
13                    CARLY MICHELLE BARTON
14                    Texas CSR No. 8985/Louisiana CCR No. 2015004
15                    Expiration Date:  December 31, 2016
16                    Nell McCallum & Associates, Inc.
17                    Firm Registration No. 143
18                    2615 Calder Avenue, Suite 111
19                    Beaumont, Texas 77702
20                    (409) 838-0333/(409) 832-4501
21
22
23
24
25
```