# EXHIBIT "C"

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                      BEAUMONT DIVISION

 3     SHAWNTEL BREED,             )
       INDIVIDUALLY AND AS         )
 4     REPRESENTATIVE OF THE       )
       ESTATE OF DUSTIN KEITH      )
 5     JONES, DECEASED, AND AS     )
       NEXT FRIEND OF DJ AND CJ,   )
 6     MINOR CHILDREN              )
          Plaintiff               )
 7                                 ) CIVIL ACTION NO.
       VS.                         ) 1:15-cv-190
 8                                 ) JURY DEMANDED
       CITY OF KIRBYVILLE, CHIEF   )
 9     PAUL BRISTER, AND OFFICER   )
       JOSH HANCOCK OF THE CITY    )
10     OF KIRBYVILLE POLICE        )
       DEPARTMENT, INDIVIDUALLY,   )
11     AND IN THEIR OFFICIAL       )
       CAPACITIES                  )
12        Defendants              )

13

14     *********************************************************

15              ORAL AND VIDEOTAPED DEPOSITION OF

16                  KRISSY THOMAS-ADAMS

17                      May 5, 2016

18     *********************************************************

19

20        ORAL AND VIDEOTAPED DEPOSITION OF KRISSY
       THOMAS-ADAMS, produced as a witness at the instance of
21     the PLAINTIFFS, and duly sworn, was taken in the
       above-styled and numbered cause on May 5, 2016, from
22     1:24 p.m. to 6:27 p.m., before Gina Medley, RPR, CSR
       No. 2379, in and for the State of Texas, reported by
23     machine shorthand, at the Comfort Suites, 13636 Michel
       Road, Tomball, Texas, pursuant to the Federal Rules of
24     Civil Procedure and the provisions stated on the record
       or attached hereto.

