SHAWNTEL BREED, *individually and as*    §
*Representative of the Estate of Dustin Keith*   §
*Jones, deceased, and as Next Friend of DJ*   §
*and CJ, minor children*,    §
　　　　　　　　　　　　　　　　§
　　　　　　Plaintiff,    §
　　　　　　　　　　　　　　　　§
*versus*    §    CIVIL ACTION NO. 1:15-CV-190
　　　　　　　　　　　　　　　　§
CITY OF KIRBYVILLE, TEXAS, CHIEF    §
PAUL BRISTER, and OFFICER JOSH    §
HANCOCK,    §
　　　　　　　　　　　　　　　　§
　　　　　　Defendants.    §

## MEMORANDUM AND ORDER

Pending before the court is Defendants City of Kirbyville, Texas ("Kirbyville"), Chief Paul Brister ("Chief Brister"), and Officer Josh Hancock's ("Officer Hancock") (collectively, "Defendants") Motion for Summary Judgment (#38), in which Defendants seek summary judgment on all claims asserted by Plaintiff Shawntel Breed ("Breed"). Having considered the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

I.　　Background[1]

On the morning of May 14, 2013, some time before 8:47 a.m., Officer Hancock of the City of Kirbyville Police Department received a call from dispatch in reference to Dustin Keith

---

[1] The court would be remiss not to note that, due to the unfortunate and tragic end to this encounter, the only remaining witnesses to the majority of the events are Chief Brister and Officer Hancock. In their summary judgment briefs, both parties submitted statements of undisputed material facts, which are primarily based on the officers' deposition testimony. Thus, the facts before the court are, in large part, based on the two defendants' testimony. Nonetheless, as required, the court will view the facts in the light most favorable to Breed.

Jones ("Jones").[2]  Officer Hancock was advised that Jones had three outstanding felony warrants issued for his arrest in Jefferson County, Texas—one for aggravated assault, another for aggravated robbery, and one for sexual assault of a child—and that Jones was within Officer Hancock's jurisdiction.  According to Defendants, a caller had reported to dispatch that Jones had been using drugs at the residence of Arthur, his father-in-law, where he could still be found.  Due to the nature of the warrants, Officer Hancock asked Chief Brister to accompany him to Arthur's home and assist in arresting Jones.  While in route to Arthur's home, Officer Hancock was further advised that Jones was known to carry a gun, which he reportedly then relayed to Chief Brister.

When Officer Hancock and Chief Brister arrived at Arthur's home, Arthur was standing outside.  The two officers asked who else was inside the residence and Arthur informed them that his daughter, Breed, and her husband, Jones, were there.  Accordingly, the officers called out to Jones, asking him to come outside and speak with them.  Jones exited the house peacefully and identified himself.  The officers then reportedly advised Jones of his outstanding warrants and asked him to place his hands on the side of Arthur's trailer home so that Officer Hancock could perform a pat-down.  Jones complied.  While performing the pat-down, Officer Hancock asked Jones if he had any weapons on his person, and Jones replied that he had a knife in his pocket.  After concluding the pat-down, Officer Hancock informed Jones that he was going to be placed

---

[2] The precise time of this call, as well as the events prior to the first call Officer Hancock made to dispatch once he was on the scene, is unknown.  According to Defendants, Officer Hancock received this call at approximately 8:50 a.m., and he arrived at Arthur Breed's ("Arthur") home at approximately 9:04 a.m.  This time line, however, is incongruous given that Officer Hancock's call informing dispatch that Jones was on the run occurred at 8:47 a.m., three minutes before Officer Hancock claims he was dispatched to Arthur's home.  Nevertheless, the exact time of day during which these events transpired is of little importance.  Rather, as explained later, the salient fact is the amount of time during which the entire encounter took place; more specifically, the length of time during which the officers held Jones on the ground.

under arrest and attempted to place handcuffs on him. As Officer Hancock reached to grab one of Jones's arms to place him in handcuffs, Jones suddenly turned and shoved Officer Hancock, knocking him backward into Chief Brister. At that time, Jones took off running, and a foot chase ensued.

At 8:47:18 a.m., Officer Hancock called and informed dispatch that Jones was on the run. Thereafter, Officer Hancock drew his Taser and attempted to fire it at Jones, but it misfired. He attempted to fire the Taser a second time, missing Jones as he tripped and fell into a ditch. Officer Hancock followed Jones into the ditch, where he also fell. Chief Brister ran back to enter his patrol unit and continued to follow Jones, who had taken off again. Officer Hancock followed Jones on foot. As this pursuit continued, Krissy Thomas-Adams ("Thomas-Adams"), who was visiting her mother, Arthur's next-door neighbor, saw the two men running and ran outside to record it on her cell phone. As they got near a church next to Thomas-Adams's mother's house, she saw Jones stop, turn, and face Officer Hancock in a combative stance.