25
```

1      THE REPORTER:  May I have your
2  stipulations before we go on the video record.
3      MR. STELLY:  Federal Rules, I think.
4  Isn't that what we do, Ronnie?
5      MR. TURNER:  That's what we're doing.
6      THE REPORTER:  How are we handling
7  signature?
8      (WITNESS WILL READ AND SIGN)
9      THE VIDEOGRAPHER:  Today is May 5th, 2016.
10  We are on the record at 1:24.  All parties have agreed
11  to read -- to waive the Federal read-in.
12      Please wait for the court reporter to
13  swear in the witness.
14      KRISSY THOMAS-ADAMS,
15  having been first duly sworn, testified as follows:
16      EXAMINATION
17  BY MR. TURNER:
18   Q.  Okay.  Could you please state your full name
19  for the record.
20   A.  **Krissy Thomas-Adams.**
21   Q.  Ms. Thomas-Adams, my name is Ronnie Turner.
22  Okay.  And I represent Dustin Jones -- the family of
23  Dustin Jones in a lawsuit that he filed against the
24  Kirbyville Police Department and also the City of
25  Kirbyville.  Okay.  Are you aware of that?

6

1   A.  **Yes.**
2   Q.  Okay.  And you're here for your deposition
3  today?
4   A.  **Yes.**
5   Q.  Have you ever given a deposition before?
6   A.  **No.**
7   Q.  Okay.  Well, I'll just tell you basically what
8  is happening is our court reporter is writing down all
9  of my questions and all of your answers so that we could
10  show them to a jury and so that they'll be admissible in
11  a court.  Okay?  It's basically sworn testimony.  Okay?
12   A.  **(Moving head up and down)**
13   Q.  Does that make sense?
14   A.  **Yes.**
15   Q.  And, so, to help her, one of -- there are kind
16  of three rules we like to kind of go by.  It's really
17  hard for her to type two people talking at the same
18  time.  So, if we agree that we won't talk over each
19  other, is that fair?
20   A.  **Yes.**
21   Q.  Okay.  Also answer verbally.  You know, I know
22  I'll probably understand if you say "uh-huh" and -- or
23  "huh-uh," but it doesn't really come off well on the --
24  on the reporter.  So -- okay?
25   A.  **Okay.**

7

1   Q.  And let me know if you don't understand any of
2  my questions.
3   A.  **Okay.**
4   Q.  Okay.  And you're aware that you took an oath?
5   A.  **Yes.**
6   Q.  And you know what that oath means?
7   A.  **Yes.**
8   Q.  All right.  And even though we're right here in
9  a hotel meeting room, it's really as if you're talking
10  to a jury in -- in the courtroom.
11   A.  **Yes.**
12   Q.  And it carries with it the penalties of
13  perjury.
14   A.  **Yes.**
15   Q.  Okay.  Are you being represented by an attorney
16  here today?
17   A.  **No.**
18   Q.  Okay.  What did you do to prepare for your
19  deposition?
20   A.  **Nothing really.**
21   Q.  You didn't do anything?  Did you review any
22  documents?
23   A.  **I reviewed a tape, my -- it was my recording.**
24   Q.  Okay.  Do you still have that recording?
25   A.  **No.**

8

1   Q.  Okay.  How did you get that recording again?
2   A.  **I took it myself.**
3   Q.  Okay.  So, where were you viewing it from, I
4  guess?
5   A.  **I spoke to Mr. Alex.**
6   Q.  Okay.  And when did you speak to him?
7   A.  **I don't remember.**
8   Q.  Okay.
9   A.  **A few weeks ago.**
10   Q.  Okay.  Was a few weeks ago the last time you
11  talked to anybody that represents Kirbyville?
12   A.  **Yes.**
13   Q.  Okay.  Okay.  When you talked to Mr. -- to
14  opposing counsel, Mr. Alex, where -- was that over the
15  phone or was that in person?
16   A.  **It was in person.  I spoke to him a couple of**
17  **times about getting my forms notarized.**
18   Q.  When did you speak with him in person?
19   A.  **A few weeks ago.  I don't remember.**
20   Q.  Was that in Tomball or was that in Beaumont or
21  was that in Kirbyville?
22   A.  **That was in Kirbyville.  I went to see my**
23  **mom -- well, actually my mom and my son.**
24   Q.  Okay.  And did you tell the folks from
25  Kirbyville that you were going to be in town or how --

9

**Page 10**

1  did y'all set up a meeting?  How did that meeting even
2  get set up?
3  A.  Yes.  I -- when I -- I texted him or e-mailed
4  him -- I don't recall which one -- before I went on
5  vacation; and I informed him that I'll be back in town
6  to -- to contact him to set up a meeting after I got
7  back in town.  So, I did that.  And I was coming through
8  from Tomball.  So, I -- we set up a time and place.
9  Q.  How long did that meeting last?
10  A.  I don't recall.  Probably 45 minutes.
11  Q.  Okay.  And other than the video that you recall
12  viewing, did you -- you did you watch or see anything else
13  in preparation for your deposition?
14  A.  Oh, no.  Just only the things that I took from
15  the time of the incident, the video that I took.
16  Q.  Okay.
17  A.  Just that stuff.
18  Q.  Okay.
19  A.  That was documents that I had actually
20  submitted to the ranger.
21  Q.  Okay.  So, the video and also the written
22  statement that you submitted to the ranger?
23  A.  No.  The -- I -- I still have that written
24  statement.  I just don't have the video because it was
25  on my old phone.

**Page 11**

1  Q.  Okay.
2  A.  So, the only thing I saw was the video.
3  Q.  Okay.  What communication had you had with
4  anybody from Kirbyville prior to the meeting that you
5  said took place about a week or so ago?
6  A.  I guess a couple of years ago.  I can't recall
7  the date.  It was really close to after the incident
8  happened -- one of the family members went by my mom's
9  to try to contact me; but my mom wouldn't give them the
10  information.  And then a few weeks later they found me
11  on Facebook, I guess -- social media.  I'm not -- I
12  don't know whether it was Facebook or what.  But they
13  found me, and they e-mailed me a few times.
14  Q.  Okay.
15      MR. TURNER:  I'm going to object,
16  nonresponsive.
17  Q.  (BY MR. TURNER)  My question was -- and I think
18  you're talking about the family member.  My question was
19  when's the last time before about a week or so that you
20  had any contact with anybody representing Kirbyville?
21  A.  No one.
22  Q.  That was the first time?
23  A.  Uh-huh.
24  Q.  Okay.
25      MR. STELLY:  Ronnie, other than the

**Page 12**

1  documents that we've produced, correct?
2      MR. TURNER:  What do you mean?
3      MR. STELLY:  In Officer Hancock's
4  deposition there was e-mail --
5      MR. TURNER:  Okay.
6      MR. STELLY:  -- produced.
7      MR. TURNER:  Okay.
8  Q.  (BY MR. TURNER)  Okay.  Other than that one
9  time where you and Mr. Alex -- where y'all met up while
10  you were in Kirbyville, have you had any other
11  conversations with anybody representing -- I mean --
12  A.  No.
13  Q.  -- not necessarily in person.  Phone call
14  conversations?
15  A.  Never.
16  Q.  Okay.  Just one time?
17  A.  Just once.
18  Q.  I thought you said earlier that y'all
19  communicated about getting your -- your affidavit
20  notarized.
21  A.  That was after.  After I met up with him in
22  Kirbyville and I had my paperwork signed, we
23  communicated on how I was going to get my affidavits
24  notarized and sent back.
25  Q.  Okay.  And what did y'all decide on how you

**Page 13**

1  were going to get your authorization -- your affidavit
2  notarized and sent back?
3  A.  I had to take it to a bank to get it notarized,
4  and then I e-mailed it back.  I was going to take it to
5  my job, but they didn't have a notary there.  So, I took
6  it to a bank.
7  Q.  I see.  So, they sent the affidavit to you; you
8  took it to a bank to get it notarized; and then you sent
9  it back?
10  A.  Yes.
11  Q.  Okay.  Did you talk to your mom to -- before
12  you came up here for your deposition, about things that
13  happened involved in this case?
14  A.  Today?
15  Q.  In preparation for the deposition.
16  A.  Oh, no.
17  Q.  Okay.  Again, we're here to talk about the --
18  the events that took place on May 14th of 2013.  Does
19  that date sound familiar to you?
20  A.  Yes.
21  Q.  Okay.
22  A.  The day after Mother's Day.
23  Q.  Involving Dustin Jones and the Kirbyville
24  Police Department.
25  A.  Okay.

**Page 22**

1  Kirbyville?
2  **A. Yes.**
3  Q. Okay. We went through the Beans, Bronsons,
4  Rawls. We know the Thomases. Anybody else?
5  **A. The Adams.**
6  Q. Adams?
7  **A. Traylors.**
8  Q. Traylors.
9  **A. Gosh. It's a lot. I can't -- I don't know**
10 **everyone.**
11 Q. Okay.
12 **A. I just know them when I pop up on them. Some**
13 **in Voths.**
14 THE REPORTER: Excuse me?
15 THE WITNESS: Voths, like right outside of
16 Beaumont.
17 MR. STELLY: Voth, I think.
18 MR. TURNER: V-O-T-H-S.
19 **A. Off of the Sour Lake exit, somewhere right --**
20 **it's a lot of Kellys.**
21 Q. (BY MR. TURNER) Okay. Let's talk about what
22 happened on May 14th, okay, the incident. Do you recall
23 the incident?
24 **A. Yes.**
25 Q. Okay. You were down in Kirbyville to visit

**Page 23**

1  your mother?
2  **A. Correct.**
3  Q. Okay. Tell me what your mother's name is
4  again.
5  **A. Joan Marie Rawls Bean.**
6  Q. Can you give me her address?
7  **A. The physical address is 234 Avenue A,**
8  **Kirbyville, Texas 75956.**
9  Q. Okay. What's the mailing address?
10 **A. P.O. Box 696, Kirbyville, Texas 75956.**
11 Q. How old is your mother currently?
12 **A. I'm sorry?**
13 Q. How old is your mother currently?
14 **A. 77? 76, 77.**
15 Q. Okay. And on that day, you were first alerted
16 to the events by your mother?
17 **A. Yes.**
18 Q. And your mother told you that she saw someone
19 fighting?
20 **A. No.**
21 Q. Your mother didn't tell you that she saw
22 someone fighting?
23 **A. No.**
24 **(EXHIBIT NO. 2 MARKED)**
25 Q. (BY MR. TURNER) I'm going to show you what I'm

**Page 24**

1  actually going to mark as Exhibit 2 to your deposition.
2  THE REPORTER: I'm sorry, Ronnie. Did you
3  say 2?
4  MR. TURNER: Yes, ma'am. I'm going to
5  mark the deposition notice as Exhibit 1.
6  (EXHIBIT NO. 1 MARKED)
7  Q. (BY MR. TURNER) Okay. Are you familiar with
8  this document?
9  **A. Yes.**
10 Q. Okay. And what is it?
11 **A. It is a -- the form that was filled out by the**
12 **Texas Ranger, by me.**
13 Q. All right. Is this your written statement to
14 the Texas Rangers?
15 MR. STELLY: Objection, form.
16 **A. Yes.**
17 Q. (BY MR. TURNER) Okay. And that was taken on
18 May 17, 2013?
19 **A. Yes.**
20 Q. Just four days after the accident -- the event?
21 **A. Yes.**
22 Q. Okay. And if you look on the back page, all
23 right, is that your signature at the back?
24 **A. Yes, it is.**
25 Q. Okay. You see right here (reading) I have read

**Page 25**

1  these statements consisting of two pages and I do affirm
2  that all the facts and statements contained herein are
3  true and correct?
4  **A. Correct.**
5  Q. Okay. And, so, I want to point you to what is
6  really, I guess, the -- the second sentence; and I'll
7  read it to you. You tell me if I read it correctly.
8  (Reading) I heard my mom call out to me and come -- and
9  come see that someone was fighting.
10 Did I read that correctly?
11 **A. Yes, you did.**
12 Q. Okay. Does this refresh your recollection that
13 your mom called out to you and tell you that she saw