At approximately 8:47:53 a.m., Officer Hancock indicated that he had caught up to Jones. According to Officer Hancock, upon encountering Jones, he grabbed Jones from behind and began riding on his back as Jones continued to run. Eventually, Jones knelt down to the ground in the yard of the church, about two hundred yards from where the pursuit began. The two men then continued to struggle on the ground as Officer Hancock attempted to hold onto Jones and Jones attempted to get away. Officer Hancock then, with his legs still wrapped around Jones, reached for his radio to call for assistance, when he reportedly realized that he had lost his handcuffs and Taser during the previous struggle. As Officer Hancock attempted to call for help, Jones stripped the radio from his hands and threw it across the yard. Jones then climbed on top of Officer

Hancock, pinning him to the ground, and began hitting him on his chest. Both men were swinging and hitting each other; however, according to Thomas-Adams, Jones was "winning his fight with the officer." Further, it appeared to Thomas-Adams as though Jones was "trying to get the better of the two . . . [and] gain control of the situation." In her words, Jones "was clearly the aggressor," and "[t]he officer appeared to be trying to defend himself."

At that point, Chief Brister arrived back on the scene. When he located the pair, he found Jones struggling on top of Officer Hancock. Chief Brister noticed that Officer Hancock appeared to be in distress, short of breath, and pale. Officer Hancock reportedly told Chief Brister that he could not breathe and asked Chief Brister to get Jones off of him. Thomas-Adams corroborates that Jones was still fighting at that time. Chief Brister assessed the situation, noting that he had only a flashlight and a gun. Opting for the less dangerous weapon, Chief Brister walked over to them and began hitting Jones with the flashlight in an attempt to get Jones off of Officer Hancock. Chief Brister concedes that he hit Jones with the flashlight numerous times, but maintains that this had no effect on Jones. Then, Chief Brister threw the flashlight out of reach and maneuvered his left arm around and up under Jones's chin and jaw, pressing Jones's head back against his body, effectively placing him in a sort of hold.[3] At the same time, Chief Brister rolled Jones onto his side, off of Officer Hancock, and remained behind him, wrapping his legs around Jones's thighs to prevent him from kicking. Thus, both men lay with one side on the ground, with Jones's back

---

[3] In referring to the hold, Plaintiffs have continued to use the terms "headlock" and "choke-hold" interchangeably, never really explaining either term or why the maneuver used by Chief Brister qualified as either one. Conversely, Defendants maintain that Chief Brister applied a "headlock." Further, Thomas-Adams describes it as Chief Brister's wrapping "his arms around the upper chest of [Jones,] which is neither a headlock nor a choke-hold. Nevertheless, as explained in the court's previous order (#13), whether Chief Brister applied a headlock or a choke-hold is not dispositive of the claims before the court because Breed's claim focuses on the timing of the force applied and not the particular maneuver employed.

to Chief Brister's front. Thomas-Adams maintains that, throughout this entire struggle, Jones continued to fight the officers. Further, she stated that Jones "was winning the fight." At over six feet tall and weighing 221 pounds, the twenty-six-year-old Jones appeared to be "the stronger person" compared to twenty-seven-year-old Officer Hancock, who was of similar height and weighed 200 pounds, or to sixty-one-year-old Chief Brister, who measured five feet eleven inches tall and weighed 205 pounds.

Officer Hancock was then able to get up and catch his breath. Chief Brister and Jones, however, were still struggling on the ground. Accordingly, Chief Brister, who thought that Jones could get free again, asked Officer Hancock to get Jones's hands and hold them down. Officer Hancock complied by getting on his knees behind Chief Brister and reaching over both Chief Brister and Jones to grab and secure Jones's arms. They remained in this position while awaiting back-up. It is at this point in time that Thomas-Adams's video recording begins.[4] The video shows Jones still tussling on the ground, thrusting and jerking until at least twenty-four seconds before the video ends.[5] Although not audible on the video, Thomas-Adams claims that she said to herself a couple of times that it looked as though Jones was not moving. She does not know, however, whether the officers heard her. She then called out, asking if they needed help. The officers responded that they did, so she stopped recording and immediately dialed 9-1-1. From her position, thirty to fifty feet away, Thomas-Adams could not tell whether Jones was still

---

[4] It is unclear at what time precisely the recording begins, as there is no time stamp on the video.