14 someone fighting?
15 **A. She told me to come out, the police are chasing**
16 **someone. That could have been a mis -- miswording**
17 **because they -- they came from the back of my mom's**
18 **house when they was running.**
19 Q. Did you type out this statement?
20 **A. Yes.**
21 Q. Okay. When you typed out this statement,
22 again, you certified that all the statements contained
23 within were true?
24 **A. Uh-huh.**
25 Q. Okay. And when you typed out this statement

1    MR. STELLY:  Objection, form.
2    **A.  -- I don't make anything -- I don't make**
3    **anything up.  I don't have a reason to.  I don't have an**
4    **interest in either way.**
5    Q.  (BY MR. TURNER)  All right.  You -- and, so, I
6    guess my question is:  So, when you wrote here, "I
7    noticed the younger officer hitting someone with a
8    club," do you think that's a true statement, that you
9    actually saw that?
10   **A.  I don't recall.  I don't recall.**
11   Q.  I know you don't recall.  I'm asking you do you
12   think it's a true statement, what you wrote here?
13   **A.  At the time, if that's what I recalled at the**
14   **moment under stress and everything, then yes.  But I**
15   **don't -- I can't say without a sound fact, certainty, on**
16   **my life, whether or not they had something in their**
17   **hands or not.  At this point, two-and-a-half-something**
18   **years later, I don't know.**
19   Q.  All right.  And it's hard to know things two
20   and a half years later?
21   **A.  For some people.  But -- but for others, it**
22   **just depends on the person.**
23   Q.  All right.  Okay.  Okay.  (Reading) While I was
24   videotaping the scene, I saw someone under the crowd
25   that stopped kicking.

                                                    38

1    Is that true?
2    **A.  Yes.**
3    Q.  Okay.  (Reading) It appeared that the guy was
4    fighting the two officers.  I ran over and I asked them
5    if they needed backup, while I heard the officer asking
6    him "do you give up"?
7    Is that true?
8    **A.  I -- that's some of what I remember.**
9    Q.  Okay.  (Reading) The younger officer was on top
10   of the pile stating "yes."
11   Is that true?
12   **A.  To my understanding, yes.**
13   Q.  Okay.  (Reading) I proceeded to dial 911, to
14   dispatch for help.
15   Did you do that?
16   **A.  Yes.**
17   Q.  (Reading) While trying to speak to the 911
18   officer -- or the 911 officer started screaming, "send
19   someone fast because they don't know where we are."
20   **A.  Yes.**
21   Q.  That's true?
22   **A.  Yes.**
23   Q.  (Reading) Then I laid my phone on the ground
24   and allowed the 911 officer to talk.
25   Is that true?

                                                    39

1    **A.  Yes.**
2    Q.  Okay.  (Reading) While doing this I informed
3    the officer that the suspect was not moving and not
4    breathing.
5    Is that true?
6    **A.  That's what I had said, yes.**
7    Q.  Okay.
8    **A.  I said, "He looks like he's not breathing."**
9    Q.  Okay.  So, that statement is true?
10   **A.  Yes.**
11   Q.  Okay.  (Reading) He asked me to get the belt
12   out of his left front seat to help him secure the
13   suspect.
14   Is that true?
15   **A.  Yes.**
16   Q.  Okay.  (Reading) I went to the vehicle but I
17   was not sure what it looked like.
18   Is that true?
19   **A.  Uh-huh.**
20   Q.  Okay.
21   **A.  Yes.**
22   Q.  Did you go back and ask him -- did you tell him
23   you couldn't find it?
24   **A.  No.  I was screaming back and forth.**
25   Q.  All right.  (Reading) Then he asked me to grab

                                                    40

1    his -- his brown backpack that was in the back; so, I
2    did.
3    Is that true?
4    **A.  Yes.**
5    Q.  Okay.  (Reading) He proceeded to secure the
6    suspect while the other officer seems -- seems in a lot
7    of distress, moved away from the scene to catch his
8    breath.
9    **A.  Yes.**
10   Q.  Is that true?
11   **A.  Yes.**
12   Q.  (Reading) I told him that I can assist with
13   CPR, I am a nursing student at UTA.
14   Is that true?
15   **A.  Yes.**
16   Q.  (Reading) He asked me to look into his truck by
17   the little black box on the right and grab the max --
18   the masks and the Ambu bag.
19   Is that true?
20   **A.  Yes.**
21   Q.  (Reading) I returned to the officer and I
22   opened up the bag and I placed the mouthpiece on the
23   suspect and began to administer CPR.
24   Is that true?
25   **A.  Breaths through the Ambu bag.**

                                                    41

**Page 50**

1    Q.  (BY MR. TURNER)  Okay.  I guess my question is
2  did the Kirbyville news report that -- what you saw
3  about the two people running?
4    **A.  No.**
5    Q.  Okay.  All right.  And you don't have the two
6  people running on tape?
7    **A.  I don't recall what's on the -- on the tape.**
8    Q.  You don't know what's on the tape?
9    **A.  Huh-uh.**
10    Q.  Okay.  Do you recall recording the two people
11  running on the tape?
12    **A.  I don't recall what's on the tape.**
13    Q.  I'm asking you what -- do you recall recording
14  it?
15    **A.  Like I said, when I was -- thought I was**
16  **recording some things, it didn't actually pick up.  So,**
17  **to this day, I reviewed the tape; but I don't -- right**
18  **now I couldn't tell you for certain when the recording**
19  **started.**
20    Q.  How do you know that it -- it just didn't pick
21  up?
22    **A.  Because there's a light on my phone at the**
23  **time, it will be flashing.**
24    Q.  Uh-huh.
25    **A.  And when I looked at it, it wasn't flashing**

**Page 51**

1  **when it's recording; and then I pressed the recording.**
2    Q.  Okay.
3    **A.  You know what I'm saying?**
4    Q.  So, at what point did you press record?
5  What -- what do you remember recording on the video?
6        MR. STELLY:  Objection to form.
7    **A.  I know I took a couple of pictures.  And I --I**
8  **recall the -- the struggle between the officers.  I --I**
9  **don't remember whether it was one or two officers.  I**
10  **just know I recorded -- I took the pictures, I remember**
11  **that, of them sitting on the church steps in the**
12  **recording.**
13    Q.  (BY MR. TURNER)  All right.  Let's -- let's
14  talk about this other affidavit that you wrote.  And I --
15  going to mark this as Exhibit 3 to your deposition,
16  okay?  All right.  Excuse me.  That you signed.
17        (EXHIBIT NO. 3 MARKED)
18    Q.  (BY MR. TURNER)  You need to read through this?
19    **A.  No.**
20    Q.  Okay.  You know this affidavit?
21    **A.  Yes.**
22    Q.  When was the last time you read this affidavit?
23    **A.  Probably about a week ago.**
24    Q.  Okay.  And you signed this affidavit on
25  April 28th of 2016?

**Page 52**

1    **A.  Yes.**
2    Q.  Okay.  Tell me about the process of this
3  affidavit.  Okay.  You said that you -- you met up in
4  person with the defense counsel.  When did you first
5  communicate with them in order to set up that -- that
6  meeting?
7        MR. STELLY:  Objection to form.
8    **A.  It was when I came back from my cruise.  So, my**
9  **cruise was on April 3rd.  I was gone six days.  And it**
10  **had to have been within 72 hours or something like that.**
11    Q.  (BY MR. TURNER)  Okay.  And who contacted you
12  about the affidavit or -- or did he contact you about
13  the affidavit?
14    **A.  Well -- I before my cruise, I got a certified**
15  **letter.**
16    Q.  Uh-huh.
17    **A.  I honestly didn't know who it was from.  I just**
18  **knew I had to respond to it and...**
19    Q.  What did the certified letter say?
20    **A.  That I was -- I don't recall.  I just know it**
21  **was a letter from the attorney's office.**
22    Q.  Do you know what attorney?  Do you still have
23  the letter?
24    **A.  I could probably find it.  I don't know which**
25  **attorney it was.**

**Page 53**

1    Q.  Okay.  Do you recall the content of the letter?
2    **A.  It was -- blankly I can say that it was**
3  **something regarding "you better contact this office or,**
4  **you know, you're going to be subpoenaed."**
5    Q.  Okay.
6    **A.  You know, I'll be subpoenaed.  I don't know**
7  **whether it was from you guys -- I didn't know at the**
8  **time -- or him.  So, I contacted in -- I think I might**
9  **have contacted by e-mail and phone.  I don't...**
10    Q.  Who did you contact?
11    **A.  It ended up being Mr. Alex.**
12    Q.  Okay.  How did you contact Mr. Alex?
13    **A.  I want to say e-mail.  I know I -- I called one**
14  **time, but I'm -- I'm sure it was probably e-mail.**
15    Q.  How did you have his e-mail?
16    **A.  It was on -- it was on a letter or something.**
17  **I called at first and then I end up e-mailing or**
18  **something, something on the letter or card --**
19    Q.  Okay.
20    **A.  -- I don't recall.**
21    Q.  So, the letter that you received talking about
22  subpoena, did you contact the people that were on that
23  letter?
24    **A.  Yes.**
25    Q.  Okay.  And that's how you got to Mr. Alex?

1    A.  Yes.
2    Q.  Okay.  And what did your e-mail to -- to
3  defense counsel say?
4    A.  I don't recall because I was getting ready to
5  go on my cruise.  I think I might have said, "I'll
6  contact you when I come back from my cruise" or
7  "from my vacation."  I don't remember exact words but --
8    Q.  Okay.
9    A.  -- I just know I was getting ready to go out of
10  town.
11    Q.  Okay.  Did they respond to that?
12    A.  Yes.  And I think it was something in the form
13  of "Thank you for contacting us.  We will talk later" or
14  something like that.
15    Q.  Okay.  Was that from defense counsel himself,
16  or was it from somebody else?
17    A.  I'm not sure.
18    Q.  Okay.  What is your e-mail address?
19    A.  KT -- I have a couple.  But the one that I use
20  is ktadams, A-D-A-M-S, 70@gmail --
21    Q.  Okay.
22    A.  -- .com.
23    Q.  Okay.  And, so, what -- after he replied to you
24  back thanks, he'll talk to you after you get back, what
25  was the next communication you had with defense counsel?

54

1    A.  Like I said, it was probably 72 hours to three
2  days after I got back from our cruise.  I can't be real
3  sure of the time frame when I got back.
4    Q.  And was this by phone call, e-mail?
5    A.  A text, I think.
6    Q.  Okay.  How did you get his number?
7    A.  From the e-mail.
8    Q.  Okay.  His e-mail had his cell phone number on
9  there?
10    A.  I don't recall.  It could have been from the
11  e-mail or he could e-mail me back.  I don't recall.
12    Q.  Okay.  And, so, somewhere in between three days
13  after the cruise, you text defense counsel on his cell
14  phone.  What did the text say?
15    A.  I have it with me, but I -- I don't recall what
16  it said.  I -- I just -- something in the form of "I'm
17  back from my vacation" or something like that.
18    Q.  You have the text with you?
19    A.  Yes, I'm sure I do.
20    Q.  Okay.  And did he text you back?
21    A.  Yes.
22    Q.  What did he text you back?