[5] Strangely, the parties submitted two separate videos, which allegedly represent the video captured on Thomas-Adams's cell phone. One of these videos spans fifty-two seconds, and the other is fifty-four seconds long. How Thomas-Adams's single cell phone was able to capture two separate videos, each spanning a different length of time, is unexplained. The court notes, however, that in both videos, Jones's feet can be seen moving until at least the thirty-second mark, at which point both videos become fuzzier and shakier.

breathing.  At that time, Officer Hancock requested that Thomas-Adams go into the patrol unit and retrieve an extra set of handcuffs.  He also screamed at her to "send someone fast, because they don't know where we are."

Thomas-Adams's call to 9-1-1 begins at 8:51:40 a.m. (the "8:51 call") and opens with her telling the dispatcher that she has "a police officer that's subduing a citizen."  At the same time she was talking to the dispatcher, she was looking for handcuffs in the patrol car.  At the forty second mark of the 8:51 call recording, at approximately 8:52:20 a.m., Thomas-Adams can be heard saying "he wants to talk to you," and Officer Hancock can be heard talking to dispatch for about two seconds before chaos ensues.  The dispatcher can be heard calling out "hello" and receiving no response.  At the one minute and twenty second mark, or 8:53 a.m., Officer Hancock can be heard yelling out to Thomas-Adams instructions regarding the bag that contains the extra handcuffs.  Shortly thereafter, Thomas-Adams returned with the bag.  It is at that point, according to Thomas-Adams, that she saw Jones's eyes opened and fixed.  Simultaneously, she heard Officer Hancock tell Chief Brister that Jones was not breathing.  This exchange can be heard on the call at the two minutes and forty-one seconds mark, at approximately 8:54:21 a.m.  Then, Chief Brister, who seemed to be in distress, got out from under the hold, releasing Jones, and Officer Hancock instructed Thomas-Adams to go back to the patrol car and retrieve an Ambu bag.[6] According to Thomas-Adams, "[t]his entire event happened very quickly."  Officer Hancock immediately started chest compressions, and Thomas-Adams, who was a nursing student at the time, assisted in administering CPR.  Less than one minute later, at 8:55:15 a.m., Chief Brister called the Jasper County Sheriff's Office to request an ambulance.

---

[6] An Ambu bag is a bag valve mask resuscitator used to help persons who are not breathing.

An ambulance arrived at approximately 9:25 a.m. After his pulse was restored, Jones was transported to a nearby hospital. Ultimately, at 5:05 p.m. on May 15, 2013, Jones died while still in the hospital. The final autopsy declared the cause of death to be myocardial infarction with hemorrhage within the myocardium due to hypertensive cardiovascular disease. In other words, cardiac arrest. Further, the autopsy lists a significant contributing factor in Jones's death as intoxication from synthetic cannabinoid, or "K-2."

On May 13, 2015, Breed, individually, as representative of the estate of Jones, and as next friend of Jones's surviving children, filed her original complaint, asserting claims under 42 U.S.C. § 1983. Specifically, Breed alleges that Chief Brister's and Officer Hancock's conduct on the day of the incident violated Jones's right to be free from unreasonable seizures and that Jones received fatal injuries from the force inflicted on him by Defendants. Breed maintains that Jones died of asphyxia caused by the officers' prolonged hold of Jones once they had him on the ground. Defendants filed the instant motion on August 5, 2016, asserting that the officers are entitled to qualified immunity. Further, Defendants contend that Breed has failed to raise a genuine issue of material fact regarding a constitutional violation, a policy that was the moving force behind Jones's death, and any alleged deficiency in the city's training and screening process. Thus, Defendants argue, the City of Kirbyville cannot be held liable.

II.   Analysis

A.   Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *accord Hefren v.*

*McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Davis v. Fort Bend Cty.*, 765 F.3d 480, 484 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2804 (2015); *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 407 (5th Cir. 2012).

"A fact issue is material if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1715 (2016); *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014); *accord Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005). "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier*, 743 F.3d at 1007 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Hudspeth v. City of Shreveport*, 270 F. App'x 332, 334 (5th Cir. 2008) (quoting *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001)). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren*, 820 F.3d at 771 (quoting *Anderson*, 477 U.S. at 248); *Tiblier*, 743 F.3d at 1007; *accord Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322

n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting FED. R. CIV. P. 56(e)); *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013). The court must "review the record 'taken as a whole.'" *Black v. Pan Am. Labs., LLC*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))); *see City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in her favor. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1863 (2014) (citing *Anderson*, 477 U.S. at 255); *Hemphill*, 805 F.3d at 538; *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014).