23    A.  I don't recall.  I don't recall what --
24    Q.  Do you have it on you?
25    A.  Yes.

55

1    Q.  Can I see it?
2    A.  (Tendering)
3    Q.  Okay.  Let's look at this real quick.  And
4  are -- your texts are in the orange, and his are in the
5  green?
6    A.  Yes.
7    Q.  Okay.  So, the first text we have is on
8  April 4th, 2016, at 11:51 a.m.  That text from you says
9  (reading) I am leaving for a cruise today.  Please
10  contact me after Saturday to schedule a time for a
11  meet -- for a meeting, Krissy Adams.
12        You provide your number (832) 416-3770.  Did I
13  read that correctly?
14    A.  Yes.
15    Q.  In the e-mail that he sent you prior to this
16  text message, did he ask you for a meeting?
17    A.  I don't recall, but I could probably produce
18  it.
19    Q.  You could produce that e-mail?
20    A.  Probably.
21    Q.  Okay.  Can you produce all the e-mails that you
22  sent between you and us --
23    A.  Sure.  I can --
24    Q.  -- and defense counsel?
25    A.  Yeah, I can give you access to my e-mail.

56

1  That's not a problem.
2    Q.  Okay.  Okay.  And then his reply is (reading)
3  Thanks.  Will do.  Enjoy your cruise.
4        That was on April 4th, 2016?
5    A.  Yes.
6    Q.  Okay.  And then your reply to that was
7  (reading) Thanks.
8        That was on April 4, 2016, as well?
9    A.  Yes.
10    Q.  Okay.  Then his next text to you was on
11  April 13th, 2016, in which it says (reading) Ms. Adams,
12  this is Alex Stelly.  I will meet you at Jenny's at 6:30
13  this evening.  If you get to town early or come -- or
14  come through Beaumont, please let me know.
15    A.  Correct.
16    Q.  Okay.  Where is Jenny's at?
17    A.  In Kirbyville.
18    Q.  Okay.  Now, it seems -- was there any
19  communication between y'all between this text on
20  April 4th and this text that he replied to you back on
21  April 13th of 2016?
22    A.  I don't recall.  I think I might have -- I
23  don't recall for sure.  I think I might have called to
24  let them know that I was back in town or -- I might have
25  e-mailed.  But I think I did contact them because -- I

57

1    think a certified letter came while I was gone.
2    Q.   Okay.
3    A.   So, I just contact whoever -- my daughter
4    picked up the certified letter from the post office.
5    Q.   Okay.  And if you called or e-mailed, what --
6    what was the content of that call or e-mail?
7    A.   Pretty much the same, "I'm -- I'm in town.  I
8    received the certified letter in regards to the case."
9    Q.   Okay.  Did you let him know that you were going
10   to be able to meet with him on the 16th?
11   A.   Yes.
12   Q.   Okay.
13   A.   Well, actually it's the 13th.
14   Q.   I'm sorry, on the 13th.  Did you let him know
15   that you were going to be able to meet him on the 13th?
16   A.   Yes, I was -- well, I was going to see my mom.
17   So, we was trying to make it convenient to where I
18   can -- you know, we was going to go through Livingston;
19   but then we went through --
20   Q.   What was the purpose of you-all meeting?
21   A.   Well, I was going to see my mom; and we was
22   going to meet in regards to this case.
23   Q.   Okay.  Were y'all meeting to talk about this
24   case?
25   A.   Yes.

58

1    Did it turn?
2    Q.   Yeah.
3    A.   Turn it like this (indicating).
4    Q.   All right.  Okay.  And to his message, you're
5    responding back on the same day, April 13th (reading)
6    Sure will.
7    And then on the same day at about 5:17 p.m.,
8    you responded again (reading) I am here in Kirbyville.
9    A.   That's when I made it.
10   Q.   Okay.
11   THE REPORTER:  Excuse me?
12   THE WITNESS:  That's when I made it to
13   Kirbyville.
14   Q.   (BY MR. TURNER)  Okay.  That -- that same day,
15   he replied (reading) Headed from Parkdale Mall, should
16   be there a little before 3:30 -- 6:30.
17   I'm sorry.
18   A.   Yes.
19   Q.   And you replied (reading) Okay.
20   A.   Yes.
21   Q.   Okay.  And then he replied (reading) About to
22   walk in.
23   A.   Correct.
24   Q.   Okay.  And at this time --
25   A.   You need me to --

59

1    Q.   No, I got it.
2    A.   -- turn it off?
3    Q.   No, I got it.
4    And after this text message, "About to walk
5    in," is that when y'all actually had y'all's meeting?
6    A.   Yes.
7    Q.   You said it lasted about 45 minutes?
8    A.   Yes, roughly.
9    Q.   Okay.  What was the first thing that y'all
10   talked about?
11   A.   My granddaughter was -- and my husband, we was
12   eating dinner there and they were -- she was being --
13   cutting up.
14   Q.   I see.  So, this meeting was with your family
15   as well?
16   A.   No.  My family was there eating.  They was at a
17   separate table.
18   Q.   Okay.  All right.
19   A.   Like behind us.
20   Q.   And, so, after y'all talked about that, what
21   was the next thing?  I mean did -- what was the first
22   thing after that that defense counsel told you or asked
23   you?
24   A.   If I recall it was do I recall the -- the date
25   in question.

60

1    Q.   Okay.  And what did you tell him?
2    A.   Yes.
3    Q.   Okay.  And what did he say then?
4    A.   He explained to me his reasons for contacting
5    me and that he was representing the -- I guess the
6    officers, Kirbyville, or somebody; and he just wanted me
7    to give him the facts according to what I recalled.
8    Q.   Okay.
9    A.   And kind of explained the process.
10   Q.   What did he tell you was his reasoning?
11   A.   He said that there has been a case that's been
12   brought against -- you know, a complaint.  And that was
13   the first that I knew about a lawsuit.
14   Q.   Okay.  And, so, the first time you ever knew
15   that there was a lawsuit involving this was on
16   April 14th of 2016?
17   A.   Yeah, pretty much, yes.
18   Q.   What did he tell you about the lawsuit?
19   A.   Just really that the family brought a lawsuit
20   against the City of Kirbyville and my statement will be
21   real important to represent either side and all that
22   needs to be said was the truth of what I saw.  He told
23   me he had spoke to my mother about everything that went
24   on in the -- at the time.
25   Q.   When did he talk to your mother?

61

**Page 62**

1    A.  I don't recall.

2    Q.  Okay.  Did he tell you what your mother said to

3  him about the incident?

4    A.  Yes, he -- he revealed to me that my mom

5  gave -- I guess she gave him -- I don't recall -- my

6  information.  But, yes, pretty much that my mom said

7  that I'm the one that -- that saw most of it and did the

8  recording.

9    Q.  What did he tell you about what your mom said

10  about what happened?

11    A.  It wasn't -- it was pretty much that she knows

12  B -- well, BB, some of the people in the community and

13  that my mom had said that the reasons I was up there --

14  me and my daughter was up there for Mother's Day and the

15  things that I -- pretty much the things that I've

16  done -- I done during the incident that took place.  It

17  wasn't anything that my mom saw.  It was more what my

18  mom said she saw me doing.

19    Q.  What did your mom say she saw you doing?  What

20  did he tell you your mom said she saw you doing?

21    A.  Videotaping, giving CPR.  My mom said that --

22  that my daughter gave him -- one of the officers water.

23  That's all I recall what he was saying that my mom,

24  just -- that my mom saw, you know, them -- the crowd and

25  that my mom didn't want -- my mom didn't want people on

**Page 63**

1  her property with some of the -- the comments that was

2  being made on both sides.  It was a lot of people

3  gathered.

4    Q.  Okay.  Did defense counsel tell you anything

5  that the family of Mr. Jones's said?

6    A.  No.

7    Q.  Okay.  So, he told you about what your mom

8  said; but he didn't tell you about any information about

9  what the family was claiming?

10    A.  No.

11    Q.  Okay.  Did he tell you what the officers

12  had said?

13    A.  No.

14    Q.  And, again, I think we've already talked about

15  this; but he didn't offer to show you your written

16  statement from three days after the incident?

17    A.  No.

18    Q.  Okay.  So, after he told you what your mom

19  said, what was the next thing that happened in the

20  conversation?

21    A.  I think he was telling me how he got to where I

22  am, how my mom said that one of the family members came

23  to her and tried to contact her or something.  I don't

24  know how long it was after the situation, but my mom

25  said one of the family members came to her.  And I think

**Page 64**

1  he said that my mom -- that they wanted to get my

2  information from my mom, to contact me; but my mom

3  wouldn't give anyone my information.

4    Q.  So, how did he end up getting your information?

5    A.  I don't know how the officer got my

6  information.  My mom was referring to the family.

7    Q.  Oh, I see.  So, he told you that the family had

8  tried to contact your mom and your mom had told the

9  family --

10    A.  That my mom -- my mom talked to him.  My mom

11  told him that she was -- some of the family members came

12  after the incident and tried to contact -- and wanted to

13  talk to her about it and wanted to contact me.  And my

14  mom was saying that she prayed for them and some of

15  stuff that my mom was telling him, that went on with

16  that meeting.

17    Q.  Okay.  What did your mom tell them about that

18  meeting that he relayed to you?

19    A.  I'm sorry.  One more?

20    Q.  What did your mom tell him about that meeting

21  between the family and her, that he relayed to you?

22    A.  That she -- she knew I was in school and she

23  didn't want me to be all stressed out any more than what

24  I was and she wasn't going to give them my information

25  and that she -- she praying for everybody that was

**Page 65**

1  involved and -- I'm sorry.

2    And if I'm not mistaken, I think my son kind of

3  interrupted their conversation when he came home from

4  school and I think the whole dynamic of the conversation

5  changed.

6    Q.  How did it change?

7    A.  Because my mom started fussing at my son about

8  some high school stuff.

9    MR. STELLY:  Ronnie, we've been going a

10  little over an hour.  If we can take a break anytime --

11    MR. TURNER:  Okay.  Let me just --

12    MR. STELLY:  -- please.

13    MR. TURNER:  Sure.  Let me just get

14  through a couple more questions, and we'll take a break.

15    MR. STELLY:  Sure.

16    Q.  (BY MR. TURNER)  Is there anything else that he

17  told you about your mom's conversation -- his

18  conversation with your mom, that you recall?

19    A.  I don't know if my mom gave him my information.

20  I'm thinking she did or -- or what the situation was --

21  was with my mom.  But if I know my mom correctly, she

22  was probably saying that she knew Mr. Brister and she

23  knew some of the people that was involved.  I don't

24  recall the whole thing.  I just know she knows Mr. --

25  Mr. Brister.

**Page 66**