Nevertheless, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence." *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992), *cert. denied*, 523 U.S. 1094 (1998)); *accord Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill*, 805 F.3d at 538 (citing *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *accord Stauffer v. Gearhart*, 741 F.3d 574, 581 (5th Cir. 2014); *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012). "Further, although courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage to the facts evidenced from video recordings taken at the

scene." *Griggs v. Brewer*, ___ F.3d ___, No. 16-10221, 2016 WL 6406642, at *2 (5th Cir. Oct. 28, 2016) (citing *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)).

Thus, summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *Tiblier*, 743 F.3d at 1007; *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013). "[W]here the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist." *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010). In such a situation, "'[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir.) (quoting *Celotex Corp.*, 477 U.S. at 322-23), *cert. denied*, 555 U.S. 1012 (2008).

B.    Section 1983 Claims

The Civil Rights Act of 1871, 42 U.S.C. § 1983, creates a private right of action for redressing the violation of federal law by those acting under color of state law. *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 65 (2009); *Inyo Cty. v. Paiute-Shoshone Indians of the Bishop Cmty.*, 538 U.S. 701, 708 (2003); *Goodman v. Harris Cty.*, 571 F.3d 388, 394 (5th Cir. 2009), *cert. denied*, 558 U.S. 1148 (2010). It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

10

42 U.S.C. § 1983; *accord Connick v. Thompson*, 563 U.S. 51, 60 (2011). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *accord Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Sepulvado v. Jindal*, 729 F.3d 413, 420 n.17 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1789 (2014). Further, a § 1983 complainant must support her claim with specific facts and may not simply rely on conclusory allegations. *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 686 (5th Cir.), *cert. denied*, 562 U.S. 893 (2010); *Priester v. Lowndes Cty.*, 354 F.3d 414, 420 (5th Cir.), *cert. denied*, 543 U.S. 829 (2004).

Here, there is no dispute that the officers were acting under color of state law. Thus, for Breed to recover, she must show that Defendants deprived Jones of a right guaranteed by the Constitution or the laws of the United States. *Daniels v. Williams*, 474 U.S. 327, 329-31 (1986); *Baker*, 443 U.S. at 139. "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (quoting *Baker*, 443 U.S. at 146); *accord Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 n.15 (2005). Breed must also prove that the alleged constitutional or statutory deprivation was intentional or due to deliberate indifference—not the result of mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986); *Daniels*, 474 U.S. at 328.

C.     Excessive Force

In the case at bar, Breed's complaint alleges that Chief Brister's and Officer Hancock's conduct violated Jones's rights under the Fourth and Fourteenth Amendments to the United States

Constitution. Essentially, Breed maintains that the officers used excessive force, which violated

Jones's right to be free from the arbitrary exercise of unreasonable seizures of persons. As an

initial matter, the court notes that the Supreme Court of the United States has made clear that "*all*

claims that law enforcement officers have used excessive force—deadly or not—in the course of

an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the

Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process'

approach [under the Fourteenth Amendment]." *Graham*, 490 U.S. at 395 (emphasis in original);

*Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir.), *cert. denied*, 135 S. Ct. 137 (2014); *Bazan*, 246

F.3d at 487. Here, it is undisputed that, on the day in question, Chief Brister and Officer Hancock

were attempting to effect an arrest of Jones, based on three outstanding felony warrants. Notably,

Breed does not allege any other violations that could fall under the Fourteenth Amendment. Thus,

the court assumes that Breed has abandoned any separate claims under the Fourteenth Amendment

and will proceed to analyze her claims under the Fourth Amendment.

To succeed on an excessive force claim arising under the Fourth Amendment, a § 1983

plaintiff "must establish: (1) an injury (2) which resulted directly and only from a use of force

that was clearly excessive, and (3) the excessiveness was clearly unreasonable." *Harris*, 745 F.3d

at 772 (quoting *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)); *Ramirez v. Martinez*,

716 F.3d 369, 377 (5th Cir. 2013); *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir.), *cert. denied*,

133 S. Ct. 409 (2012). If any of the three elements fails, the plaintiff's claim of excessive force

will not succeed. *Huong v. City of Port Arthur*, 961 F. Supp. 1003, 1006 (E.D. Tex. 1997).

"Claims of excessive force are fact-intensive; whether the force used was 'clearly excessive' and

'clearly unreasonable' depends on 'the facts and circumstances of each particular case.'" *Newman*

*v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Graham*, 490 U.S. at 396), *cert. denied*, 134 S. Ct. 162 (2013); *accord Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009), *cert. denied*, 559 U.S. 1048 (2010). As the Supreme Court commented in *Graham*: "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 550 (1979) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985))); *accord Ramirez*, 716 F.3d at 377; *Newman*, 703 F.3d at 761. These factors are commonly referred to as the "*Graham* factors." *Ramirez*, 716 F.3d at 377.