```
 1     Q.  Okay.  And we'll get back to that.  I want
 2  to -- kind of want to finish this conversation that you
 3  had with the attorney, and then we'll take a break.
 4     Okay.  So, after y'all talked about that, what
 5  was the next thing that y'all talked about?  After you
 6  talked about his conversation with your mom, what is the
 7  next thing y'all talked about at this meeting?
 8     A.  Pretty much -- it was kind of off record about
 9  my granddaughter was -- and my son was -- it was kind of
10  a little confusing -- confusion going on between my --
11  my family and us before we actually got into the
12  conversation.
13     Q.  Okay.
14     A.  And then my family, my husband and my
15  granddaughter and all of them, they left.
16     Q.  Okay.  All right.  And, so, after that
17  happened, what was the next thing he told you?
18     A.  He introduced hisself and where he was from and
19  then he asked me where was I from and did I know some of
20  the people there that was in -- in Kirbyville.  Pretty
21  much the same questions that you asked.
22     Q.  Let's pause right here.  Do you know either
23  Officer Hancock or Chief Brister?
24     A.  No.
25     Q.  Were you familiar with them before this
```

**Page 67**

```
 1  incident?
 2     A.  Never saw them before.
 3     Q.  Okay.  Did you know Dustin Jones before this
 4  incident?
 5     A.  No.
 6     Q.  Okay.  Did you know BB before this incident?
 7     A.  Yes.
 8     Q.  Okay.  How did you know BB?
 9     A.  He graduated with my brother.
10     Q.  Okay.  That's that.  Okay.  So, he asked you if
11  you knew any of the people involved; and you told him
12  what you just told me, you don't know anybody?
13     A.  Exactly.
14     Q.  Okay.  And then what was the next thing he told
15  you?
16     A.  I think it was did I know what was going on --
17  to kind of pretty much tell him what -- what I -- what I
18  recalled.
19     Q.  Okay.  Okay.  And this is what you've been
20  telling us today?
21     A.  Yes.
22     Q.  Okay.  All right.  What did he say after you
23  told him what you did recall?
24     A.  Just started me -- asking me questions.  Do you
25  recall the tape?  Do you recall giving the tape to
```

**Page 68**

```
 1  anyone else?  Do you recall giving CPR?  Where did I
 2  learn CPR from, just -- do I recall how long it took for
 3  assistance to show up?  How long was the -- did I --
 4  could I estimate how long did I give CPR?  Did I do --
 5  did I bag first or do I -- did I do chest compressions
 6  first?  Did I recall -- where did I go after the
 7  situation?  Did I talk to anyone in the crowd about the
 8  situation?  Have I contact anyone else about the
 9  incident?  The family, did I respond to them, because I
10  think I might have told him that they e-mailed me or
11  they called me or they in-boxed me on the social media.
12  They contacted me.  I don't remember how, but they
13  contacted me.  I want to say Face -- social media.
14     Q.  Uh-huh.
15     A.  I don't remember.
16     Q.  Okay.  Did he ever tell you what the
17  officers -- or what he was claiming had happened in this
18  incident?
19     A.  No.
20     Q.  Okay.  Did he ever tell you any specific facts
21  about the case?
22     A.  No.
23     Q.  That you recall?
24     A.  No, not that I recall.
25     Q.  Did he tell you the issues involved?
```

**Page 69**