The Supreme Court has held that officers cannot resort to deadly force unless they "have probable cause . . . to believe that the suspect [has committed a felony and] poses a threat to the safety of the officers or a danger to the community if left at large." *Garner*, 471 U.S. at 6; *accord Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Hathaway v. Bazany*, 507 F.3d 312, 320-21 (5th Cir. 2007).[7] "Deadly force is a subset of excessive force; deadly force violates the Fourth Amendment *unless* 'the officer has probable cause to believe the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Bazan*, 246 F.3d at 287-88 (emphasis in

---

[7] In the case at bar, there is no evidence to suggest that the officers intended to resort to deadly force. "'Deadly force' is defined as 'force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.'" *Sappington v. Bartee*, 195 F.3d 234, 234 (5th Cir. 1999) (citing Tex. Penal Code § 9.01(3)). Indeed, the court finds it telling that the officers did not opt for lethal weapons, such as their guns, but, rather, they tried to control the situation using their Taser, flashlight, handcuffs, and bodily force.

original) (quoting *Garner*, 471 U.S. at 11); *see Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998). Clearly, "[a] police officer may not seize an unarmed nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. Nonetheless, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.*; *Fraire v. City of Arlington*, 957 F.2d 1268, 1280 (5th Cir.), *cert. denied*, 506 U.S. 972 (1992).

"In gauging the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for that force." *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996) (citing *Spann v. Raney*, 978 F.2d 1110, 1115 (5th Cir. 1993)); *accord Deville*, 567 F.3d at 167; *Francis v. Harris Cty.*, No. H-14-2943, 2016 WL 6662275, at *13 (S.D. Tex. Nov. 10, 2016) (citations omitted). Importantly, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033 (1973)). Nevertheless, "officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Deville*, 567 F.3d at 167 (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)); *accord Newman*, 703 F.3d at 763. Hence, "the use of chemical spray or even a choke-hold" is not unreasonable when the suspect physically resists arrest." *Wagner v. Bay City*, 227 F.3d 316, 323 (5th Cir. 2000).

Furthermore, the determination of whether a particular use of force was reasonable under the Fourth Amendment "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97; *accord Newman*,

703 F.3d at 762; *Poole*, 691 F.3d at 628. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *accord Wagner*, 227 F.3d at 321 (holding that courts should be "careful not to engage in second-guessing officers in situations in which they have to make split-second, on-the-scene decisions while confronted with a violent individual").

D.    Qualified Immunity

In claims against state and local government officials under 42 U.S.C. § 1983, the official may raise the affirmative defense of qualified immunity. *Griggs*, 2016 WL 6406642, at *2. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *accord Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Mendez v. Poitevant*, 823 F.3d 326, 331 (5th Cir. 2016); *Wilkerson v. Goodwin*, 774 F.3d 845, 851 (5th Cir. 2014). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see Pearson*, 555 U.S. at 231; *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

"Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised." *Poole*, 691 F.3d at 627 (citing *Brumfield v. Hollins*, 551 F.3d

322, 326 (5th Cir. 2008)).  For summary judgment purposes, "a defendant asserting immunity is not required to establish the defense beyond peradventure, as he would have to do for other affirmative defenses." *Cousin v. Small*, 325 F.3d 627, 632 (5th Cir.) (quoting *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir.), *cert. denied*, 531 U.S. 871 (2000)), *cert. denied*, 540 U.S. 826 (2003).  Where a defendant pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion, the plaintiff then has the burden to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." *Kovacic v. Villarreal*, 628 F.3d 209, 211-12 (5th Cir. 2010) (quoting *Thompson v. Upshur Cty.*, 245 F.3d 447, 456 (5th Cir. 2001)), *cert. denied*, 564 U.S. 1038 (2011); *Hampton v. Oktibbeha Cty. Sheriff Dep't*, 480 F.3d 358, 363 (5th Cir. 2007); *accord Michalik v. Hermann*, 422 F.3d 252, 258 (5th Cir. 2005).  As the Fifth Circuit has explained, "[w]e do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs." *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 407 (5th Cir. 2007) (quoting *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997)).