```
 1     A.  Issues?
 2     Q.  Involved in the case?
 3     A.  Meaning?
 4     Q.  Issues meaning whether or not he died as a
 5  result of what the officers did or not, whether or not
 6  it was a headlock, as opposed to a choke hold?
 7     A.  No.  I asked -- I knew he had died, obviously.
 8  And some of the things that kind of stood out in my mind
 9  that kept me from sleeping was the four-leaf clover in
10  his mouth and situations like that.  And I asked him
11  about something that I felt that -- in the midst of
12  trying to help him, that I did when I broke his -- I
13  think I broke his ribs.  So, I kind -- I asked the
14  question about that.
15     Q.  Okay.  Okay.  So, I get this -- okay.  So,
16  after that part of the conversation, what happened next?
17     A.  I think he -- he explained to me that he would
18  be recording it, and I -- I might have reviewed the
19  tape.  And some of the questions -- he started asking me
20  just questions.
21     Q.  Questions like what?
22     A.  Do -- do I recall, you know, what happened in
23  the process of him running and what do I recall -- what
24  do I think I saw, and do I recall going to the car or
25  getting the bag?  Did I recall him being in handcuffs
```

NELL MCCALLUM & ASSOCIATES
GINA MEDLEY, CSR, RPR

**Page 70**

1  and not being in handcuffs?  Do I recall what -- what --
2  did some of the family members come over?
3      And none of this that I'm saying is in order.
4  Q.  Uh-huh.
5  A.  What was some of the family members saying?
6  Did I talk to anyone else in the crowd?
7  Q.  Did he ask you if you recalled whether or
8  not -- did he ask you whether or not you recalled him
9  running or whether or not you called -- recalled just
10  the struggle part of it?
11  A.  Yes.
12  Q.  Okay.  Okay.  And after these questions --
13  well, first of all, he told you that he was going to be
14  recording your conversation?
15  A.  Yes.
16  Q.  Did he record your conversation?
17  A.  Yes.
18  Q.  Okay.  Okay.  Did he get most of the
19  conversation?
20  A.  I -- I don't know.  I never listened to it.  I
21  don't know what part -- if he recorded the whole way
22  through or when the taped stopped or anything like that.
23  Q.  When did he tell you that he was going to be
24  recording?
25  A.  My sworn statement.

**Page 71**

1  Q.  All right.  Okay.  And was this on -- was he
2  recording it on his phone or was it on a recorder with a
3  tape or --
4  A.  I don't recall.
5  Q.  Okay.
6  A.  I know it wasn't his phone.
7  Q.  Okay.  It was some type of recording device?
8  A.  I think so.
9  Q.  Okay.  And, so, after the recording was done
10  and he stopped, what happened next?
11  A.  After -- my family had to leave me because we
12  had a 3-year-old with us, and I asked him if he could
13  take me home.
14  Q.  Okay.  He took you home?
15  A.  Yes.
16  Q.  What was your conversation on the way home?
17  Did y'all talk about this case at all?
18  A.  No.  Just about UT, college, my son, sports.
19  Q.  Okay.
20  A.  And how difficult it is when your kid is not,
21  you know, with you on a daily basis and...
22  Q.  Okay.  And then he dropped you off.  Is there
23  any part of the conversation that I missed, that we
24  haven't talked about yet, between you and him in that
25  meeting, that you recall?

**Page 72**

1  A.  No.  Everything that was at the meeting is
2  pretty much redundant to the stuff that you're asking
3  me.
4  Q.  Okay.  Okay.  What time was it that he dropped
5  you off that night?  Do you recall?
6  A.  I don't -- I don't remember.
7  Q.  Was it nighttime, daytime?
8  A.  It was late evening.
9  Q.  Okay.  Was it night outside?
10  A.  Yes.
11  Q.  Okay.
12  A.  It was getting dark.  So, the time had changed.
13  So...
14  Q.  Okay.  Okay.
15      MR. TURNER:  At this time we'll take a
16  break.
17      THE VIDEOGRAPHER:  We are off the record
18  at 2:49.
19      (RECESS)
20      THE VIDEOGRAPHER:  We are back on the
21  record at 2:56.
22  Q.  (BY MR. TURNER)  How far is your -- I'm sorry.
23      We took a quick break?  We took a quick --
24  quick break?
25  A.  Yes.

**Page 73**

1  Q.  Okay.  You're aware that you're still under
2  oath?
3  A.  Yes.
4  Q.  Okay.  How far does your mom live away from
5  Arthur Breed, would you estimate?
6  A.  50 feet.
7  Q.  50 feet?  How many houses down is it?
8  A.  It's not even -- it's just a yard.  My mom's
9  backyard --
10  Q.  Are you -- are you familiar with the -- the
11  area where this happened?
12  A.  Yes.
13  Q.  Okay.  Could I -- could I get you to draw a
14  diagram of where the events took place?
15  A.  Yes.
16  Q.  Okay.  First let me just get you to draw, you
17  know, everybody's houses and, you know, including the
18  spot where the -- where the struggle between the three
19  guys happened.
20      Here you go (tendering).  My pen might work a
21  little bit better.
22  A.  So, you want where my mom --
23  Q.  Your mom's house, BB's house, and the spot
24  where Mr. Jones eventually died.
25      MR. STELLY:  We'll object to the form of

1    they were both involved in the...
2       Q.   Okay.  Okay.  And he was involved in the actual
3    incident himself?
4       A.   On the ground, yes.
5       Q.   Okay.  But your recollection in the affidavit
6    you signed two years after the event is different than
7    Chief Brister's?
8       A.   Yes.
9       Q.   What does "winning the fight" mean?
10      A.   In my opinion?
11      Q.   Uh-huh.
12      A.   If he wanted to get up at some point in time, a
13   couple of more blows or something, he -- he could have.
14      Q.   What does the "winning the fight" mean in this
15   situation?
16      A.   Well, he -- he was out powering them
17   strengthwise.
18      Q.   All right.  And that's what you mean when you
19   say "winning" the situation when they were on the
20   ground?
21      A.   Pretty much, yes.
22      Q.   Okay.  Now.  In your statement you say
23   (reading) The African-American male appeared to be super
24   strong and was beating the officers pretty good.
25      A.   Yes.
                                                          106

1       Q.   Corrections?
2       A.   Uh-huh.
3       Q.   Okay.  Can you recall any other corrections
4    that you made?
5       A.   I -- I don't recall.
6       Q.   Okay.  Okay.
7            (SOTTO VOCE)
8       Q.   (BY MR. TURNER)  After you say that, you say
9    (reading) At some point it appeared that the officers
10   were gaining control of the situation and the
11   African-American male.
12        How long was the time period, according to this
13   affidavit, where the African-American male was strong
14   and beating the officers pretty good?
15      A.   I don't -- I don't recall how long all that
16   took place.
17      Q.   Would you say it was fairly quickly, fairly
18   slowly?
19      A.   It was fast.
20      Q.   Okay.
21      A.   The -- the whole thing was fast.
22      Q.   Okay.  And at that point, the next line says
23   (reading) I noticed, and even commented to myself out
24   loud, that it appeared that the African-American male
25   was not moving.
                                                          108

1       Q.   Yeah.  And, again, from Officer Brister's
2    recollection, they had him pretty secure at this time?
3       A.   That's what he said.
4       Q.   Okay.  Did they allow you to look at the video
5    before you filled out this affidavit?
6       A.   No.  Well, I take that back.  I saw the video
7    when we were at the meeting in Kirbyville, while I --
8    this was -- this (indicating) was typed up after our
9    meeting.
10      Q.   Okay.  After they typed it up the first time,
11   did they ever -- did you ever send it back to them --
12      A.   Yes.
13      Q.   -- aside from to sign it?
14      A.   Yes.
15      Q.   Okay.  What did you send it back to them for?
16      A.   I made corrections.
17      Q.   What corrections did you make?
18      A.   Oh, I done read this so many times, I just -- I
19   think it was dealing with the CPR and when I -- the
20   position where I was at the time, I might have said at
21   first that I was giving chest compressions at first,
22   when actually I was bagging at first.  And I think when
23   I contacted the -- the process of me getting the -- the
24   bag and the handcuffs and the call to the 911 operator,
25   I'm thinking that's some of the...
                                                          107

1    Is that correct?
2       A.   Uh-huh.
3       Q.   Is that a true statement?
4       A.   Yes.
5       Q.   Okay.  Do you remember what the comment that
6    you made to yourself was exactly?
7       A.   Not exactly.  But I can...
8       Q.   Paraphrase?
9       A.   Yeah.  This is going to sound weird.  My
10   daughter had a towel wrapped around her hair and she --
11   and I was telling her, "Back up, you -- you know, you
12   don't want to get caught up in all of this" while we --
13   I was videoing.
14        And when I saw him -- when I saw they was
15   tussling on the ground and I saw him, he was like hip
16   thrusting off of the ground or -- in my opinion, it was
17   like jerking; and then it stopped.  And then that's when
18   I kind of -- you know, I was looking in the camera and
19   on the outside of the camera and I was -- and I
20   started -- that's when I noticed things got real serious
21   real quick.
22        And I said, "Oh, my gosh.  I don't think
23   he's -- he's breathing.  I don't think he's moving."
24   And then I kind of said it a little bit louder, "He
25   not -- he's not moving."  Yeah, that's pretty much
                                                          109

**Page 110**

1  something like that.
2  Q.  Okay.  You noticed that the African-American
3  male wasn't moving from, what, you said, about 30 feet
4  away?
5  A.  In between 30 and -- and 50.
6  Q.  In between 30 and 50 feet away?
7  A.  Yeah.  It was on the other side of the ditch.
8  Q.  Okay.  When you noticed that the
9  African-American -- I keep saying that.  When you
10  noticed that Dustin was not moving, did the officers do
11  anything to indicate that they realized that he wasn't
12  moving, that you recall?
13  A.  I -- not that I -- I recall.  I just -- it
14  was -- I wasn't sure because all I could see was like
15  the thighs down and I -- the -- the bottom part of him.
16  What was going on, the actions he -- he did have, he
17  wasn't having them anymore.
18  Q.  Okay.  And, again, that's something that you
19  noticed from 30 to 50 feet away?
20  A.  That's what I noticed.
21  Q.  And when you noticed that, did the officers
22  continue to hold Mr. -- hold Dustin in the hold that
23  they had him in on the ground?
24  A.  Yes, they was still holding him.
25  Q.  Okay.  They were still holding him even when

**Page 111**

1  you whispered it to yourself the first time?
2  A.  I whispered it the first time; but then I
3  probably said it out loud, yes.
4  Q.  And they were still holding him when you said
5  it out loud the second time?
6  A.  Yes.
7  Q.  Okay.  And, in fact, that's when you yelled to
8  the officers, "Do you need help?"
9  A.  After I said it, I started noticing the
10  situation...
11  Q.  Had turned?
12  A.  Yes.
13  Q.  Okay.  Now, you had just advised your daughter
14  don't get involved in this situation.  What made you
15  decide to, at that point, get involved in the situation?
16  A.  Somebody wasn't breathing and -- he wasn't
17  breathing.  I -- I mean I couldn't -- there was no
18  movement.  And just standing there, you could tell that
19  it was a bad situation on both sides.  He wasn't
20  breathing.  The officers were struggling.
21       And at this point you would have thought that
22  just by looking -- you know, living these days that they
23  would have had a handcuff or something, at least one, on
24  him at some point in time.
25  Q.  Would you have thought that -- when you noticed

**Page 112**

1  that the African -- that Dustin wasn't moving, that the
2  officers would have let go of the hold that they had on
3  him?
4  A.  I don't know what was going on up under the
5  crowd.  I don't know.  It just -- there was no movement.
6  So, I don't know whether he was not breathing or whether
7  or not he was talking to them.  All I could see was the
8  bottom part of him.  And then -- you know, and I just
9  assumed, just from my experience at the time.
10  Q.  And you, looking from 30 to 50 feet away, did
11  it look like something was wrong to you?
12  A.  Yes.
13  Q.  Would you have expected for trained officers
14  that are nearly less than 0 feet away from him to
15  realize that something was wrong?
16      MR. STELLY:  Objection, form.
17  A.  I don't know what the officer -- in training
18  just -- like I said, from just my experience in this
19  world, I'm sure they're trained to notice things like
20  that.  I don't know what they know and what they don't
21  know.  I wasn't that close.
22  Q.  (BY MR. TURNER)  Okay.  And I understand that
23  you're not an officer and you don't know their training.
24  But as a citizen would you expect that if officers had a
25  person in a hold like that and that person became

**Page 113**

1  motionless and stopped breathing, that they would let
2  that hold go?
3  A.  Yes.
4      MR. STELLY:  Objection, form.
5  Q.  (BY MR. TURNER)  Pretty immediately?
6      MR. STELLY:  Objection, form.
7  A.  I don't know what their time frame -- when you
8  say "immediately," I don't know -- you know, sometimes
9  people can fake.  So, I don't know.  I can't answer
10  that.  I've saw -- I've saw on TV that some people will
11  fake like something's not and then they'll go back to
12  the combative situation.  So, I don't know --
13  Q.  (BY MR. TURNER)  Okay.
14  A.  -- at that time.
15  Q.  But like you said, when you saw it, you thought
16  that something was wrong?
17  A.  I did.
18  Q.  And you didn't believe that he was faking?
19  A.  I did not.
20  Q.  And did you alert the officers that he wasn't
21  moving, he wasn't breathing?
22  A.  I -- I screamed out that, I think.  I think I
23  probably -- kind of reaction.
24  Q.  Okay.  So, you screamed out while you were 30
25  to 50 feet away?

1    A.  Yes.
2    Q.  Okay.  But you also told them when you was
3    right next to the officer?
4    A.  Once -- once I came over.
5    Q.  Once you came over to help?
6    A.  Yeah, I had to --
7    Q.  Okay.  So, did the officers let go of Mr. Jones
8    after you screamed it from 30 to 50 feet away?
9    A.  I think -- they didn't let go.  I think the --
10   the position kind of changed.  I don't think -- just
11   like a release.
12   Q.  You noticed the position changed from 30 to
13   50 feet away?