"Whether a government official is entitled to qualified immunity 'generally turns on the "objective reasonableness of the action" assessed in light of the legal rules that were "clearly established" at the time it was taken.'" *Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994) (quoting *Tex. Faculty Ass'n v. Univ. of Tex. at Dallas*, 946 F.2d 379, 389 (5th Cir. 1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987))); *see Brosseau*, 543 U.S. at 198; *Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 823 (5th Cir. 2007), *cert. denied*, 562 U.S. 897 (2010).  In considering a claim of qualified immunity, the court must utilize a bifurcated approach, asking first "whether the facts taken in the

light most favorable to the party asserting the injury show the [defendant's] conduct violated a federal right;" and second, "whether the defendant's behavior was objectively reasonable under clearly established law at the time the conduct occurred." *Tolan*, 134 S. Ct. at 1865 (citing *Saucier*, 533 U.S. at 201); *Hampton*, 480 F.3d at 363; *accord Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 289 (5th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)); *Doe v. Robertson*, 751 F.3d 383, 387 (5th Cir. 2014). The court may consider these factors in any order. *Ashcroft*, 563 U.S. at 735; *Wilkerson*, 774 F.3d at 851 (citing *Pearson*, 555 U.S. at 236); *Morgan v. Swanson*, 659 F.3d 359, 384-85 (5th Cir. 2011) (discussing *Pearson* and noting that the court need not consider both prongs if one or the other is dispositive), *cert. denied*, 132 S. Ct. 2740 (2012).

"The first prong requires the plaintiff to allege 'the deprivation of an *actual* constitutional [or statutory] right.'" *Hampton*, 480 F.3d at 363 (quoting *Felton v. Polles*, 315 F.3d 470, 477 (5th Cir. 2002), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). The court must "assess whether a statutory or constitutional right would have been violated on the facts alleged." *Griggs*, 2016 WL 6406642, at *2 (citing *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)). Under the second prong, "a clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)); *see Brosseau*, 543 U.S. at 198-99; *Wilkerson*, 774 F.3d at 851. "In excessive force cases, 'the second prong of the analysis is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in

light of that then clearly established law." *Griggs*, 2016 WL 6406642, at *3 (citing *Tarver v. City of Edna*, 410 F.3d 754, 750 (5th Cir.), *cert. denied*, 546 U.S. 1007 (2005)).

Qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))); *accord City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citations omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments." *Thompson v. Mercer*, 762 F.3d 433, 435 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1492 (2015); *accord Sheehan*, 135 S. Ct. at 1774. Hence, government officials may be accorded qualified immunity "if their decision was reasonable, albeit mistaken." *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993), *cert. denied*, 511 U.S. 1019 (1994). An "officer could make a constitutionally reasonable judgment based on a factual misperception." *Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998), *cert. dismissed*, 526 U.S. 1083 (1999).

At the time of the incident in question, Jones had a clearly established constitutional right to be free from the use of excessive force by a police officer in the course of an arrest. *See*, *e.g.*, *Graham*, 490 U.S. at 394-95; *Griggs*, 2016 WL 6406642, at *2 (citing *Poole,* 691 F.3d at 627). Thus, the issue is whether the force applied by Chief Brister and Officer Hancock was excessive and unreasonable. Applying the *Graham* factors, the court finds that it was not. Notably, Breed does not contend that the officers applied excessive force during their initial takedown of Jones or during any of the events leading up to the takedown. Rather, Breed's claim is that "Officer Hancock's and Chief Brister's application of force to [ ] Jones *after* he ceased movement and was

incapable of resisting arrest was clearly excessive and unreasonable." (emphasis added). Importantly, each officer's actions must be examined individually to determine whether the officer is entitled to qualified immunity. *Pratt v. Harris Cty.*, 822 F.3d 174, 181 (5th Cir. 2016) (citing *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007)).

In the case at bar, Chief Brister's force was proportionate to the need to restrain Jones and, thus, was not excessive under the circumstances. *See Griggs*, 2016 WL 6406642, at *3-4 (holding that placing an individual in a choke-hold, sweeping his legs out from under him, and body-slamming him onto the nearby grass did not amount to excessive force when it appeared to the officer that the individual was resisting arrest); *Wagner*, 227 F.3d at 324 (stating that the use of chemical spray or a choke-hold are consistent with the officers' attempt to restrain a violent individual who was physically resisting arrest); *Castillo v. City of Round Rock*, 177 F.3d 977, 1999 WL 195292, at *3 (5th Cir.) (per curiam) (holding that the force used was justified given the circumstances of the case when an officer and a bystander piled on top of the plaintiff for four to six minutes after the plaintiff had raised a beer bottle in response to officers' commands, refused to submit, actively resisted arrest by kicking and yelling, and struck an officer's nose), *cert. denied*, 528 U.S. 1019 (1999). While Breed maintains that Chief Brister held Jones to the ground for too long a period of time, all the evidence suggests that Jones was still resisting arrest while he was on the ground. Breed's argument that Jones was no longer resisting falls short. Although the video evidence indicates that Jones was not actively fighting the officers the entire time that he was being held down, the video shows persistent tussling and kicking. The "court must measure the force used under the facts as a reasonable officer *would perceive them*" and here, under the totality of the circumstances, the court cannot say that a reasonable officer in Chief

Brister's shoes would not have believed that Jones's constant kicking amounted to resisting arrest. *Griggs*, 2016 WL 6406642, at *3-4 (emphasis in original).