14   A.  Once I got over -- I had to jump the ditch -- I
15   think that their position had changed.  You know, they
16   were wiggling and one of the -- they -- they looked like
17   they were in distress, too.  So, Chief Brister was
18   trying to come from the bottom because, in my opinion,
19   he was having some heart problems.  He was -- breathing
20   problems.  Visually just looking at him, he was flushed.
21   He was having breathing problems, and it was hot that
22   day.  So, the position of the hands and the whole
23   situation, where Chief Brister was trying to leave and
24   get away to go somewhere else, from under the crowd.
25   Q.  And if Chief Brister and Officer Hancock said

114

1    that they held him in the same position until you
2    brought them the bag and the handcuffs, would you
3    disagree with that?
4          MR. STELLY:  Objection, form.
5    A.  No.
6    Q.  (BY MR. TURNER)  Okay.  And so, anyway, back --
7    back to my question, which is:  So, when you're 30 to
8    50 feet away when you first noticed it and you said
9    something to yourself out loud, the officers continued
10   to hold Mr. Jones on the ground?
11   A.  To my knowledge, yes.
12   Q.  Okay.  From what you saw?
13   A.  From what I saw.
14   Q.  Okay.  Even when you yelled it, Chief Brister
15   and Officer Hancock still continued to hold Mr. Jones on
16   the ground?
17   A.  They were holding him, yes.
18   Q.  Okay.  When you came up and told them, after
19   you asked them if they needed help, they still continued
20   to hold Mr. Jones on the ground?
21   A.  Yes.
22   Q.  Okay.  And when you came over to help the
23   officers, one of the officers told you to go get his
24   belt from the vehicle?
25   A.  It -- I don't know if it was a belt or a bag.

115

1    Q.  Okay.
2    A.  He told me to get something that had the
3    handcuffs on it.  So, I don't recall whether it was a
4    belt or a bag.
5    Q.  Okay.  And in your written statement -- and
6    tell me if I'm reading this correctly -- it says
7    (reading) He asked me to get his belt out of the left
8    front seat to help him secure the suspect.
9    A.  Correct.
10   Q.  Does that refresh your recollection he asked
11   you to get the belt?
12   A.  It's -- it's belt, bag.
13   Q.  Uh-huh.  He went to the -- (reading) I went to
14   the vehicle, but I was not sure what it looked like.
15   Then he asked me to grab his brown backpack.
16          Does that seem like the order of events?
17   A.  Uh-huh, yeah.
18   Q.  Okay.  Okay.  And the whole time while you were
19   searching for this bag, the officers still were holding
20   Dustin on the ground?
21   A.  To my understanding, yes.
22   Q.  Okay.
23   A.  And I was -- I had called 911 during...
24   Q.  You also called 911 --
25   A.  I was --

116

1    Q.  -- during this period?
2    A.  Yes.
3    Q.  Okay.  And also it says that you laid your
4    phone on the ground to allow the officer to talk to 911?
5    A.  I did.
6    Q.  Okay.  And they were still holding Mr. Jones at
7    this point?
8    A.  Yes.
9    Q.  And this is after -- again, after you initially
10   saw it from 30 feet or 50 feet away that Mr. Jones was
11   not moving?
12   A.  Yes.
13   Q.  Okay.  And, so, you eventually brought him the
14   handcuffs out the -- out the vehicle?
15   A.  I didn't touch the handcuffs.
16   Q.  Well, you -- I'm sorry.  You brought him the
17   bag out the vehicle?
18   A.  Yes.
19   Q.  Okay.  Which had the handcuffs in them?
20   A.  Yes.
21   Q.  Okay.  And when you returned, that's when you
22   remember noticing that Dustin's eyes were -- were open
23   and motionless?
24   A.  I'm sorry, who?
25   Q.  Okay.  Okay.  About that time -- oh, I'm sorry.

117

**Page 118**

1  Where are we at?
2      (Reading) When I returned where they had
3  Mr. Jones, I remember noticing that Mr. Jones' eyes
4  being opened, fixed, and with a clover in his mouth.
5      Is that a true statement?
6      A.   Yes.
7      Q.   When you came back, you saw Mr. Jones' eyes was
8  motionless?
9      A.   Yes.
10     Q.   Okay.  And when you came back, they were still
11  holding Mr. Jones in that hold on the ground?
12     A.   Yes.
13     Q.   (Reading) About that time I noticed -- about
14  that time I noticed the clover in the African-American
15  male's mouth.  I heard the younger officer say to the
16  African-American male -- say the African-American male
17  didn't appear to be breathing and he told me to go
18  get -- go back to the police vehicle and get the Ambu
19  bag from the rear of the vehicle.
20     Is that a correct statement?
21     A.   Yes.
22     Q.   Okay.  And, so, this occurred after you had
23  said three times that Mr. Jones wasn't moving, the
24  second two times to the officers; is that correct?
25     A.   Yes.

**Page 119**

1      Q.   You had been to the vehicle to grab -- to help
2  them get the handcuffs and came back in that time?
3      A.   Yes.
4      Q.   You had given the phone to the officer to allow
5  him to talk to 911 during that time?
6      A.   Yes.  And I tried to give help -- give
7  directions to where we were.
8      Q.   During that time?
9      A.   To the 911 officer while I was doing chest
10  compressions.
11     Q.   Okay.  Well, we're -- chest compressions come a
12  little bit later.  Okay.
13     Then -- so, this is after you brought back
14  the bag with the handcuffs in it, the officer says --
15  finally says, "I don't think that Dustin is breathing."
16  They don't even let go of that hold at that point?
17     A.   I -- like I -- I don't remember what kind of
18  hold it was at that point.  I don't recall.  But he was
19  still in --
20     Q.   On the ground?
21     A.   Yes.
22     Q.   Okay.  In that position?
23     A.   Yes.
24     Q.   Okay.  And -- but, again, they didn't change
25  their position?  At that point the officer asked you to

**Page 120**

1  go get the Ambu bag?
2      A.   Yes.
3           MR. STELLY:  Objection, form.
4      Q.   (BY MR. TURNER)  And then you got it, the Ambu
5  bag?
6      A.   Yes.
7      Q.   You returned back to where the officers were?
8      A.   Yes.
9      Q.   And where Dustin was?
10     A.   (Moving head up and down)
11     Q.   And then is that when they finally let go of
12  Mr. Jones?
13     A.   He was doing chest compressions when I made it
14  back.
15     Q.   Okay.  You say in your affidavit that you don't
16  remember the -- the officers putting the handcuffs on
17  the African-American male.
18     A.   I don't.
19     Q.   Okay.  Would you disagree if both Officer
20  Hancock and Chief Brister say that they did put
21  handcuffs on Mr. -- on Mr. Jones?
22           MR. STELLY:  Objection, form.
23     A.   If they said they did, they did.  I don't
24  recall.  I was trying to -- he wasn't breathing.  I was
25  trying to...

**Page 121**

1      Q.   (BY MR. TURNER)  Did you think that it was
2  necessary to put handcuffs on this motionless man that
3  wasn't breathing?
4           MR. STELLY:  Objection, form.
5      Q.   (BY MR. TURNER)  In your opinion?
6           MR. STELLY:  Objection, form.
7      A.   If someone is not breathing, then they're no
8  threat.
9      Q.   (BY MR. TURNER)  And just to make sure I got
10  this clear for the record, in your opinion, if a person
11  is not breathing, there's not -- they're not a threat?
12     A.   If --
13           MR. STELLY:  Objection, form.
14     A.   If -- from what I've seen in my life, if
15  someone is not breathing, there's no threat.
16     Q.   (BY MR. TURNER)  You said that you saw a clover
17  in his mouth?
18     A.   (Moving head up and down)
19     Q.   What type of clover was it?
20     A.   It was like a fungus off of the ground.
21     Q.   You want to take a quick break?
22     A.   (Moving head up and down)
23     Q.   Okay.
24           THE VIDEOGRAPHER:  We are off the record
25  at 4:03.

1    MR. STELLY:  Objection, form.
2    **A.  I could not see it.**
3    Q.  (BY MR. TURNER)  You couldn't see from the
4  place where you were at whether or not Chief Brister was
5  holding Mr. Jones so tight that he couldn't breathe?
6    **A.  I couldn't tell.**
7    Q.  All right.  You know that when you got up
8  there, you saw that he was not breathing?
9    MR. STELLY:  Objection.
10    **A.  Exactly.**
11    Q.  (BY MR. TURNER)  And, so, if the officers were
12  choking Dustin Jones and he was squirming and moving the
13  way that you saw him, would that have been reasonable?
14    MR. STELLY:  Objection, form.
15    **A.  If he was squirming and moving in -- as a**
16  **result of the choking, that would have been my opinion**
17  **of a reaction to --**
18    Q.  (BY MR. TURNER)  That would have been
19  reasonable?
20    **A.  For me, yes.**
21    Q.  I mean -- and, again, as you sit here today,
22  you don't know whether or not Chief Brister was choking
23  Dustin while you were videotaping?
24    **A.  I don't know.  I didn't -- I just saw the**
25  **struggle.**

150

1    Q.  Okay.  But what we can agree and I think what
2  you said earlier is is that once the person stopped
3  moving, the officers should release the hold that they
4  have on that person?
5    MR. STELLY:  Objection, form.
6    **A.  Yes.**
7    Q.  (BY MR. TURNER)  But that's not what you saw?
8    MR. STELLY:  Objection, form.
9    **A.  I'm sorry?**
10    Q.  (BY MR. TURNER)  That's not what you saw?  You
11  said that once the person stopped moving, the officers
12  should release the hold.  But even once you saw
13  Mr. Jones stopped moving, the officers still had
14  Mr. Jones on the ground?
15    **A.  Yes.**
16    Q.  So, I'll ask you again:  If Kirbyville Police
17  Department, if -- if Chief Brister had Dustin Jones in a
18  choke hold for the entire time that they were on the
19  ground, do you think that would have been reasonable?
20    MR. STELLY:  Objection, form.
21    **A.  If -- if he was resisting arrest and fighting,**
22  **I mean I don't -- like I said, I don't know what a choke**
23  **hold --**
24    Q.  (BY MR. TURNER)  Well, we don't even have to
25  guess about it because we see it on the video.  There's

151

1  some point where Dustin Jones stopped moving, right?
2    **A.  Correct.**
3    Q.  We've got it on the video, and he even
4  continued not to move after you stopped the video?
5    **A.  Correct.**
6    Q.  And the officers continued to have him in that
7  hold after you stopped the video?
8    MR. STELLY:  Objection, form.
9    **A.  That's what alerted me to --**
10    Q.  (BY MR. TURNER)  Is that -- that's correct --
11    **A.  That's correct.**
12    Q.  If the officers had Dustin in a choke hold for
13  the entire time that he was on the ground, do you think
14  that would have been a reasonable amount of force?
15    MR. STELLY:  Objection, form.
16    **A.  Yes, it would have been excessive.**
17    Q.  (BY MR. TURNER)  You think it would have been
18  excessive?
19    **A.  If he's on the ground in a choke hold the**
20  **entire time until he stopped breathing, then that would**
21  **have been excessive.**
22    Q.  All right.  And it's excessive to continue to
23  restrain or hold a person down and choke them when
24  they're not moving?
25    MR. STELLY:  Objection, form.

152

1    **A.  In my opinion.**
2    Q.  (BY MR. TURNER)  Okay.  Well, it's --
3    MR. TURNER:  Let me address to the
4  objection.
5    ==Q.  (BY MR. TURNER)  It's obsessive (sic) to==
6    ==continue to hold a person down on the ground even when==
7    ==they're not moving anymore?==
8    ==MR. STELLY:  Objection, form.==
9    ==A.  Yes.==
10    Q.  (BY MR. TURNER)  And as I stated before, the
11  video clearly shows and you testified today that past
12  the point where Dustin was motionless, even past the
13  point where you came back and you saw his -- his mouth
14  open and his eyes motionless, the officers still had him
15  on that ground in that hold?
16    MR. STELLY:  Objection to form.
17    **A.  I don't know what hold he was -- when I came**
18  **back with the bag, I saw one of the officers doing chest**
19  **compression and the heavyset officer had crawled away.**
20  **That's what I saw when I got -- when I came back.  And I**
21  **came back with the -- I had to go back immediately.**
22    **When I came back the first time was for the**
23  **handcuffs, and then I -- I instantly had to go back --**
24  **and during the process, I called 911 -- to get the bag**
25  **to administer CPR.**

153

1  correct?
2    **A.  Correct.**
3    Q.  All right.  So, up to that point and you went
4  to the vehicle the first time, are you able to tell the
5  ladies and gentlemen of the jury whether or not
6  Mr. Jones was or wasn't breathing at that time?
7         MR. TURNER:  Form.
8    **A.  I wasn't able to tell.  I could just tell he --**
9  **he wasn't moving.  I could not tell if he was breathing**
10 **or not.**
11   Q.  (BY MR. STELLY)  Okay.  So, you bring a bag or
12 what you thought was -- and there's some -- let me --
13 let's talk about this a little bit more.
14       You stated in your affidavit, that I don't
15 think was talked about, that (reading) The younger
16 officer yelled for me to go and get handcuffs.
17       Is that accurate in your --
18   **A.  Yes.**
19   Q.  Why don't you go ahead and read that entire
20 paragraph to us.
21   **A.  (Reading) The younger officer yelled for me to**
22 **go and get handcuffs.  My initial response was "what**
23 **handcuffs," and the officer responded, "in the police**
24 **vehicle."  There was a police vehicle in the -- in the**
25 **road in front of my mother's house.  I was initially a**

170

1  **confused because I didn't feel it was appropriate to go**
2  **into a police vehicle.  I remember even asking "can I go**
3  **in the car" and the younger officer yelled "yes."  To**
4  **the best of my knowledge all my communications with**
5  **the younger officer.  I could not find the handcuffs,**
6  **and the younger officer immediately instructed me to**
7  **simply bring the bag to the -- in the vehicle to him**
8  **which I promoted did.**
9    Q.  Okay.  So, through all of this, from you
10 yelling "do you need help," going to his vehicle, having
11 these conversations, do you know the condition of
12 Mr. Jones, other than he wasn't moving?
13   **A.  I do not because I was listening at the**
14 **commands from the officer and talking to 911 at the --**
15 **at the same time.  So, I wasn't -- all I know is what I**
16 **saw when I first initially yelled out "do you need**
17 **help."**
18   Q.  And that was what?
19   **A.  I don't understand the question.**
20   Q.  What did you initially see?  Did you see him
21 not breathing or just not moving?
22   **A.  Not breathing --**
23        MR. TURNER:  Leading.
24   **A.  -- not moving.  His legs had stopped.  The hip**