Moreover, the force was reasonable given the circumstances. Immediately before Chief Brister placed Jones in the hold and pulled him to the ground, he had been pursuing Jones in the patrol unit. At that time, Chief Brister knew that Jones was dangerous—he had three outstanding warrants for serious and violent offenses, had hit an officer, and had taken off running in an attempt to evade arrest. Further, although Officer Hancock's pat-down had not revealed a weapon, Chief Brister had heard Jones admit to carrying a knife. It is well known that "[p]at downs do not always reveal weapons, leading to tragic circumstances." *Griggs*, 2016 WL 6406642, at *n.1 (citing *Tamayo v. Stephens*, 740 F.3d 991, 993 (5th Cir. 2011), *cert. denied*, 134 S. Ct. 1022 (2014)). Finally, and perhaps most importantly, when Chief Brister arrived on the scene after the pursuit, Jones was on top of Officer Hancock and was striking him. According to Officer Hancock and Thomas-Adams, Jones had the upper hand. Chief Brister saw that Officer Hancock was in duress and perceived danger. Moreover, Officer Hancock told Chief Brister that he could not breathe and asked for help. Chief Brister then attempted to get Jones away from Officer Hancock by striking him with a flashlight, to no avail. Thus, viewing the events from the perspective of a reasonable officer on the scene, it appeared that Jones was actively resisting arrest, attempting to flee, and posed a danger to Officer Hancock, evidenced by the fact that he was, in fact, on top of him and hitting him while admittedly possessing a knife, and he did not stop even while being confronted by Chief Brister. Applying the *Graham* factors, therefore, Chief Brister's holding Jones to the ground for approximately four minutes while awaiting back-up was not objectively unreasonable.

The determination as to whether Officer Hancock's actions constituted excessive force or were objectively reasonable involve much of the same analysis. Officer Hancock did not initiate the hold, but he assisted Chief Brister in keeping Jones on the ground while they awaited back-up. Again, it is not excessive for multiple people to pile on top of a suspect while awaiting further assistance. *Castillo*, 1999 WL 195292, at *3. When Officer Hancock joined Chief Brister on the ground, Jones was still struggling to escape from Chief Brister's hold. Chief Brister had his arms around Jones's neck and head and had his legs wrapped around Jones's thighs. Thus, Jones's arms were free. Concerned that Jones could still flee, Chief Brister asked Officer Hancock to help secure his arms. Officer Hancock, however, knew that he had lost his handcuffs during the earlier pursuit; thus, his only choice was to secure Jones with bodily force. Therefore, as with Chief Brister, Officer Hancock's use of force was proportionate to the need to prevent Jones from evading arrest and resume hitting him.

Furthermore, it was reasonable for both officers to secure Jones given that he did not stop struggling and that his arms were free, thus giving him an opportunity to continue hitting the officers, reach for his knife, or take one of the officer's weapons. At the time Officer Hancock secured Jones's hands, he was aware of this information, as well as the nature of Jones's warrants, his propensity to flee, and his willingness to attack officers. Indeed, Officer Hancock had just been involved in a fight with Jones, which prompted Chief Brister to initiate the hold, and had received numerous blows in the struggle. Thus, it is the court's opinion that a reasonable officer would have assessed that Jones was definitely not subdued or under restraint and that he posed a danger to Chief Brister, who was significantly older and smaller than Jones. Moreover, the evidence is clear that during the entire time period in which he was securing Jones, Officer

Hancock was also instructing Thomas-Adams to retrieve the extra set of handcuffs, call for help, and find an Ambu bag to perform CPR. Officer Hancock's use of force is "the sort of 'split-second judgment' in a difficult situation that qualified immunity is designed to protect." *Griggs*, 2016 WL 6406642, at *5 (citing *Graham*, 490 U.S. at 395-97).