25 **thrusts had stopped.**

171

1    Q.  (BY MR. STELLY)  Okay.  When you returned from
2  the vehicle with the bag for the handcuffs --
3    **A.  Uh-huh.**
4    Q.  -- okay, was this when you noticed for the
5  first time his eyes being fixed -- open and fixed?
6    **A.  Yes.**
7    Q.  All right.  And was it at this time when you
8  returned from the vehicle that you noticed Chief
9  Brister, which you later learned was Chief Brister,
10 trying to get -- get from under or away from Mr. Jones?
11        MR. TURNER:  Leading.
12   **A.  That's when I noticed Chief Brister coming from**
13 **under the pile of the -- at the scene, from under the**
14 **bodies of the police officer and Mr. Dustin.**
15   Q.  (BY MR. STELLY)  All right.  Is that part of
16 your affidavit that's marked as Exhibit 3?
17   **A.  Yes.**
18   Q.  Okay.  Why don't you read us the part of your
19 affidavit, if it's correct, that talks about this time
20 between when you returned from the vehicle from getting
21 the bag of handcuffs.
22   **A.  (Reading) When I returned near where they had**
23 **the African-American male, I remember noticing the**
24 **African-American male's eyes being opened, fixed, and a**
25 **clover in his mouth.  I remember the older officer**

172

1  **trying to get the African-American male off of him and**
2  **crawling on his hands and knees near my mom's driveway.**
3  **The entire event happened very quickly.  It was very**
4  **clear the older officer was exhausted and having trouble**
5  **catching his breath.  My mother told my -- my daughter**
6  **to go into the house and get the older officer some**
7  **water.  My mother recognized the older officer as Chief**
8  **Brister.**
9    Q.  Okay.  So, was this -- when you returned from
10 the police vehicle and you now recognized there's
11 something more, I guess, than Mr. Jones just not moving,
12 correct?
13   **A.  When I returned the first time with the**
14 **handcuffs, bag, I noticed his eyes was fixed and open**
15 **and his mouth was open; and that's when the other -- not**
16 **Chief Brister, the other police officer asked me to go**
17 **back and get the Ambu bag.**
18   Q.  Now, did he -- tell me kind of how he did that.
19 Was it nonchalant?  Was it kind of excited, he was
20 trying to get the situation taken care of?
21        MR. TURNER:  Leading.
22   Q.  (BY MR. STELLY)  Explain that to us.
23   **A.  When he was --**
24        MR. TURNER:  Form.
25   **A.  When he was -- when I returned -- all of -- all**

173

**206**

1  Q.  Okay.  Opposing counsel asked you if you put
2  what you ate for breakfast in this affidavit.  Do you
3  recall that?
4  **A.  Yes.**
5  Q.  And did you put what you ate for breakfast in
6  either affidavit?
7  **A.  No.**
8  Q.  Because it's not relevant to what's going on in
9  this case, is that why you didn't?
10  **A.  I don't know why I didn't.  I just didn't.**
11  Q.  Did you feel like what you ate for breakfast
12  was something that you needed to put in either one of
13  these affidavits?
14  **A.  Not necessary -- it doesn't -- it doesn't help**
15  **or hurt.**
16  Q.  And I guess the question is did you only tell
17  both the officer and defense counsel the things that you
18  thought were relevant when you made those statements?
19  **A.  The things -- the best of my memory.**
20  Q.  Okay.  Okay.  And again...
21  **A.  Oh, Jesus help me.**
22  Q.  When the -- the Texas Ranger came to you and
23  met you in the IR -- IRS office, did he make you -- did
24  you actually type out that question in the IR -- I mean
25  your statement in the IRS office?

**207**

1  **A.  No.**
2  Q.  This -- you actually typed up your statement
3  what, sometime later?
4  **A.  No.**
5  Q.  When -- when did you actually make -- make the
6  statement, the witness statement?
7  **A.  I typed it out in my truck.**
8  Q.  Okay.  Outside of the IRS office?
9  **A.  Yes.**
10  Q.  Okay.  Do you think that the -- the ranger
11  could have recognized that you were not in the state
12  where you could give your information truthfully --
13  **A.  He know I was --**
14  Q.  -- and completely?
15      MR. STELLY:  Objection, form.
16  Q.  (BY MR. TURNER)  Go ahead.
17  **A.  He know I was very nervous because I told him.**
18  **I didn't understand what was going on.**
19  Q.  What did he tell you when you told him that you
20  were nervous?
21  **A.  He told me don't be, he wasn't going to drive**
22  **off.  I really didn't -- being in Houston, I really**
23  **didn't think that he was really the Rangers or I didn't**
24  **know what to expect.  And my husband was with me.  And**
25  **he told me he wasn't going to drive off with me and he**

**208**

1  **show -- that's when he showed me his badge and he gave**
2  **me his card.  He was pretty much trying to reassure me**
3  **that he was not trying to hurt me or anything like that.**
4  Q.  I see.  Okay.  And I guess finally -- oh, you
5  don't know the difference between -- you stated earlier
6  you don't know the difference between a choke hold and a
7  headlock?
8  **A.  I've -- I've heard choke hold, headlock; and**
9  **full Nelson is kind of like the same, same thing.**
10  **That's...**
11  Q.  Okay.  And I'll tell you that's -- that's not
12  correct, but that's why I'll ask you again.  You don't
13  know the difference between a choke hold and a headlock?
14  **A.  No.**
15  Q.  Okay.  And, so, really -- and we talked about
16  earlier when you were 30 or 50 feet away recording it,
17  you couldn't tell whether or not he was in a choke hold,
18  a headlock, or whether or not his arms was around his
19  chest?
20  **A.  I could not.**
21  Q.  Okay.  The only --
22      MR. STELLY:  Objection --
23      Q.  (BY MR. TURNER)  The only time --
24      MR. STELLY:  -- form and responsiveness.
25  Q.  (BY MR. TURNER)  The only time -- so, then the

**209**

1  only time that you would say for sure that Dustin Jones
2  was not in a choke hold was after the officers released
3  him when you came back with the Ambu bag?
4      MR. STELLY:  Objection, form.
5  **A.  With the -- the handcuff --**
6  Q.  (BY MR. TURNER)  The belt?
7  **A.  Yes.**
8  Q.  Okay.  So, only time you could say for sure
9  that Dustin Jones was not in a headlock was when you
10  came back with the belt --
11  **A.  Correct.**
12  Q.  -- I mean the handcuffs?
13  **A.  Yes.**
14  Q.  Okay.  And that's because after you came back
15  with the handcuffs, that's when the officer said
16  himself, "I don't think he's breathing" finally?
17  **A.  Correct.**
18  Q.  And, again, I just got to do it one more time.
19  These two affidavits, they're obviously different; is
20  that true?
21      MR. STELLY:  Objection, form.
22  **A.  Correct.**
23  Q.  (BY MR. TURNER)  All right.  And you would
24  agree with me that these -- the witness statement that
25  you made to the ranger and the affidavit that you made

1 after talking to defense counsel, frankly, at some
2 points they contradict each other?
3        MR. STELLY: Objection, form.
4    A.  There -- there are some statements that's not
5 the same from one to the next.
6    Q.  (BY MR. TURNER) Okay.  And -- and not only is
7 there, in the second affidavit, statements that don't
8 conform with your first affidavit three days after, in
9 the second affidavit, from what you read today, there's
10 some parts of it that doesn't comport with what the
11 officers testified?
12        MR. STELLY: Objection, form.
13    A.  It's what -- it doesn't go with what they're
14 saying, but it's my -- what I recall.
15    Q.  (BY MR. TURNER) Right.  And I understand.
16 My -- I understand.  My question is a little bit
17 different than that, and my question is:  In comparison
18 with the first witness statement, the second witness
19 statement in some areas doesn't even comport with what
20 the officers testified?  And that's true, correct?
21    A.  Correct.
22        MR. STELLY: Objection, form.
23    Q.  (BY MR. TURNER) Is that correct?
24    A.  Correct.
25    Q.  And, again, the second affidavit, you didn't

210

1 type out; the defense counsel typed out for you?
2    A.  Correct.
3    Q.  This affidavit was only created after defense
4 counsel had a 45-minute conversation with you?
5    A.  After our -- our conversation.
6    Q.  Right.  And the conversation in which the
7 defense discussed -- discussed what you -- what you
8 remembered and the facts that -- and the facts about the
9 case?
10    A.  One more time?
11    Q.  Yeah.  In this conversation where the defense
12 counsel discussed what you remembered and the facts
13 about the case?
14    A.  Correct.
15    Q.  Would you agree with me that really most of the
16 contradictions between what you remember and what the
17 officers saw was during the part of the incident prior
18 to all three of them being on the ground?
19        MR. STELLY: Objection, form.
20    A.  I didn't read the entire thing what happened,
21 what they said.
22    Q.  (BY MR. TURNER) Okay.
23    A.  Just basically what you -- we went over?
24    Q.  Yes, ma'am.
25    A.  Yes.

211

1    Q.  Okay.  And, again, in your original statement,
2 you said that you didn't -- that the first thing that
3 you noticed was the three people in the struggle?
4        MR. STELLY: Objection, form.
5    A.  That's what I said at first.
6    Q.  (BY MR. TURNER) Okay.  And finally, if the
7 officers were holding Mr. Jones in a choke hold past the
8 point where he was motionless and unresponsive, do you
9 think that would have been a reasonable thing to do?
10        MR. STELLY: Objection, form.
11    A.  No.
12    Q.  (BY MR. TURNER) Okay.
13        MR. TURNER: I'll pass the witness.
14        REEXAMINATION
15 BY MR. STELLY:
16    Q.  Less than five probably.
17        At any time during this -- these events, do you
18 know what the officers were thinking, other than what
19 they may have told you?
20    A.  No.
21    Q.  All right.  And -- and you're not a trained
22 police officer, correct?
23    A.  Correct.
24    Q.  Both of -- both your statement to the ranger,
25 which is Exhibit 2, and your affidavit, which is

212

1 Exhibit 3, they have the events that you believe are
2 relevant and that you recall at the time that you made
3 both of those statements and affidavits; is that
4 correct?
5        MR. TURNER: Leading.
6    A.  That's correct.
7        MR. TURNER: Leading.
8    Q.  (BY MR. STELLY) And although these two -- the
9 statement to the -- the ranger, Exhibit 2, and the
10 affidavit, Exhibit 3, although there may be some
11 differences, you would say that neither of these are
12 wrong or inaccurate in any way --
13    A.  Absolutely.
14    Q.  -- as to your recollection?
15    A.  Absolutely.
16        MR. STELLY: That's all I have.  Thank
17 you.
18        REEXAMINATION
19 BY MR. TURNER:
20    Q.  One final question.  Did you ever see a weapon
21 on -- on Dustin Jones, a knife, a gun, or anything like
22 that?
23    A.  No.
24    Q.  Okay.
25        MR. TURNER: I will pass the witness and

213



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

SHAWNTEL BREED,                )
INDIVIDUALLY AND AS            )
REPRESENTATIVE OF THE          )
ESTATE OF DUSTIN KEITH         )
JONES, DECEASED, AND AS        )
NEXT FRIEND OF DJ AND CJ,      )
MINOR CHILDREN                 )
    Plaintiff                  )
                               )    CIVIL ACTION NO.
VS.                            )    1:15-cv-190
                               )    JURY DEMANDED
CITY OF KIRBYVILLE, CHIEF      )
PAUL BRISTER, AND OFFICER      )
JOSH HANCOCK OF THE CITY       )
OF KIRBYVILLE POLICE           )
DEPARTMENT, INDIVIDUALLY,      )
AND IN THEIR OFFICIAL          )
CAPACITIES                     )
    Defendants                 )

*********************************************************

REPORTER'S CERTIFICATION

DEPOSITION OF KRISSY THOMAS-ADAMS

May 5, 2016

I, GINA MEDLEY, Certified Shorthand Reporter in and

for the State of Texas, hereby certify to the following:

That the witness, KRISSY THOMAS-ADAMS, was duly

sworn by the officer and that the transcript of the oral

deposition is a true record of the testimony given by

the witness;

That the deposition transcript was submitted on

_____, to the witness or to the attorney for

the witness for examination, signature, and return to

1    the offices of Nell McCallum & Associates, Inc., by

2    _____.

3        That pursuant to information given to the deposition

4    officer at the time said testimony was taken, the

5    following includes all parties of record:

6        FOR THE PLAINTIFF:

7            RONNIE TURNER, JR.

8            SBOT NO. 24075533

9            Provost * Umphrey Law Firm, L.L.P.

10           490 Park Street

11           Beaumont, Texas 77701

12           -and-

13           TYRONE L. HAYNES

14           SBOT NO. 24076430

15           Steele Law Group, P.L.L.C.

16           One Allen Center, Penthouse

17           500 Dallas, Suite 3440

18           Houston, Texas 77002

19       FOR THE DEFENDANTS:

20           ALEX J. STELLY, JR.

21           SBOT NO. 00791728

22           Calvert, Eaves, Clarke & Stelly, L.L.P.

23           2615 Calder Avenue, Suite 1070

24           Beaumont, Texas 77702

25       I further certify that I am neither counsel for,

1  related to, nor employed by any of the parties or

2  attorneys in the action in which this proceeding was

3  taken, and further that I am not financially or

4  otherwise interested in the outcome of the action.

5     Further certification requirements pursuant to

6  Federal Rules of Civil Procedure will be certified to

7  after they have occurred.

8     Certified to by me this ____ day of_____, 2016.

9

10  _____

11  Gina Medley, RPR, Texas CSR No. 2379
    Expiration Date: December 31, 2017
12  Nell McCallum & Associates, Inc.
    Firm Registration No. 143
13  2615 Calder, Suite 111
    Beaumont, Texas 77702
14  (409)838-0333/FAX(409)832-4501

15

16     REPORTING FIRM'S FURTHER CERTIFICATION

17     The Changes and Signature Page were/were not

18  returned to the deposition officer on _____;

19     If returned, the attached Changes and Signature Page

20  contains any changes and reasons therefor;

21     The original deposition was delivered to Ronnie

22  Turner, Jr., for safekeeping on _____;

23     That a copy of this certificate was served on all

24  parties shown herein.

25

1      Certified to by me this _____ day of _____, 2016.

2

3      _____

4      Gina Medley, RPR, Texas CSR No. 2379
       Expiration Date:  December 31, 2015
5      Nell McCallum & Associates, Inc.
       Firm Registration No. 143
6      2615 Calder, Suite 111
       Beaumont, Texas 77702
7      (409)838-0333/FAX(409)832-4501

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25