Accordingly, both officers are entitled to qualified immunity under the second prong—the reasonableness prong—of the test. Additionally, the officers are entitled to immunity under the first prong because, based on these facts, their use of force did not violate a constitutional right. If a suspect's movements give an officer reasonable cause to believe that there is a threat of serious physical harm or death to himself or others, the use of deadly force is not a constitutional violation. *Mendez*, 823 F.3d at 331 (citing *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)); *Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir. 1997), *cert. denied*, 525 U.S. 1054 (1998); *Fraire*, 957 F.2d at 1275-76. "[N]o right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985); *Kellough v. Bertrand*, 22 F. Supp. 2d 602, 610-11 (S.D. Tex. 1998). Although the parties offer different interpretations of the facts, the objective facts, as demonstrated by Thomas-Adams's independent testimony, the video, and the audio from the 9-1-1 calls, lead the court to conclude that no material fact issue exists regarding Chief Brister's and Officer Hancock's entitlement to qualified immunity. Therefore, Chief Brister and Officer Hancock are shielded from liability for Breed's § 1983 claims and are entitled to summary judgment.

E.     Municipal Liability in § 1983 Actions

When a § 1983 suit is brought against a municipality, a plaintiff "must plead facts which show that: (1) a policy or custom existed; (2) the governmental policy makers actually or constructively knew of its existence; (3) a constitutional violation occurred; (4) and the custom or policy served as the moving force behind the violation." *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 533 (5th Cir. 1996); *accord Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010), *cert. denied*, 563 U.S. 935 (2011); *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 467 (5th Cir. 2010). When the claim is one of excessive force, the key to recovery against a municipality under § 1983 is demonstrating a deprivation of a constitutional right inflicted pursuant to an official policy or custom. Hence, to prevail against Kirbyville under § 1983, Breed must demonstrate the deprivation of a constitutional right that took place pursuant to an official policy or custom of the municipality. *See Connick*, 563 U.S. at 60-61; *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010), *cert. denied*, 564 U.S. 1038 (2011); *Shields v. Twiss*, 389 F.3d 142, 151 (5th Cir. 2004); *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003), *cert. denied*, 540 U.S. 1108 (2004). Breed maintains that the constitutional violation giving rise to municipal liability is the allegedly excessive force used by Chief Brister and Officer Hancock. As explained above, however, the force applied by Chief Brister and Officer Hancock was not excessive given that Jones was violent toward the officers, actively resisted arrest, and attempted to flee. Accordingly, there was no deprivation of a constitutional right and Breed's claim fails.

F.    <u>Inadequate Training and Hiring of Officers</u>

Additionally, Breed's complaint alleges that Kirbyville can be held liable for "inadequate training and screening of police officers."[8]  Nevertheless, these claims likewise fail, as the court has determined that no constitutional right was violated.   In any event, Breed appears to have abandoned these claims.   Significantly, Breed's summary judgment briefs proffer no evidence or argument in support of her claims of inadequate training and hiring.   In fact, Breed failed to address these claims at all even though Defendants clearly moved for summary judgment on them. Consequently, summary judgment is warranted as to these claims.   *See Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 190 (5th Cir. 2007)  (stating that inadequately briefed issues are considered waived); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 525-26 (5th Cir. 2005); *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 653 (5th Cir.), *cert. denied*, 543 U.S. 979 (2004); *United States ex rel. Phillips v. L-3 Commc'ns Integrated Sys., L.P.*, No. 3:10-CV-1784, 2012 WL 3649699, at *9 (N.D. Tex. Aug. 24, 2012) (treating relator's conspiracy claim abandoned where he failed to respond to motion to dismiss); *accord United States v. Stanley*, 595 F. App'x 314, 317 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2891 (2015) (stating that a party's failure to raise an issue in response to a motion summary judgment is a waiver, and the subsequent filing of a motion for reconsideration does not abrogate the waiver); *Moore v. Delta Airlines, Inc.*, No. 3:10-CV-2241, 2012 WL 685414, at *5 (N.D. Tex. Mar. 1, 2012) (citing *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006)) (holding that the plaintiff abandoned any claims not addressed in her summary judgment response); *Penrod v. Bank of N.Y. Mellon*, 824 F. Supp. 2d

_____

[8] Breed does not elaborate on what she means by "screening" of officers.  Typically, screening refers to the hiring process; thus, the court will assume that is what Breed intended.

754, 762-63 (S.D. Tex. 2011) ("Plaintiffs' summary judgment response has abandoned the claim, offering no briefing on the subject."). Therefore, dismissal of these claims is proper.

III.    Conclusion

Consistent with the foregoing analysis, Breed presents no claim that warrants relief. She has failed to raise a genuine issue of material fact with respect to Chief Brister's and Officer Hancock's claims to qualified immunity, to which the court has determined that they are entitled. Further, she has failed to raise a genuine issue of material fact regarding Kirbyville's municipal liability. Consequently, Chief Brister, Officer Hancock, and Kirbyville are entitled to judgment as a matter of law. Accordingly, Defendants' Motion for Summary Judgment is GRANTED.

SIGNED at Beaumont, Texas, this 19th day of December, 2016.

*Marcia A. Crone*
_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE